**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITIZENS BANK, N.A., <br><br> Plaintiff, <br><br> v. <br><br> FINEHILL CONSTRUCTION LLC, AJAY K. KESHRI, PRAMOD KESHRI, SANJAY GUPTA, and HARRISON M. FINBERG, <br><br> Defendants. | Civil Action No. _____ |

## NOTICE

You are hereby notified that a CONFESSION OF JUDGMENT FOR MONEY has been entered against you in the above proceeding, together with interest, costs and attorneys' fees, and that enclosed herewith is a copy of all documents filed in support of said judgment.

SHOULD YOU HAVE ANY QUESTIONS CONCERNING THIS NOTICE, PLEASE CONTACT:

Benjamin R. Wilson, Esq., of Holland & Knight LLP, 1650 Market Street, Suite 3300, Philadelphia, Pennsylvania 19103 at (215) 252-9571.

_____
Clerk

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITIZENS BANK, N.A.,<br><br>    Plaintiff,<br><br>v.<br><br>FINEHILL CONSTRUCTION LLC, AJAY K. KESHRI, PRAMOD KESHRI, SANJAY GUPTA, and HARRISON M. FINBERG,<br><br>    Defendants. | Civil Action No. _____ |

## <u>NOTICE TO DEFENDANT PURSUANT TO 42 Pa C.S. § 2737.1</u>

Pursuant to 42 Pa. C.S. § 2737.1, please take notice that the Plaintiff in this matter has entered a judgment by confession against you in the amount of $10,768,745.81, plus post-judgment interest at the applicable base rate and default rate.

You are entitled to file a petition to "strike" or "open" the judgment. In order to do so, you must promptly file a petition with the U.S. District Court for the Eastern District of Pennsylvania, as required by Rule 2959 of the Pennsylvania Rules of Civil Procedure. You file a petition by leaving it with the clerk of courts.

A petition is a formal statement of your reasons for challenging the judgment. You must include the names of the parties at the top of the first page and the case number, which is shown above.

The petition must state your reasons for challenging the judgment in separate numbered paragraphs. You have to sign the petition and include a sworn statement at the end of the document verifying the facts you state in the petition are true and accurate. You will waive any defenses and objections not included in your petition to strike or open. You must therefore make every effort to raise all possible issues and defenses in your petition to strike or open in order to avoid waiving any claims.

If you elect to file a petition, it must meet the requirements of Rule 2959 of the Rules of Civil Procedure. A full copy of Rule 2959 is attached to this Notice. You may also have to comply with local rules of procedure in effect in the court where the judgment was entered.

If you do not file a petition challenging the judgment, the Plaintiff may take steps to collect on the judgment by asking the Marshall or Sheriff to seize your assets. Accordingly, you should

1

immediately seek the advice of an attorney. If you wish to discuss the matter with an attorney but do not know how to find one, you may request a referral by contacting the following agency:

Philadelphia Bar Association
Lawyer Referral and Information Service
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone (215) 238-1701

Corporations may be unable to represent themselves in court. If the defendants include a corporation, the corporation must appear through an attorney if it intends to challenge the judgment.

You may receive other papers and notices regarding the judgment. Those other papers do not negate or override this Notice. Likewise, this Notice is not intended to and does not negate any of the notices or information obtained in other papers that may be served upon you.

We reiterate that you are required to act promptly if you wish to seek relief from the judgment. Under certain circumstances, you have only thirty (30) days in which to file a petition after papers are served on you. Even if the 30-day rule does not apply, you must act promptly in order to protect your interests. Failing to act in a timely manner will render you unable to challenge the judgment at a later time.

If you are incorrectly identified and the judgment was entered against you in error, you may be entitled to collect costs and reasonable attorney's fees as determined by the Court.


Dated: May 7, 2026

/s/ Benjamin R. Wilson
Benjamin R. Wilson (PA Bar No. 327118)
Lindsey C. Cook (PA Bar No. 332040)
**HOLLAND & KNIGHT LLP**
1650 Market Street, Suite 3300
Philadelphia, PA 19103
(215) 252-9571
benjamin.wilson@hklaw.com

*Attorneys for Plaintiff Citizens Bank, N.A.*

2

## Rule 2959.  Striking off or Opening Judgment.
## Pleadings.  Procedure

(a)     (1)   Relief from a judgment by confession shall be sought by petition. Except as provided in subparagraph (2), all grounds for relief whether to strike off the judgment or to open it must be asserted in a single petition. The petition may be filed in the county in which the judgment was originally entered, in any county to which the judgment has been transferred or in any other county in which the sheriff has received a writ of execution directed to the sheriff to enforce the judgment.

(2)  The ground that the waiver of the due process rights of notice and hearing was not voluntary, intelligent and knowing shall be raised only

    (i)     in support of a further request for a stay of execution where the court has not stayed execution despite the timely filing of a petition for relief from the judgment and the presentation of prima facie evidence of a defense; and

    (ii)     as provided by Rule 2958.3 or Rule 2973.3

(3)  If written notice is served upon the petitioner pursuant to Rule 2956.1(c)(2) or Rule 2973.1(c), the petition shall be filed within thirty days after such service. Unless the defendant can demonstrate that there were compelling reasons for the delay, a petition not timely filed shall be denied.

(b)     If the petition states prima facie grounds for relief the court shall issue a rule to show cause and may grant a stay of proceedings. After being served with a copy of the petition the plaintiff shall file an answer on or before the return day of the rule. The return day of the rule shall be fixed by the court by local rule or special order.

(c)     A party waives all defenses and objections which are not included in the petition or answer.

(d)     The petition and the rule to show cause and the answer shall be served as provided in Rule 440.

(e)     The court shall dispose of the rule on petition and answer, and on any testimony, depositions, admissions and other evidence. The court for cause shown may stay proceedings on the petition insofar as it seeks to open the judgment pending disposition of the application to strike off the judgment. If evidence is produced which in a jury trial would require the issues to be submitted to the jury the court shall open the judgment.

(f)     The lien of the judgment or of any levy or attachment shall be preserved while the proceedings to strike off or open the judgment are pending.

(g)     (1)  A judgment shall not be stricken or opened because of a creditor's failure to provide a debtor with instructions imposed by an existing statute, if any, regarding procedures to follow to strike a judgment or regarding any rights available to an incorrectly identified debtor.

(2)   Subdivision (g)(1) shall apply to (1) judgments entered prior to the effective date of subdivision (g) which have not been stricken or opened as of the effective date and (2) judgments entered on or after the effective date.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CITIZENS BANK, N.A.,

    Plaintiff,

v.

FINEHILL CONSTRUCTION LLC, AJAY
K. KESHRI, PRAMOD KESHRI, SANJAY
GUPTA, and HARRISON M. FINBERG,

    Defendants.

Civil Action No. _____

**PRAECIPE FOR ENTRY OF JUDGMENT BY CONFESSION**

TO THE CLERK:

Please enter judgment by confession in the above-captioned matter in favor of Plaintiff Citizens Bank, N.A. and against Defendants FineHill Construction LLC, Ajay K. Keshri, Pramod Keshri, Sanjay Gupta, and Harrison M. Finberg, jointly and severally, in the amount of $10,768,745.81, plus post-judgment interest at the applicable base rate and default rate as provided in the Note and Loan Agreement together with additional legal fees and costs, broken down as follows:

| | |
|---|---|
| Unpaid Principal | $9,970,527.00 |
| Accrued but Unpaid Interest through May 7, 2026 | $114,145.92 |
| Interest at Default Rate through May 7, 2026 | $412,115.12 |
| Attorneys' Fees and Costs through March 17, 2026 | $266,957.77 |
| Appraisal: | $5,000.00 |
| **JUDGMENT TOTAL** | **$10,768,745.81** |

*[Signature page follows]*

1

Dated: May 7, 2026                    Respectfully submitted,

*/s/ Benjamin R. Wilson*

Benjamin R. Wilson (PA Bar No. 327118)
Lindsey C. Cook (PA Bar No. 332040)
HOLLAND & KNIGHT LLP
1650 Market Street, Suite 3300
Philadelphia, PA 19103
Tel: (215) 252-9571
Fax: (215) 687-6070
benjamin.wilson@hklaw.com
lindsey.cook@hklaw.com

*Attorneys for Plaintiff Citizens Bank, N.A.*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CITIZENS BANK, N.A.,

    Plaintiff,

v.

FINEHILL CONSTRUCTION LLC, AJAY K. KESHRI, PRAMOD KESHRI, SANJAY GUPTA, and HARRISON M. FINBERG,

    Defendants.

Civil Action No. _____

## JUDGMENT BY CONFESSION

AND NOW, this _____ day of _____, 2026, a complaint in confession of judgment, and an affidavit as to the grounds therefor, having both been filed,

JUDGMENT IS HEREBY ENTERED in favor of Plaintiff Citizens Bank, N.A. and against Defendants FineHill Construction LLC, Ajay K. Keshri, Pramod Keshri, Sanjay Gupta, and Harrison M. Finberg, jointly and severally, in the amount of $10,768,745.81, plus post-judgment interest at the applicable base rate and default rate as provided in the Note and Loan Agreement together with additional legal fees and costs, broken down as follows:

| | |
|---|---|
| Unpaid Principal | $9,970,527.00 |
| Accrued but Unpaid Interest through May 7, 2026 | $114,145.92 |
| Interest at Default Rate through May 7, 2026 | $412,115.12 |
| Attorneys' Fees and Costs through March 17, 2026 | $266,957.77 |
| Appraisal: | $5,000.00 |
| **JUDGMENT TOTAL** | **$10,768,745.81** |

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
George V. Wylesol
Clerk

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITIZENS BANK, N.A.,<br><br>    Plaintiff,<br><br>v.<br><br>FINEHILL CONSTRUCTION LLC, AJAY K. KESHRI, PRAMOD KESHRI, SANJAY GUPTA, and HARRISON M. FINBERG,<br><br>    Defendants. | Civil Action No. _____ |

## COMPLAINT IN CONFESSION OF JUDGMENT

Plaintiff Citizens Bank, N.A. ("Plaintiff," "Citizens" or "Lender"), by and through its undersigned counsel, hereby files this Complaint for Judgment by Confession against Defendants FineHill Construction LLC ("FineHill"), Ajay K. Keshri ("Ajay"), Pramod Keshri ("Pramod"), Sanjay Gupta ("Sanjay"), and Harrison M. Finberg ("Harrison") (each individually, a "Guarantor," and collectively, the "Defendants"), and in support thereof, avers as follows:

### I.    NATURE OF THE ACTION

1.    This is an action in confession of judgment arising out of each Defendants' guaranty of payment in connection with borrower Hancock Lofts LLC's ("Borrower") construction loan obligations to Plaintiff. All Defendants explicitly authorized entry of a confessed judgment against each of them in the event that Borrower defaults on its payment obligations.

2.    In November 2022, Plaintiff and Borrower entered a construction loan agreement for a loan in an aggregate amount of up to $10,000,000 to finance the construction of a mixed-use project comprised of approximately 49 market-rate apartments located in Philadelphia, Pennsylvania.

3. Borrower's debt obligations to Plaintiff under the construction loan agreement are secured by, among other things, a mortgage from the Borrower and, as relevant here, Defendants' guarantees of payment by the Borrower of those obligations under the construction loan.

4. Borrower defaulted on many of its obligations to Plaintiff, and all sums owing by the Borrower to Plaintiff have become due and payable, which Defendants have refused to pay despite Plaintiff's demand. Plaintiff brings this action to confess judgment against Defendants pursuant to the confession of judgment provisions set forth in Defendants' payment guarantees.

## II.   PARTIES

5. Plaintiff Citizens is a national banking association duly organized and existing under the laws of the State of Rhode Island that maintains its principal place of business at 1 Citizens Plaza, Providence, Rhode Island.

6. Defendant FineHill is a for-profit limited liability company organized under the laws of Pennsylvania with its principal place of business located at 1415 S. 12th Avenue, Philadelphia, Pennsylvania 19147. FineHill's sole member is Defendant Harrison, a citizen of Pennsylvania.

7. Defendant Ajay is a citizen of Pennsylvania with a residential address of 2731 Norfolk Lane, Doylestown, Pennsylvania 18902.

8. Defendant Pramod is a citizen of Pennsylvania with a residential address of 4 Ren Way, Doylestown, Pennsylvania 18901.

9. Defendant Sanjay is a citizen of Pennsylvania with a residential address of 2796 Buttercup Court, Huntingdon Valley, Pennsylvania 19006.

10. Defendant Harrison is a citizen of Pennsylvania with a residential address of 1415 S. 12th Avenue, Philadelphia, Pennsylvania 19147.

3

### III.    JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the action involves a dispute between citizens of different States in which a citizen of a foreign state is an additional party and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.    Venue is properly based in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Citizens' claims occurred in this District.

13.    Venue is properly based in this District pursuant to 28 U.S.C. § 1391(b)(3) because all Defendants have agreed by contract to submit themselves to the jurisdiction of this Court.

14.    Venue is properly based in this District because all Defendants have agreed by contract to waive any objection which they may otherwise have to the laying of venue in this District.

### IV.    FACTUAL ALLEGATIONS

#### A.    Defendants Guarantee Borrower's Payment and Performance Obligations

15.    On November 17, 2022, Citizens entered into a Construction Loan Agreement (the "Loan Agreement") with the Borrower in connection with the construction of a mixed-use project located in Philadelphia, Pennsylvania (as further described in the Loan Agreement, the "Property") comprised of 49 market-rate residential units (the "Project").  A true and accurate copy of the Loan Agreement is attached as **Exhibit A** to the Affidavit of David W. Bruner, dated May 7, 2026 (the "Affidavit").[1] *See also* Affidavit ¶ 2.

16.    Pursuant to the Loan Agreement, Citizens agreed to make a loan (the "Loan") to the Borrower in an aggregate amount of up to $10,000,000.  This loan is evidenced by a Promissory

---

[1] The Affidavit is **Exhibit 1** to this Complaint in Confession of Judgment.

Note dated as of November 17, 2022, made by the Borrower to Citizens in the principal amount of $10,000,000 (the "Note"), and secured by, among other things, an Open-End Mortgage, Assignment of Leases and Rents, and Security Agreement dated as of November 17, 2022, under which Citizens was granted a mortgage on the Property (the "Mortgage"). A true and accurate copy of the Note is attached as **Exhibit B** to the Affidavit. *See also* Affidavit ¶ 3.

17.     Under the Loan Agreement and the Note, Borrower was required to make monthly interest payments until maturity, at which point Borrower was required to pay, among other things, all outstanding principal and interest. *See* Loan Agreement § 3.9(b); Note § 5.

18.     Under the Note, upon the occurrence and during the existence of an Event of Default, interest on the principal balance of the Note bears interest at the Default Rate, which is the lesser of four percentage points over the Applicable Interest Rate (as defined in the Loan Agreement) or the maximum rate permitted by law. *See* Loan Agreement § 1.1; Note § 7.

19.     Likewise, Borrower agreed to pay Lender's attorneys' fees and disbursements incurred in connection with the Loan, which include, among other things, "to enforce any rights of the Lender of the Lender or obligations of Borrower or any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or under any of the Loan Documents or any other agreement, . . . [which] shall constitute an additional indebtedness owing by Borrower to Lender payable on demand, and secured by the Mortgage and other Loan Documents." Loan Agreement § 7.29.

20.     To secure Borrower's obligations under the Loan Agreement and Note, Defendants each executed a separate Guaranty of Payment, each made as of November 16, 2022 and effective as of November 17, 2022, in favor of Citizens (each a "Payment Guaranty" and collectively, the

5

"Payment Guarantees").   True and accurate copies of each of the Payment Guarantees are collectively attached as **Exhibit C** to the Affidavit. *See also* Affidavit ¶ 5.

21.    Pursuant to Section 1 of the Payment Guarantees, Defendants each absolutely, unconditionally, irrevocably and jointly and severally guaranteed, among other things, (1) the Borrower's obligation to make full and prompt payment when due of the principal and interest on the Note, (2) the Borrower's full and prompt payment of all sums which may become due and owing under the Loan Agreement, Note, and the other Loan Documents (as defined in the Loan Agreement), (3) the Borrower's prompt, full and complete performance of its obligations under each and every covenant contained in the Loan Agreement, Note, Mortgage and the other Loan Documents, and (4) the full and prompt payment of any Enforcement Costs (as defined in Section 8 of the Payment Guarantees) (collectively, the "Payment Guarantee Obligations").   *See* Affidavit ¶ 6.

22.    Under Section 2 of the Payment Guarantees, in the event the Borrower fails to pay when due any of the Payment Guarantee Obligations, Defendants agreed to pay to Citizens those obligations on demand by Citizens, regardless of any defense, right of set-off or claims which the Borrower or any Defendant may have against Citizens.   Indeed, at Section 3 of the Payment Guarantees, each Defendant expressly waived, among other things, "any defense, right of set-off or other claim which Guarantor or Borrower may have against Lender, or the holder of the Note"; "any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations"; and "any rights to set-offs, recoupments and counterclaims".

23.    At Section 3 of the Payment Guarantees, each Defendant also covenanted that "[t]his is an absolute, present and continuing guaranty of payment and not of collection."

24.     Defendants further agreed in Section 8 of the Payment Guarantees to pay upon demand by Citizens applicable Enforcement Costs, which include all reasonable attorneys' fees, costs and expenses incurred by Citizens in connection with, among other things, the collection of the Payment Guarantees.

**B.      Defendants Expressly and Conspicuously Agree to Confessions of Judgment**

25.     Under the Payment Guarantees, each Defendant agreed that its or his obligations thereunder are independent of the obligations of the Borrower or any other guarantor, and that a separate action or actions may be brought against each Defendant whether or not any action is brought against the Borrower or any other guarantor and whether or not the Borrower is joined in any such action.

26.     To secure Defendants' performance of the Payment Guarantee Obligations, at Section 26 of the Payment Guarantees, each Defendant agreed that judgment may be confessed directly against each of them for failing to perform the Payment Guaranty Obligations:

> **CONFESSION OF JUDGMENT AND EXECUTION**. UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, GUARANTOR IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR GUARANTOR IN ANY AND ALL ACTIONS AND TO CONFESS JUDGMENT AGAINST GUARANTOR FOR ALL OR ANY PART OF THE SUMS DUE UNDER THIS GUARANTY; AND IN EITHER CASE FOR INTEREST, INCLUDING INTEREST ON ANY JUDGMENT OBTAINED BY LENDER AT THE APPLICABLE DEFAULT RATE UNTIL ACTUAL PAYMENT IS MADE TO LENDER IN THE FULL AMOUNT DUE TO LENDER, LATE CHARGES, COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION FOR COLLECTION IN THE AMOUNT OF FIFTEEN PERCENT (15%) THEREOF, BUT IN NO EVENT LESS THAN $25,000.00. GUARANTOR FURTHER AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, TO APPEAR FOR AND ENTER JUDGMENT AGAINST SUCH GUARANTOR IN AN ACTION OF REPLEVIN OR ANY OTHER ACTION TO RECOVER POSSESSION OF ANY COLLATERAL SECURING THIS GUARANTY. SUCH CONFESSIONS OF JUDGMENT OR ACTIONS SHALL BE WITH RELEASE OF ERRORS, WAIVERS OF APPEALS, WITHOUT STAY OF EXECUTION

7

AND GUARANTOR WAIVES ALL RELIEF FROM ANY AND ALL APPRAISEMENT OR EXEMPTION LAWS NOW IN FORCE OR HEREAFTER ENACTED. IF A COPY OF THIS GUARANTY, VERIFIED BY AN OFFICIAL OR AN OFFICER OF LENDER, SHALL BE FILED IN ANY PROCEEDING OR ACTION WHEREIN JUDGMENT IS TO BE CONFESSED, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF AND SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR HEREIN FOR AND CONFESS JUDGMENT AGAINST GUARANTOR AS PROVIDED HEREIN. JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS AND NO SINGLE EXERCISE OF THE AFORESAID POWERS TO CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, SHALL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, AVOIDABLE, OR VOID, BUT THE POWER SHALL CONTINUE UNDIMINISHED AND IT MAY BE EXERCISED FROM TIME TO TIME AFTER AND AS LENDER SHALL ELECT UNTIL SUCH TIME AS LENDER SHALL HAVE RECEIVED PAYMENT IN FULL OF ALL SUMS DUE UNDER THIS GUARANTY, TOGETHER WITH INTEREST, COSTS, AND FEES.

27.     At Section 27 of the Payment Guarantees, Defendants expressly waived any right

to notice, a hearing, or other due process prior to entry of judgment, and released any right to

challenge such entry or recover damages in connection therewith:

**WAIVER OF DEFENSES TO CONFESSION OF JUDGMENT AND EXECUTION**. GUARANTOR HAS REVIEWED THE WARRANT OF ATTORNEY FOR CONFESSION OF JUDGMENT SET FORTH IN SECTION 26 ABOVE WITH GUARANTOR'S ATTORNEY AND ACKNOWLEDGES THAT LENDER IS AUTHORIZED TO TAKE ANY ACTION WITHOUT ANY ADVANCE NOTICE TO GUARANTOR, TO CONFESS JUDGMENT. THEREFORE, GUARANTOR IS AWARE THAT, TO THE EXTENT PERMITTED BY LAW, IT HAS GIVEN UP ANY RIGHTS IT MIGHT HAVE TO A HEARING TO CONTEST THE VALIDITY OF ANY SUCH JUDGMENT OR OTHER CLAIMS THAT LENDER MAY ASSERT THEREUNDER. GUARANTOR SPECIFICALLY AND VOLUNTARILY WAIVES AND RELINQUISHES ANY RIGHTS IT MAY HAVE TO ANY NOTICE OR HEARING OR OTHER DUE PROCESS IN CONNECTION WITH LENDER'S IMPLEMENTATION OF ITS RIGHTS TO TAKE JUDGMENT, OR TO EXECUTE UPON OR TAKE ANY ADDITIONAL ACTION TO ENFORCE SUCH JUDGMENT. GUARANTOR ALSO SPECIFICALLY RELEASES ANY RIGHTS IT MAY HAVE TO CHALLENGE SUCH ACTION BY LENDER OR TO CLAIM OR RECOVER ANY DAMAGES AGAINST LENDER IN CONNECTION WITH SUCH ACTIONS, TO THE EXTENT PERMITTED BY LAW. GUARANTOR ACKNOWLEDGES THAT IT IS REPRESENTED BY

8

COUNSEL AND THAT SUCH GUARANTOR'S COUNSEL HAS REVIEWED AND EXPLAINED THE MEANING OF THESE WAIVERS TO GUARANTOR.

28.    In addition, and to reaffirm the confession of judgment and waiver provisions contained in the Payment Guarantees, each Defendant executed a separate Disclosure for Confession of Judgment (each a "COJ Disclosure"), dated November 16, 2022 and effective as of November 17, 2022, in connection with the Loan Agreement and Payment Guarantees. True and accurate copies of each of the COJ Disclosures are collectively attached as **Exhibit D** to the Affidavit. *See also* Affidavit ¶ 14.

29.    In the COJ Disclosures, each Defendant acknowledged and agreed that the Payment Guarantees contains wording (1) that "permits Lender to obtain a judgment against me in any federal or state court in the Commonwealth of Pennsylvania" and (2) "by which I am consenting to the entry of judgment against me, and to execution efforts on such judgment (which may result in the taking of my property), without a court hearing prior to such execution efforts."

30.    Each Defendant further acknowledged in the COJ Disclosures that judgment may be obtained without, among other things: (a) "the right to notice of any hearing (whether such rights arise under the United States Constitution, the constitution of any state, any federal or state statute, or any judicial decision) on the validity of any claim that may be asserted against me by the Lender under the Loan Documents"; (b) "the right to reduce or set off a claim by deducting a claim I may have against Lender"; (c) "release of all errors"; (d) "inquest (the right to ascertain whether the rents and profits of real estate will be sufficient to satisfy the judgment within seven years)"; (e) "stay of execution"; and (f) "exemption laws now in force or hereafter to be passed."

31.    Each Defendant also represented in the COJ Disclosures that it was "fully aware of the constitutional and statutory rights to prior notice and hearing on the validity of any claims that may be asserted against me by the Lender under the Loan Documents before judgment can be

9

entered and before my assets can be executed on, garnished, or attached" and that "by authorizing confession of judgment, I am giving up the right to notice or opportunity to be heard prior to the entry of judgment in favor of Lender and prior to garnishment and attachment of my bank accounts and other assets; and that the Lender may garnish and attach such bank accounts and other assets (whether personal property or other assets) without prior notice or opportunity for a hearing."

32.    Pursuant to Section 13 of the Payment Guarantees, Defendants have waived their right to a jury trial:

> **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS GUARANTY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. GUARANTOR FURTHER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY LEGAL PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER WITH RESPECT TO THIS GUARANTY OR OTHERWISE IN RESPECT OF THE LOAN, ANY AND EVERY RIGHT GUARANTOR MAY HAVE TO (A) INTERPOSE ANY COUNTERCLAIM THEREIN, OTHER THAN A COMPULSORY COUNTERCLAIM, AND (B) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING CONTAINED IN THE IMMEDIATELY PRECEDING SENTENCE SHALL PREVENT OR PROHIBIT GUARANTOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.**

C.    **Borrower Defaults and Defendants Refuse to Fulfill the Payment Guarantee Obligations**

33.    The Loan matured on May 17, 2025.  Borrower, however, failed to pay the outstanding balance and accrued and unpaid interest on the Loan and such failure constituted an "Event of Default" under the Loan Agreement and a default under the Note.

10

34. Numerous other "Events of Default" have occurred and are continuing under the Loan Agreement, certain of which were memorialized in reservation of rights letters (the "Reservation of Rights Letters") issued by Citizens to Borrower and Guarantors on April 21, 2025, May 6, 2025, August 5, 2025, September 26, 2025 and February 26, 2026. True and correct copies of those letters are collectively attached as **Exhibit E** to the Affidavit. *See also* Affidavit ¶ 20.

35. Accordingly, interest at the Default Rate began to accrue as of April 30, 2025.

36. On May 21, 2025, Citizens made written demand on the Defendants for payment under the Payment Guarantees. A true and correct copy of the May 21, 2025 demand letter is attached as **Exhibit F** to the Affidavit. *See also* Affidavit ¶ 21.

37. Defendants, however, have failed to satisfy their obligations under the Payment Guarantees and are in default thereunder. *See* Affidavit ¶ 22.

## V.    CITIZENS IS ENTITLED TO CONFESS JUDGMENT AGAINST DEFENDANTS

38. One or more "Events of Default" and defaults have occurred under the Loan Agreement and Note, including Borrower's nonpayment of the Loan at maturity, which has continued for almost one year.

39. The Loan Agreement and the Note have not been assigned, and Citizens is the current holder thereof.

40. Pursuant to the Reservation of Rights Letters, Citizens provided notice to Defendants that Events of Default have occurred and are continuing.

41. Defendants each unconditionally and jointly and severally guaranteed the Payment Guarantee Obligations.

42. The Payment Guarantees are valid and enforceable contracts between Citizens and the respective Defendants.

43. Citizens has fully performed its obligations under the Payment Guarantees.

11

44. The explicit warrants contained in the Payment Guarantees, as shown and reaffirmed herein, provide that Citizens may confess judgment against Defendants, and each of them, upon their default under the Payment Guarantees. The warrants provide that judgment may be confessed from time to time as often as there is occasion therefor.

45. Each Defendant has breached its Payment Guaranty by failing and refusing to pay the Payment Guarantee Obligations upon demand by Citizens.

46. As a consequence of Defendants' failures to cure the Defaults, Defendants are each liable to Citizens as of May 7, 2026 as follows:

| | |
|---|---|
| Unpaid Principal | $9,970,527.00 |
| Accrued but Unpaid Interest through May 7, 2026 | $114,145.92 |
| Interest at Default Rate through May 7, 2026 | $412,115.12 |
| Attorneys' Fees and Costs through March 17, 2026 | $266,957.77 |
| Appraisal: | $5,000.00 |
| **JUDGMENT TOTAL** | **$10,768,745.81** |

*See* Affidavit ¶ 31.

**WHEREFORE**, Plaintiff demands judgment against each of Defendants FineHill Construction LLC, Ajay K. Keshri, Pramod Keshri, Sanjay Gupta, and Harrison M. Finberg, in the total amount of $$10,768,745.81 (as of May 7, 2026), plus continuing interest and costs and fees until paid in full.

*[Signature page follows]*

12

Dated: May 7, 2026                            Respectfully submitted,

                                              /s/ Benjamin R. Wilson
                                              Benjamin R. Wilson (PA Bar No. 327118)
                                              Lindsey C. Cook (PA Bar No. 332040)
                                              HOLLAND & KNIGHT LLP
                                              1650 Market Street, Suite 3300
                                              Philadelphia, PA 19103
                                              Tel: (215) 252-9571
                                              Fax: (215) 687-6070
                                              benjamin.wilson@hklaw.com
                                              lindsey.cook@hklaw.com

                                              *Attorneys for Plaintiff Citizens Bank, N.A.*

**Exhibit 1**

**IN IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITIZENS BANK, N.A., <br><br> Plaintiff, <br><br> v. <br><br> FINEHILL CONSTRUCTION LLC, AJAY K. KESHRI, PRAMOD KESHRI, SANJAY GUPTA, and HARRISON M. FINBERG, <br><br> Defendants. | Civil Action No. _____ |

## AFFIDAVIT IN SUPPORT OF CONFESSION OF JUDGMENT

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA <br><br> COUNTY OF FAIRFAX | SS. |

I, David W. Bruner, being first duly sworn upon my oath according to law, depose and say:

## DEFAULT

1.      I am over the age of 18 and competent to make this Affidavit, and all statements in this Affidavit are true and correct to the best of my knowledge, information, and belief. I am the Vice President of Citizens Bank, N.A. ("Citizens" or "Lender"), and I am authorized to make this Affidavit on behalf of Citizens. I have personal knowledge of the facts set forth herein or have acquired knowledge of such facts through my review of Citizens' business records maintained in the ordinary course of business.

2.      On November 17, 2022, Citizens entered into a Construction Loan Agreement (the "Loan Agreement") with Hancock Lofts LLC ("Borrower") in connection with the construction of

a mixed-use project located in Philadelphia, Pennsylvania (the "Property") comprised of 49 market-rate residential units and 6 commercial units (the "Project"). A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A**.

3.    Pursuant to the Loan Agreement, Citizens agreed to make a loan (the "Loan") to the Borrower in an aggregate amount of up to $10,000,000. The Loan is evidenced by a Promissory Note dated as of November 17, 2022, made by the Borrower to Citizens in the principal amount of $10,000,000 (the "Note"), and secured by, among other things, an Open-End Mortgage, Assignment of Leases and Rents, and Security Agreement dated as of November 17, 2022, under which Citizens was granted a mortgage on the Property (the "Mortgage"). A true and correct copy of the Note is attached hereto as **Exhibit B**.

4.    Under the Loan Agreement and the Note, Borrower was required to make monthly interest payments until maturity, at which point Borrower was required to pay, among other things, all outstanding principal and interest.

5.    To secure Borrower's obligations under the Loan Agreement and Note, Defendants FineHill Construction LLC ("FineHill"), Ajay K. Keshri ("Ajay"), Pramod Keshri ("Pramod"), Sanjay Gupta ("Sanjay"), and Harrison M. Finberg ("Harrison") (each individually, a "Guarantor," and collectively, the "Defendants") each executed a separate Guaranty of Payment, each made as of November 16, 2022 and effective as of November 17, 2022, in favor of Citizens (each a "Payment Guaranty" and collectively, the "Payment Guarantees"). True and accurate copies of each of the Payment Guarantees are collectively attached hereto as **Exhibit C**.

6.    Pursuant to Section 1 of the Payment Guarantees, Defendants each absolutely, unconditionally, irrevocably and jointly and severally guaranteed, among other things, (1) the Borrower's obligation to make full and prompt payment when due of the principal and interest on

2

the Note, (2) the Borrower's full and prompt payment of all sums which may become due and owing under the Loan Agreement, Note, and the other Loan Documents (as defined in the Loan Agreement), (3) the Borrower's prompt, full and complete performance of its obligations under each and every covenant contained in the Loan Agreement, Note, Mortgage and the other Loan Documents, and (4) the full and prompt payment of any Enforcement Costs (as defined in Section 8 of the Payment Guarantees) (collectively, the "Payment Guarantee Obligations").

7.     Under Section 2 of the Payment Guarantees, in the event the Borrower fails to pay when due any of the Payment Guarantee Obligations, Defendants agreed to pay to Citizens those obligations on demand by Citizens, regardless of any defense, right of set-off or claims which the Borrower or any Defendant may have against Citizens.

8.     At Section 3 of the Payment Guarantees, each Defendant expressly waived, *among other things*, "any defense, right of set-off or other claim which Guarantor or Borrower may have against Lender, or the holder of the Note"; "any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations"; and "any rights to set-offs, recoupments and counterclaims."

9.     At Section 3 of the Payment Guarantees, each Defendant also covenanted that "[t]his is an absolute, present and continuing guaranty of payment and not of collection."

10.    Defendants further agreed in Section 8 of the Payment Guarantees to pay upon demand by Citizens applicable Enforcement Costs, which include all reasonable attorneys' fees, costs and expenses incurred by Citizens in connection with, among other things, the collection of the Payment Guarantees.

11.    Under the Payment Guarantees, each Defendant agreed that its or his obligations thereunder are independent of the obligations of the Borrower or any other guarantor, and that a

3

separate action or actions may be brought against each Defendant whether or not any action is brought against the Borrower or any other guarantor and whether or not the Borrower is joined in any such action.

12. To secure Defendants' performance of the Payment Guarantee Obligations, at Section 26 of the Payment Guarantees, each Defendant agreed that judgment may be confessed directly against each of them for failing to perform the Payment Guarantee Obligations.

13. At Section 27 of the Payment Guarantees, Defendants expressly waived any right to notice, a hearing, or other due process prior to entry of judgment, and released any right to challenge such entry or recover damages in connection therewith.

14. In addition, and to reaffirm the confession of judgment and waiver provisions contained in the Payment Guarantees, each Defendant executed a separate Disclosure for Confession of Judgment (each a "COJ Disclosure"), dated November 16, 2022 and effective as of November 17, 2022, in connection with the Loan Agreement and Payment Guarantees. True and accurate copies of each of the COJ Disclosures are collectively attached hereto as **Exhibit D**.

15. In the COJ Disclosures, each Defendant acknowledged and agreed that the Payment Guarantees contains wording (1) that "permits Lender to obtain a judgment against me in any federal or state court in the Commonwealth of Pennsylvania" and (2) "by which I am consenting to the entry of judgment against me, and to execution efforts on such judgment (which may result in the taking of my property), without a court hearing prior to such execution efforts."

16. Each Defendant further acknowledged in the COJ Disclosures that judgment may be obtained without, among other things: (a) "the right to notice of any hearing (whether such rights arise under the United States Constitution, the constitution of any state, any federal or state statute, or any judicial decision) on the validity of any claim that may be asserted against me by

4

the Lender under the Loan Documents"; (b) "the right to reduce or set off a claim by deducting a claim I may have against Lender"; (c) "release of all errors"; (d) "inquest (the right to ascertain whether the rents and profits of real estate will be sufficient to satisfy the judgment within seven years)"; (e) "stay of execution"; and (f) "exemption laws now in force or hereafter to be passed."

17.    Each Defendant also represented in the COJ Disclosures that it was "fully aware of the constitutional and statutory rights to prior notice and hearing on the validity of any claims that may be asserted against me by the Lender under the Loan Documents before judgment can be entered and before my assets can be executed on, garnished, or attached" and that "by authorizing confession of judgment, I am giving up the right to notice or opportunity to be heard prior to the entry of judgment in favor of Lender and prior to garnishment and attachment of my bank accounts and other assets; and that the Lender may garnish and attach such bank accounts and other assets (whether personal property or other assets) without prior notice or opportunity for a hearing."

18.    Pursuant to Section 13 of the Payment Guarantees, Defendants have waived their right to a jury trial.

19.    The Loan matured on May 17, 2025. Borrower, however, failed to pay the outstanding balance and accrued and unpaid interest on the Loan and such failure constituted an "Event of Default" under the Loan Agreement and a default under the Note.

20.    Numerous other "Events of Default" have occurred and are continuing under the Loan Agreement, certain of which were memorialized in reservation of rights letters (the "Reservation of Rights Letters") issued by Citizens to Borrower and Guarantors on April 21, 2025, May 6, 2025, August 5, 2025, September 26, 2025 and February 26, 2026. True and correct copies of those letters are collectively attached hereto as **Exhibit E.**

21. On May 21, 2025, Citizens made written demand on the Defendants for payment under the Payment Guarantees. A true and correct copy of the May 21, 2025 demand letter is attached hereto as **Exhibit F**.

22. Defendants, however, have failed to satisfy their obligations under the Payment Guarantees and are in default thereunder.

23. One or more "Events of Default" have occurred under the Loan Agreement, including Borrower's nonpayment of the Loan, which has continued for almost one year.

24. The Loan Agreement and the Note have not been assigned, and Citizens is the current holder thereof.

25. Pursuant to the Reservation of Rights Letters, Citizens provided notice to Defendants that Events of Default have occurred and are continuing.

26. Defendants each unconditionally guaranteed the Payment Guarantee Obligations.

27. The Payment Guarantees are valid and enforceable contracts between Citizens and the respective Defendants.

28. Citizens has fully performed its obligations under the Payment Guarantees.

29. The explicit warrants contained in the Payment Guarantees, as shown and reaffirmed herein, provide that Citizens may confess judgment against Defendants, and each of them, upon their default under the Payment Guarantees. The warrants provide that judgment may be confessed from time to time as often as there is occasion therefor.

30. Each Defendant has breached its Payment Guaranty by failing and refusing to pay the Payment Guarantee Obligations upon demand by Citizens.

31. To date, Defendants owe Citizens the unpaid principal of $9,970,527.00; $114,145.92 for accrued but unpaid interest through May 7, 2026; $412,115.12 for interest at the

6

default rate through May 7, 2026; $266,957.77 in attorneys' fees and costs through March 17, 2026; and a $5,000.00 appraisal fee. To date, Defendants owe Citizens the total sum of $10,768,745.81.

## AFFIDAVIT OF NON-CONSUMER CREDIT TRANSACTION

32.     The judgment being sought herein is not being entered against a natural person in connection with a consumer credit transaction.

## AFFIDAVIT OF NON-RESIDENTIAL LEASE AGREEMENT

33.     The judgment being sought herein is not being entered against a natural person in connection with a residential lease.

## AFFIDAVIT OF BUSINESS TRANSACTION

34.     The transaction upon which judgment is being entered in this matter was a business transaction, and was not entered into for personal, family or household purposes.

## AFFIDAVIT OF NON-MILITARY SERVICE

35.     On information and belief, none of the Defendants is in the Military Service of the United States.

## AFFIDAVIT THAT ACTION DOES NOT ARISE OUT OF A RETAIL INSTALLMENT CONTRACT

36.     This is not an action by a seller, holder or assignee arising out of a retail installment sale, contract, or account.

7

**AFFIDAVIT OF INCOME**

37.    Upon information and belief, the income of each Defendant is in excess of $10,000 per year.

**CERTIFICATE OF RESIDENCE/AFFIDAVIT OF ADDRESSES**

38.    The address of Plaintiff Citizens Bank, N.A. is 1 Citizens Plaza, Providence, Rhode Island.

39.    Defendant FineHill Construction LLC has an address of 1415 S. 12th Avenue, Philadelphia, Pennsylvania 19147.

40.    Defendant Ajay K. Keshri has an address of 2731 Norfolk Lane, Doylestown, Pennsylvania 18902.

41.    Defendant Pramod Keshri has an address of 4 Ren Way, Doylestown, Pennsylvania 18901.

42.    Defendant Sanjay Gupta has an address of 2796 Buttercup Court, Huntingdon Valley, Pennsylvania 19006.

43.    Defendant Harrison M. Finberg has an address of 1415 S. 12th Avenue, Philadelphia, Pennsylvania 19147.

* * *

44.    The facts set forth above and the allegations contained in the complaint are true and correct to the best of my knowledge, information, and belief.

*[Signature page follows]*

8

Dated: May 7, 2026

_____
David W. Bruner

Sworn to before me
This ⁊ day of May 2026

_____   Maria G. Flores
Notary Public
My Commission ID: 284354
My Commission Expires:   3/31/28

> MARIA GABRIELA FLORES
> Notary Public
> Commonwealth of Virginia
> Registration No. 00284354
> My Commission Expires Mar 31, 2028

9

# EXHIBIT A

# CONSTRUCTION LOAN AGREEMENT

by and between

**HANCOCK LOFTS LLC**, a Pennsylvania limited liability company
as Borrower,

and

**CITIZENS BANK, N.A.**
as Lender

Effective as of November 17, 2022

ME1 42686889v.6

**TABLE OF CONTENTS**

**Page**

SECTION 1 INCORPORATION AND DEFINITIONS ...............................................................1

1.1        Definitions ................................................................................................................1
1.2        Definitions in Loan Documents .............................................................................21

SECTION 2 REPRESENTATIONS AND WARRANTIES......................................................21

2.1        Representations and Warranties.............................................................................21
2.2        Continuation of Representations and Warranties...................................................25

SECTION 3 THE LOAN.............................................................................................................25

3.1        Agreement to Borrow and Lend..............................................................................25
3.2        The Note...................................................................................................................25
3.3        Interest......................................................................................................................25
3.4        Benchmark Replacement Setting.............................................................................26
3.5        Increased Costs; Illegality; Taxes. .........................................................................28
3.6        Intentionally Omitted ..............................................................................................30
3.7        Prepayment...............................................................................................................30
3.8        Principal Payments..................................................................................................32
3.9        Loan Term................................................................................................................32
3.10      Time of Payment of Fees and Expenses. ................................................................33
3.11      Late Charge .............................................................................................................33

SECTION 4 LOAN DOCUMENTS............................................................................................34

SECTION 5 CONDITIONS TO LOAN CLOSING ..................................................................36

SECTION 6 THE BUDGET AND DISBURSEMENTS ...........................................................41

6.1        The Budget and Disbursements. .............................................................................41
6.2        Requests for Loan Disbursements...........................................................................42
6.3        Monthly Disbursements ..........................................................................................43
6.4        Construction Disbursements ...................................................................................43
6.5        Conditions to All Disbursements ............................................................................44
6.6        Final Disbursement .................................................................................................45
6.7        Documents Required for Final Disbursement.........................................................45
6.8        Management Agreement ..........................................................................................46
6.9        Payments Directly to Contractors ..........................................................................46
6.10      Amount of Disbursements .......................................................................................46
6.11      Retainage..................................................................................................................47
6.12      Stored Materials ......................................................................................................47
6.13      Sufficiency of Loan to Complete Construction .......................................................47
6.14      Provisions Applicable to All Disbursements ..........................................................48
6.15      Intentionally Omitted ..............................................................................................48

SECTION 7 FURTHER COVENANTS OF BORROWER .......................................................48

7.1        Construction of Project ...........................................................................................48

i

| 7.2 | Changes in Plans and Specifications and Contracts | 49 |
|---|---|---|
| 7.3 | Inspection by Lender | 49 |
| 7.4 | Mechanics' Liens | 49 |
| 7.5 | Settlement of Mechanics' Lien Claims | 50 |
| 7.6 | Sign and Publicity | 50 |
| 7.7 | Renewal of Insurance and Payment of Taxes and Escrows | 50 |
| 7.8 | Proceedings to Enjoin or Prevent Construction | 51 |
| 7.9 | Lender's Action for Its Own Protection Only | 51 |
| 7.10 | Furnishing Information; Financial Covenants. | 52 |
| 7.11 | Documents of Further Assurance | 54 |
| 7.12 | Furnishing Reports | 54 |
| 7.13 | Operation of Project | 54 |
| 7.14 | Management Agents' and Brokers' Contracts | 54 |
| 7.15 | Furnishing Notices | 55 |
| 7.16 | Correction of Defects | 55 |
| 7.17 | No Additional Debt; No Assignment. | 55 |
| 7.18 | Hold Disbursements in Trust | 55 |
| 7.19 | Indemnification | 55 |
| 7.20 | Prohibition Against Cash Distributions and Application of Net Cash Flow to Other Expenditures | 55 |
| 7.21 | Insurance Reporting Requirements | 56 |
| 7.22 | Compliance With Laws. | 56 |
| 7.23 | Alterations | 56 |
| 7.24 | Lost Note | 56 |
| 7.25 | Hazardous Materials. | 56 |
| 7.26 | Asbestos/Toxic Mold | 57 |
| 7.27 | Expenses and Advances Secured by Loan Documents | 57 |
| 7.28 | Appraisals | 57 |
| 7.29 | Lender's Attorneys' Fees | 57 |
| 7.30 | Register with County | 57 |
| 7.31 | Single Purpose Entity | 58 |
| 7.32 | Federal Historic Tax Credit Conditions | 59 |
| 7.33 | State Historic Tax Credit Conditions | 61 |
| SECTION 8 CASUALTIES AND CONDEMNATION | | 61 |
| 8.1 | Notice | 61 |
| 8.2 | Application of Insurance Proceeds and Condemnation Awards | 61 |
| SECTION 9 ASSIGNMENTS, SALE AND ENCUMBRANCES | | 63 |
| 9.1 | Lender's Right to Assign | 63 |
| 9.2 | Prohibition of Assignments and Encumbrances by Borrower | 63 |
| 9.3 | Organizational Documents | 63 |
| 9.4 | Successors and Assigns | 64 |

ME1 42686889v.6

SECTION 10 DEFAULTS BY BORROWER ............................................................................64

SECTION 11 LENDER'S REMEDIES UPON DEFAULT ........................................................66

11.1    Remedies Conferred Upon Lender..................................................................66
11.2    Right of Lender to Make Advances to Cure Defaults....................................67
11.3    No Waiver .......................................................................................................67
11.4    Availability of Remedies................................................................................68

SECTION 12 PERMANENT LOAN ........................................................................................68

12.1    Permanent Loan Conversion Option...............................................................68
12.2    Permanent Loan Principal and Interest Payments..........................................69

SECTION 13 MISCELLANEOUS ...........................................................................................69

13.1    Time Is of the Essence ...................................................................................69
13.2    Prior Agreements ...........................................................................................69
13.3    Disclaimer by Lender .....................................................................................70
13.4    Indemnification ..............................................................................................70
13.5    Captions ..........................................................................................................70
13.6    Inconsistent Terms and Partial Invalidity .....................................................70
13.7    Gender and Number ........................................................................................70
13.8    Definitions Included in Amendments .............................................................71
13.9    WAIVER OF JURY TRIAL............................................................................71
13.10   Notices.............................................................................................................71
13.11   JURISDICTION; VENUE................................................................................72
13.12   Waiver of Damages.........................................................................................73
13.13   Office of Foreign Asset Control (OFAC) and Patriot Act 326 (PA 326)
        Verification of Customers; Beneficial Ownership. ........................................73
13.14   Governing Law................................................................................................73
13.15   Divisions .........................................................................................................70

Exhibits

Exhibit A        Legal Description of Land

Exhibit B        Budget

Exhibit C        Title Requirements

Exhibit D        Form of Survey Certification

Exhibit E        Insurance Requirements

Exhibit F        Borrower's Certificate for Payment

Exhibit G        Form of Partial Release of Mechanics' Liens

Exhibit H        Form of Final Release of Mechanics' Liens

iii

ME1 42686889v.6

## CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT (this "Agreement"), is made and entered on this 16th day of November, 2022, to be effective as of November 17, 2022, by and between **Hancock Lofts LLC**, a Pennsylvania limited liability company with a principal place of business at 2001 Market Street, Suite 2519, Philadelphia, PA 19103 ("Borrower"), and **CITIZENS BANK, N.A.** ("Lender").

### RECITALS

WHEREAS, Borrower owns that certain real property formerly known as 2545 Hancock Street, Philadelphia, PA 19133, OPA No. 88-10754-00, as more particularly described on <u>Exhibit A</u> attached as a part hereof (the foregoing referred to, collectively, as the "Land" or "Property"), which term shall include such present improvements and all rights, privileges, easements, hereditaments and appurtenances thereunto relating or appertaining);

WHEREAS, Borrower proposes to rehabilitate and build a mixed-use project, which will be comprised of 49 market-rate apartments and 5,954 SF of commercial space on the Land (the "Project"); and

WHEREAS, Borrower has applied to Lender for a mortgage loan for the purpose of such construction, and Lender is willing to make the loan upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements herein contained, the sufficiency of which is hereby acknowledged, the parties hereto represent and agree as follows:

### SECTION 1

### INCORPORATION AND DEFINITIONS

1.1    <u>Definitions</u>.

The foregoing recitals and all exhibits hereto are made a part of this Agreement. The following terms shall have the following meanings in this Agreement:

<u>ABR</u>: Alternate Base Rate.

<u>ABR Loans</u>: The Loan for the period(s) when the rate of interest applicable to the Loan is calculated by reference to the Alternate Base Rate in the manner set forth herein.

<u>Affiliate</u>: With respect to a specified person or entity, any individual, partnership, corporation, limited liability company, trust, unincorporated organization, association or other entity which, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such person or entity, including, without limitation, any general or limited partnership or limited liability company in which such person or entity is a partner or member.

ME1 42686889v.6

Alternate Base Rate:  Means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Rate in effect on such day plus 0.50% per annum and (c) Daily Simple SOFR in effect on such day (taking into account any floor set forth in the definition of "Daily Simple SOFR") plus 1.00% per annum, provided that the Alternate Base Rate shall at no time be less than 1.00% per annum.  If Lender shall have determined (which determination shall be conclusive absent clearly manifest error) that it is unable to ascertain the Federal Funds Rate or Daily Simple SOFR for any reason, including the inability or failure of Lender to obtain sufficient quotations in accordance with the terms of the definition of the term Federal Funds Rate, the Alternate Base Rate shall be determined without regard to clause (b) or (c), as applicable, of the preceding sentence until the circumstances giving rise to such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Rate or Daily Simple SOFR, as applicable, shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Rate or Daily Simple SOFR, as applicable, respectively.

Anti-Corruption Laws:  Means all laws, rules, and regulations of any jurisdiction applicable to the Loan Parties from time to time concerning or relating to bribery or corruption.

Anti-Terrorism Laws: Has the meaning assigned to such term in Section 2.1.

Applicable Interest Rate:  The rate(s) of interest established pursuant to Section 3.3(a) and 3.3(b) hereof, as applicable.

Appraisal:  A fair market value real estate appraisal prepared by an appraiser satisfactory to Lender, in form and substance satisfactory to Lender.

Approved Lease:  Any leases, subleases and occupancy agreements affecting the Project or any part thereof now existing or hereafter executed and all amendments, modifications or supplements thereto approved by Lender.

Architect:  JKR Partners LLC.

Architect's Contract: Contract between Architect and Harrison Finberg and Finberg Development dated August 25, 2022, as assigned to Borrower.

Assignment of Leases and Rents:  As defined in Section 4.1(c).

Authorized Signer/Representative:  Harrison Merriman Finberg.

Available Tenor:  means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period (or a similar or analogous period) pursuant to this Credit Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is

2

then-removed from the definition of "interest period" (or a similar or analogous term) pursuant to Section 3.4.

Bankruptcy Code: Means Title 11 of the United States Code or any similar federal or state law for the relief of debtors.

Beneficial Ownership Certification:  With respect to Borrower, a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation, which certification shall be in the form required by Lender.

Beneficial Ownership Regulation:  31 C.F.R. § 1010.230.

Benchmark:  means, initially, Daily Simple SOFR; provided that if a Benchmark Transition Event has occurred with respect to Daily Simple SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.4 hereof.

Benchmark Replacement:  means with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by Lender giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Loan Agreement and the other Loan Documents.

Benchmark Replacement Adjustment: means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Lender giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities.

Benchmark Replacement Conforming Changes or Conforming Changes:  Means, with respect to either the use or administration of the Benchmark, or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including or example and not by way of limitation or prescription, changes to the definition of "Alternate Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Lender in a manner

3

substantially consistent with market practice (or, if the Lender decides that adoption of any portion of such market practice is not administratively feasible or if the Lender determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Lender decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

Benchmark Replacement Date:  means the earliest to occur of the following events with respect to the then-current Benchmark:

(1)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(2)    in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

Benchmark Transition Event: Means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of

4

such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

Benchmark Transition Start Date:  Means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

Benchmark Unavailability Period:  Means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.4 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.4.

Borrower:  As such term is defined in the opening paragraph.

Borrower Equity Escrow Account:  Means that certain escrow account No. xxxx92843 established and maintained by Borrower with Lender, which escrow account shall be at all times subject to Lender's control.

Borrower's Equity:  A sponsor equity contribution in an amount equal to or greater than 10.2% of the total Project cost, estimated at $1,193,595 as of the date hereof, to be contributed by Borrower to the Project to Lender's satisfaction at or prior to Closing.  To the extent not already spent on the Project as of the date of closing, the Borrower's Equity shall be deposited into the Borrower Equity Escrow Account held by Borrower at Lender to fund all draws with respect to the Project until that portion of the Borrower's Equity so deposited is disbursed in its entirety, prior to the first advance under the Loan.

Borrower Operating Agreement: Means the Second Amended and Restated Operating Agreement of Borrower, dated as of the same date herewith.

Budget:  The budget attached as Exhibit B hereto.

5

Business Day: Means any day other than a Saturday, Sunday or day on which banks in New York City, New York are authorized or required by law to close.

Casualty Event:  Means any event that (a) gives rise to the receipt by any Loan Party or any of its Subsidiaries of any insurance proceeds or condemnation awards arising from any damage to, destruction of, or other casualty or loss involving, or any seizure, condemnation, confiscation or taking under power of eminent domain of, or requisition of title or use of or relating to or in respect of any equipment, fixed assets or the Project (including any improvements thereon) of such Loan Party, and (b) provides Net Cash Proceeds in the aggregate in excess of $100,000.

Certificate of Occupancy: Means the Certificate of Occupancy issued by the Department of Licenses and Inspections of the City of Philadelphia, which certifies that a building is safe to be occupied.

Change in Law:  Means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority or the compliance therewith by Lender; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

Change of Control:  With respect to Borrower, the result caused by the occurrence of any event which results in (i) Harrison Merriman Finberg's failure or inability to, directly or indirectly, manage, control and/or be the manager or managing member of the Managing Member; and/or (ii) Harrison Merriman Finberg ceasing to own the Managing Member; and/or (iii) the Managing Member ceasing to be the managing member of the Master Tenant; and/or (iv) the Managing Member ceasing to be the managing member of  Borrower.

Closing:  Means the satisfaction of all conditions of this Agreement and the execution and delivery of this Agreement and all other Loan Documents by all respective parties thereto.

Commencement Date:    The date upon which construction of the Improvements commences, which date shall occur not later than thirty (30) days after the Loan Closing Date.

Commitment Letter:  The letter dated October 3, 2022, summarizing the terms and conditions applicable to the Loan, issued by Lender and accepted by Borrower.

Completion of Construction:  Completion of the entire exterior and interior of all buildings, structures and improvements constituting the Improvements substantially in accordance with the Plans and Specifications approved by Lender (subject to change orders permitted in Section 7.2 below), with all utilities actually connected to and servicing the

6

ME1 42686889v.6

Improvements, as shall be evidenced by a Certificate of Occupancy with respect to the entire Project delivered by Borrower to Lender.

Completion Guaranty:  As defined in Section 4.1(k).

Construction Contract:  The contract between the Borrower and the General Contractor for construction of the Project.

Construction Consultant:  Jim Long d/b/a Longview.

Construction Consulting Agreement: Means that certain agreement between Borrower and Construction Consultant, pursuant to which Borrower retained Construction Consultant to oversee manage the construction of the Project.

Conforming Changes: means, with respect to either the use or administration of the Benchmark, or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including, for example and not by way of limitation or prescription, changes to the definition of "Alternate Base Rate," the definition of "Business Day," the addition of a concept of "interest period" or any similar or analogous definition, or the modification of the definition of "interest period" or any similar or analogous definition, the definition of "U.S. Government Securities Business Day," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions and other technical, administrative or operational matters) that Lender decides may be appropriate in connection with the use or administration of the Benchmark or to reflect the adoption and implementation of any Benchmark Replacement or to permit the use and administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of any such rate exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

Construction Period:  As defined in Section 3.10(a).

Construction Period Interest Rate:  As defined in Section 3.3(a).

Construction Schedule:  A schedule of construction of the Project showing approximate start and finish dates of all major stages of the Project.  The Construction Schedule shall provide that construction of the Project shall commence no later than **thirty (30) days** after the Loan Closing Date.

Contingency Fund:  A Budget line item which shall represent an amount necessary to provide reasonable assurances to Lender that additional funds are available to be used if additional costs and expenses are incurred or additional interest accrues on the Loan, or unanticipated events or problems occur, which shall be not less than 10% of the hard costs of construction, as set forth in the Construction Contract with General Contractor.

7

ME1 42686889v.6

Control or control:  As such term is used with respect to any person or entity, including the correlative meanings of the terms "controlled by" and "under common control with", shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

Corresponding Tenor:  with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

Cost Certification: The final written certification of the itemized amounts of the development costs and the QREs incurred in connection with the Project, the date of the final QREs incurred in connection with the Project, and the actual Historic Tax Credits, delivered by the Borrower to Master Tenant pursuant to the Master Tenant Operating Agreement.

County:  Philadelphia County, Pennsylvania.

Daily Simple SOFR: means, for any calendar day (a "SOFR Rate Day"), a rate per annum equal to the greater of (a) SOFR for the day (such day, the "SOFR Determination Date") that is five U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website, and (b) 1.00% per annum.  If by 5:00 p.m. (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Date, the SOFR in respect of such SOFR Determination Date has not been published on the SOFR Administrator's Website and a Benchmark Replacement Date with respect to the Daily Simple SOFR has not occurred, then the SOFR for such SOFR Determination Date will be the SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR Administrator's Website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to Borrower or any other Person.

Debt Service Coverage Ratio ("DSCR"):  Determined using the Permanent Loan terms by dividing actual Net Operating Income from the Project by the actual Permanent Loan Debt Service for the Loan.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

8

ME1 42686889v.6

Default:  Any event, condition or circumstances, which if it were to continue uncured would, with notice or lapse of time or both, constitute an Event of Default hereunder, under any Loan Documents or any Approved Lease.

Default Rate:  A rate per annum equal to the lesser of:  (i) four (4) percentage points over the Applicable Interest Rate or (ii) the maximum rate permitted by law.  In the event portions of the Loan Proceeds bear interest at different Applicable Interest Rates, for purposes of determining the Default Rate payable with respect to sums other than the principal balance, the Applicable Interest Rate shall be the rate for a Prime Rate Loan.

Deficiency Deposit:  As defined in Section 6.13(b).

Division: means the division of the assets, liabilities, or obligations of, or the creation or reorganization into one or more series by, a Person (the "Dividing Person") among two or more Persons, whether pursuant to a "plan of division" or similar arrangement pursuant to Section 18-217 of the Delaware Limited Liability Company Act or any similar provision under the laws of any other applicable jurisdiction, whether in one transaction or in a series of transactions and whether or not the Dividing Person survives.

Disbursement:   A disbursement of Loan Proceeds by Lender as contemplated by Section 6.

Disposition: means, with respect to any Person, the sale, transfer, license, lease or other disposition by such Person to any other Person, with or without recourse, of (a) any notes or accounts receivable or any rights and claims associated therewith, (b) any equity interests of any subsidiary, or (c) any other assets, provided, however, that none of the following shall constitute a Disposition:  (i) the collection of accounts receivable and other obligations in the ordinary course of business, (ii) sales of inventory in the ordinary course of business, (iii) residential and/or commercial leases of the Project (or any portion thereof) or any other revenues generated from the Project in the ordinary course of business, or (iv) dispositions of substantially worn out, damaged, uneconomical, surplus or obsolete equipment, equipment that is no longer useful in the business of Borrower.

Entity Guarantor:  Means FineHill Construction LLC, a Pennsylvania limited liability company.

Environmental Indemnity Agreement:  As defined in Section 4.1(i), jointly and severally from Borrower and Guarantor.

Environmental Law(s):  means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Materials, relating to liability for or costs of Remediation or prevention of Releases of Hazardous Materials or relating to liability for or costs of other actual or future danger to human health or the environment or relating to any wrongful death, personal injury or property damage that is caused by or related to the presence, growth, proliferation, reproduction, dispersal, or contact with any biological organism or portion thereof, including molds or other fungi, bacteria or other microorganisms or any etiologic agents or materials arising from or at the Property.  The term "Environmental Law" includes, but is not

9

limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues:  the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Materials Transportation Act; the Resource Conservation and Recovery Act (including, but not limited to, Subtitle I relating to underground Storage Tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.  The term "Environmental Law" also includes, but is not limited to, any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law: conditioning transfer of property upon a negative declaration or other approval of a governmental authority of the environmental condition of the Property; requiring notification or disclosure of Releases of Hazardous Materials or other environmental condition of the Property to any governmental authority or other person or entity, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to the Property; and relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or the presence of biological or etiologic agents or materials or use, management, or maintenance of the Property.

Equity Investor: APS OZF Florida LLC, a Pennsylvania limited liability company.

Escrow Account:  Means that certain escrow account No. xxxxx27750 established and maintained by Borrower with Lender, which escrow account shall be at all times subject to Lender's control.

Event of Default:  As defined in Section 10.

Excluded Taxes:  Means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender:  Taxes imposed on or measured by net income, franchise Taxes, and branch profits Taxes, in each case, imposed as a result of Lender being organized under the laws of the jurisdiction imposing such Tax (or any political subdivision thereof).

Extension Fee:  An extension fee equal to twenty-five basis points (.25%) of the maximum principal amount of the Loan (estimated at $25,000), payable in accordance with Section 3.10(a) hereof.

Extension Option:  As defined in Section 3.10(a).

Federal Funds Rate: means, for any day, a rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (a) if the day for which

10

ME1 42686889v.6

such rate is to be determined is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, (b) if such rate is not so published for any day, the Federal Funds Rate for such day shall be the average of the quotations for such day on such transactions received by Lender from three federal funds brokers of recognized standing selected by it and (c) if the Federal Funds Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

Federal Reserve Bank of New York's Website:  Means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

Federal Historic Tax Credits:  That certain twenty percent (20%) historic rehabilitation tax credit described in Section 47 of the Internal Revenue Code of 1986, as amended, estimated in a minimum amount of at least $2,105,067, subject to adjustment, up or down, based on the Project's actual rehabilitation costs which are QREs.

Federal Historic Tax Credit Documents:  All those certain documents relating to the application, issuance, guaranty and qualification for the Historic Tax Credits and/or the Historic Tax Credit Equity, including, without limitation, the Historic Tax Credit Guaranty, the Master Lease, the Master Tenant Operating Agreement, the Option Agreement, and the SNDA, and any and all amendments, modifications, supplements and restatements thereof.

Federal Historic Tax Credit Equity:  That certain historic tax credit equity contributed or to be contributed by  the Federal Historic Tax Credit Investor in the Master Tenant in the approximate amount of $1,578,000 as of the date hereof, subject to the conditions and adjustments set forth in the Master Tenant Operating Agreement.  The Federal Historic Tax Credit Equity shall be contributed to the Master Tenant in the following installments, to be subsequently contributed to Borrower in accordance with Section 7.32 hereof:

> (i)    $315,760 or 20% of the Federal Historic Tax Credit Equity;

> (ii)    $789,400 or 50% of the Federal Historic Tax Credit Equity shall be funded after the Project is "Placed in Service";

> (iii)    $236,820 or 15% of the Federal Historic Tax Credit Equity shall be funded upon receipt of the final cost  certification  of  the  Borrower's  accountants and Form 10-168c certified by the NPS; and

> (iv)    $236,820 or 15% of the Federal Historic Tax Credit Equity shall be funded upon delivery of the K-1 Schedule for the taxable year in which the Project was Placed in Service.

Federal Historic Tax Credit Equity Contributions: All contributions of the Historic Tax Credit Equity contributed or to be contributed by the Master Tenant to Borrower, in the approximate amount of $1,321,747 as of the date hereof, subject to the terms and conditions of the Borrower Operating Agreement.  All Federal Historic Tax Credit Equity Contributions shall be invested in the Project in accordance with Section 7.32 hereof.

11

Federal Historic Tax Credit Investor Guaranty:  That certain Guaranty dated of even date herewith from Harrison Merriman Finberg, Sanjay Gupta, Pramod Keshri, and Ajay K. Keshri in favor of Federal Historic Tax Credit Investor and any and all amendments, supplements, modifications and restatements thereof.

Federal HTC Investor:  RiseImpact Hancock Lofts FTCI, LLC.

Floor:  Means the benchmark rate floor, if any, provided in this  Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Loan Agreement or otherwise) with respect to Daily Simple SOFR.

General Contractor:  FineHill Construction LLC.

Governmental Approvals:  All consents, licenses and permits and all other authorizations or approvals required from any Governmental Authority for construction in accordance with the Plans and Specifications.

Governmental Authority:   Any federal, state, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court, administrative tribunal, or public utility.

Gross Revenues:  For any period, all revenues of Borrower (determined on a cash basis, except as may be otherwise expressly provided herein), derived from the Project during such period and any other revenues derived during such period from the ownership, operation, use, leasing and occupancy of the Project, in Lender's reasonable discretion; provided, however, that in no event shall Gross Revenues include (i) any Loan Proceeds, (ii) proceeds or payments under insurance policies (except proceeds of business interruption insurance); (iii) condemnation proceeds; or (iv) any security deposits received from tenants in the Project, unless and until the same are applied to rent or other obligations in accordance with the tenant's lease; or (v) any other extraordinary items, in Lender's sole discretion.

Guarantors:  means Individual Guarantors and Entity Guarantor, collectively, jointly and severally, and each, individually, a "Guarantor".

Hard Costs:  Costs incurred by Borrower for materials and labor in connection with construction of the Improvements which are shown as "Hard Costs" on the Budget approved by Lender.

Hazardous Material(s):  Gasoline, petroleum, asbestos containing materials, Toxic Mold, explosives, radioactive materials or any hazardous or toxic material, substance or waste which is defined by those or similar terms or is regulated as such under any applicable Environmental Law.

Historic Tax Credits:   Collectively, the Federal Historic Tax Credits and the State Historic Tax Credits.

ME1 42686889v.6

Historic Tax Credit Documents:   Collectively, the Federal Historic Tax Credit Documents and the State Historic Tax Credit Documents.

Historic Tax Credit Equity:  Collectively, the Federal Historic Tax Credit Equity and the State Historic Tax Credit Equity.

HTC Consultant:  Powers & Company.

Improvements:  All buildings, structures and other improvements, including all common areas, to be located on the Land, together with any off-site improvements contemplated by the Plans and Specifications to be completed in accordance with the Plans and Specifications and the Approved Leases, if applicable, together with all fixtures and equipment required for the operation thereof.

In Balance:  As defined in Section 6.13.

Indemnified Taxes:  Means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

Individual Guarantors: Means, collectively, Harrison Merriman Finberg, Sanjay Gupta, Pramod Keshri, and Ajay K. Keshri, each an adult individual.

Inspecting Agent:   An inspector selected by Lender, in its sole discretion, who shall perform reviews of the Plans and Specifications and inspections of the Improvements at Lender's request.  The Inspecting Agent may be a third party or an employee of Lender.  Borrower shall be responsible for all fees, costs and expenses of the Inspecting Agent.

Initial Disbursement:  As defined in Section 6.1.

Interest Reserve:  A portion of the proceeds of the Loan allocated to pay interest on the Loan during the first thirty (30) months of the Loan, the initial amount of which is estimated at Nine  Hundred Five Thousand Dollars 00/100 ($905,000).

Interest Payment Date:  Means, with respect to the Loan, the first day of each calendar month and the Maturity Date.

Land:  As defined in the first recital.

Late Charge:  As is defined in Section 3.12.

Law(s):  Collectively, all present and future federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, including judicial opinions or precedential authority in the applicable jurisdiction.

Lender:  As such term is defined in the opening paragraph.

Loan:  The loan to be made pursuant to this Agreement.

ME1 42686889v.6

Loan Amount:  A principal amount not to exceed Ten Million 00/100 Dollars ($10,000,000.00).

Loan Closing Date:  The earlier of (i) the date on which all conditions of the Agreement have been satisfied or (ii) the date of the first disbursement of Loan Proceeds.

Loan Origination Fee:  Sixty-five basis points (.65%) of the maximum principal amount of the Loan (estimated at $65,000).

Loan Document Obligations:  Means the due and punctual payment and performance of all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party under or pursuant to each of the Loan Documents or otherwise with respect to any Loan or Letter of Credit and all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed claims in such proceeding.

Loan Documents:  This Agreement, the Commitment Letter, the documents specified in Section 4 hereof, and any other instruments evidencing or securing the obligations of Borrower under the Note or any of the other Loan Documents executed from time to time, provided that, in the event of a conflict between the Commitment Letter and this Agreement, the terms of this Agreement shall control.

Loan Expenses:  As defined in Section 6.1(b).

Loan Party:  Means, collectively and each, individually, Borrower any and all guarantors of the Loan.

Loan Proceeds:  All amounts or any portion advanced as part of the Loan, whether advanced directly to Borrower or other parties.

Management Company:  As defined in Section 5.1(j).

Manager:  Harrison Merriman Finberg.

Managing Member: Hancock Lofts MM LLC, a Pennsylvania limited liability company.

Master Lease:  That certain Master Lease dated of even date herewith by and between Borrower, as landlord, and Master Tenant, as tenant for the lease of the entire Project.

Master Tenant:  Hancock Lofts MT LLC, a Pennsylvania limited liability company.

Master Tenant Account:  As defined in Section 7.32.

Master Tenant Controlled Account Agreement:  As defined in Section 7.32.

14

Master Tenant Operating Agreement:  That certain Operating Agreement of Master Tenant of even date herewith and any and all amendments, modifications, supplements or other restatements thereof.

Material Adverse Change or material adverse change:  If, in Lender's reasonable discretion, the business prospects, operations or financial condition of a person, entity or property has changed in a manner which could impair the value of Lender's security for the Construction Loan or Permanent Loan, prevent timely repayment of the Construction Loan or Permanent Loan or otherwise prevent the applicable person or entity from timely performing any of its material obligations under the Loan Documents.

Maturity Date:  May 17, 2025, unless accelerated sooner pursuant to the terms hereof or extended pursuant to the Extension Option and/or pursuant to the Permanent Loan Conversion Option.  In the event the Loan is converted to the Permanent Loan pursuant to the Permanent Loan Conversion Option, "Maturity Date" shall mean the Permanent Loan Maturity Date.

Members: Managing Member, Master Tenant, and Equity Investor.

Mortgage:  As defined in Section 4.1(b).

Net Cash Proceeds: means, with respect to any (a) Disposition or Casualty Event by any Loan Party, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of non-cash consideration initially received and including all insurance settlements and condemnation awards from any single event or series of related events) net of the sum, without duplication, of (i) transaction expenses (including reasonable broker's fees or commissions, legal fees, accounting fees, investment banking fees and other professional fees, transfer and similar taxes and Borrower's good faith estimate of income taxes paid or payable in connection with the receipt of such cash proceeds), (ii) in the case of insurance settlements and condemnation awards related to a Casualty Event, amounts previously paid by such Loan Party to replace or restore the affected property, and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the asset sold in such Disposition which is senior in priority to the Liens securing Secured Obligations and is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset).

Net Operating Income:  For applicable period of calculation, the operating revenues of the Project less operating expenses of the Project, excluding interest expense, depreciation expense or amortization expense, which shall include:  (1) the greater of 5% vacancy or actual on the residential space and 10% vacancy or actual on the commercial space; (2) the greater of 4% management fee or actual; (3) minimum replacement reserves of $200/residential unit and $.25/SF for commercial space.

Note:  As defined in Section 3.2.

NPS:  The National Park Service.

Operating Account: As defined in Section 6.1(a), a deposit account with Lender that Borrower shall open prior to the Loan Closing Date.

15

ME1 42686889v.6

Option Agreement:  That certain Put Option Agreement dated of even date herewith by and between Borrower and Federal HTC Investor and any and all amendments, supplements, modifications and restatements thereof.

Other Taxes:  Means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

Payment Guaranty:  As defined in Section 4.1(m).

Permanent Loan:  As defined in Section 3.10(b).

Permanent Loan Conversion Date:  The last day of the Construction Period, subject to all of the terms and conditions of this Agreement.

Permanent Loan Conversion Fee:  As defined in Section 12.1.

Permanent Loan Conversion Option:  As defined in Section 12.1.

Permanent Loan Debt Service:  Means the aggregate amount of principal and interest payments on the Loan due and payable during the Permanent Loan Period.

Permanent Loan Maturity Date:  The last day of the Permanent Loan Period, unless accelerated sooner pursuant to the terms hereof.

Permanent Loan Note Rate:  As defined in Section 3.3(b).

Permanent Loan Payment Date:  The first (1st) day of each calendar month, commencing first (1st) day of the month immediately following the Permanent Loan Conversion Date, and the Permanent Loan Maturity Date.

Permanent Loan Period:  As defined in Section 3.10(b).

Permitted Exceptions:  Defects, liens and encumbrances, the planned unit development declaration, and other items affecting title to the Land and agreed to in writing by Lender.

Person: Any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

Plans and Specifications:  Those plans and specifications for the Project, as such plans and specifications may be amended from time to time (but only with the written approval of Lender or otherwise in accordance with this Agreement), including any working or shop drawings made in furtherance of the plans and specifications.

Pledge of Membership Interests:  As defined in Section 4.1(i).

16

ME1 42686889v.6

Prime Rate:  means a rate per annum equal to the prime rate of interest announced from time to time by Lender or its parent company (which is not necessarily the lowest rate charged to any customer), changing when and as said prime rate changes.

Principal Repayment Amount:  If the Loan is converted to a Permanent Loan, Borrower shall immediately begin making monthly principal payments on each Permanent Loan Payment Date based on the outstanding principal balance of the loan amortized over a five (5) year period based on a thirty (30) year amortization schedule.

Pro Forma Debt Service:  Means the aggregate amount of payments on the Loan which would be due and payable during the Permanent Loan Period, using a rate of interest equal to 6.25%.

Pro Forma DSCR:  Determined by dividing the annualized Pro Forma Net Operating Income by the annualized Pro Forma Debt Service, using the Permanent Loan terms.

Pro Forma Net Operating Income:  Means annualized operating revenues from the Project less operating expenses, which shall include:  (1) the greater of 5% vacancy or actual on the residential space and the greater of 10% vacancy or actual on the commercial space; (2) the greater of a 4% management fee or actual; and (3) minimum replacement reserves of $200/residential unit and $0.25/SF for commercial space.

Prohibited Transfer:  As defined in Section 9.2.

Project:  As defined in the Recitals.

Qualified Replacement Manager:  Means any Person that reasonably satisfies the following criteria: (1) such Person, or its management team, is not known to any party to this Agreement to be a Person of poor moral character or a Person who has been convicted of or pleaded a *nolo contendere* to a felony; (2) such Person is a reputable, nationally or regionally recognized manager having successfully developed, if the Premises have not been completed, and managed, at least three (3) developments meeting the requirements for the Federal Historic Tax Credit of similar type properties of similar size and in a similar urban locations as the Project in the preceding ten (10)-year period; (3) at the time of its engagement as the manager of the Project, such Person is not the subject of a bankruptcy, liquidation, reorganization, receivership, assignment for the benefit of creditors or similar insolvency or liquidation proceeding; and (4) at the time of its engagement as the manager of the Project, such Person satisfies all of the Lender's requirements with respect to "know your customer" and anti-money laundering rules and regulations, including PA 326, and is not on the US Department of Treasury's list for Specially Designated Nationals and Blocked Persons, as determined by Lender's based on its customary "know your customer" and anti-money laundering compliance policies and procedures and applicable banking regulations.  In addition if such Person is acquiring an ownership interest, directly or indirectly, in either Borrower or Master Tenant, such Person shall not be a Disqualified Person as defined herein.  Subject to the terms of this Agreement, either the Federal HTC Investor or Lender may propose a Person as a Qualified Replacement Manager.

17

QRE:  Qualified rehabilitation expenditures, as defined in Section 47(c)(3) of the Internal Revenue Code of 1986, as amended.

Reference Time: With respect to any setting of the then-current Benchmark means (a) if such Benchmark is Daily Simple SOFR, then four U.S. Government Securities Business Days prior to (i) if the date of such setting is a U.S. Government Securities Business Day, such date or (ii) if the date of such setting is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such date and (b) if such Benchmark is not Daily Simple SOFR, then the time determined by Lender in accordance with the Conforming Changes.

Request for Disbursement:  As defined in Section 6.2.

Required Permits:  Each building permit, environmental permit, utility permit, land use permit, wetland permit and any other permits, approvals or licenses issued by any Governmental Authority which are required in connection the construction or operation of the Project.

Relevant Governmental Body:  Means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

Sanctioned Country:  Means any country, territory or region which is itself the subject or target of any comprehensive Sanctions (which may include the Crimean region of Ukraine, Cuba, Iran, North Korea, Darfur, South Sudan and Syria).

Sanctioned Person: Means (a) any Person or group listed in any Sanctions related list of designated Persons maintained by OFAC, including the List of Specially Designated Nationals and Blocked Persons, or the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any Person subject to any law that would prohibit all or substantially all financial or other transactions with that Person or would require that assets of that Person that come into the possession of a third-party be blocked (c) any legal entity organized or domiciled in a Sanctioned Country, (d) any agency, political subdivision or instrumentality of the government of a Sanctioned Country, (e) any natural person ordinarily resident in a Sanctioned Country, or (f) any Person 50% or more owned, directly or indirectly, individually or in the aggregate by any of the above.

Sanctions:  Means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

Secured Obligations:  Means, collectively, the Loan Document Obligations.

Site Improvement Account:  As defined in section 5.1(y).

ME1 42686889v.6

SNDA: That certain Subordination, Non-Disturbance, and Attorney Agreement dated as of even date herewith, by and among Borrower, as landlord, Lender, Federal HTC Investor, and Master Tenant.

SOFR:  Means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

SOFR Administrator:  Means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

SOFR Administrator's Website:  Means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

SOFR Loan: Means the Loan, and any advances thereon, when it bears interest at a rate based on Daily Simple SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate."

Soft Costs:  Costs incurred by Borrower for professional and other services in connection with the Project including design and engineering work.

Soils Report:  As defined in Section 5.1(x).

Solvent and Solvency: Mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the present assets of such Person, taken as a whole, is not less than the sum of the debt (including contingent liabilities) of such Person, taken as a whole, (b) the present fair salable value of the assets of such Person, taken as a whole, is not less than the amount that will be required to pay the probable liabilities (including contingent liabilities) of such Person, taken as a whole, on its debts as they become absolute and matured, (c) the capital of such Person, taken as a whole, is not unreasonably small in relation to the business of such Person, taken as a whole, contemplated as of such date and (d) such Person does not intend to incur, or believe that it will incur, debts (including current obligations and contingent liabilities) beyond its ability to pay such debts as they mature in the ordinary course of business; except that the amount of contingent liabilities at any time will be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

State Historic Tax Credits:  That certain historic preservation incentive tax credit available under the Pennsylvania Historic Preservation Incentive Tax Credit Program, estimated in a minimum amount of at least $250,000, subject to adjustment, up or down, based on the Project's actual rehabilitation costs which are QREs.

State Historic Tax Credit Documents:  All those certain documents relating to the application, issuance, guaranty and qualification for the State Historic Tax Credits, including, without limitation, the purchase agreement between Borrower and State Historic Tax Credit Investor, and any and all amendments, modifications, supplements and restatements thereof.

19

State Historic Tax Credit Contribution:  That purchase price for the State Historic Tax Credit paid by the State Historic Tax Credit Investor to the Borrower in the approximate amount of $230,000, as of the date hereof, subject to the conditions and adjustments set forth in the State Historic Tax Credit Documents.  The Historic Tax Credit Contribution shall be invested in the Project in accordance with Section 7.33 hereof.

State Historic Tax Credit Investor:  U.S. Bank, N.A.

Subcontractor:  Any contractor with the General Contractor or subcontractor thereof.

Substantial Completion of Construction:  Substantial completion of both the exterior and interior of all buildings, structures and improvements constituting the Improvements substantially in accordance with the Plans and Specifications approved by Lender (subject to change orders permitted in Section 7.2 below), with all utilities actually connected to and servicing the Improvements, as shall be evidenced by a Temporary Certificate of Occupancy with respect to the residential portion of the Project delivered by Borrower to Lender.  The Project shall achieve "Substantial Completion of Construction" within twenty-four (24) months from the Loan Closing Date.

Survey:  As defined in Sections 5.1(b) and 6.8.

Taxes or "taxes":  means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

Temporary Certificate of Occupancy:  Means the Temporary Certificate of Occupancy issued by the Department of Licenses and Inspections of the City of Philadelphia, which allows to inhabit and use part of a structure for a defined period, before the structure is completed.

Tenant:  The tenant under an Approved Lease.

Title Agent:  Land Services USA, LLC, as agent for first American Title Insurance Company.

Title Commitment:  As defined in Exhibit C.

Title Policy:  As defined in Section 5.1(a).

Toxic Mold:  Any substance, chemical, material, or element in any physical state (liquid, solid, gaseous/vapor, etc.) which is or contains excessive moisture, mildew, mold, microbial contamination, microbial growth or other fungi, or biological agents that can or are known to produce mycotoxins or other bioaerosols, such as antigens, bacteria, amoebae and microbial organic compounds or other similar matter, in each case that poses a risk to human health or the environment, or negatively impacts the value of the Project.

UCC Financing Statements:  As defined in Section 4.1(d).

20

Unadjusted Benchmark Replacement:  Means the Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

Unavoidable Delay:  Any delay in the construction of the Project, caused by natural disaster, fire, earthquake, floods, explosion, extraordinary adverse weather conditions, inability to procure or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, strikes or lockouts not within the control of Borrower, and/or a lockdown order issued by the Federal, state or municipal government, provided that such order is binding upon the Borrower and the construction of the Project.

U.S. Government Securities Business Day: Any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

5-year U.S. SOFR Swap Rate: An index which denotes the fixed leg of an interest rate swap based on SOFR, as determined by Bloomberg.

1.2    Definitions in Loan Documents.  All terms not otherwise defined in the Loan Documents shall have the same meanings as set forth herein.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement.

SECTION 2

REPRESENTATIONS AND WARRANTIES

2.1    Representations and Warranties.  To induce Lender to execute and perform its obligations under this Agreement, Borrower hereby represents, covenants and warrants to Lender as follows:

(a)    On the Loan Closing Date and at all times thereafter until the Loan is paid in full, the Borrower will have good and marketable indefeasible fee simple title to the Land, subject only to Permitted Exceptions.

(b)    Borrower has the power to execute, deliver and perform under each of the Loan Documents, and each of the Loan Documents has been duly authorized by all requisite action, and, when executed and delivered, will constitute the duly authorized, legal, valid and binding obligations of each party executing the same, and will be enforceable strictly in accordance with their respective terms.  Borrower is a validly organized and existing limited liability company under the Laws of the Commonwealth of Pennsylvania, and Borrower has the legal capacity to own, develop and operate the Land and the Project.

(c)    No condition, circumstance, event, agreement, document, instrument, restriction, or pending or, to Borrower's knowledge, threatened litigation or proceeding exists which could cause a Material Adverse Change to the Borrower, any Guarantor or the Project.

21

ME1 42686889v.6

(d)      The Land, the present use and occupancy of the Land, the Plans and Specifications, the construction of the Project and the use and occupancy of the Project upon its completion, will not violate or conflict with any Approved Lease, any applicable law, statute, ordinance, rule, regulation or order of any kind, including, without limitation, zoning, building, environmental, land use, noise abatement, occupational health and safety or other laws, any building permit or any condition, grant, easement, covenant, condition or restriction, whether recorded or not.

(e)      All financial statements submitted by Borrower to Lender in connection with this Loan are true and correct in all material respects, have been prepared in accordance with generally recognized accounting principles consistently applied, and fairly present the respective financial conditions and results of operations of the entity and persons as of the respective dates thereof.  No Material Adverse Change has occurred in the financial conditions reflected therein since the respective dates thereof and no additional borrowings have been made by Borrower since the date thereof other than the Loan contemplated hereby.

(f)      All financial statements, budgets, schedules, opinions, certificates, confirmations, applications, rent rolls, affidavits, agreements, Construction Contract, Subcontracts, and other materials submitted to the Lender in connection with or in furtherance of this Agreement, and by or on behalf of the Borrower, fully and fairly state the matters with which they purport to deal, do not misstate any material fact, nor, separately or in the aggregate, fail to state any material fact necessary to make the statements made not misleading.

(g)      All utility and municipal services required for the construction, occupancy and operation of the Project, including, but not limited to, water supply, storm and sanitary sewage disposal system, gas, electric and telephone facilities are available for use and tap-in at the boundaries of the Land, and written permission has been obtained (or will be obtained prior to any advances of the Loan following the Loan Closing Date) from the applicable utility companies or municipalities to connect the Project into each of said services and to thereafter provide the Project with such services to the extent necessary for operation of the Project.

(h)      All Required Permits have been issued and are in full force or, if the present stage of preparation of Plans and Specifications, or the stage of construction of the Project, does not allow such issuance, then such permits and licenses will be issued when the Project is constructed pursuant to the Plans and Specifications, and Borrower is not aware of any circumstance which would delay the issuance of any such Required Permits.

(i)      The storm and sanitary sewage disposal system, water system and all mechanical systems of the Land and the Project do (or when constructed will) comply with all applicable environmental, pollution control and Environmental Laws, ordinances, rules and regulations.  The applicable environmental protection agency, pollution control board and/or other Governmental Authority having jurisdiction of the Land have issued their permits for the construction, tap-in and operation of those systems.

(j)      All utility, parking, vehicular access (including curb cuts and highway access), construction, recreational and other permits and easements required for the construction,

22

use and operation of the Project have been granted and issued, to the extent necessary or required for the then-current stage of construction, operation and use of the Project.

(k)     When completed in accordance with the Plans and Specifications, the Project will not encroach (other than as set forth on the Survey) upon any building line, set back line, side yard line, or any recorded or visible easement, or other easement of which Borrower is aware or has reason to believe may exist, affecting the Land.

(l)     At the time of the Initial Disbursement, the Plans and Specifications will be complete in all respects, containing all detail requisite for the Project which, when built and equipped in accordance therewith, shall be ready for the intended use thereof.

(m)     All roads necessary for ingress and egress to the Project and for the full utilization of the Improvements for their intended purposes have either been completed pursuant to easements approved by the Lender or the necessary rights-of-way thereof have been dedicated to public use and accepted by the appropriate Governmental Authority and if not completed, all necessary steps have been taken by the Borrower and all necessary Governmental Authorities to assure the complete construction and installation thereof to the satisfaction of the Lender.

(n)     (i) No condemnation of any portion of the Project and (ii) no proceedings to deny access to the Project from any point of access to the Project, has commenced, or to the best of Borrower's knowledge, is contemplated by any Governmental Authority.

(o)     The amounts set forth in the Budget present a full and complete representation of all costs, expenses and fees which Borrower after diligent inquiry and analysis by Borrower, and persons of appropriate expertise on behalf of Borrower, expects to pay or anticipates becoming obligated to pay (other than from revenue generated from the operation of the Project) to complete the construction of, and to operate, the Project.  Except as specifically identified in the Budget (and except the General Contractor) all such costs, expenses and fees are payable to third parties unrelated to Borrower.

(p)     Except as disclosed by Borrower to Lender in writing prior to the date hereof and/or as disclosed in the environmental report provided to Lender, (i) the Project is in a clean, safe and healthful condition, free of all Hazardous Materials; (ii) neither Borrower nor, to the best knowledge of Borrower, any other person or entity, has ever caused or permitted any Hazardous Materials to be placed, held, located or disposed of on, under, at or in a manner to affect the Project, or any part thereof, and the Project has never been used for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Materials; (iii) neither the Project nor Borrower is subject to any existing, pending, or, to the best of Borrower's knowledge, threatened investigation or inquiry by any Governmental Authority, and the Project is not subject to any remedial obligations under any applicable Laws pertaining to health or the environment; and (iv) there are no underground tanks, vessels, or similar facilities for the storage, containment or accumulation of Hazardous Materials of any sort on or affecting the Project.

(q)     Neither Borrower nor Guarantor is a "foreign person" within the meaning of Section 1445 or 7701 of the Internal Revenue Code.

23

(r)    Borrower uses no trade name other than its actual name set forth herein. The principal place of business of Borrower is as stated in the preamble to this Agreement.

(s)    There is no Default or Event of Default under this Agreement or the other Loan Documents, nor any condition which, given notice or the passage of time or both, would constitute a Default or an Event of Default under said documents.

(t)    Except for the Master Lease, Borrower and its agents have not entered into any leases, subleases or other arrangements for occupancy of space within the Project.

(u)    The Project is taxed separately without regard to any other property and for all purposes the Project may be mortgaged, conveyed and otherwise dealt with as an independent parcel.

(v)    The Borrower, the Federal HTC Investor, the Master Tenant, and the State Historic Tax Investor have duly authorized and executed all Historic Tax Documents and no defaults exist thereunder.

(w)    As of the Loan Closing Date, the Federal HTC Investor has made the first installment of its required capital contributions timely to the Master Tenant in accordance with the Master Tenant Operating Agreement.

(x)    As of the Loan Closing Date, the information set forth in the Beneficial Ownership Certification is true and correct in all respects.

(y)    Each Loan Party, its/his respective members, managers, employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions.  Neither any Loan Party, nor any of their respective members, managers, officers or employees is a Sanctioned Person.  Each Loan Party has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by the Loan Party and its/his respective members, managers, officers, employees and agents with Anti-Corruption Laws and all applicable Sanctions.

(z)    The Loan, or use of any proceeds of the Loan or other transactions contemplated hereby will not violate Anti-Corruption Laws or applicable Sanctions.  No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the Anti-Corruption Laws.

(aa)    Neither the making of the Loan hereunder nor the use of the proceeds thereof will violate the any regulations passed under the USA PATRIOT Act or will violate the Trading with the Enemy Act, the International Emergency Economic Powers Act, or any regulations passed thereunder, including the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V) or any enabling legislation or executive order relating thereto or successor statute thereto (together with Sanctions, "Anti-Terrorism Laws").  Each Loan Party is in compliance with applicable Anti-Terrorism Laws.

24

ME1 42686889v.6

(bb)    Borrower (i) has not entered into this Agreement or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and (ii) has received reasonably equivalent value in exchange for its Secured Obligations under the Loan Documents. Immediately before and after the making of the Loan and consummation of the Transactions, each of the Loan Parties is Solvent.  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it.

2.2    <u>Continuation of Representations and Warranties</u>.  Except for matters disclosed by Borrower and approved in writing by Lender, the Borrower hereby covenants, warrants and agrees that each of the representations and warranties made in Section 2.1 hereof shall be and shall remain true and correct as of the Loan Closing Date and at all times thereafter so long as any part of the Loan shall remain outstanding.  Each Request for Disbursement shall constitute a reaffirmation that these representations and warranties are true on and as of the date of such Request for Disbursement and will be true on the date of the Disbursement.

SECTION 3

THE LOAN

3.1    <u>Agreement to Borrow and Lend</u>.  Borrower agrees to borrow from Lender, and Lender agrees to lend to Borrower, such amount as shall be requested by the Borrower, but in no event exceeding the stated Loan Amount, on the terms of and subject to the conditions of this Agreement.

3.2    <u>The Note</u>.  The Loan shall be evidenced by a promissory note (as may be amended, restated, replaced, superseded, or otherwise modified from time to time, the "<u>Note</u>") executed by Borrower, payable to the order of Lender and in the Loan Amount.

3.3    <u>Interest</u>.

(a)    <u>Construction Period Interest Rate</u>.  During the Construction Period and, if Borrower duly elects the Extension Option, the Extension Period, interest on the outstanding principal balance of the Loan shall accrue at a floating rate equal to the Daily Simple SOFR plus Two and 50/100 percent (2.50%), adjusted monthly (the "<u>Construction Period Interest Rate</u>"), provided that the Daily Simple SOFR shall at no time be less than one percent (1.00%) per annum.  During the Construction Period, commencing on the first Interest Payment Date following the Loan Closing Date, which shall be December 1, 2022, and continuing on each Interest Payment Date thereafter, up to and including the Maturity Date or, in the event Borrower duly exercises the Permanent Loan Conversion Option in accordance with Section 12.1 below, the Permanent Loan Conversion Date, Borrower shall make monthly payments of interest on the outstanding principal balance of the Loan at the Construction Loan Note Rate.

(b)    <u>Permanent Loan Note Rate</u>.  During the Permanent Loan Period, the Loan shall bear interest at a fixed rate of interest equal to the 5-year U.S. SOFR Swap Rate plus three

25

and 50/100 percent (3.50%), which fixed rate of interest will be set on the Permanent Loan Conversion Date (the "Permanent Loan Note Rate").

(c)    Daily Simple SOFR Conforming Changes.  In connection with the use or administration of Daily Simple SOFR, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  Lender will promptly notify Borrower of the effectiveness of any Conforming Changes in connection with the use or administration of Daily Simple SOFR.

(d)    Interest Reserve.  During the time period the Project is not generating income in order to pay interest, fees and other amounts due to Lender under the Loan, Lender shall make advances of Loan proceeds available once each month therefor from the Interest Reserve to cover any shortfalls.  Borrower hereby authorizes Lender to disburse the Interest Reserve to pay interest accrued on the Note and all other expenses and fees directly to the party to whom such payment is owed.  Borrower further authorizes Lender to disburse the Interest Reserve to pay interest accrued on the Loan.  Borrower acknowledges that the Interest Reserve may be insufficient to cover interest payments on the Loan throughout the entire term thereof, and, in such event, Borrower shall be responsible for making interest payments on the Loan out of funds other than the Loan Proceeds.

(e)    Rates.  Lender does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Alternate Base Rate, the Benchmark, any component definition thereof or rates referred to in the definitions thereof or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Alternate Base Rate or any Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  Lender and its affiliates or other related entities may engage in transactions that affect the calculation of the Alternate Base Rate, the Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  Lender may select information sources or services in its reasonable discretion to ascertain the Alternate Base Rate or the Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

3.4    Benchmark Replacement Setting.

(1)    Benchmark Replacement.

26

ME1 42686889v.6

(i)     Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, Lender may amend this Loan Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the date Borrower is notified of such changes by Lender.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 3.4(b) will occur prior to the applicable Benchmark Transition Start Date.

(ii)     intentionally omitted.

(2)     <u>Benchmark Replacement Conforming Changes</u>.  In connection with the implementation of a Benchmark Replacement, the Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of the Borrower or any other party to this Agreement or any other Loan Document.

(3)     <u>Notices; Standards for Decisions and Determinations</u>.  Lender will promptly notify Borrower of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  Lender will promptly notify the Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to <u>Section 3.4</u>.  Any determination, decision or election that may be made by Lender pursuant to this <u>Section 3.4</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Loan Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 3.4</u>.

(4)     <u>Unavailability of Tenor of Benchmark.</u>  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by Lender in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then Lender may modify the definition of "interest period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for

27

a Benchmark (including a Benchmark Replacement), then Lender may modify the definition of "interest period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(5)    Benchmark Unavailability Period.  Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Borrower may revoke any pending request for a borrowing of or conversion to of SOFR Loans to be made or converted during any Benchmark Unavailability Period and, failing that, (i) Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to ABR Loans and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans immediately.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

(6)    Initial Funding of the Loan.  Subject to the conditions set forth in Sections 5.1 and 6.1(a) below, on the Loan Closing Date and on terms and subject to the conditions of the Note, proceeds of the Loan in the amount of the Initial Disbursement (as defined in Section 6.1 (a)) shall be made available to the Borrower by a deposit to the Operating Account.

3.5    Increased Costs; Illegality; Taxes.

(a)    Increased Costs Generally.  If any Change in Law shall:

(1)    impose, modify or deem applicable any reserve, special deposit, liquidity, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, Lender;

(2)    subject Lender to any Taxes (other than Indemnified Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(3)    impose on Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or the Loan made by Lender;

and the result of any of the foregoing shall be to increase the cost to Lender of making, converting to, continuing or maintaining the Loan or of maintaining its obligation to make any advance on the Loan, or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then, upon request of Lender, Borrower will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If Lender determines that any Change in Law affecting Lender or Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on Lender's capital or on the capital of Lender's holding company, if any, as a consequence of this Agreement, the Loan, to a level

28

below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy and liquidity), then from time to time Borrower will pay to Lender such additional amount or amounts as will compensate Lender or Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to Borrower, shall be conclusive absent manifest error.  Borrower shall pay Lender, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of Lender's right to demand such compensation.

(e)    Illegality.  If Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for Lender to make, maintain or fund Loans whose interest is determined by reference to SOFR or Daily Simple SOFR, or to determine or charge interest rates based upon SOFR or Daily Simple SOFR, then, upon notice thereof by Lender to Borrower, (a) any obligation of Lender to make SOFR Loans, and any right of Borrower to convert ABR Loans to SOFR Loans, shall be suspended, and (b) the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by Lender without reference to clause (c) of the definition of "Alternate Base Rate", in each case until Lender notifies Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) Borrower shall, if necessary to avoid such illegality, upon demand from Lender, prepay or, if applicable, convert all SOFR Loans to ABR Loans (the interest rate on which ABR Loans of Lender shall, if necessary to avoid such illegality, be determined by Lender without reference to clause (c) of the definition of "Alternate Base Rate"), on the Interest Payment Date therefor, if Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if Lender may not lawfully continue to maintain such SOFR Loans to such day, and (ii) if necessary to avoid such illegality, Lender shall during the period of such suspension compute the Alternate Base Rate without reference to clause (c) of the definition of "Alternate Base Rate" in each case until Borrower advised in writing by Lender that it is no longer illegal for Lender to determine or charge interest rates based upon SOFR or Daily Simple SOFR.  Upon any such prepayment or conversion, Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 3.5(f).

(f)    Compensation for Losses.  In the event of (a) the payment or prepayment of any principal of any SOFR Loan other than on the Interest Payment Date therefor whether voluntary, mandatory, automatic, by reason of acceleration (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the Interest Payment Date therefor (including as a result of an Event of Default) or (c) the failure to borrow, convert or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, then, in any such event, Borrower shall compensate Lender for any loss, cost and expense attributable to such event, including any loss, cost or expense arising from the liquidation or redeployment of funds.  A

29

certificate of Lender setting forth any amount or amounts that Lender is entitled to receive pursuant to this Section shall be delivered to Borrower and shall be conclusive absent manifest error.  Borrower shall pay Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(g)     Taxes.

(1)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of any Loan Party or Lender) requires the deduction or withholding of any Tax from any such payment by a such party, then such party shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(2)     Payment of Other Taxes by the Loan Parties.  Each of the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Lender timely reimburse it for the payment of, any Other Taxes.

(3)     Indemnification by the Loan Parties.  Each of the Loan Parties shall jointly and severally indemnify Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Lender.

(4)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.5, such Loan Party shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(5)     Confidentiality.  Nothing contained in this Section 3.5 shall require Lender or any other indemnified party to make available any of its Tax returns (or any other information that it deems to be confidential or proprietary) to the indemnifying party or any other Person.

3.6     Intentionally Omitted.

3.7     Prepayment.

30

(a)    Optional Prepayments.  Borrower may, upon written notice to Lender, at any time and from time to time, voluntarily prepay the Loan in whole or in part without premium or penalty (except as set forth in Section 3.5(f)), provided that such notice must be received by Lender not later than (i) 1:00 p.m. (1) three U.S. Government Securities Business Days prior to any date of prepayment of a SOFR Loan and (ii) one Business Day prior to the date of prepayment of an ABR Loan.  Each such notice shall specify the date and amount of such prepayment.  If such notice is given by Borrower, Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Each prepayment of the Loan pursuant to this Section 3.7(a) shall be applied first to late payment charges or other sums owed to Lender, if applicable, and then to the outstanding principal balance of the Loan.

(b)    Mandatory Prepayments.

(1)    Net Cash Proceeds.

(i)    Dispositions.  In the event that any Loan Party receives Net Cash Proceeds in respect of any Disposition, then, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds, Borrower shall prepay the Loan in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(ii)    Casualty Events.  In the event that any Loan Party receives Net Cash Proceeds in respect of any Casualty Event, then, substantially simultaneously with the receipt of such Net Cash Proceeds, Borrower shall prepay the Loan in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(2)    Application of Mandatory Prepayments.  Each prepayment of the outstanding principal balance of the Loan required to be made pursuant to Section 3.7(b) shall be applied in the following order of priority: First, to any amounts (other than principal and interest) then due and payable under the Loan Documents, including any costs and expenses of the Lenders in connection with such prepayment; Second; accrued and unpaid interest on the Loan at the rate of interest then applicable hereunder; Third, to repayment of the outstanding principal balance of the Loan; and Fourth, in payment or reduction of any other outstanding Secured Obligations.  Any partial principal prepayment under this Section 3.7(b) shall be applied to the last payments of principal due under the Loan.

(3)    Notice of Mandatory Prepayment.  Borrower shall deliver to Lender, at the time of each prepayment required under this Section 3.7(b), (i) a certificate signed by a Manager of Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) to the extent practicable, at least three Business Days' prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date and the principal amount of the Loan (or portion thereof) to be prepaid.

31

(c)    General Rules.  All prepayments shall be subject to Section 3.5(f), but shall otherwise be without premium or penalty.  All prepayments shall be accompanied by accrued interest thereon and, in the case of any prepayment of a SOFR Loan, any additional amounts required pursuant to Section 3.5(f).

3.8    Principal Payments.  Commencing on the first Permanent Loan Payment Date following the conversion to the Permanent Loan, and continuing on each Permanent Loan Payment Date thereafter, up to and including the Permanent Loan Maturity Date, Borrower shall make principal payments in the scheduled Principal Repayment Amount together with monthly payments of interest at the Permanent Loan Note Rate.

3.9    Loan Term.

(a)    The interest-only period shall commence on the Loan Closing Date and shall continue through and including the date which is thirty (30) months from and after such date (such period, the "Construction Period"); provided, however, Borrower shall have an option to extend the Construction Period (the "Extension Option") for a six (6) month period from and after the initial expiration date of the Construction Period (the "Extension Period") subject to the conditions set forth herein.  During the Construction Period and prior to conversion to the Permanent Loan (as defined below), the Loan is also referred to as the "Construction Loan".  The Extension Option shall be subject to the following conditions: (i) the Project has achieved Substantial Completion of Construction, (ii) no default or Event of Default has occurred and is continuing under the Loan Documents (as defined below), (iii) Borrower shall give sixty (60) day written notice of its exercise of the Extension Option prior to the last day of the First Extension Period, (iv) Borrower has leased a minimum of 50% of the residential units at the time of its exercise of the Extension Option at the rates contained in Borrower's initial rate projections submitted to Lender or greater, (v) if at the time of the exercise of the Extension Option, the Loan does not support a DSCR equal to 1.0x an interest-only basis, using annualized rents from the leases in places and projected operating expenses and a rate of interest equal to the actual rate of interest, the Interest Reserve will be rebalanced at the time of Borrower's exercise of the Extension Option, and (vi) Borrower shall have paid the Extension Fee.

(b)    Subject to the terms and conditions set forth in Section 12.1 below, Borrower may exercise the Permanent Loan Conversion Option to convert the Loan to a five (5) year amortizing permanent mortgage loan, based on a thirty-year amortization schedule, in the principal amount of the lesser of Eight Million Six Hundred Fifty Thousand Dollars ($8,650,000.00), provided that, prior to the date of such conversion (the "Conversion Date"), Borrower shall meet the following conditions:  (i) the Project has achieved Completion of Construction, (ii) the Project shall have achieved a Pro Forma DSCR equal to or greater than 1.20x for three (3) consecutive months based on actual Permanent Loan terms and annualized expenses, (iii) no default or Event of Default shall have occurred under the Loan Documents, (iv) Borrower shall give ninety (90) day written notice of its exercise of the Conversion Option prior to the last day of the Construction Period or, if Borrower duly exercises the Extension Option, the Extension Period (a "Permanent Loan") on the Permanent Loan Conversion Date, and (v) Borrower shall have paid the Permanent Loan Conversion Fee.

ME1 42686889v.6

(c)    All principal, interest and other sums due under the Loan Documents shall be due and payable in full on the Maturity Date.

3.10    Time of Payment of Fees and Expenses.

(a)    Borrower shall pay to Lender on or before the Loan Closing Date the Loan Origination Fee.  Such fee is fully earned and non-refundable.  In addition, Borrower shall pay all expenses and fees incurred as of the Loan Closing Date (unless sooner required herein).  At the time of the Loan Closing Date, Lender may pay from the proceeds of the Initial Disbursement of the Loan (to the extent provided for in the Budget) all Loan Expenses.

(b)    Borrower shall pay to Lender the Extension Fee at the time of or prior to Borrower's exercise of the Extension Option in accordance with Section 3.10(a) above.

(c)    Borrower shall pay to Lender the Permanent Loan Conversion Fee at the time of or prior to Borrower's exercise of the Permanent Loan Conversion Option in accordance with Section 12.1 below.

(d)    Lender may require the payment of outstanding fees and expenses as a condition to any Disbursement of the Loan.  Lender is hereby authorized, without any specific request or direction by Borrower, to make Disbursements from time to time in payment of or to reimburse Lender for all Loan Expenses and fees (whether or not, at such time, there may be any undisbursed amounts of the Loan allocated in the Budget for the same).

3.11    Late Charge.  In the event that any regularly scheduled monthly payment of interest or principal and interest, as the case may be, shall not be received by Lender within ten (10) days after the date such payment is due, Lender shall have the right, at its sole option and without notice to the Borrower, such notice being expressly waived hereby, to assess the Borrower a late payment charge ("Late Charge") in the amount of five percent (5%) for each Dollar ($1.00) of such overdue monthly installment, which shall become immediately due to Lender as agreed compensation to Lender for the additional costs and expenses reasonably expected to be incurred by Lender by reason of such nonpayment, such as in contacting the Borrower and arranging for and processing remedial payment.  The Borrower acknowledges that the exact amount of such costs and expenses may be difficult, if not impossible, to determine with certainty, and further acknowledges and confesses the amount of such charge to be a consciously considered, good faith estimate of the actual damage to Lender by reason of such default.  The payment of such Late Charge shall be secured by this Loan Agreement, shall be payable on demand, but in any event not later than the due date of the next regularly scheduled monthly payment hereunder, and shall apply only to monthly installments due and payable hereunder prior to any acceleration by Lender of the indebtedness evidenced hereby.  Whether or not expressed, this election shall not impair the Lender's further right to interest on the unpaid amount at the Default Rate from the date such payment was due through the date of actual payment.

33

SECTION 4

LOAN DOCUMENTS

4.1     Borrower agrees to execute and deliver to Lender, on or prior to the Loan Closing Date, the following documents, all of which must be satisfactory to Lender and Lender's counsel in form, substance and execution and all of which are executed on or about the date hereof:

(a)     The Note.

(b)     An open-end mortgage(s), assignment(s) of leases and rents, security agreement(s) and fixture filing(s) (the "Mortgage"), duly executed by the Borrower and granting a valid and subsisting, title-insured first lien on the Land and the Project, and a security interest in the personal property and fixtures securing all obligations of the Borrower under all of the Loan Documents, subject only to the Permitted Exceptions.

(c)     An assignment(s) to Lender from Borrower and Master Tenant of the rents, leases, security and other deposits, income, issues, proceeds and profits associated with or arising from the Project or any part thereof, and which assignment is prior to all other such assignments and valid as such against all creditors of Borrower (the "Assignment of Leases and Rents").

(d)     Uniform Commercial Code ("UCC") financing statements naming Borrower as debtor with respect to the Mortgage and the collateral described in the Mortgage and other Loan Documents and which financing statements are prior to all other such financing statements and valid as such against all creditors of Borrower.  Borrower hereby authorizes Lender to file UCC financing statements without Borrower's signature.

(e)     An assignment to Lender of all of Borrower's rights, title and interest in and to (i) the Construction Contracts, (ii) all assignable Governmental Approvals issued from time to time in connection with construction or operation of the Project, and (iii) all trademarks, trade names, logos, and all other materials used to identify or advertise the Project, and which assignment is prior to all other such assignments and valid as such against all creditors of Borrower.  Borrower shall also cause the General Contractor to assign all of its rights, title and interest in and to all construction contracts which are entered into directly between the General Contractors and the party providing the services or materials thereunder.  Notwithstanding anything herein to the contrary, no construction contracts shall be entered into without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion if Borrower fails to (A) deliver to Lender an assignment of such contract in form and substance similar to the assignment described above, or (B) obtain and deliver to Lender a consent to such collateral assignment of any and all such contracts from the party performing the work thereunder.

(f)     An assignment to Lender of (i) the Plans and Specifications, (ii) Borrower's agreements with the mechanical and structural engineers, if any, retained by Borrower in connection with construction of the Project, and (iii) any and all tests, studies, results and reports performed or prepared in contemplation of the aforesaid construction, and

34

ME1 42686889v.6

which assignment is prior to all other such assignments and valid as such against all creditors of Borrower.

(g)     An assignment to Lender of all rights of Borrower in any contract for construction and/or management of the Project or any portion thereof, together with assignments of such maintenance and service contracts entered into in connection with the operation of the Project by Borrower as Lender may require, and which assignment is prior to all other such assignments and valid as such against all creditors of Borrower.

(h)     An assignment to Lender of all of Borrower's right to the Federal Historic Tax Credit  Equity Contributions from  Master Tenant pursuant to the Borrower Operating Agreement.

(i)     A pledge of all membership interests in the Managing Member executed and delivered by Harrison Finberg, as the sole member of the Managing Member (the "Pledge of Membership Interests").

(j)     An assignment to Lender of all of Borrower's rights under the Construction Consulting Agreement.

(k)     To the extent required by Lender, consents to the foregoing assignments by (i) the other parties to the leases, licenses, contracts and agreements being assigned and (ii) any guarantors of the performance of the obligations of such other parties under such leases, licenses, contracts and agreements, together with the confirmation by such other parties and guarantors that they will continue to perform and guaranty performance of such leases, licenses, contracts and agreements, as the case may be, after enforcement of and realization on such assignment by Lender.

(l)     An environmental indemnity agreement (the "Environmental Indemnity Agreement") from Borrower and Guarantors, jointly and severally in favor of Lender confirming the perpetual survival of Borrower's representations, warranties and indemnities herein with respect to Hazardous Materials, among other things, and compliance with all applicable Laws.

(m)     An unconditional guaranty of payment executed by Guarantors jointly and severally guarantying all payment obligations of Borrower ("Payment Guaranty").

(n)     A guaranty of completion executed by Guarantors guarantying the lien free Completion of Construction no later than the exercise of the Permanent Loan Conversion Option in accordance with the Plans and Specifications ("Completion Guaranty").

(o)     The Commitment Letter, provided, however, that in the event of a conflict in the terms of the Commitment Letter and this Agreement, the terms of this Agreement shall control.

(p)     The SNDA.

(q)     The HTC Equity Controlled Account Agreement (as defined in Section 7.32).

35

ME1 42686889v.6

(r)    The Escrow Account Control Agreement (as defined in Section 5.11(u)).

(s)    The Master Tenant Controlled Account Agreement (as defined in Section 7.32).

(t)    Such other papers and documents as may be required by this Agreement or as Lender may reasonably require.

SECTION 5

CONDITIONS TO LOAN CLOSING

5.1    Lender shall have been satisfied that there is no Default or Event of Default under this Agreement or the other Loan Documents, and there is no litigation (existing, pending or threatened) which could cause a Material Adverse Change in the Borrower, Guarantor or the Project.  The Loan Closing Date shall occur at such time as all of the conditions and requirements of this Agreement required to be performed by Borrower or other parties have been satisfied or performed.  Borrower shall furnish the following to Lender on or prior to the Loan Closing Date or at such time as is set forth below, all of which must be strictly satisfactory to Lender and Lender's counsel in their sole discretion, in form, content and execution:

(a)    Title Policy.  A commitment (the "Title Commitment") for issuance of an ALTA Loan Policy of Title Insurance with respect to the Mortgage(s) in compliance with the requirements of Exhibit C attached hereto (the "Title Policy").

(b)    Survey.  An ALTA survey ("Survey") of the Land in compliance with the requirements of Exhibit D attached hereto.

(c)    Insurance Policies.  Evidence of insurance, satisfactory to Lender, as determined in its sole discretion, as set forth on Exhibit E attached hereto.

(d)    Utilities; Licenses; Permits:  Evidence, which shall include a certificate of the Borrower and listing (and reciting that they are so listed) all such services, permits, licenses and easements, together with copies of all Permits and all utility letters, licenses and easements, as follows:

(1)    That all services and utilities such as water, gas, electricity and storm and sanitary sewers required for the construction, occupancy and operation of the Land are available for use and tap-in at the Land, subject only to payment of fees included in the Budget, or will be available after construction of the Project, subject only to payment of costs and fees included in the Budget;

(2)    That all Required Permits and including tap-in permits required by applicable Law to construct, occupy and operate the Project have been issued, are in full force and effect and all fees therefore have been fully paid or, if the stage of construction

36

of the Project does not allow such issuance, then such permits and licenses will be issued if and when the Project is constructed in accordance with the Plans and Specifications;

(3)     That the storm and sanitary sewage disposal system, and all mechanical systems serving the Project do (or when constructed will) comply with all applicable Environmental Laws, ordinances, rules and regulations, and the applicable, environmental protection agency, pollution control board and/or other governmental agencies having jurisdiction of the Land have issued their permits for the construction and operation thereof; but if no storm sewer is available on the Land, Borrower shall furnish evidence that proper disposal of rain water is assured; and

(4)     That all utility, parking, access (including curb cuts and highway access), construction, recreational and other easements and permits required or, in the Lender's judgment, necessary for the construction and use of the Project have been granted or issued and are in good standing and unencumbered.

(e)     <u>Final Plans and Specifications</u>.  The Final Plans and Specifications which shall include architectural, structural, mechanical, plumbing, electrical, civil drawings, paving and landscaping drawings which are identical to the documents approved by the appropriate Governmental Authorities.

(f)     <u>Construction Documents</u>.  True, correct and complete copies of the Construction Contracts, Architect's Contract, Engineer's Contract, and all other contracts for the complete construction of the Project, certified as such in writing by the Borrower.  The Construction Contract with General Contractor shall be a fixed price or guaranteed maximum amount contract, provided such maximum amount is acceptable to Lender and shall provide that 50% of the General Contractor's fee will be deferred until the delivery of a Temporary Certificate of Occupancy with respect to the Project, provided, however, that the so deferred funds may be used for cost overruns.

(g)     <u>Compliance with Laws</u>.  Evidence satisfactory to Lender that the Project as contemplated by the Plans and Specifications will be in compliance with all applicable Laws, (including, without limitation, requirements for parking and operation of the Project), and that any approvals thereof required from third parties or any Governmental Authorities have been obtained or, in the case of approvals relating to the operation of the Project which cannot be obtained until Completion of Construction, evidence satisfactory to Lender that such approvals are obtainable.  Such evidence shall include, to the extent applicable, copies of all letters of grant or approval of all zoning changes and other site plan approvals, all variances of zoning regulations affecting the height, bulk, location or configuration of improvements (or evidence satisfactory to Lender that the same are not required), all vacations of plats or of streets, alleys or other public rights-of-way, all approvals or variances relating to parking or loading areas (both on-street and off-street), approval of the height, design and lighting of the Project as affecting navigable airspace by the FAA and any similar approval required form any state agency and that the Property and the Project, as so designed in the Plans and Specifications, complies with all applicable governmental, zoning and building Laws, ordinances and regulations.  Upon Completion of Construction, Borrower shall furnish Lender evidence satisfactory to Lender that the Project complies with the foregoing requirements.

37

ME1 42686889v.6

(h)    Financial Statements.  Guarantors' current financial statement.

(i)    Escrow Account.  On or before the Loan Closing Date, Borrower shall have funded One Hundred Fifty Thousand 00/100 Dollars ($150,000.00) into the Escrow Account (the "Escrowed Funds").  The Escrow Account shall be maintained in accordance with the Escrow Account Control Agreement.  Without limiting the generality of the foregoing, the Escrowed Funds will be released to Borrower upon Borrower's delivery to Lender of a Certificate of Occupancy with respect to the Project.

(j)    Environmental Assessment; Wetlands; Flood Plain Determination.  Evidence, including an environment assessment, including, without limitation, a Phase I Environmental Site Assessment and a Phase II Environmental Site Assessment, indicating that the Land, and the existing improvements, in Lender's sole judgment, (i) contain no Hazardous Materials and no other contamination which, even if not so regulated, is known to pose a hazard to the health of any person on or about the Land, (ii) is not located in a "Wetlands" (as defined in 33 C.F.R. Section 328.3 or in any comparable state or local Law, statute, ordinances, rule or regulation) or "Flood Plain"( as defined under the Flood Disaster Protection Act of 1973, as amended from time to time), and (iii) contains no underground storage tanks.  Lender reserves the right, at Borrower's expense, to retain an independent consultant to review any such evidence submitted by Borrower or to conduct its own investigation of the Land. If the Land lies within an area in which flood insurance is required to be maintained under the Flood Disaster Protection Act of 1973, as amended from time to time, Borrower shall provide flood insurance acceptable to Lender, as determined in its sole discretion.  In addition, Borrower shall have delivered to Lender a structural report with respect to the Property.

(k)    Payment of Loan Origination Fee.  Payment to Lender of the Loan Origination Fee.

(l)    Historic Tax Credit Documents.  Delivery to Lender of copies of all fully executed Historic Tax Credit Documents including, without limitation, the SNDA, and the Historic Preservation Certification Application and Approval (Part I and Part II) and evidence acceptable to Lender that the Historic Tax Credits are available to the Project and the Historic Tax Credit Equity is available to the Master Tenant in the amounts described in Section 7.32.

(m)    Documents of Record.  Borrower shall provide to Lender copies of all covenants, conditions, restrictions, easements and matters of record which affect the Land.

(n)    Budget.  Borrower shall provide to Lender the Budget for the Project.  The Budget shall include a cost breakdown by line item listing all subcontractors and suppliers with copies of related purchase orders, Subcontracts, quotes and all other documents that may be required by the Lender.  The cost breakdown shall itemize in detail the Hard Costs, the Soft Costs and the Loan interest.

(o)    Construction Schedule.  Borrower shall provide to Lender an acceptable Construction Schedule showing approximate start and finish dates of all major stages of the Project.  The Construction Schedule shall indicate that the Project will achieve Substantial

Completion of Construction within twenty-four (24) months following the Loan Closing Date and Completion of Construction prior to the exercise of the Permanent Loan Conversion Option.

(p)    Borrower's and Guarantors' Attorney's Opinion.    The opinion of Borrower's and Guarantors' legal counsel that with respect to the Borrower, Guarantors, the Land, and the Project:  (a) there is no existing, threatened or pending litigation that might affect the Loan, the Land, the Project, Guarantors or the Borrower; (b) the transactions contemplated by this Agreement do not violate any provision of any Law, restriction or other document affecting the Borrower, Guarantors, the Land, or the Project; (c) the Loan Documents have been duly executed and delivered, constitute legal, valid and binding obligations of the Borrower and Guarantors, as applicable, and are enforceable in accordance with their terms; (d) Borrower is a validly organized and existing limited liability company under the Laws of the Commonwealth of Pennsylvania, that Borrower has the legal capacity to own, develop and operate the Land and the Project, and has the legal capacity to perform its obligations under the Loan Documents, and that the Loan has been duly authorized by the Borrower, (e) the individuals executing the Loan Documents are properly authorized to do so on behalf of Borrower and Borrower's action with respect to the Loan has been duly authorized, (f) each Member of Borrower is a limited liability company validly formed and in good standing in the respective state of its formation, and (g) such other matters  concerning the Loan, the Loan Documents, and the Land, the Project, and the Borrower, as the Lender or its counsel may require.

(q)    (1)    Organizational Documents of Borrower:

(i)    Certified copy of the Borrower Operating Agreement;

(ii)    Certified copy of Borrower's Certificate of Formation;

(iii)    Certified copy of Resolutions of the members or the Managing Member of Borrower to enter into Loan, the right of Lender to confess judgment in an event of default, and designating the Manager of the Managing Member authorized to execute all Loan Documents; and

(iv)    Borrower's Subsistence Certificate from the Secretary of State of the Commonwealth of Pennsylvania.

(2)    Organization Documents of Borrower's Members:

(i)    Certified copy of each Member's Certificate of Formation;

(ii)    Certified copy of each Member's Operating Agreement; and

(iii)    each Member's Good Standing Certificate from the state of its formation.

(3)    Organizational Documents of Master Tenant:

(i)    Certified copy of Master Tenant's Certificate of Formation;

39

ME1 42686889v.6

(ii)    Certified copy of Master Tenant's Operating Agreement;

(iii)    Certified copy of Resolutions of Master Tenant's manager or managing member, as the case may be, approving the SNDA, authorizing Master Tenant to enter into the Borrower Operating Agreement and become a 10% member in Borrower, and designating the member(s) or manager(s) of Master Tenant authorized to execute all respective Loan Documents and other applicable documents on behalf of Master Tenant.; and

(iv)    Master Tenant's Subsistence Certificate from the Secretary of State of the Commonwealth of Pennsylvania.

(4)    Other Formation Documents:

(i)    Copies of all of all certificates of formation, operating agreements, and joint venture agreements with respect all members in Borrower and in Master Tenant, respectively, including, without limitation, the Federal HTC Investor.

(r)    Appraisal.  Lender shall have obtained (at Borrower's cost) an Appraisal of the Project demonstrating a Loan-to-value ratio of 70% or lower based on the aggregate maximum Loan Amount (based upon the Project's "as stabilized" value upon Completion of Construction) which Appraisal is satisfactory to Lender, as determined in its sole discretion.

(s)    Intentionally Omitted.

(t)    Borrower's Equity.  Borrower shall have delivered to Lender evidence that it has contributed all of Borrower's Equity in the Project.  Such evidence may include cash deposited into the an escrow account to be used before the Initial Disbursement, or paid invoices to evidence funds contributed to the Project on or before the Loan Closing Date (subject to review and approval by Lender).

(u)    Master Lease.  Borrower shall have delivered to Lender a copy of the fully executed Master Lease.

(v)    Plan and Cost Review; Inspecting Agent:  Lender has received a final plan and cost review from the Inspecting Agent.  The plan and cost review demonstrates to the Lender that the Budget is adequate to achieve Substantial Completion of Construction within twenty-four (24) months following the Loan Closing Date and the Completion of Construction prior to the exercise of the Permanent Loan Conversion Option, when analyzed with the Plans and Specifications, Construction Contract and other construction documents.

(w)    UCC, Tax and Judgment Searches:  Lender shall have received UCC, tax and judgment lien searches on the Borrower and Guarantors.

(x)    Additional Documents.  Borrower shall have provided Lender such other papers and documents regarding Borrower, Guarantors, the Land, or the Project as Lender may require, including, without limitation, all documents required in Section 13.13 below.

40

(y)     No Default.  There is no Default or Event of Default under this Agreement or the other Loan Documents.

Notwithstanding the foregoing or anything to the contrary contained herein or in any other Loan Document, to the extent that Lender may have acquiesced in noncompliance with any requirements precedent to the Loan Closing Date, or precedent to any subsequent Disbursement of Loan Proceeds, such acquiescence shall not constitute a waiver by Lender, and Lender may at any time after such acquiescence require Borrower to comply with all such requirements prior to any additional Disbursement.

SECTION 6

THE BUDGET AND DISBURSEMENTS

6.1     The Budget and Disbursements.

(a)     Disbursement of the Borrower's Equity, to the extent not already invested in the Project at or prior to the Loan Closing Date and deposited into the Borrower Equity Escrow Account opened by Borrower with Lender, and the Loan Proceeds shall be governed by the Budget for the Project, which shall be in form and substance acceptable to Lender as determined in Lender's sole discretion, specifying all Hard Costs and Soft Costs and expenses to be incurred by Borrower in connection with the Project and the amount of equity.  Subject to the provisions of this Agreement, and also subject to the terms and conditions of the other Loan Documents, the Lender shall make and the Borrower shall accept the Loan in periodic Disbursements not exceeding, in the aggregate, the Loan Amount (except for additional Disbursements for protective advances which the Lender shall have the right to make at its option pursuant to the Mortgage).  Provided that all Borrower's Equity shall have been invested in the Project prior to the Loan Closing Date, the first Disbursement will be funded at Closing and shall be in the amount of $722,200.94 (the "Initial Disbursement").  Borrower hereby designates Deposit Account No. xxxxx27742 opened by Borrower at Lender as the Operating Account (the "Operating Account") hereunder.  Borrower authorizes Lender to make Disbursement of the Loan Proceeds by crediting the Operating Account; provided, however, that Lender shall not be obligated to use such method.  Lender, in its sole discretion, may disburse Loan Proceeds directly to the Title Agent, or any other party that Lender deems appropriate or necessary to complete the Project as contemplated herein.  Any Disbursement made to the Title Agent shall be deemed to have been made upon deposit with the Title Agent regardless of when the Title Agent distributes the Loan Proceeds.  After an Event of Default has occurred and is continuing Lender is further authorized to pay any principal or interest due upon the Note when and as same shall become due by debiting funds on deposit in the Operating Account.  The provisions of this Section 6.1(a) shall apply to the Initial Disbursement and all Disbursements thereafter.  Without limiting the generality of the foregoing, Lender may, in its sole and absolute discretion and subject to the other terms and conditions set forth in this Section 6, advance funds to Borrower for deposits on materials.

(b)     Borrower hereby requests and authorizes Lender to make Disbursements (through the Initial Disbursement and subsequent remaining Disbursements) directly to Lender for payment and reimbursement of all interest, charges, costs and expenses incurred by Lender in

41

connection with the Loan, pursuant to this Agreement or other Loan Documents, including, but not limited to, (i) interest due on the Loan and any points, loan fees, service charges, commitment fees, or other fees due to Lender in connection with the Loan, provided, however, that such authorization does not relieve Borrower of its obligation to pay interest as it becomes due; (ii) all title examination, survey, escrow, filing, search, recording and registration fees and charges; (iii) all documentary stamp and other taxes and charges imposed by Law on the issuance or recording of any of the Loan Documents; (iv) all appraisal fees, environmental fees and the fees of Lender's Inspecting Agent; (v) all title, casualty liability, payment, performance or other insurance or bond premiums, including force placed flood insurance premiums; (vi) all fees and disbursements for legal services including, without limitation, in-house attorney's costs and fees, and outside counsel engaged in connection with the preparation, negotiation, enforcement or administration of this Agreement or any of the Loan Documents; and (vii) any amounts required to be paid by Borrower under this Agreement, the Mortgage or any Loan Document after the occurrence of a Default (all of which are herein referred to as "Loan Expenses").

(c)     No Disbursement of Loan Proceeds shall be made at any time that the Loan is not In Balance as provided in Section 6.13 hereof.  Any Disbursement of Loan Proceeds must be made for payment of a specified cost of the Project in strict accordance with the Budget attached hereto as Exhibit B.  No change or amendment to the Budget shall be made without Lender's prior written consent.  No reallocation of line items within the Budget shall be made (whether through cost savings or otherwise) unless Lender determines, in Lender's reasonable discretion, that (i) sufficient funds remain in the line item from which the amount is to be reallocated to pay all Project Costs which may be paid from that line item; and (ii) no line items in the Budget (other than the line item to which the reallocation is sought) are required to be increased.  Borrower shall present paid receipts or other proof of payment prior to subsequent Disbursements.

(d)     The Budget shall contain a Budget line item designated for the Contingency Fund.  Borrower may from time to time request that the Contingency Fund be reallocated to pay needed costs of the Project.  Such requests shall be subject to Lender's written approval as determined in its reasonable discretion.  Borrower agrees that the decision with respect to utilizing portions of the Contingency Fund in order to keep the Loan In Balance shall be made by Lender in its reasonable discretion, and that Lender may require Borrower to make a Deficiency Deposit even if funds remain in the Contingency Fund.

(e)     Prior to the funding of the Initial Disbursement, Borrower shall deliver to Lender evidence, which shall be satisfactory to Lender in an exercise of its discretion, that at least 75% of all trade costs, as determined by Lender based upon the approved Project budget, including the  Construction Contracts with all major subcontractors, shall have been bought out.

(f)     Notwithstanding anything to the contrary contained herein, if any Loan Proceeds remain after Completion of Construction, such Loan Proceeds shall not be made available for disbursement to Borrower.

6.2     Requests for Loan Disbursements.  All requests for Disbursements, including, without limitation, the Initial Disbursement shall be submitted on the Lender's form of

42

"Borrower's Certificate for Payment" in the form of <u>Exhibit F</u> attached hereto, signed by the Borrower stating, among other things, the amount of Loan Proceeds requested for each line item shown on the Budget, the amount previously disbursed for each such line item, and the remaining balance of Loan Proceeds (collectively a "<u>Request for Disbursement</u>").  Each Request for Disbursement shall be accompanied by (a) the Borrower's affidavit, certifying the amount of all outstanding balances due but unpaid for work in place for the Project, (b) invoices from the General Contractor and any other supporting documentation, and (c) lien waivers from the General Contractor and all contractors in the sum received by each such contractor for all of Borrower's preceding draw requests, all to be in form and substance satisfactory to Lender and the Title Agent.  Borrower shall not submit more than one Request for Disbursement per calendar month.  Each Request for Disbursement, together with all supportive documentation required in this Section 6.2, shall be received by the Lender on or before a date which is at least ten (10) business days prior to the date upon which the requested Disbursement is to be made, excluding the date of receipt by the Lender.

6.3    <u>Monthly Disbursements</u>.  Disbursements shall be made no more than once per month.

6.4    <u>Construction Disbursements</u>.    The first Disbursement after the Initial Disbursement shall be made by Lender following receipt of a Request for Disbursement, provided that, prior to the funding of the said Disbursement Borrower shall furnish the following to Lender, all of which must be in form, substance and execution satisfactory to Lender:

(a)    Evidence that all conditions set forth in Section 6.5 below shall have been met.

(b)    A Request for Disbursement.

(c)    A completed standard AIA Form G702 and Form G703 signed by the General Contractor, together with General Contractor's sworn statements and unconditional waivers of lien, and all subcontractors', material suppliers' and laborers' conditional waivers of lien, covering all work, to be paid with the proceeds of the prior draw requests, together with such invoices, contracts or other supporting data as Lender may require to evidence that all costs for which disbursement is sought have been incurred;

(d)    Paid invoices or other evidence satisfactory to Lender that fixtures and equipment, if any, have been paid for and are free of any lien or security interest therein;

(e)    An endorsement or bring down to the Title Policy issued to Lender covering the date of disbursement and showing the Mortgage as a first, prior and paramount lien on the Project subject only to the Permitted Exceptions and real estate taxes that have accrued but are not yet due and payable and particularly that nothing has intervened to affect the validity or priority of the Mortgage;

(f)    Copies of any proposed or executed change orders on standard AIA G701 form, which have not been previously furnished to Lender;

43

(g)    Copies of all construction contracts (including subcontracts) which have been executed since the last disbursement, together with any bonds obtained or required to be obtained with respect thereto;

(h)    All Required Permits, further provided that no Disbursement for any work subject to a Permit, including, but not limited to the external demolition permit, the ancillary garage demolition permit, and the building permit to be delivered in accordance with Section 5.1(d) above, shall be requested prior to the delivery of such respective permit(s) to Lender;

(i)    Satisfactory evidence that all Government Approvals have been obtained for development of the Project;

(j)    A partial release of liens executed by each contractor, subcontractor, or materialman who has performed or supplied any work, materials, labor or service with regard to the Project, satisfactory to Lender and substantially in similar in form to Exhibit "G" attached hereto, covering that part of the work previously paid for, if any, and by a search prepared by the Title Agent which insured the lien of the Mortgage or by other evidence satisfactory to the Lender, that there has not been filed any mechanics' lien or other lien or encumbrances on or affecting the Land or Project;

(k)    Such other instruments, documents and information as Lender or the Title Insurer may reasonably request; and

(l)    Lender has received a satisfactory report from Lender's Inspecting Agent, indicating that the items for which payment has been requested have been performed at or incorporated into the Project, and that the percentage of all Hard Costs for the Project then disbursed bears a reasonable relationship to the percentage of construction of the Project which has been completed at that time.  The cost of this inspection shall be paid by Lender and shall be reimbursed by Borrower.

6.5    Conditions to All Disbursements.  No Disbursement of Loan Proceeds shall be made by Lender to Borrower at any time unless:

(a)    All conditions precedent to that Disbursement have been satisfied, including without limitation, performance of all of Borrower's obligations under this Agreement and the Loan Documents which are to be performed prior to such Disbursement.

(b)    The Loan is In Balance.

(c)    Lender shall be reasonably satisfied as to the continuing accuracy of the Budget.

(d)    No Default or Event of Default has occurred under this Agreement, or under any of the Loan Documents, or under any Approved Lease.

(e)    No material litigation or proceedings are pending or threatened (including but not limited to, proceedings under Title 11 of the United States Code) against Borrower, the Land or the Project.

44

ME1 42686889v.6

(f)     No event, circumstance or condition exists or has occurred which could, in Lender's reasonable judgment, delay or prevent the achievement of Substantial Completion of Construction within twenty-four (24) months following the Loan Closing Date and Completion of Construction prior to the exercise of the Permanent Loan Conversion Option.

(g)     No Material Adverse Change has occurred or is threatened with respect to the Project or the financial condition of Borrower or any Guarantor.

(h)     All representations and warranties made by Borrower to Lender herein and otherwise in connection with this Loan continue to be accurate, and all statements and representations made in the application for the Loan submitted to Lender continue to be accurate in all material respects.

(i)     The Loan is not in Default and Borrower has complied with all of the terms and conditions of this Agreement.

(j)     Borrower acknowledges that unless a satisfactory partial release of liens or final release of liens accompanies a request for a Disbursement, Lender has the right to deny said request.

6.6     <u>Final Disbursement</u>.  At such time as the Project shall have achieved Completion of Construction and Borrower has received a Certificate of Occupancy with respect to the residential portion of the Project (which shall be delivered to Lender), the Borrower shall submit to the Lender a final Request for Disbursement in an amount not to exceed the amount of the direct costs shown on the Budget, as modified by any change orders approved by the Lender, less the aggregate amount of all previous Disbursements made by the Lender.  Notwithstanding anything to the contrary contained herein, Disbursements for development fees and contractor fees shall be held until the final Disbursement.

6.7     <u>Documents Required for Final Disbursement</u>.     The final Request for Disbursement shall include, in addition to the items required under Section 6.4 and satisfaction of the requirements of Section 6.5, the following, all of which shall be strictly satisfactory to Lender in its sole and absolute discretion:

(a)     Any certificates, licenses and permits, as may be required by any applicable Governmental Authority for the use, occupancy, or operation of the Project.

(b)     All fixtures, furniture, furnishings, equipment and other property contemplated under the Budget and Plans and Specifications to be incorporated into or installed in the Project shall have been incorporated or installed free and clear of all liens and security interests other than the Permitted Exceptions, except in favor of Lender.

(c)     Borrower shall have furnished to Lender copies of all final waivers of lien and sworn statements from contractors, subcontractors and material suppliers and an affidavit from the General Contractor in accordance with the mechanic's lien law of the State where the Project is located or as otherwise established by Lender.

45

(d)     An affidavit of the Borrower stating that each person providing any material or performing any work in connection with the Project has been paid in full and that all withholding taxes have been paid.

(e)     Any permits, licenses, certificates of occupancy or other evidence of compliance with the requirements of any Governmental Authorities necessary for the use of the Land contemplated in the Plans and Specifications.

(f)     Evidence that all insurance required under the terms of this Agreement, including "all risk" casualty insurance, is in full force and effect.

(g)     The Improvements have been fully completed and equipped in accordance with the Plans and Specifications free and clear of mechanics' liens and security interests and are ready for occupancy.

(h)     A final release of liens satisfactory to Lender and substantially in similar in form to Exhibit "H" attached hereto.

(i)     Such other items as may be required by Lender to confirm that the Improvements have been completed in accordance with the requirements of this Agreement.

If Borrower fails to comply with and satisfy any of the final disbursement conditions contained in this Section 6.7 within sixty (60) days after the achievement of Completion of Construction, such failure shall constitute an Event of Default hereunder.

6.8     Management Agreement.    Borrower shall have delivered to Lender a fully executed property management agreement with a property manager ("Property Manager") with respect to the Project no later than 12 months after Closing.  The management agreement shall be subject to Lender's review and approval in its reasonable discretion.

6.9     Payments Directly to Contractors.  Lender may, in its discretion, make or cause to be made payments for the cost of construction of the Project directly to any contractor or to any vendor of fixtures and equipment, or jointly to the Borrower and any of such parties.

6.10    Amount of Disbursements.  Subject to the provisions of this Agreement and the other Loan Documents, the Lender shall make Disbursements up to the aggregate amount of the direct costs specified in the Budget for the purposes and in the amounts described therein, and not in excess of the budgeted amount thereof, and the Lender shall make Disbursements for indirect costs up to the aggregate amount of the indirect costs specified in the Budget for the purposes and in the amounts described therein and not in excess of the budgeted amount thereof; provided, however, that in no event shall the total of all Disbursements, together with the Initial Disbursement, exceed the Loan Amount, unless otherwise agreed in writing by the Lender.  The amount of each Disbursement will be based upon the completion of work performed.  Subject to Section 6.9, Disbursements shall be deposited in the Operating Account.  In the event a dispute arises with respect to any Request for Disbursement, the Lender shall have the right without notice, to delay the Disbursement until the dispute has been resolved.

46

6.11    Retainage.  Lender shall withhold from each Disbursement for any Hard Costs and stored materials an amount (the "Retainage") equal to ten percent (10%) of each such requested Disbursement until fifty percent (50%) completion of the Project and five percent (5%) of each such requested Disbursement thereafter.  The Retainage shall be held until Completion of Construction.  Notwithstanding the foregoing, Lender may release, prior to Completion of Construction, portions of the Retainage relating to a particular construction contract as long as the items requested for release are set forth as a separate line item on the Budget (as required under Section 6.1(a)) and upon:  (i) Borrower's written request, (ii) Lender's receipt of evidence of completion of the work to which such construction contract applies, (iii) Lender's receipt of lien waivers and such other documentation as Lender may require relative to such release and (iv) approval by Inspecting Agent, all as determined in Lender's sole discretion.

6.12    Stored Materials.

(a)    On-Site Materials.  Any Requests for Disbursements which in whole or in part relate to materials, equipment or furnishings which Borrower owns and which are not incorporated into the Improvements as of the date of the Request for Disbursement, but are to be temporarily stored at the Project, shall be made in an amount not to exceed One Hundred Thousand Dollars ($100,000.00) per occurrence and Two  Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate.  Any such request must be accompanied by evidence satisfactory to Lender that (i) such stored materials are included within the coverages of insurance policies carried by Borrower, (ii) the ownership of such materials is vested in Borrower free of any liens and claims of third parties, (iii) such materials are properly insured and protected against theft or damage, (iv) the materials used in the Construction are not commodity items but are uniquely fabricated for the Construction, and (v) the Lender's Inspecting Agent has viewed and inspected the stored materials.  Lender may require separate Uniform Commercial Code financing statements to cover any such stored materials.

(b)    Offsite Materials.  Lender may in its sole discretion, but shall not be obligated to, make Disbursements for materials stored off-site, in which event all of the requirements of Section 6.12(a) shall be applicable to such disbursement as well as any other requirements which Lender may, in its sole discretion, determine are appropriate under the circumstances.

6.13    Sufficiency of Loan to Complete Construction.  (a)  Anything in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that the Loan shall at all times be "In Balance."  The Loan shall be In Balance only at such time and from time to time, as Lender determines, in its sole discretion, that the then undisbursed portion of the Loan Amount, plus undisbursed funds from other sources, equals or exceeds the amount necessary to pay for, both on a line item basis and in the aggregate, (i) all work done and not theretofore paid for or to be done in connection with Completion of Construction in accordance with the Plans and Specifications, and (ii) all costs incurred and not theretofore paid for, or to be incurred in connection with the Project and as shown on the Budget.

(b)    Borrower agrees Lender shall have the right at any time and from time to time to determine, in its sole discretion, if the Loan is In Balance.  Borrower further agrees that if Lender determines that the Loan is not In Balance, Borrower shall, within ten (10) days after

47

receipt of written request by the Lender, deposit with Lender the amount, as determined by Lender, in its sole discretion, required to put the Loan In Balance (the "Deficiency Deposit"), which Deficiency Deposit shall first be exhausted before any further Disbursements shall be made.  Borrower's failure to provide the Deficiency Deposit within said ten (10) days shall constitute an Event of Default hereunder.  Lender shall not be obligated to make any Loan Disbursements if the Loan is not In Balance.

6.14   Provisions Applicable to All Disbursements. (a)  Borrower authorizes Lender to make Disbursement to the Operating Account, and the Borrower agrees that, in so doing, the Lender is not acting as agent or trustee for the Borrower and the Lender will not be held accountable for any such Disbursement made in good faith.

(b)   Each Request for Disbursement by the Borrower shall constitute an affirmation that the warranties and representations contained in Section 2 hereof remain true and correct and that no breach of the covenants of Borrower contained in this Agreement has occurred, in each case as of the date of the Disbursement, unless Lender is notified to the contrary in writing prior to funding of the requested Disbursement.

(c)   The Lender may apply amounts due hereunder to the satisfaction of the conditions hereof, and amounts so applied shall be part of the Loan and shall be secured by the Mortgage, evidenced by the Note, bear interest in accordance with the Note and shall be due and payable in accordance with the provisions of the Note.

6.15   Intentionally Omitted.

SECTION 7

FURTHER COVENANTS OF BORROWER

7.1   Construction of Project.  Borrower agrees that the Project will be constructed and fully equipped in a good and workmanlike manner with materials of high quality, in accordance with the Plans and Specifications and applicable building, zoning, pollution control, and environmental protection and other Laws and ordinances and the Approved Leases, if applicable. Borrower further agrees that construction of the Project will be commenced on or before the Commencement Date and be prosecuted with due diligence and will achieve Completion of Construction no later than the exercise of the Permanent Loan Conversion Option (as defined below).  If Lender or any Inspecting Agent disapproves of any portion of the construction or equipping of the Project as not being in compliance with the Plans and Specifications, Borrower shall, within ten (10) days after such disapproval, commence to correct the condition so disapproved, and thereafter will diligently complete such correction.  Borrower agrees that all materials contracted or purchased for construction of the Project and all labor hired or contracted for with respect to the Project and paid for with Loan Proceeds will be used and employed solely on the Project and for no other purpose.  Borrower shall not commence construction on any property adjacent to or surrounding the Project until the Project has been completed and stabilized.

ME1 42686889v.6

7.2     Changes in Plans and Specifications and Contracts.  Borrower agrees that no changes will be made in the Plans and Specifications, no changes will be made to any contract with the General Contractor, any other contractors or materials supplier, and no extras will be allowed as to any of the foregoing, except upon the written approval of the same by Lender; provided, however, Borrower may make changes in the Plans and Specifications or such contracts, or allow such extras, without first obtaining approval of Lender, only if (a) Borrower notifies Lender in writing of such change within five (5) Business Days thereafter; (b) the architectural, electrical, plumbing, mechanical or structural portions of the Improvements are not affected; (c) no substantial change in architectural appearance is effected; (d) no default in any obligations to any other party, including the tenant under any Approved Lease, results from such changes; (e) such change will not violate any applicable Laws, ordinances, rules or regulations; (f) the cost resulting from one such change or extra does not exceed Seventy-Five Thousand Dollars ($75,000.00), and the aggregate cost of all such changes and extras does not exceed Two Hundred Fifty Thousand Dollars ($250,000.00); and (g) no Default hereunder exists at the time such change is made.  Any changes to the Plans and Specifications must be documented on AIA Form G701 or an equivalent form.  The aforesaid changes to Plans and Specifications are also referred to herein as "change orders".

7.3     Inspection by Lender.  Borrower will cooperate with Lender in arranging for inspections by Lender's Inspecting Agent and other representatives of Lender of the progress of the Construction from time to time including an examination of (i) the Improvements, (ii) all materials to be used in the Construction, (iii) all Plans and Specifications which are or may be kept at the construction site, (iv) any contracts, bills of sale, statements, receipts or vouchers in connection with the Improvements, (v) all work done, labor performed, materials furnished in and about the Improvements, (vi) all books, contracts and records with respect to the Improvements, and (vii) any other documents relating to the Improvements or the Construction.  Borrower shall cooperate with Lender's Inspecting Agent to enable him to perform his functions hereunder and will promptly comply with Lender's requirements and correct any defects regarding the Construction of the Improvements or the progress thereof.

7.4     Mechanics' Liens.  Borrower will not suffer or permit any mechanics' lien claims to be filed or otherwise asserted against the Project or any funds due any contractor, and will promptly bond (or post cash with Lender) or discharge the same if any claims for lien or any proceedings for the enforcement thereof are filed or commenced; provided, however, that Borrower shall have the right to contest in good faith and with due diligence the validity of any such lien or claim upon furnishing to the Title Agent such security or indemnity as it may require to induce the Title Agent to issue its Title Policy or an endorsement thereto insuring against all such claims, liens or proceedings; and provided further that Lender will not be required to make any further Disbursements unless (i) any mechanics' lien claims shown by any title insurance commitments or interim binders or certifications have been bonded (or cash has been posted with Lender) against, released or insured against by the Title Agent or (ii) Borrower shall have provided Lender with such other security with respect to such claim as may be acceptable to Lender, in its sole discretion.  In the event Borrower elects to bond (or post cash with Lender) any mechanic's lien claim, such bond or cash shall be in an amount equal to at least one hundred fifty percent (150%) of such claim.

ME1 42686889v.6

7.5     Settlement of Mechanics' Lien Claims.  If Borrower shall fail promptly to bond or discharge any mechanics' lien claim filed or otherwise asserted or to contest any such claims and give security or indemnity in the manner provided in Section 7.4 above, or, having commenced to contest the same, and having given such security or indemnity, shall thereafter fail to prosecute such contest in good faith or with due diligence, or fail to maintain such indemnity or security so required by the Title Agent for its full amount, or, upon adverse conclusion of any such contest, shall fail to cause any judgment or decree to be satisfied and lien to be released, then, and in any such event, Lender may at its election (but shall not be required to), (i) procure the release and discharge of any such claim and any judgment or decree thereon, without inquiring into or investigating the amount, validity or enforceability of such lien or claim and (ii) effect any settlement or compromise of the same, or may furnish such security or indemnity to the Title Agent, and any amounts so expended by Lender, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute Disbursements of the Loan Proceeds hereunder (even if the total amount of Disbursements would exceed the face amount of the Note).

7.6     Sign and Publicity.  Subject to Borrower's reasonable approval, Lender, at its expense, may erect signs on the construction site indicating that financing for the Project has been provided by Lender and use the Loan Amount, Borrower's name and Project location in any such sign or in any publicity by Lender as hereinafter provided.  Lender, at its expense, shall also have the right to engage in reasonable publicity and public relations pertaining to the financing provided by Lender.  Additionally, Borrower shall use its good faith and best efforts to include in any public announcement or media release concerning the general development of the Project a statement that Lender has provided the financing for the Project.

7.7     Renewal of Insurance and Payment of Taxes and Escrows.

(a)     Renewal of Insurance.  Borrower shall cause insurance policies to be maintained in compliance with Exhibit E at all times.  Borrower shall timely pay all premiums on all insurance policies required hereunder, and as and when additional insurance is required, from time to time, during the progress of Construction, and as and when any policies of insurance may expire, furnish to Lender, premiums prepaid, additional and renewal insurance policies with companies, coverage and in amounts satisfactory to Lender.

(b)     Payment of Taxes.  Borrower shall pay all real estate taxes and assessments and charges of every kind upon the Project before the same become delinquent, provided, however, that Borrower shall have the right to pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and also of preventing the sale or forfeiture of the Project or any part thereof or any interest therein, (ii) Borrower has notified Lender of Borrower's intent to contest such taxes, and (iii) Borrower has deposited with Lender security in form and amount satisfactory to Lender, in its sole discretion, and has increased the amount of such security so deposited promptly after Lender's request therefor.  If Borrower fails to commence such contest or, having commenced to contest the same, and having deposited such security required by Lender for its full amount, shall thereafter fail to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Lender may, at its election (but shall not be required to), pay

50

and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended by Lender shall be deemed to constitute Disbursements of the Loan proceeds hereunder (even if the total amount of Disbursements would exceed the Loan Amount). Borrower shall furnish to Lender evidence that taxes are paid at least five (5) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest.

(c)     Escrow Accounts.  Borrower shall, following the written request of Lender or upon the occurrence of any Event of Default, make insurance and tax escrow deposits, in amounts reasonably determined by Lender from time to time as being needed to pay taxes and insurance premiums when due, in an interest bearing escrow account held by Lender in Lender's name and under its sole dominion and control.  All payments deposited in the escrow account, and all interest accruing thereon, are pledged as additional collateral for the Loan. Notwithstanding Lender's holding of the escrow account, nothing herein shall obligate Lender to pay any insurance premiums or real property taxes with respect to any portion of the Project if an Event of Default has occurred unless the Event of Default has been cured to the satisfaction of Lender.  If the Event of Default has been satisfactorily cured, Lender shall make available to Borrower such funds as may be deposited in the escrow account from time to time for Borrower's payment of insurance premiums or real property taxes due with respect to the Project.

If the amount of the funds held by Lender shall not be sufficient to pay taxes, assessments and insurance premiums as they fall due, Borrower shall pay to Lender the amount of any such deficiency within thirty (30) days after notice from Lender to Borrower requesting payment thereof.

Upon payment in full of all sums secured by the Mortgage, Lender shall promptly refund to Borrower any funds held by Lender pursuant to this Section 7.7.

7.8     Proceedings to Enjoin or Prevent Construction.  If any proceedings are filed seeking to enjoin or otherwise prevent or declare unlawful the construction or the occupancy, maintenance or operation of the Project or any portion thereof, Borrower shall at its sole expense (i) cause such proceedings to be vigorously contested in good faith and (ii) in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom.  Without limiting the generality of the foregoing, Borrower shall resist the entry or seek the stay of any temporary or permanent injunction that may be entered and use its commercially reasonable efforts to bring about a favorable and speedy disposition of all such proceedings.

7.9     Lender's Action for Its Own Protection Only.  The authority herein conferred upon Lender, and any action taken by Lender, including, without limitation, actions to inspect the Project, to procure waivers or sworn statements, to approve contracts, and to approve Plans and Specifications, will be exercised and taken by Lender, the Inspecting Agent, and by Lender's other advisors or representatives for their own protection only and may not be relied upon by Borrower or any other person for any purposes whatever.  Neither Lender, the Inspecting Agent nor any other advisor or representative of Lender shall be deemed to have assumed any responsibility to Borrower or any other person with respect to any such action herein authorized or taken by Lender or any other advisor or representative of Lender or with respect to the proper construction of improvements on the Project, performance of contracts, subcontracts or purchase orders by any contractor, subcontractor or material supplier, or prevention of mechanics' liens

51

from being claimed or asserted against any of the Project. Any review, investigation or inspection conducted by Lender, the Inspecting Agent or any other architectural or engineering consultants retained by Lender or any agent or representative of Lender in order to verify independently Borrower's satisfaction of any conditions precedent to Loan disbursements under this Agreement, Borrower's performance of any of the covenants, agreements and obligations of Borrower under this Agreement, or the validity of any representations and warranties made by Borrower hereunder (regardless of whether or not the party conducting such review, investigation or inspection should have discovered that any of such conditions precedent were not satisfied or that any such covenants, agreements or obligations were not performed or that any such representations or warranties were not true), shall not affect (or constitute a waiver by Lender of) (i) any of Borrower's representations and warranties under this Agreement or Lender's reliance thereon or (ii) Lender's reliance upon any certifications of Borrower required under this Agreement or any other facts, information or reports furnished Lender by Borrower hereunder.

      7.10    <u>Furnishing Information; Financial Covenants</u>.

      (a)    During the term of the Loan, Borrower and Guarantors shall deliver to the Lender the following financial statements and reports, all in form and substance acceptable to Lender in its sole discretion:

      (1)    Commencing at the first filing, Borrower shall also deliver annually its accountant prepared, signed copies of federal filed tax returns, including K-1's, within thirty (30) days after filing. In any tax return is on extension, a copy of the filed extension shall be delivered to Bank within thirty (30) days of filing.

      (2)    After the Substantial Completion of Construction, Borrower shall deliver annually, within one hundred twenty (120) days after the closing of each fiscal year, and at Lender's request, internally prepared profit and loss statement, income statement and balance sheet for that fiscal year and rent roll. All statements shall set forth, in reasonable detail, the results of operations and conditions of the Borrower, certified as true and correct by the members of Borrower's managing member.

      (3)    At Lender's request, each Entity Guarantor shall deliver annually, within one hundred twenty (120) days after the closing of each fiscal year internally prepared profit and loss statement, income statement and balance sheet for that fiscal year. All statements shall set forth, in reasonable detail, the results of operations and conditions of the Entity Guarantor, certified as true and correct by the Entity Guarantor's president or chief financial officer and shall be in form satisfactory to Lender.

      (4)    Each Individual Guarantor shall deliver annually, within one hundred twenty (120) days after the closing of each fiscal year, his current personal financial statements, supported by, if requested by Lender, bank and brokerage account statements. All statements shall set forth, in reasonable detail, the results of operations and conditions of each Individual Guarantor, as applicable, certified as true and correct by the Individual Guarantor, and shall be in form satisfactory to Lender.

(5)    Each Guarantor shall deliver annually its/his accountant prepared, signed copies of filed tax returns, including K-1's, within thirty (30) days after filing.  In any tax return is on extension, a copy of the filed extension shall be delivered to Lender within thirty (30) days of filing.

(b)    Commencing at the Substantial Completion of Construction, Borrower shall also deliver quarterly, and as requested by Lender, within thirty (30) days of each quarter end, a certified rent roll with respect to the Project.

(c)    Additionally, Borrower shall:

(1)    promptly notify Lender of any condition or event which constitutes a Default, a breach or Event of Default of any term, condition, warranty, representation or provision of this Agreement or of any of the Loan Documents;

(2)    promptly notify Lender of any Material Adverse Change in its financial conditions and maintain a standard and modern system of accounting in accordance with generally accepted accounting principles;

(3)    promptly notify Lender of any Material Adverse Change in connection with the operation of the Project;

(4)    promptly notify Lender of any change in the information provided in the most recently delivered Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein;

(5)    upon reasonable notice from Lender, at any time whatever during regular business hours permit Lender or any of its agents or representatives to have access to and examine all of its books and records regarding the development and operation of the Project; and

(6)    permit Lender to copy and make abstracts from any and all of said books and records.

(d)    Debt Service Coverage Ratio.  After conversion to the Permanent Loan, the Project shall maintain a minimum Debt Service Coverage Ratio ("DSCR") of 1.20:1.00 with respect to the Loan, to be tested quarterly within ninety (90) days following the end of each fiscal quarter. In the event Borrower fails to meet the DSCR for two (2) consecutive quarters, the Borrower shall be subject to a cash sweep by Lender of all excess cash flow after payment of operating expenses and debt service, and such funds shall be put into a restricted deposit account at Lender and pledged to Bank  as a cash collateral account (the "Cash Sweep Account") under the sole control and dominion of Lender until such time that minimum DSCR is equal to or greater than 1.20:1.00, for two (2) consecutive quarters. Funds from excess cash flow sweep shall be held in the Cash Sweep Account and will be returned to Borrower at such time Borrower is in compliance with the DSCR as set forth herein.  In the event Borrower fails to comply with the DSCR for four (4) consecutive quarters, the Borrower shall be required to pay down the outstanding principal balance of the Loan to achieve the DSCR of 1.20:1.00, provided that

53

Borrower may use the funds held in the Cash Sweep Account may be used to pay down the outstanding principal balance of the Loan as required herein.

(e)    Combined Net Worth.  For each calendar year during the Construction Period and the Permanent Loan Period, Guarantors' combined minimum Net Worth shall be not less than $10,000,000.00 at all times.  For the purpose of this Agreement, "Net Worth" means Guarantors' combined total assets less Guarantors' combined total debt.  This Net Worth covenant shall be tested annually, on the basis of Guarantors' financial statements.

(f)    Combined Liquidity.  For each calendar year during the Construction Period and the Permanent Loan Period, Guarantors' combined minimum Liquid Assets shall be not less than $500,000.00 at all times.  For the purpose of this Agreement, "Liquid Assets" means cash and unencumbered marketable securities owned by Guarantors, as supported by statements of bank accounts and brokerage accounts delivered by Guarantors to Lender together with Guarantors' financial statements.  This Liquidity covenant shall be tested annually, on the basis of Guarantors' financial statements and statements of bank accounts and brokerage accounts.

(g)    No Distributions.  During the Construction Period, including the Extension Period, provided that Borrower duly exercises its Extension Option, Borrower shall not make any distributions or pay any dividends to its equity holders or holders of its subordinated debt.  This covenant shall be tested annually, based on a certification provided by Borrower.

7.11    Documents of Further Assurance.  Borrower shall, from time to time, upon Lender's request, execute, deliver, record and furnish such documents as Lender may reasonably deem necessary or desirable to (i) perfect and maintain perfected as valid liens upon the Project, the liens granted by Borrower to Lender under the Mortgage and the assignments and other security interests under the other Loan Documents as contemplated by this Agreement, (ii) correct any errors of a typographical nature which may be contained in any of the Loan Documents, and (iii) consummate fully the transaction contemplated under this Agreement.

7.12    Furnishing Reports.  Borrower shall provide Lender with copies of all inspections, reports (including environmental reports), test results and other information received by Borrower from time to time from its employees, agents, representatives, architects, engineers, any contractors and any other parties involved in the construction, the design, development or operation of the Project, which in any material way relate to the Project or the construction, or any part thereof.

7.13    Operation of Project.  As long as any portion of the Loan remains outstanding, the Project, after Completion of Construction, shall be operated in a first class manner as a mixed use commercial and residential project.

7.14    Management Agents' and Brokers' Contracts.  Borrower shall not enter into, modify, or amend any management contracts for the Project or agreements with agents or brokers, without the prior written approval of Lender which approval shall not unreasonably be withheld.  All such contracts shall be subordinate to the Loan and the Loan Documents.

54

7.15    Furnishing Notices.  Borrower shall deliver to Lender copies of all notices received or given by Borrower (or its agents or representatives) under any of the leases of space in the Project, within five (5) business days after such notice is given or received, as the case may be.  Borrower shall also provide Lender with copies of all notices pertaining to the Project or any part thereof received by Borrower (or its agents or representatives) from any Governmental Authority or from any insurance company providing insurance on any of the Project, within five (5) business days after such notice is received.

7.16    Correction of Defects.  Within five (5) days after Borrower acquires knowledge of or receives notice of a defect in the Project or any departure from the Plans and Specifications, or any other requirement of this Agreement, Borrower will proceed with diligence to correct all such defects and departures.  The Disbursement of any Loan Proceeds shall not constitute a waiver of Lender's right to require compliance with this covenant with respect to any such defect or departure from the Plans and Specifications or any other requirements of this Agreement, nor shall anything in this subsection affect Borrower's obligation to cause the Project achieve Substantial Completion of Construction within twenty-four (24) months following the Loan Closing Date and Completion of Construction prior to the exercise of the Permanent Loan Conversion Date.

7.17    No Additional Debt; No Assignment.  As more particularly provided in Section 9.2, Borrower shall not consent or agree to any lien, mortgage, security interest, encumbrance, ground lease or sale and leaseback transaction affecting the Land or the Project except the liens created by the Loan Documents.

7.18    Hold Disbursements in Trust.  Borrower shall receive and hold in trust for the sole benefit of Lender (and not for the benefit of any other person, including, without limitation, the General Contractor or any subcontractors) all advances made hereunder directly to Borrower, for the purpose of paying costs of construction in accordance with the Budget.  Borrower shall use the Loan Proceeds solely for the payment of costs as specified in the Budget.  Borrower will pay all other costs, expenses and fees relating to the acquisition, equipping, fixturing, use and operation of the Project.

7.19    Indemnification.  Borrower hereby indemnifies Lender and agrees to defend Lender and hold Lender harmless from and against all claims, injuries, losses, costs, damages, liabilities and expenses (including reasonable attorneys' fees and consequential damages) of any and every kind to any persons or property by reason of (i) the construction or other work contemplated herein, (ii) the operation or maintenance of the Project, (iii) any other action or inaction by, or matter which is the responsibility of Borrower, or (iv) the breach of any representation or obligation of Borrower hereunder, except to the extent caused by the gross negligence or willful misconduct of Lender.  The foregoing indemnification shall survive repayment of the Loan and shall continue to benefit Lender following any assignment of the Loan with respect to matters arising or accruing prior to such assignment.

7.20    Prohibition Against Cash Distributions and Application of Net Cash Flow to Other Expenditures.  With respect to all rental or other cash flow from the Project, no funds shall be distributed or applied to the payment of any obligations, debts or expenses (other than normal operating expenses of the Project) not set forth on the Budget until the Project has been

55

completed.  Furthermore, in no event shall Borrower make any disbursements from rental or other cash flow from the Project to any party during any month until the installment due under the Note for that month has been paid.

7.21    Insurance Reporting Requirements.  Borrower shall promptly notify the insurance carrier or agent therefor (with a copy of such notification being provided to Lender) if there is any increase in hazard relating to the Project, suspension of construction, or transfer of ownership.

7.22    Compliance With Laws.  Borrower shall comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, including with respect to Borrower's ownership, construction, and operation of the Project as herein provided.  In no event shall Borrower consent to or cause any zoning change on the Property or any portion thereof (including any variance, plan approval, rezoning, or modification of any zoning commitment) without Lender's prior written consent.  In addition, and without limiting the foregoing sentence, each Loan Party shall comply with all applicable Environmental Laws and with all applicable Anti-Corruption Laws, applicable Sanctions, and the USA PATRIOT Act and other applicable Anti-Terrorism Laws and the regulations promulgated thereunder in all respects.

7.23    Alterations.  Without the prior written consent of Lender, Borrower shall not make any material alterations to the Project.

7.24    Lost Note.  Borrower shall, if the Note is mutilated, destroyed, lost or stolen, deliver to Lender, in substitution therefor, a new promissory note containing the same terms and conditions as the Note with a notation thereon of the unpaid principal accrued and unpaid interest.

7.25    Hazardous Materials.  Borrower shall comply with any and all Laws, regulations or orders with respect to the discharge and removal of Hazardous Materials, shall pay immediately when due the costs of removal of any such Hazardous Materials, and shall keep the Project free of any lien imposed pursuant to Environmental Laws, regulations or orders.  In the event Borrower fails to do so, after notice to Borrower and the expiration of the earlier of (i) applicable cure periods hereunder or (ii) the cure period permitted under applicable Law, regulation or order, Lender may declare an Event of Default and/or cause the remediation of the Hazardous Materials with the cost of the remediation added to the indebtedness evidenced by the Note and secured by the Mortgage (regardless of whether such indebtedness then increases the outstanding balance of the Note to an amount in excess of the face amount thereof).  Borrower further agrees that Borrower shall not release or dispose of any Hazardous Materials at the Project without the express prior approval of Lender and any such release or disposal will be in compliance with all applicable Laws and regulations and conditions, if any, established by Lender, including, without limitation, those set forth in Section 6 of the Mortgage.  Lender shall have the right at any time to conduct an environmental audit of the Project for reasonable cause, at Borrower's sole cost and expense, and Borrower shall cooperate in the conduct of such environmental audit.  Borrower shall give Lender and its agents and its employees access to the Project to inspect and test the Project and to remove Hazardous Materials.  Borrower hereby indemnifies Lender and agrees to defend Lender and hold Lender harmless from and against all claims, injuries, losses, costs, damages, liabilities and expenses (including reasonable attorneys' fees and consequential damages) by reason of any claim in connection with any Hazardous

56

Materials which were present at the Project during or prior to Borrower's ownership of the Project.  The foregoing indemnification shall be included within the indemnity agreement referred to in Section 4 hereof, and shall survive repayment of the Note.

7.26    Asbestos/Toxic Mold.  Without limiting the generality of Section 7.25, Borrower shall not install nor permit to be installed in the Project asbestos or any substance containing asbestos or allow to exist in or on the Project any Toxic Mold.  If Borrower shall fail to comply with this Section 7.26, Lender may declare an Event of Default and/or do whatever is necessary to eliminate said substances from the Project or otherwise comply with the applicable Law, regulation, or order and the costs thereof shall be added to the indebtedness evidenced by the Note and secured by the Mortgage.

7.27    Expenses and Advances Secured by Loan Documents.  Any and all advances or payments made by Lender under this Agreement or the Loan Documents from time to time, and any amounts expended by Lender pursuant to Section 11.1(e), shall, as and when advanced or incurred, constitute additional indebtedness evidenced by the Note and secured by the Mortgage and the other Loan Documents.

7.28    Appraisals.  Lender shall have the right to obtain a new or updated appraisal of the Project from time to time.  Borrower shall reasonably cooperate with Lender in this regard.  If the appraisal is obtained to comply with this Agreement or any applicable Law or regulatory requirement, or bank policy promulgated to comply therewith, or if an Event of Default exists, Borrower shall pay for any such appraisal upon Lender's request, provided, however, that absence an Event of Default or compliance with a requirement of any Governmental Authority, Borrower shall be required to pay for only one (1) such appraisal ordered by Lender after the Loan Closing Date.

7.29    Lender's Attorneys' Fees.  Borrower agrees to pay Lender's attorneys' fees and disbursements incurred in connection with the Loan, including (i) the preparation of this Agreement, the other Loan Documents, and the preparation of the closing binders, and (ii) the disbursement, syndication and administration of the Loan, if applicable.  Further, if at any time or times hereafter (whether or not a Default has occurred) Lender employs counsel for advice or other representation with respect to any matter concerning Borrower, this Agreement, the Land, or the Loan Documents, or to protect, collect, lease, sell, take possession of or liquidate all or any portion of the Land, or to attempt to enforce or protect any security interest or lien or other right in any of the premises or under any of the Loan Documents, or to enforce any rights of the Lender or obligations of Borrower or any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or under any of the Loan Documents or any other agreement, instrument or document, heretofore or hereafter delivered to Lender in furtherance hereof, then in any such event, all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, shall constitute an additional indebtedness owing by Borrower to Lender payable on demand, and secured by the Mortgage and other Loan Documents.

7.30    Register with County.  Borrower shall register with the County its name and address and any other required information as the owner of residential rental property in accordance with applicable Laws.

ME1 42686889v.6

7.31   <u>Single Purpose Entity</u>.  Borrower has not since the date of its formation and shall not without the prior written consent of Lender:

(a)   engage in any business or activity other than the acquisition, ownership, operation, development, and maintenance of the Land and the Project, and activities incidental thereto;

(b)   acquire or own any material asset other than:  (i) the Land and the Project, and (ii) such incidental personal property as may be necessary for the operation and development of the Land and the Project;

(c)   fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation;

(d)   own any subsidiary or make any investment in or acquire the obligations or securities of any other person or entity;

(e)   commingle its assets with the assets of any of its partner(s), members, shareholders, Affiliates, or of any other person or entity or transfer any assets to any such person or entity other than distributions on account of equity interests in the Borrower permitted hereunder and properly accounted for;

(f)   fail to maintain its records, books of account and bank accounts separate and apart from those of the shareholders, partners, members, principals and Affiliates of Borrower, the Affiliates of a shareholder, partner or member of Borrower, and any other person or entity or fail to prepare and maintain its own financial statements in accordance with GAAP and susceptible to audit, or if such financial statements are consolidated fail to cause such financial statements to contain footnotes disclosing that the Land and the Project are actually owned by the Borrower;

(g)   enter into any contract or agreement with any shareholder, partner, member, principal or Affiliate of Borrower or any guarantor or any shareholder, partner, member, principal or Affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any shareholder, partner, member, principal or Affiliate of Borrower or guarantor, or any shareholder, partner, member, principal or Affiliate thereof;

(h)   fail to correct any known misunderstandings regarding the separate identity of Borrower;

(i)   fail to file its own tax returns (unless Borrower is not legally required to file its own tax returns) or to use separate contracts, purchase orders, stationery, invoices and checks;

(j)   fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the entity with which such other party is transacting business, or (ii)

58

to suggest that Borrower is responsible for the debts of any third party (including any shareholder, partner, member, principal or Affiliate of Borrower, or any shareholder, partner, member, principal or Affiliate thereof);

(k)    allow any person or entity to pay the salaries of its own employees or fail to maintain a sufficient number of employees for its contemplated business operations;

(l)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(m)    file a voluntary petition or otherwise initiate proceedings to have the Borrower or any general partner, manager or managing member of Borrower adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Borrower or any general partner, manager or managing member of Borrower, or file a petition seeking or consenting to reorganization or relief of the Borrower or any general partner, manager or managing member of Borrower as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Borrower or any general partner, manager or managing member of Borrower; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Borrower or any general partner, manager or managing member of Borrower or of all or any substantial part of the properties and assets of the Borrower or any general partner, manager or managing member of Borrower, or make any general assignment for the benefit of creditors of the Borrower or any general partner, manager or managing member of Borrower, or admit in writing the inability of the Borrower or any general partner, manager or managing member of Borrower to pay its debts generally as they become due or declare or effect a moratorium on the Borrower or any general partner, manager or managing member of Borrower incurring debt or take any action in furtherance of any such action;

(n)    share any common logo with or hold itself out as or be considered as a department or division of (i) any shareholder, partner, principal, member or Affiliate of Borrower, (ii) any Affiliate of a shareholder, partner, principal, member or Affiliate of Borrower, or (iii) any other person or entity or allow any person or entity to identify the Borrower as a department or division of that person or entity; or

(o)    conceal assets from any creditor, or enter into any transaction with the intent to hinder, delay or defraud creditors of the Borrower or any Guarantor or the creditors of any other person or entity.

7.32    Federal Historic Tax Credit Conditions. Subject to the terms and conditions of Master Tenant Operating Agreement (and adjustments as provided therein), and as approved by Lender, and the amounts contributed by the Federal HTC Investor, APS Hancock5 Management LLC, and the Managing Member to the Master Tenant, the Master Tenant shall contribute $1,321,747 in Federal Historic Tax Credit Equity Contributions to Borrower to be funded as follows:

59

(i)    $45,949 (calculated as $318,949 in total equity contributions to the Master Tenant less the sum of $18,000 for the cost of tree planting and hardscaping and $255,000 for the cost of furniture, fixtures and equipment) (the "First Installment") shall be funded at closing of the transaction contemplated in the Federal Historic Tax Credit Documents, which shall be simultaneous with or prior to the Loan Closing Date.  On the Loan Closing Date, the Federal HTC Investor or Master Tenant shall fund the First Installment into Borrower by transferring such funds to the Title Agent;

(ii)    $797,374 (the "Second Installment") shall be funded after the Project is "Placed in  Service", which shall be evidenced by the delivery of a Certificate of Occupancy issued by the City of Philadelphia, certificate of Historic Tax Credit compliance with respect to Project completion issued by the Architect, evidence of the operating reserve funding, draft cost certificate prepared by the Architect, and Form 10-168c completed by the Borrower for filing with the NPS;

(iii)    $239,212 (the "Third Installment") shall be funded upon receipt of the final cost  certification  of  the  Borrower's  accountants  and  Form  10-168c certified by the NPS; and

(iv)    $239,212 (the "Fourth Installment") shall be funded upon delivery of the K-1 Schedule for the taxable year in which the Project was Placed in Service.

The Second Installment, the Third Installment, and the Fourth Installment shall be initially funded by the Federal HTC Investor  in full into a deposit account which shall be opened in the name of Master Tenant at Lender (the "Master Tenant Account"), and shall be subject to Lender's control, as more fully shall be set forth in a controlled account agreement by and among Lender and Master Tenant (the "Master Tenant Controlled Account Agreement").  Upon the funding of the Second Installment, the Third Installment, and the Fourth Installment, respectively, into the Master Tenant Account, Master Tenant shall contribute such Federal Historic Tax Credit Equity Contributions to Borrower as capital contributions, and Borrower shall cause Master Tenant to transfer, such Federal Historic Tax Credit Equity Contributions directly into the Borrower Equity Escrow Account.

As further provided in this Section 7.32, the Second Installment, the Third Installment, and the Fourth Installment shall be in Lender's sole discretion, applied to permanently pay down $1,346,005 of the outstanding principal balance of the Construction Loan or invested in the Project.  Borrower hereby pledges and grants to Lender a security interest in and to the Borrower Equity Escrow Account and any and all proceeds and funds held therein.  The construction of the Improvements shall comply in all respects with the conditions attached to Part II of the Historic Preservation Certification Application submitted by Borrower to the NPS with respect to the Project, as the same may be amended from time to time.  Borrower shall at all times comply with the Historic Tax Credit Documents and with all applicable federal, state and local laws, rules and regulations which must be complied with in order to qualify for Federal Historic Tax Credits applicable to the Project or to avoid an event of recapture in respect of such Federal Historic Tax Credits including, without limitation, filing Part III of the Historic Preservation Certification

ME1 42686889v.6

Application with the NPS and receipt of a final certification of QREs resulting in Federal Historic Tax Credits of not less than $2,113,692 (copies of which shall be provided to Lender promptly upon receipt thereof by Borrower).  In addition, Borrower shall, in accordance with the provisions of the Federal Historic Tax Credit Documents, file an election to pass through such Federal Historic Tax Credits to Master Tenant pursuant to the provisions of Section 50(d) of the Internal Revenue Code and Section 1.48-4 of the Regulations relating thereto and provide Lender with a copy thereof, concurrently with such filing.  Except as otherwise specifically permitted by the Federal Historic Tax Credit Documents or pursuant to the Loan Documents, neither Borrower nor any of Borrower's members shall transfer, assign or otherwise grant any lien or encumbrance with respect to any such Federal Historic Tax Credits allocable to them or any of them.

7.33   State Historic Tax Credit Conditions.  On or before the Loan Closing Date, Borrower shall have delivered to Lender a fully executed letter of intent ("LOI") from the State Historic Tax Credit Investor, evidencing  the State Historic Tax Credit Investor's commitment to make the State Historic Tax Credit Contribution to Borrower in an amount estimated at $230,000 as of the date hereof.  The LOI shall be in form and substance acceptable to Bank.  The LOI shall provide for funding of the State Historic Tax Credit Contribution upon delivery of the K-1 Schedule for the taxable year in which the Project was Placed in Service.

SECTION 8

CASUALTIES AND CONDEMNATION

8.1   Notice.  In case of any material damage or destruction, taking, or condemnation of the Project, or any part thereof, or any interest therein or right accruing thereto, Borrower shall promptly give to Lender written notice generally describing the nature and extent of such damage, destruction or taking which has resulted or which may result therefrom.  So long as Borrower is not in Default, Borrower may adjust, settle and compromise any such insurance policy or any proposed condemnation award, but in any event, no final adjustment, compromise or settlement of any insurance claim or condemnation award shall be entered into without the prior written approval of Lender as to such settlement, adjustment or compromise thereof.  Lender may appear in any such proceedings and negotiations and Borrower shall promptly deliver to Lender copies of all notices and pleadings in any such proceedings.  Borrower will in good faith, file and prosecute all claims necessary for any award or payment resulting from such damage, destruction or taking.  Borrower shall reimburse Lender for all costs and expenses incurred by Lender in exercising its rights under this section and such costs shall constitute indebtedness secured by the Mortgage and other Loan Documents.

8.2   Application of Insurance Proceeds and Condemnation Awards.  (a)  Upon the occurrence of any loss or damage to all or any portion of the Project resulting from fire, vandalism, malicious mischief or any other casualty or physical harm (a "Casualty") or any exercise of the power of condemnation or eminent domain (a "Taking"), other than a Casualty Event, Lender may elect to collect, retain and apply as a Loan prepayment all proceeds (the "Proceeds") of any insurance policies collected or claimed as a result of such Casualty and all awards resulting from such Taking ("Awards") after deduction of all expenses of collection and settlement, including attorney's and adjusters' fees and charges.  Subject to the provisions of

61

Section 8.1, Borrower hereby authorizes Lender, at Lender's option, to collect any losses under any insurance with respect to the Project which is kept, or caused to be kept, by Borrower, and hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, for such purposes.  Any Proceeds or Awards remaining after payment in full of the Loan and all other sums due Lender hereunder shall be paid by Lender to Borrower without any allowance for interest thereon.  Notwithstanding anything to the contrary contained herein, in the event that (i) no Event of Default has occurred and is continuing hereunder, (ii) the Proceeds or Awards, as the case may be, are sufficient to rebuild the Project or, if they are insufficient, as determined by Lender in its sole discretion, Borrower provides Lender with additional funds necessary, as determined in Lender's reasonable discretion, to rebuild the Project, (iii) construction can be completed not less than three (3) months prior to the Maturity Date, and (iv) after completion of the reconstruction, the loan to value ratio of the Project is satisfactory to Lender, as determined in Lender's reasonable discretion, then the Proceeds or Awards, as the case may be, may, at Borrower's request, be applied towards reconstruction of the Project, which funds shall be disbursed pursuant to the disbursement provisions set forth herein.

(a)    In the event Lender does not apply the Proceeds or Awards to prepayment of the Loan as provided for in Section 8.2(a) or in the event such Proceeds or Awards, if applied, do not fully discharge the Loan, Borrower will:

(1)    Proceed with diligence to make settlement (which shall be subject to the approval of Lender) with insurers or with condemning authorities and cause the Proceeds or Awards to be deposited with Lender, unless Lender shall elect to make such settlement without the consent of Borrower.

(2)    In the event of any delay in making settlement with insurers or effecting collection of Proceeds or Awards, that Lender determines to be unreasonable, Borrower shall deposit with Lender the full amount required to complete construction and restoration, disregarding such Proceeds or Awards.

(3)    In the event the Proceeds or Awards deposited with Lender and the undisbursed proceeds of the Loan are insufficient to place the Loan In Balance, Borrower shall deposit with Lender on demand any amount necessary to place the Loan In Balance.

(4)    Promptly proceed with construction and restoration of the Project, including the repair of all such loss or damage.

All Proceeds, Awards and funds deposited by Borrower hereunder shall first be fully disbursed before disbursement of any further Loan Proceeds.  Borrower shall not be entitled to any payment of or credit for interest on such Proceeds, Awards and funds.  In the event of deposit by Borrower of the full amount required to complete construction of the Project, as aforesaid, upon the subsequent receipt of Proceeds or Awards, such Proceeds or Awards, as and when received, may be collected and retained by Borrower.

(b)    Lender shall not be obligated to see to the proper application of any of the Proceeds nor shall the amount so released or used be deemed a payment on any indebtedness evidenced by the Note or secured by any of the Loan Documents.  In the event of foreclosure of

62

ME1 42686889v.6

the Mortgage or other transfer of title in lieu of foreclosure, all right, title and interest of Lender, in and to any insurance policies then in force shall pass to the purchaser or Lender, as the case may be.

(c)     All proceeds of use and occupancy or rental value insurance shall be paid to Lender for the purposes of paying, in the following order:  (i) insurance premiums payable with respect to any insurance required to be carried by Borrower hereunder; (ii) taxes, assessments and charges payable by Borrower under any of the Loan Documents; and (iii) all amounts payable on the Note, together with any and all other amounts evidenced or secured by any of the Loan Documents, and to the extent that such insurance proceeds are available to pay the items listed in clauses(i), (ii) and (iii), Lender shall pay such items for the account of Borrower.  All such insurance proceeds not deemed necessary, in Lender's sole opinion, to pay (or establish reserves for the payment of) the above items shall be paid over to Borrower.

(d)     Upon failure on the part of Borrower promptly to commence or continue the repair or restoration of the Project after settlement of any claim with the insurer, Lender shall have the right to apply such Proceeds to the payment of any indebtedness secured by the Loan Documents, and resort to such other remedies available to Lender hereunder; provided, however, that nothing herein contained shall prevent Lender from applying at any time the whole or any part of such insurance proceeds to the curing of any Event of Default hereunder.

SECTION 9

ASSIGNMENTS, SALE AND ENCUMBRANCES

9.1     Lender's Right to Assign.  Lender may assign, negotiate, pledge or otherwise hypothecate this Agreement or any of its rights and security hereunder, including the Note, and any of the other Loan Documents and in case of such assignment, Borrower will accord full recognition thereto, and hereby agree that all rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by such assignee with the same force and effect and to the same extent as the same would have been enforceable by Lender but for such assignment.  Borrower agrees to cooperate with Lender's efforts to do any of the foregoing and to execute all documents reasonably required by Lender in connection therewith which do not materially adversely affect Borrower's rights under the Loan Documents.

9.2     Prohibition of Assignments and Encumbrances by Borrower.  Borrower shall not, without the prior written consent of Lender, create, effect, consent to, attempt, contract for, agree to make, suffer or permit any conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest, encumbrance or alienation ("Prohibited Transfer") of all or any portion of, or any interest in Borrower, the Land, or the Project, whether effected directly, indirectly, voluntarily, involuntarily, or by operation of Law or otherwise; provided, however, that the foregoing shall not apply to (i) liens securing the Loan, and/or (ii) the lien of current taxes and assessments not in default.

9.3     Organizational Documents.  Borrower shall not, without the prior written consent of Lender, permit or suffer (i) a material amendment or modification of its organizational

documents, (ii) the admission of any new member, partner or shareholder, or (iii) any dissolution or termination of its existence.

9.4    Successors and Assigns.  Subject to the foregoing restrictions on transfer and assignment contained in this Section 9, this Agreement shall inure to the benefit of and shall be binding on the parties hereto and their respective successors and permitted assigns.

SECTION 10

DEFAULTS BY BORROWER

The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder, and any Event of Default which may occur hereunder shall constitute an Event of Default under each of the other Loan Documents:

(a)    A failure by Borrower to make any payment on the Note when and as the same becomes due.

(b)    Any failure of Borrower for a period of twenty (20) days after written notice from Lender to Borrower, to observe or perform any of the covenants (other than any payment on the Note), contained in this Agreement or any of the other Loan Documents; (to the extent this Agreement or the other Loan Documents do not otherwise provide for a notice and/or cure period in connection with any such covenant) provided, that such twenty (20)-day period shall be extended to permit the cure of any default which by its nature is not reasonably susceptible to cure within said twenty (20)-day period, so long as Borrower promptly within said twenty (20)-day period commences its efforts to cure and thereafter diligently pursues the same to completion within forty (40) days after the lapse of the initial twenty (20) days.

(c)    The disapproval by Lender of any construction work and failure of Borrower to commence correction thereof to the satisfaction of Lender within fifteen (15) days after written notice to Borrower, which notice may be delivered via e-mail, of such disapproval, and thereafter to diligently complete the same.

(d)    Except for a delay(s) caused by an Event of Unavoidable Delay, a delay in construction of the Project, or a discontinuance or abandonment of construction, for a period of thirty (30) days, material failure to adhere to the Construction Schedule, or any delay in construction or equipping of the Project so that the Substantial Completion of Construction may not, in the Lender's judgment, be achieved within twenty-four (24) months following the Loan Closing Date and/or the Completion of Construction may not, in the Lender's judgment, be achieved prior to the exercise of the Permanent Loan Conversion Option.

(e)    Bankruptcy or insolvency of any contractor or subcontractor and failure of Borrower to diligently procure a replacement contractor or subcontractor satisfactory to Lender.

(f)    The occurrence of a Prohibited Transfer and/or any Change of Control.

64

(g)     The existence of any collusion, fraud, dishonesty or bad faith by or with the acquiescence of Borrower, which in any way relates to or materially affects the Loan or the Project.

(h)     If, at any time, any representation, statement, report or certificate made now or hereafter by Borrower is not materially true and correct, or if at any time any material statement or representation made in the Loan application or any supporting materials submitted to Lender for this Loan is not true and correct in all material respects.

(i)     If all or a substantial part of the assets of Borrower are attached, seized, subjected to a writ or distress warrant, or is levied upon, and such attachment, seizure, writ, warrant or levy is not vacated within forty-five (45) days thereafter.

(j)     If Borrower is enjoined or restrained or in any way prevented by court order from performing any of its obligations hereunder or under the other Loan Documents or conducting all or a substantial part of its business affairs.

(k)     If Borrower or any Guarantor:

(1)     Shall file a voluntary petition in bankruptcy or for arrangement, reorganization or other relief under any chapter of the federal bankruptcy code of any similar Law, now or hereafter in effect;

(2)     Shall file an answer or other pleading in any proceedings admitting insolvency, bankruptcy, or inability to pay its debts as they mature;

(3)     Within seventy-five (75) days after the filing against it of any involuntary proceedings under the federal bankruptcy code or similar Law, now or hereafter in effect, such proceedings shall not have been vacated;

(4)     Have an order issued appointing a receiver, trustee or liquidator for it or for all or a major part of its property or the Land which is not be vacated within seventy-five (75) days following entry thereof;

(5)     Shall be adjudicated insolvent;

(6)     Shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts generally as they become due or shall consent to the appointment of a receiver or trustee or liquidator of all or the major part of its property, or the Land;

(7)     Shall for any reason cease to exist.

(l)     Failure by Borrower to make any Deficiency Deposit with Lender within the time and in the manner required by Section 6.13 hereof.

(m)     One or more final, unappealable judgments are entered (i) against Borrower in amounts aggregating in excess of $75,000 or (ii) against any Guarantor in amounts

65

aggregating in excess of $100,000, and said judgments are not stayed or bonded over within forty-five (45) days after entry.

(n)      If Borrower or any Guarantor shall fail to pay any debt owed by it or is in default under any agreement with Lender or any other party (other than a failure or default for which Borrower's or Guarantor's maximum liability does not exceed $100,000) and such failure or default continues after any applicable grace period specified in the instrument or agreement relating thereto.

(o)      If a Material Adverse Change occurs with respect to Borrower, the Project or any Guarantor.

(p)      The occurrence of any other event or circumstance denominated as an Event of Default herein or under any of the other Loan Documents and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default herein or therein, as the case may be.

(q)      The death, incarceration, or incapacity of Individual Guarantor.

(r)      The occurrence of any event denominated as an "Actionable Default" in the SNDA and the expiration of any applicable grace or cure periods, if any, specified for such Actionable Default, provided that any defaulted amount is not otherwise contributed by any other member or other Person to Borrower or Master Tenant, as applicable, within the applicable grace or cure periods.

(s)      Failure by any Member in Borrower to make any of its capital contributions required to be made by such member for the costs of construction of the Project in accordance with the Borrower Operating Agreement, provided that such failed capital contribution is not otherwise contributed by any other member or other Person to Borrower.

(t)      The occurrence of a breach under any other Loan Document executed therewith or theoccurrence of any other event or circumstance denominated as an event of default in or under any other Loan Document and the expiration of any applicable grace or cure periods, if any, specified for such breach or such event of default herein or therein, as the case may be.

SECTION 11

LENDER'S REMEDIES UPON DEFAULT

11.1    <u>Remedies Conferred Upon Lender</u>.  Upon the occurrence of any Event of Default, Lender, in addition to all remedies conferred upon Lender by Law and by the terms of the Note, the Mortgage and the other Loan Documents, may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any others:

(a)      Withhold further disbursement of Loan Proceeds and terminate any or all of its obligations to Borrower.

66

(b)    Declare the Note to be due and payable forthwith, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived.

(c)    In addition to any rights of set-off that Lender may have under applicable Law, Lender may, without notice of any kind to Borrower, appropriate and apply to the payment of the Note or of any sums due under this Agreement, any and all balances, deposits, credits, accounts, certificates of deposit, instruments or money of Borrower then or thereafter in the possession of Lender, or its Affiliates.  Borrower hereby irrevocably authorizes and directs Lender from time to time to charge Borrower's accounts and deposits with Lender (or its Affiliates), and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Note or under any other Loan Document.  Borrower hereby grants to Lender a security interest in and to all such accounts and deposits maintained by the Borrower with Lender (or its Affiliates).

(d)    Exercise or pursue any other remedy or cause of action permitted at Law or at equity or under this Agreement or any other Loan Document, including but not limited to, foreclosure of the Mortgage and/or the Security Agreement and enforcement of all Loan Documents.  Without limiting the generality of the foregoing, in the event Lender exercises its rights under the Pledge of Membership Interest and terminates the manager of the Managing Member, Lender agrees to engage a Qualified Replacement Manager to replace the so terminated manager.

(e)    With or without entry upon the Land, cause construction of the Project to be completed.  Lender, for such purpose, may use all available materials and equipment located upon the Land and purchase all other necessary materials and employ contractors and other employees.  All sums expended by Lender for such purpose shall constitute disbursements pursuant hereto and shall be secured by the Mortgage and other Loan Documents and shall forthwith be due and payable by Borrower to Lender with interest thereon at the Default Rate. The authority and agency conferred hereby upon Lender shall be deemed to create a power coupled with an interest and shall be irrevocable.

11.2    Right of Lender to Make Advances to Cure Defaults.  In the event that Borrower shall fail to perform any of its covenants or agreements herein or in any of the other Loan Documents contained, Lender may (but shall not be required to) perform any of such covenants and agreements, and any amounts so expended by Lender shall be deemed advanced by Lender under an obligation to do so regardless of the identity of the person or persons to whom said funds are disbursed. Loan Proceeds advanced by Lender in the exercise of its judgment that the same are needed to complete the Project to protect its security for the Loan are obligatory advances hereunder and shall constitute additional indebtedness payable on demand which is evidenced and secured by the Loan Documents.

11.3    No Waiver.  No failure by Lender to exercise, or delay by Lender in exercising, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege.  The rights and remedies provided in this Agreement and in the Loan Documents are cumulative and not exclusive of each other or of any right or remedy provided by law or equity.  No notice to or demand on Borrower in any

67

case shall, in itself entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

11.4    Availability of Remedies.  All of the remedies set forth herein, in the other Loan Documents and/or provided by law or equity shall be equally available to Lender, and the choice by Lender of one (1) such alternative over another shall not be subject to question or challenge by Borrower or any other person, nor shall any such choice be asserted as a defense, set-off, or failure to mitigate damages in any action, proceeding, or counteraction by Lender to recover or seeking any other remedy under this Agreement or any of the Loan Documents, nor shall such choice preclude Lender from subsequently electing to exercise a different remedy, except as otherwise provided by Law.  The parties have agreed to the alternative remedies hereof specified in part because they recognize that the choice of remedies in the event of a failure hereunder will necessarily be and should properly be a matter of business judgment, which the passage of time and events may or may not prove to have been the best choice to maximize recovery by Lender at the lowest cost to Borrower.  It is the intention of the parties that such choice by Lender be given conclusive effect regardless of such subsequent developments.  At any sale of the security or collateral for the Loan or any part thereof whether by foreclosure or otherwise, Lender may in its discretion purchase all or any part of such collateral so sold or offered for sale for its own account and may apply against the balance due Lender pursuant to the terms of the Note the amount bid therefore.

SECTION 12

PERMANENT LOAN

12.1    Permanent Loan Conversion Option.  As set forth in Section 3.10(b) above, Borrower may request that the Construction Loan be converted to a Permanent Loan ("Permanent Loan Conversion Option").  This conversion shall be exercised by delivery from Borrower to Lender of a written notice to exercise the option no later than 90 days prior to the Maturity Date of the Construction Loan (the "Permanent Loan Conversion Notice").

Lender's obligation to permit the conversion shall be subject to the following conditions:

(a)    There shall be no defaults (including without limitation an Event of Default) by Borrower in any terms or conditions of any Loan Document;

(b)    Completion of Construction has occurred and Borrower has received a Certificate of Occupancy with respect to the Project;

(c)    The receipt by Lender of a permanent loan conversion fee equal to one percent (1.00%) of the maximum principal amount of the Permanent Loan (presently estimated at $86,500.00) ("Permanent Loan Conversion Fee");

(d)    The Project has achieved a Pro Forma DSCR for the three (3) consecutive months immediately prior to the Permanent Loan Conversion Date of at least 1.20:1.00. Borrower shall have the right to reduce the amount of the Permanent Loan to a level which shall result the Borrower's achievement of a Pro Forma DSCR in compliance with this paragraph by

68

either paying down and permanently reducing the outstanding principal balance of the Loan or by permanently eliminating remaining undrawn funds under the Loan.

(e)     No Material Adverse Change has occurred with the Project, Borrower or Guarantor;

(f)     Borrower and Guarantors shall execute any and all reasonable documents required by Lender in connection with Borrower's selection of the Permanent Loan Conversion Option; and

(g)     Borrower has furnished to Lender an "as built" ALTA survey made in accordance with the requirements of Exhibit D showing all buildings and showing no encroachments of the Improvements over any easements or lot lines and showing no violations of any building lines.

12.2   <u>Permanent Loan Principal and Interest Payments</u>.   On the Permanent Loan Conversion Date, Borrower shall pay all previously unpaid interest and any and all other fees, costs and expenses due and owing Lender.  Payments of interest will be due and payable on each Permanent Loan Payment Date.   Commencing on the first Permanent Loan Payment Date following the Permanent Loan Conversion Date, and continuing on each Permanent Loan Payment Date thereafter, up to and including the Permanent Loan Maturity Date, Borrower shall make principal payments in the scheduled Principal Repayment Amount together with the monthly payments of interest.  The Permanent Loan will bear interest at a rate of interest elected by Borrower prior to the Loan Closing Date, which shall be equal to the Permanent Loan Note Rate.

If the Loan is converted to the Permanent Loan in accordance with all of the terms and conditions above, all outstanding principal balance, together with accrued interest thereon, unless accelerated sooner, shall be due and payable on the Permanent Loan Maturity Date.  Borrower acknowledges that the payments during the Loan term will not be sufficient to completely retire the indebtedness under the Loan and that a substantial balloon payment shall be due.  If the Loan is converted to the Permanent Loan in accordance with all of the terms and conditions above, the principal portion of the Guarantor's Payment Guaranty shall be reduced to fifty percent (50%) of the Permanent Loan Amount.

SECTION 13

<u>MISCELLANEOUS</u>

13.1   <u>Time Is of the Essence</u>.  Lender and Borrower agree that time is of the essence of all of their covenants under this Agreement.

13.2   <u>Prior Agreements.</u>  This Agreement and the other Loan Documents, and any other documents or instruments executed pursuant thereto or contemplated thereby, shall represent the entire, integrated agreement between the parties hereto with respect to the Loan and shall supersede all prior negotiations, representations, or agreements pertaining thereto, either oral or written.  This Agreement and any provision hereof shall not be modified, amended, waived or discharged in any manner other than by a written amendment executed by all parties to this

ME1 42686889v.6

Agreement. An action on the part of the Lender waiving a specific provision or requirement herein contained, shall not be construed to be a waiver of future application of such provision or requirement or a waiver of any other provision or requirement hereunder.

13.3 <u>Disclaimer by Lender</u>. Lender shall not be liable to any subcontractor, supplier, laborer, architect, engineer or any other party for services performed or materials supplied in connection with construction of the Project. Lender shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or against the Land. The Borrower shall not be considered an agent of Lender for any purposes, and Lender is not a venture partner with Borrower. Lender shall not be deemed to be in privity of contract with any contractor, subcontractor or provider of services on or to the Land, nor shall any payment of funds directly to the General Contractor or provider of services on or to the Land, be deemed to create any third party beneficiary status or recognition of same by Lender unless and until Lender expressly assumes such status in writing. Approvals granted by Lender for any matters covered under this Agreement shall be narrowly construed to cover only the parties and facts identified in any written approval or if not in writing such approvals shall be solely for the benefit of Borrower. Borrower acknowledges and agrees that any construction monitoring done by or at the request of Lender is solely for Lender's benefit and cannot and will not be relied upon or used by Borrower for any purpose whatsoever.

13.4 <u>Indemnification</u>. To the fullest extent permitted by Law, Borrower hereby agrees to protect, indemnify, defend and save harmless, Lender and its directors, officers, agents and employees from and against any and all liability, expense or damage of any kind or nature and from any suits, claims, or demands, including reasonable legal fees and expenses, arising out of this Agreement or in connection herewith, except to the extent such suit, claim or damage is caused by the gross negligence or willful misconduct of Lender. This obligation on the part of Borrower shall survive the closing of the Loan, the repayment thereof and any cancellation of the Loan Agreement.

13.5 <u>Captions</u>. The captions and headings of various sections of this Agreement and exhibits pertaining hereto are for convenience only and not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

13.6 <u>Inconsistent Terms and Partial Invalidity</u>. In the event of any inconsistency among the terms hereof (including incorporated terms), or between such terms and the terms of any other Loan Document, this Agreement shall be controlling. If any provision of this Agreement, or any paragraph, sentence, clause, phrase, or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein.

13.7 <u>Gender and Number</u>. Any word herein which is expressed in the masculine or neuter gender shall be deemed to include the masculine, feminine and neuter genders. Any word herein which is expressed in the singular or plural number shall be deemed, whenever appropriate in the context, to include the singular and plural.

70

13.8    Definitions Included in Amendments.  Definitions contained in this Agreement which identify documents, including, without limitation, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of the Lender.  Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

13.9    WAIVER OF JURY TRIAL.  BORROWER AND LENDER EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR RELATING THERETO OR ARISING FROM THE BANKING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

13.10   Notices.  Except for any notice required under applicable Law to be given in another manner, any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (i) if hand delivered or if sent by telecopy, effective upon receipt or (ii) if delivered by overnight courier service, effective on the Business Day following delivery to such courier service, or (iii) if mailed by United States registered or certified mail, postage prepaid, return receipt requested, effective two (2) Business Days after deposit in the United States mails, with copies via e-mail, addressed in each case as follows:

If to Borrower:

HANCOCK LOFTS LLC
2001 Market Street, Suite 2519
Philadelphia, PA  19103
Attention: Mr. Harrison Finberg

With a Copy To:

BERMAN INDICTOR LLP
30 N. 41st Street, Suite 450
Philadelphia, PA 19104
Attention:      Penny S. Indictor, Esq.
                Michael J. Taichman-Robins, Esq.

71

ME1 42686889v.6

If to Lender:

> CITIZENS BANK, N.A.
> Community Development Lending
> 130 North 18th Street, 13th Floor
> Citizens Bank - One Logan Square
> PL 1325
> Philadelphia, PA 19103
> Attention:  Molly J. Skilton, Vice President
> Molly.Skilton@citizensbank.com

With a Copy To:

> MCCARTER & ENGLISH LLP
> 1600 Market Street, Suite 3900
> Philadelphia, PA 19103
> Attention:  Inez M. Markovich, Esquire
> Facsimile:  (215) 988-4319
> imarkovich@mccarter.com

or at such other address or to such other addressee as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.11  <u>JURISDICTION; VENUE</u>.  TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "PROCEEDING"), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION.  BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY PENNSYLVANIA STATE OR UNITED STATES COURT SITTING IN THE COUNTY OF PHILADELPHIA MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT THE ADDRESS INDICATED ABOVE, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; <u>EXCEPT</u> THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE

72

ME1 42686889v.6

SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

13.12   Waiver of Damages.  In no event shall Lender be liable to Borrower for punitive, exemplary or consequential damages, including, without limitation, lost profits, whatever the nature of a breach by Lender of its obligations under this Agreement or any of the Loan Documents, and Borrower for itself and its Guarantors waive all claims for punitive, exemplary or consequential damages.

13.13   Office of Foreign Asset Control (OFAC) and Patriot Act 326 (PA 326) Verification of Customers; Beneficial Ownership.

(a)    PA 326.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each customer who opens an account (including the extension of credit to a customer).  Therefore, all new and existing customers are subject to the identity verification requirements.  Borrower shall deliver to Lender any and all documentation and information requested by Lender in connection with applicable "know your customer" and anti-money laundering rules and regulations, including PA 326.  Without limitation, Lender requires the following information for the Business:  Business Name, Business Address, Business TIN and Business Phone Number.  For the Authorized Representative (person signing for the Business), Lender requires the following information:  Individual's Name, Individual's Address, Identification Information and Date of Birth.

(b)    OFAC.  In addition, all financial institutions must check all Borrowers; Collateral Owners; Guarantors; Co-signors; Receiving and Sending Parties; General Partners, Managing Members, and Trustees; and Limited Partners, Managing Members and Beneficiaries holding interest; against the US Department of Treasury's list for Specially Designated Nationals and Blocked Persons.

(c)    Beneficial Ownership.  To the extent Borrower constitutes a "legal entity customer" under the Beneficial Ownership Regulation, a completed Beneficial Ownership Certification in relation to Borrower.

(d)    All documents and/or verifications required in paragraphs (a), (b), and (c) hereof must be completed and delivered to Lender at least five (5) days prior to the Loan Closing Date.

13.14   Governing Law.  This Agreement has been negotiated, executed and delivered in Philadelphia, Pennsylvania and shall be construed and enforced in accordance with the Laws of the Commonwealth of Pennsylvania, except to the extent pre-empted by Federal laws without reference to the choice of law or conflicts of law principles of that State.

13.15   Divisions.  For all purposes under the Loan Documents, in connection with any Division (if applicable): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes

73

74

into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

ME1 42686889v.6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed the day and year first above written.

BORROWER:

**HANCOCK LOFTS LLC**, a Pennsylvania limited liability company

By:     Hancock Lofts MM, LLC, a Pennsylvania limited liability company, its Managing Member

By:_____
Name:    Harrison Merriman Finberg
Title:    Sole Member

LENDER:

**CITIZENS BANK, N.A.**

By:_____
Name:    Molly J. Skilton
Title:    Vice President

[Citizens-Hancock Lofts-Signature Page to Construction Loan Agreement]

## **EXHIBIT A**

Legal Description

ME1 42686889v.6

LEGAL DESCRIPTION

ALL THAT CERTAIN lot or piece of ground. Situate in the 19th Ward of the City of Philadelphia and described according to a Lot Consolidation Plan mode by Urban Land Surveying LLC as follows:

BEGINNING at the point of intersection of the Easterly side of Hancock Street (Legally open 50 feet wide on City plan)  and the South side of Huntingdon Street (legally open 50 feet wide on City plan),

Thence extending South 78 degrees 39 minutes 00 seconds East along the said Southerly side of Huntingdon Street, the distance of 92.500 feet to the point of intersection of the said Southerly side of Huntingdon Street and the Westerly side of Mutter Street (legally open 25 feet wide on City plan)

Thence extending South 11 degrees 08 minutes 00 seconds West, along the said Southerly side of Mutter Street, partly crossing the head of a proposed 3' wide alley, which extends Westwardly to communicate with a second proposed 3' wide alley, which extends Northwardly to a terminuses the distance of 192.000 feet to a point.

Thence extending through the bed of the first mentioned proposed 3' wide alley and also through the bed of the second mentioned proposed 3' wide alley, North 78 degrees 39 minutes 00 seconds West, the distance of 41.500 feet to a point on the Westerly side of the second mentioned proposed 3' wide alley;

Thence extending North 11 degrees 08 minutes 00 seconds East along the side of the second mentioned proposed 3' wide alley.

Thence extending North 78 degrees 39 minutes 00 seconds West, partly through a wall, the distance of 51.000 feet to a point on the said Easterly side of Hancock Street;

Thence extending North 11 degrees 08 minutes 00 seconds East, sting the said Easterly side of Hancock Street, the distance of 150.000 feet to a point, being the first mentioned point and place of beginning.

CONTAINING in area 15.617 square feet or 0.358 acres, more or less.

BEING known as 2545 North Hancock Street.

BEING Parcel No. 88-1-0754-00.

## **EXHIBIT B**

Budget

| Hancock Lofts | | | |
|---|---|---|---|
| **Sources** | | | |
| | | | LTC |
| First Mortgage | $ | 8,650,000 | 74.2% |
| HTC Equity | $ | 1,808,800 | 15.5% |
| Equity | $ | 1,193,595 | 10.2% |
| Total | $ | 11,652,395 | 100.0% |
| | | | |
| **Uses** | | | |
| Acquisition | $ | 1,400,000 | 12.0% |
| Soft Costs | $ | 893,837 | 7.7% |
| Hard Costs | $ | 7,685,053 | 66.0% |
| Interest Reserve | $ | 905,000 | 7.8% |
| Contingency | $ | 768,505 | 6.6% |
| Total | $ | 11,652,395 | 100% |

ME1 42686889v.6

## EXHIBIT C

Title Requirements

A commitment (the "Title Commitment") for issuance of an ALTA Loan Policy of Title Insurance, Form 2006 (the "Title Policy"), issued by the Title Insurer to Lender, in the Loan Amount, insuring the Mortgage to be a valid first, prior and paramount mortgage lien upon the fee title to the Land and the Project, and a valid first lien upon any easement in favor of the Land which provides access to the Land for ingress and egress and/or for utilities, to the extent of funded by Disbursements of the Loan, subject only to the Permitted Exceptions and to customary exceptions which, by their nature, cannot be eliminated until construction of the Project has been completed, and with all so-called "standard" exceptions deleted. The Title Commitment shall (i) contain a so-called "Comprehensive Endorsement"; (ii) contain an endorsement affirmatively insuring the priority of the Mortgage against any vendor's or mechanic's lien; (iii) affirmatively insure the Lender that (A) no restrictions of record affecting the Land have been violated, and that such instruments contain no right of reverter or forfeiture, (B) the survey described in Section 5.1(b) hereof is accurate and accurately depicts the same real estate as is covered by the Title Commitment, and (C) Lender is the holder of the Mortgage and that the Mortgage is the first lien against the Land; (iv) insure contiguity of the Land with adjoining public rights of way; (v) contain an ALTA Variable Rate Endorsement No. 6; (vi) contain an endorsement affirmatively insuring that all future advances of Loan Proceeds made by Lender shall be secured by the Mortgage and have priority as of the date the Mortgage is filed for record with the County Recorder; (vii) a Creditor's Rights endorsement; and (viii) contain such other endorsements as Lender may require. If requested by Lender, appropriate provisions satisfactory to Lender for co-insurance and reinsurance, with direct access agreements acceptable in form and substance to Lender, shall also be obtained. Contemporaneously with delivery to Lender of the Title Commitment, Borrower shall also deliver to Lender copies of all documents constituting encumbrances on the Land, including but not limited to the Permitted Exceptions. Borrower agrees to deliver to the Title Agent, with a copy of each to Lender, such other papers, instructions and documents as the Title Agent may require for the issuance of the Title Commitment and the issuance of date down endorsements and interim certifications relating to construction payouts as provided in Section 6 hereof, and in accordance with all requirements of this Agreement.

ME1 42686889v.6

## EXHIBIT D

Survey Certification

An ALTA survey ("Survey") of the Land, in duplicate, made by a registered land surveyor, dated no later than six (6) months prior to the Loan Closing Date, showing:

(1)      the proposed location of the Improvements, on the Land;

(2)      the location (and recording numbers, to the extent recorded) of all visible or recorded easements (including appurtenant easements), water courses, drains, sewers, public and private roads (including the names and widths thereof and recording numbers for the dedications thereof), other rights of way, and curb cuts, if any, within, adjacent to or serving the Land and Project or to which the Land and Project are or will be subject, and the location of any such proposed easements; that the same are, and after Construction of the Project and granting of easements will be, unobstructed; and that all portions of the Project will have access over recorded easements to dedicated public roads;

(3)      the common street address of the Land and Project and the dimensions, boundaries and acreage or square footage of the Land and the Improvements;

(iv)      that all foundations and other structures currently existing or to be constructed pursuant to the Plans and Specifications, and all other improvements on the Land, are placed within the lot and building lines, all deed restriction, recorded plats, other restrictions of record and ordinances relating to the location thereof (and, to the extent that any such restrictions or ordinances require any structure to be set back specified distances from any line, showing said line and the measured distance of said structure, or the proposed location of said structure, from said line);

(v)      that there are no encroachments on the Land from improvements located on adjoining property;

(vi)      the location and course of all utility lines;

(vii)      if the Land comprises more than one parcel, interior lines and other data sufficient to insure contiguity; and

(viii)      such additional information which may be required by the Lender or the Title Agent.

The Survey shall be made in accordance with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys most recently adopted by the American Land Title Association, and the National Society of Professional Surveyors, a copy of which is attached.

ME1 42686889v.6

## MINIMUM STANDARD DETAIL REQUIREMENTS FOR
## ALTA/ACSM LAND TITLE SURVEYS
*(Effective February 23, 2011)*

**1.     Purpose -** Members of the American Land Title Association (ALTA) have specific needs, unique to title insurance matters, when asked to insure title to land without exception as to the many matters which might be discoverable from survey and inspection, and which are not evidenced by the public records.

For a survey of real property, and the plat, map or record of such survey, to be acceptable to a title insurance company for the purpose of insuring title to said real property free and clear of survey matters (except those matters disclosed by the survey and indicated on the plat or map), certain specific and pertinent information must be presented for the distinct and clear understanding between the insured, the client (if different from the insured), the title insurance company (insurer), the lender, and the surveyor professionally responsible for the survey.

In order to meet such needs, clients, insurers, insureds, and lenders are entitled to rely on surveyors to conduct surveys and prepare associated plats or maps that are of a professional quality and appropriately uniform, complete and accurate.  To that end, and in the interests of the general public, the surveying profession, title insurers and abstracters, the ALTA and the National Society of Professional Surveyors, Inc. (NSPS) jointly promulgate the within details and criteria setting forth a minimum standard of performance for ALTA/ACSM Land Title Surveys.  A complete 2011 ALTA/ACSM Land Title Survey includes the on-site fieldwork required under Section 5 herein, the preparation of a plat or map showing the results of the fieldwork and its relationship to record documents as required under Section 6 herein, any information in Table A herein that may have been negotiated with the client, and the certification outlined in Section 7 herein.

**2.     Request for Survey** - The client shall request the survey or arrange for the survey to be requested, and shall provide a written authorization to proceed from the person or entity responsible for paying for the survey.  Unless specifically authorized in writing by the insurer, the insurer shall not be responsible for any costs associated with the preparation of the survey.  The request shall specify that an **"ALTA/ACSM LAND TITLE SURVEY"** is required and which of the optional items listed in Table A herein, if any, are to be incorporated.  Certain properties, including, but not limited to, marinas, campgrounds, trailer parks and leased areas, may present issues outside those normally encountered on an ALTA/ACSM Land Title Survey. The scope of work related to such properties should be discussed with the client, lender and insurer, and agreed upon in writing prior to requesting the survey.  The client may need to secure permission for the surveyor to enter upon the property to be surveyed, adjoining properties, or offsite easements.

**3.     Surveying Standards and Standards of Care**

      **A.     Effective Date** - The 2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys are effective February 23, 2011.  As of that

ME1 42686889v.6

date, all previous versions of the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys are superseded by these standards.

B.    **Other Requirements and Standards of Practice** - Some Federal agencies, many states and some local jurisdictions have adopted statutes, administrative rules and/or ordinances that set out standards regulating the practice of surveying within their jurisdictions.  In addition to the standards set forth herein, surveyors shall also conduct their surveys in accordance with all applicable jurisdictional requirements and standards of practice.  Where conflicts between the standards set forth herein and any such jurisdictional requirements and standards of practice occur, the more stringent shall apply.

C.    **The Normal Standard of Care** - Surveyors should recognize that there may be unwritten local, state, and/or regional standards of care defined by the practice of the 'prudent surveyor' in those locales.

D.    **Boundary Resolution** - The boundary lines and corners of any property being surveyed as part of an ALTA/ACSM Land Title Survey shall be established and/or retraced in accordance with appropriate boundary law principles governed by the set of facts and evidence found in the course of performing the research and survey.

E.    **Measurement Standards** - The following measurement standards address Relative Positional Precision for the monuments or witnesses marking the corners of the surveyed property.

   i.    "Relative Positional Precision" means the length of the semi-major axis, expressed in feet or meters, of the error ellipse representing the uncertainty due to random errors in measurements in the location of the monument, or witness, marking any corner of the surveyed property relative to the monument, or witness, marking any other corner of the surveyed property at the 95 percent confidence level (two standard deviations).  Relative Positional Precision is estimated by the results of a correctly weighted least squares adjustment of the survey.

   ii.    Any boundary lines and corners established or retraced may have uncertainties in location resulting from (1) the availability, condition, history and integrity of reference or controlling monuments, (2) ambiguities in the record descriptions or plats of the surveyed property or its adjoiners, (3) occupation or possession lines as they may differ from the written title lines, and (4) Relative Positional Precision.  Of these four sources of uncertainty, only Relative Positional Precision is controllable, although due to the inherent errors in any measurement, it cannot be eliminated.  The magnitude of the first three uncertainties can be projected based on evidence; Relative Positional Precision is estimated using statistical means (see Section 3.E.i. above and Section 3.E.v. below).

**iii.** The first three of these sources of uncertainty must be weighed as part of the evidence in the determination of where, in the surveyor's opinion, the boundary lines and corners of the surveyed property should be located (see Section 3.D. above). Relative Positional Precision is a measure of how precisely the surveyor is able to monument and report those positions; it is not a substitute for the application of proper boundary law principles. A boundary corner or line may have a small Relative Positional Precision because the survey measurements were precise, yet still be in the wrong position (i.e. inaccurate) if it was established or retraced using faulty or improper application of boundary law principles.

**iv.** For any measurement technology or procedure used on an ALTA/ACSM Land Title Survey, the surveyor shall (1) use appropriately trained personnel, (2) compensate for systematic errors, including those associated with instrument calibration, and (3) use appropriate error propagation and measurement design theory (selecting the proper instruments, geometric layouts, and field and computational procedures) to control random errors such that the maximum allowable Relative Positional Precision outlined in Section 3.E.v. below is not exceeded.

**v.** The maximum allowable Relative Positional Precision for an ALTA/ACSM Land Title Survey is 2 cm (0.07 feet) plus 50 parts per million (based on the direct distance between the two corners being tested). It is recognized that in certain circumstances, the size or configuration of the surveyed property, or the relief, vegetation or improvements on the surveyed property will result in survey measurements for which the maximum allowable Relative Positional Precision may be exceeded. If the maximum allowable Relative Positional Precision is exceeded, the surveyor shall note the reason as explained in Section 6.B.ix below.

**4.** **Records Research** - It is recognized that for the performance of an ALTA/ACSM Land Title Survey, the surveyor will be provided with appropriate data which can be relied upon in the preparation of the survey. The request for an ALTA/ACSM Land Title Survey shall set forth the current record description of the property to be surveyed or, in the case of an original survey, the current record description of the parent parcel that contains the property to be surveyed. Complete copies of the most recent title commitment, the current record description of the property to be surveyed (or, in the case of an original survey, the parent parcel), the current record descriptions of adjoiners, any record easements benefiting the property, the record easements or servitudes and covenants burdening the property (all hereinafter referred to collectively as "Record Documents"), documents of record referred to in the Record Documents, documents necessary to ascertain, if possible, the junior/senior relationship pursuant to Section 6.B.vii. below, and any other documents containing desired appropriate information affecting the property being surveyed, and to which the ALTA/ACSM Land Title Survey shall make reference, shall be provided to the surveyor for use in conducting the survey. Reference is made to Section 3.B. above.

**5.**    **<u>Field Work</u>** - The Survey shall be performed on the ground (except as otherwise negotiated pursuant to Table A, Item 15 below, if selected by the client), and the field work shall include the following:

    **A.**    **Monuments**

        **i.**    The location and description of any monuments or lines that control the boundaries of the surveyed property.

        **ii.**    The location, size and type of any monuments found (or set, if Table A, Item 1 is requested by the client, or if otherwise required – see Section 3.B. above) on the boundary of the surveyed property.

    **B.**    **Rights of Way and Access**

        **i.**    The distance from the appropriate corner or corners of the surveyed property to the nearest right of way line, if the surveyed property does not abut a right of way.

        **ii.**    The name of any street, highway or other public or private way abutting the surveyed property, and the width and location of the travelled way relative to the nearest boundary line of the surveyed property.

        **iii.**    Visible evidence of physical access (such as, but not limited to, curb cuts and driveways) to any abutting streets, highways or other public ways.

        **iv.**    The location and character of vehicular, pedestrian or other forms of access by other than the apparent occupants of the surveyed property to or across the surveyed property, including, but not limited to driveways, alleys, private roads, sidewalks and footpaths observed in the process of conducting the survey.

        **v.**    Without expressing a legal opinion as to ownership or nature, the location and extent of any potentially encroaching driveways, alleys, and other ways of access from adjoining properties onto the surveyed property observed in the process of conducting the survey.

        **vi.**    Where documentation of the width or location of any abutting street, road or highway right of way was not disclosed in Record Documents provided to the surveyor or was not otherwise available from the controlling jurisdiction (see Section 6.C.iv. below), the evidence and location of parcel corners recovered which might indicate the width or location of such right of way lines.

        **vii.**    Evidence of access to and from waters adjoining the surveyed property, such as paths, boat slips, launches, piers and docks observed in the process of conducting the survey.

**C.**    **Lines of Possession, and Improvements along the Boundaries**

**i.**    The character and location of evidence of possession or occupation along the perimeter of the surveyed property, both by the occupants of the surveyed property and by adjoiners, observed in the process of conducting the survey.

**ii.**    The character and location of all walls, buildings, fences, and other improvements within five feet of each side of the boundary lines, observed in the process of conducting the survey.

**iii.**    Without expressing a legal opinion as to the ownership or nature of the potential encroachment, the evidence, location and extent of potentially encroaching structural appurtenances and projections observed in the process of conducting the survey, such as fire escapes, bay windows, windows and doors that open out, flue pipes, stoops, eaves, cornices, areaways, steps, trim, etc., by or onto adjoining property, or onto rights of way, easements or setback lines disclosed in Record Documents provided to the surveyor.

**D.**    **Buildings**

Based on the normal standard of care, the location of all buildings on the surveyed property shown perpendicular to the nearest perimeter boundary line(s) and expressed to the appropriate degree of precision.

**E.**    **Easements and Servitudes**

**i.**    Evidence of any easements or servitudes burdening the surveyed property, disclosed in the Record Documents provided to the surveyor and observed in the process of conducting the survey.

**ii.**    Evidence of easements or servitudes not disclosed in the Record Documents provided to the surveyor, but observed in the process of conducting the survey, such as those created by roads; rights of way; water courses; ditches; drains; telephone, fiber optic lines, or electric lines; water, sewer, oil or gas pipelines on or across the surveyed property and on adjoining properties if they appear to affect the surveyed property.

**iii.**    Surface indications of underground easements or servitudes on or across the surveyed property observed in the process of conducting the survey.

**iv.**    Evidence of use of the surveyed property by other than the apparent occupants observed in the process of conducting the survey.

**F.**    **Cemeteries**

As accurately as the evidence permits, the location of cemeteries, gravesites, and burial grounds (i) disclosed in the Record Documents provided to the surveyor, or (ii) observed in the process of conducting the survey.

### G.    Water Features

**i.**    The location of springs, together with the location of ponds, lakes, streams, and rivers bordering on or running through the surveyed property, observed during the process of conducting the survey.  See Table A, Item 19 for wetlands locations.

**ii.**    The location of any water boundary on the surveyed property.  The attribute(s) of the water feature located (e.g. top of bank, edge of water, high water mark, etc.) should be congruent with the boundary as described in the record description or, in the case of an original survey, in the new description.  (See Section 6.B.vi. below).

**6.    Plat or Map** - A plat or map of an ALTA/ACSM Land Title Survey shall show the following information.  Where dimensioning is appropriate, dimensions shall be in accordance with the appropriate standard of care.

### A.    The evidence and locations gathered during the field work as outlined in Section 5 above.

### B.    Boundary, Descriptions, Dimensions and Closures

**i.**    The current record description of the surveyed property, and any new description of the surveyed property that was prepared in conjunction with the survey, including a statement explaining why the new description was prepared.  Preparation of a new description should be avoided unless deemed necessary or appropriate by the surveyor and insurer.  Preparation of a new description should also generally be avoided when the record description is a lot or block in a platted, recorded subdivision.

**ii.**    The location and description of any monuments, lines or other evidence that control the boundaries of the surveyed property or that were otherwise relied upon in establishing or retracing the boundaries of the surveyed property, and the relationship of that evidence to the surveyed boundary. In some cases, this will require notes on the plat or map.

**iii.**    All distances and directions identified in the record description of the surveyed property (and in the new description, if one was prepared). Where a measured or calculated dimension differs from the record by an amount deemed significant by the surveyor, such dimension shall be shown in addition to, and differentiated from, the corresponding record dimension.

**iv.** The directional, distance and curve data necessary to compute a mathematical closure of the surveyed boundary. A note if the record description does not mathematically close. The basis of bearings and, when it differs from the record basis, the difference.

**v.** The remainder of any recorded lot or existing parcel, when the surveyed property is composed of only a portion of such lot or parcel, shall be graphically depicted. Such remainder does not need to be included as part of the actual survey, except to the extent necessary to locate the lines and corners of the surveyed property, and it need not be fully dimensioned or drawn at the same scale as the surveyed property.

**vi.** When the surveyed property includes a water boundary, a note on the face of the plat or map noting the date the boundary was measured, which attribute(s) of the water feature was/were located, and the caveat that the boundary is subject to change due to natural causes and that it may or may not represent the actual location of the limit of title. When the surveyor is aware of natural or artificial realignments or changes in such boundaries, the extent of those changes and facts shall be shown or explained.

**vii.** The relationship of the boundaries of the surveyed property (i.e. contiguity, gaps, or overlaps) with its adjoiners, where ascertainable from Record Documents and/or from field evidence gathered during the process of conducting the survey of the property being surveyed. If the surveyed property is composed of multiple parcels, the extent of any gaps or overlaps between those parcels shall be identified. Where gaps or overlaps are identified, the surveyor shall, prior to preparation of the final plat or map, disclose this to the insurer and client for determination of a course of action concerning junior/senior rights.

**viii.** When, in the opinion of the surveyor, the results of the survey differ significantly from the record, or if a fundamental decision related to the boundary resolution is not clearly reflected on the plat or map, the surveyor shall explain this information with notes on the face of the plat or map.

**ix.** A note on the face of the plat or map explaining the site conditions that resulted in a Relative Positional Precision that exceeds the maximum allowed under Section 3.E.v. of these standards.

**x.** A note on the face of the plat or map identifying the title commitment/policy number, effective date and name of the insurer for any title work provided to the surveyor.

**C.** **Easements, Servitudes, Rights of Way, Access and Record Documents**

**i.** The width and recording information of all plottable rights of way, easements and servitudes burdening and benefitting the property surveyed,

as evidenced by Record Documents which have been provided to the surveyor.

ii.      A note regarding any right of way, easement or servitude evidenced by a Record Document which has been provided to the surveyor (a) the location of which cannot be determined from the record document, or (b) of which there was no observed evidence at the time of the survey, or (c) that is a blanket easement, or (d) that is not on, or does not touch, the surveyed property, or (e) that limits access to an otherwise abutting right of way, or (f) in cases where the surveyed property is composed of multiple parcels, which of such parcels the various rights of way, easements, and servitudes cross.

iii.      A note if no physical access to a public way was observed in the process of conducting the survey.

iv.      The width of abutting rights of way and the source of such information (a) where available from the controlling jurisdiction or (b) where disclosed in Record Documents provided to the surveyor.

v.      The identifying titles of all recorded plats, filed maps, right of way maps, or similar documents which the survey represents, wholly or in part, with their recording or filing data.

vi.      For non-platted adjoining land, names and recording data identifying adjoining owners according to current public records.  For platted adjoining land, the recording data of the subdivision plat.

vii.      Platted setback or building restriction lines which appear on recorded subdivision plats or which were disclosed in Record Documents provided to the surveyor.

**D.    Presentation**

i.      The plat or map shall be drawn on a sheet of not less than 8 ½ by 11 inches in size at a legible, standard engineering scale, with that scale clearly indicated in words or numbers and with a graphic scale.  When recordation or filing of a plat or map is required by law, such plat or map shall be produced in recordable form.  The boundary of the surveyed property drawn in a manner that distinguishes it from other lines on the plat or map.  A north arrow (with north to the top of the drawing when practicable), a legend of symbols and abbreviations, and a vicinity map showing the property in reference to nearby highway(s) or major street intersection(s).

ii.      Supplementary or detail diagrams when necessary.

ME1 42686889v.6

      **iii.**     If there are no visible buildings on the surveyed property, a note stating *"No buildings existing on the surveyed property"* shall appear on the face on the survey.

      **iv.**     The surveyor's project number (if any), and the name, registration or license number, signature, seal, street address, telephone number, and email address of the surveyor who performed the survey.  The date(s) of any revisions made by said surveyor.

      **v.**     Sheet numbers where the plat or map is composed of more than one sheet.

      **vi.**     The caption "ALTA/ACSM Land Title Survey."

**7.**     **Certification** - The plat or map of an ALTA/ACSM Land Title Survey shall bear only the following certification, unaltered, except as may be required pursuant to Section 3.B. above:

*To [Borrower], [Lender], (name of title insurer, if known), (names of others as negotiated with the client):*

*This is to certify that this map or plat and the survey on which it is based were made in accordance with the 2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys, jointly established and adopted by ALTA and NSPS, and includes Items 1-4, 6, 7(a), 7(b)(1), 7(c), 8-10, 11(b), 13, 14, 16, 17, 18, 19, 20(a), 20(b) and 21 of Table A thereof.  The field work was completed on _____.*

Date of Plat or Map:_____    (Surveyor's signature, printed name and seal with Registration/License Number)

**8.**     **Deliverables** - The surveyor shall furnish copies of the plat or map of survey to the insurer and client, and as otherwise negotiated with the client.  Hard copies shall be on durable and dimensionally stable material of a quality standard acceptable to the insurer.  Digital copies of the plat or map may be provided in addition to, or in lieu of, hard copies in accordance with the terms of the contract.  When required by law or requested by the client, the plat or map shall be produced in recordable form and recorded or filed in the appropriate office or with the appropriate agency.

*TABLE A*

**OPTIONAL SURVEY RESPONSIBILITIES AND SPECIFICATIONS**

NOTE:  The items on Table A must be negotiated between the surveyor and client.  It may be necessary for the surveyor to qualify or expand upon the description of these items, e.g., in reference to Item 6(b), there may be a need for an interpretation of a restriction.  The surveyor cannot make a certification on the basis of an interpretation or opinion of another party. Notwithstanding Table A Items 5 and 11(b), if an engineering design survey is desired as part of an LSTS/ACSM Land Title Survey, such services should be negotiated under Table A, Item 22.

**If checked, the following optional items are to be included in the ALTA/ACSM LAND TITLE SURVEY, except as otherwise negotiated:**

1.   __X__   Monuments placed (or a reference monument or witness to the corner) at all major corners of the boundary of the property, unless already marked or referenced by an existing monument or witness to the corner.

2.   __X__   Address(es) if disclosed in Record Documents, or observed while conducting the survey.

3.   __X__   Flood zone classification (with proper annotation) based on federal Flood Insurance Rate Maps or the state or local equivalent, depicted by scaled map location and graphic plotting only.

4.   __X__   Gross land area (and other areas if specified by the client).

5.   __X__   Vertical relief with the source of information (e.g. ground survey or aerial map), contour interval, datum, and originating benchmark identified.

6.   ____   (a)   Current zoning classification, as provided by the insurer.

   __X__   (b)   Current zoning classification and building setback requirements, height and floor space area restrictions as set forth in that classification, as provided by the insurer.  If none, so state

7.   __X__   (a)   Exterior dimensions of all buildings at ground level

   __X__   (b)   Square footage of:

      __X__   (1)   Exterior footprint of all buildings at ground level

      ____   (2)   Other areas as specified by the client

   __X__   (c)   Measured height of all buildings above grade at a location specified by the client.  If no location is specified, the point of measurement shall be identified.

8.  __X__    Substantial features observed in the process of conducting the survey (in addition to the improvements and features required under Section 5 above) such as parking lots, billboards, signs, swimming pools, landscaped areas, etc.

9.  __X__    Striping, number and type (e.g. handicapped, motorcycle, regular, etc.) of parking spaces in parking areas, lots and structures.

10. __X__    (a)    Determination of the relationship and location of certain division or party walls designated by the client with respect to adjoining properties (client to obtain necessary permissions).

   __X__    (b)    Determination of whether certain walls designated by the client are plumb (client to obtain necessary permissions).

11. __X__    Location of utilities (representative examples of which are shown below) existing on or serving the surveyed property as determined by:

   ____    (a)    Observed evidence

   __X__    (b)    Observed evidence together with evidence from plans obtained from utility companies or provided by client, and markings by utility companies and other appropriate sources (with reference as to the source of information)
   - Railroad tracks and sidings;
   - Manholes, catch basins, valve vaults and other surface indications of subterranean uses;
   - Wires and cables (including their function, if readily identifiable) crossing the surveyed property, and all poles on or within ten feet of the surveyed property. Without expressing a legal opinion as to the ownership or nature of the potential encroachment, the dimensions of all encroaching utility pole crossmembers or overhangs; and
   - Utility company installations on the surveyed property.

12. Governmental Agency survey-related requirements as specified by the client, such as for HUD surveys, and surveys for leases on Bureau of Land Management managed lands

13. __X__    Names of adjoining owners of platted lands according to current public records.

14. __X__    Distance to the nearest intersecting street as designated by the client.

15. Rectified orthophotography, photogrammetric mapping, laser scanning and other similar products, tools or technologies may be utilized as the basis for location of certain features (excluding boundaries) where ground measurements are not otherwise necessary to locate those features to an appropriate and acceptable accuracy relative to a nearby boundary. The surveyor shall (a) discuss the ramifications of such methodologies (e.g. the potential precision and completeness of the data gathered thereby) with the insurer, lender and

ME1 42686889v.6

client prior to the performance of the survey and, (b) place a note on the face of the survey explaining the source, date, precision and other relevant qualifications of any such data.

16.  __X__  Observed evidence of current earth moving work, building construction or building additions.

17.  __X__  Proposed changes in street right of way lines, if information is available from the controlling jurisdiction.  Observed evidence of recent street or sidewalk construction or repairs.

18.  __X__  Observed evidence of site use as solid waste dump, sump or sanitary landfill.

19.  __X__  Location of wetland areas as delineated by appropriate authorities.

20.  __X__  (a)  Locate improvements within any offsite easements or servitudes benefitting the surveyed property that are disclosed in the Record Documents provided to the surveyor and that are observed in the process of conducting the survey (client to obtain necessary permissions).

  __X__  (b)  Monuments places (or a reference monument or witness to the corner) at all major corners of any offsite easements or servitudes benefitting the surveyed property and disclosed in Record Documents provided to the surveyor (client to obtain necessary permissions).

21.  __X__  Professional Liability Insurance policy obtained by the surveyor in the minimum amount of $1,000,000 to be in effect throughout the contract term.  Certificate of Insurance to be furnished upon request.

*22.*  ___   _____

*Adopted by the Board of Governors, American Land Title Association, on October 13, 2010. American Land Title Association, 1828 L St., N.W., Suite 705, Washington, D.C. 20036.*

*Adopted by the Board of Directors, National Society of Professional Surveyors, on November 15, 2010.*
*National Society of Professional Surveyors, Inc., a member organization of the American Congress on Surveying and Mapping, 6 Montgomery Village Avenue, Suite 403, Gaithersburg, MD 20879*

ME1 42686889v.6

## EXHIBIT E

## INSURANCE REQUIREMENTS[1] [2]

1.    Insurance Requirements During Construction.    Borrower shall secure, pay for and maintain or cause Borrower's contractors to secure, pay for and maintain during the continuance of any work, evidence of insurance policies as set forth below; all of which must be satisfactory to Administrative Agent in carrier, forms, amounts and coverage by an insurance carrier licensed to do business in the State in which the Property is located with an AM Best Rating of at least A- or better, and providing for 30 days' (or in the case of Flood Insurance Policies issued by private insurance companies, 45 days') prior written notice by insurance carrier to Administrative Agent in advance of cancellation of said policies for non-payment of premiums or any other mason or for material modification or non-renewal of said policies, and 10 days' prior written notice to Administrative Agent in advance of payment of any insurance claims under said policies to any person.  A maximum deductible of Five Thousand Dollars ($5,000.00) shall apply to all policies. Without limiting the generality of the foregoing, such policies shall include the following:

(A)    Builder's risk insurance on an "all risk" basis (including, without limitation, coverage from loss or damage arising from fire or other casualty, vandalism, theft and malicious mischief, flood, [earthquake, and acts of terrorism,] and comprehensive boiler and machinery or "breakdown" coverage) in an amount not less than [the MI insurable replacement value][_____ ($_____)], insuring the Project and [Existing Structure] if a renovation, including materials in storage, and bearing a replacement cost agreed amount endorsement (such Builder's Risk Insurance may be included in the coverage provided by the policy of insurance required pursuant to Section 2.(A) of below.) Administrative Agent (for the benefit of itself and the Lenders) shall be named First Mortgagee and provide a "standard" or "New York" Lender's Loss Payable endorsement.

(B)    Comprehensive general liability insurance (including Contractor's Protective Liability) in an amount not less than $1,000,000 per occurrence, whether involving bodily injury liability (or death resulting therefrom) or property damage liability or a combination thereof with a minimum aggregate limit of 52,000,000. Such insurance shall provide for explosion and collapse, completed operations coverage and broad form blanket contractual liability coverage and shall insure against any and all claims for bodily injury, including death resulting therefrom, and damage to the property of others and arising from its operations under the contracts whether such operations are performed by Borrower, Borrower's contractors or by anyone directly or indirectly employed by any of them.  Administrative Agent (for the benefit of itself and the Lenders) and Borrower shall *be* named as additional insureds for ongoing and completed operations on a primary and non-contributory basis.  A waiver of subrogation shall apply to all parties.

(C)    Worker's compensation as prescribed by applicable Law; and Employers' Liability insurance in an amount of no less than 51,000,000 per accident for bodily injury and

---

[1]    NTD: Bank and its insurance consultant to confirm specific details/requirements.
[2]    NTD: Sample provisions provided by Bank: confirm specific requirements – including re terrorism insurance. etc.  – and any further changes required for subject transaction.  Ensure that any form of insurance requirements provided to Borrower includes the provisions of this Exhibit.  including relative to the flood insurance requirement.

EXHIBIT E – Page 1

ME1 42686889v.6

disease; covering all Borrower or Borrower's contractors' employees working on or about the Project.  A waiver of subrogation shall apply to all parties.

(D)    Automobile liability insurance, including the ownership, maintenance and operation of any "autos" owned, hired, or non-owned in an amount not less than $1,000,000 for bodily injury and property damage.  Such insurance shall insure against any and all claims for bodily injury, including death resulting therefrom, and damage to the property of others arising from its operations under the contracts, whether such operations are performed by Borrower, Borrower's contractors, or by anyone directly or indirectly employed by any of them.  A waiver of subrogation shall apply to all parties.

(E)    Umbrella or excess liability insurance following form to all coverages and endorsements listed above, in an amount not less than $5,000,000 per occurrence, with a minimum aggregate limit of 55,000,000.

2.    <u>Insurance Requirements For Completed Projects</u>.  Borrower shall secure, pay for and maintain evidence of insurance policies as set forth below; all of which must be satisfactory to Administrative Agent in carrier, forms, amounts and coverage by an insurance carrier licensed to do business in the State in which the Property is located with an AM Best Rating of at least A- or better, and providing for 30 days' (or in the case of Flood Insurance Policies issued by private insurance companies, 45 days') prior written notice by insurance carrier to Administrative Agent in advance of cancellation of said policies for non-payment of premiums or any other reason or for material modification or non-renewal of said policies, and 10 days' prior written notice to Administrative Agent in advance of payment of any insurance claims under said policies to any person.  A maximum deductible of Five Thousand Dollars ($5,000.00) shall apply to all policies. Without limiting the generality of the foregoing, such policies shall include the following:

(A)    "All-risk" property insurance (including, without limitation, coverage from loss or damage arising from fire or other casualty, vandalism, theft and malicious mischief, flood, [earthquake, and acts of terrorism,] and comprehensive boiler and machinery or "breakdown" coverage), covering the Premises and any and all furniture, fixtures, equipment, supplies, inventory, contents and other property owned, leased, held or possessed by Borrower and contained therein, in an amount equal to the greater of (1) the Loan Amount, or (2) the replacement cost of the Project, with Special Form and Replacement Cost endorsements and in such amounts so as to avoid the operation of any coinsurance clause, without deduction for depreciation, providing protection against all perils such as fire, extended coverage, vandalism, malicious mischief, boiler and machinery, law & ordinance, flood, glass breakage and sprinkler leakage.  Administrative Agent (for the benefit of itself and the Lenders) shall be named First Mortgagee and provide a "standard" or "New York" Lender's Loss Payable endorsement if applicable.

(B)    Business interruption insurance, including loss of rental income, for one hundred percent (100%) of gross revenues for a period of twelve (12) months.

(C)    Comprehensive general liability insurance in an amount not less than $1,000,000 per occurrence, whether involving bodily injury liability (or death resulting therefrom) or property damage liability or a combination thereof with a minimum aggregate limit of

EXHIBIT E – Page 2

$2,000,000. Administrative Agent (for the benefit of itself and the Lenders) shall be named as additional insured on a primary and non-contributory basis.  A waiver of subrogation shall apply in favor of Administrative Agent (for the benefit of itself and the Lenders).

(D)     Automobile liability insurance, including the ownership, maintenance and operation of any "autos" owned, hired, or non-owned in an amount not less than $1,000,000 for bodily injury and property damage.  A waiver of subrogation shall apply in favor of Administrative Agent (for the benefit of itself and the Lenders).

(E)     Umbrella or excess liability insurance following form to all coverages and endorsements listed above, in an amount not less than $5,000,000 per occurrence, with a minimum aggregate limit of $5,000,000.

3.      Additional Insurance Requirements: The following coverages are applicable to [both (1) and (2) above] with the same terms and requirements:

(A)     [For Low Income Housing Tax Credit Loans only:] Fidelity Bond Insurance Coverage should name Administrative Agent (for the benefit of itself and the Lenders) as an Additional Insured on the fidelity bond with limits of One Hundred Thousand Dollars ($100,000).

(B)     With respect to any portion of the Property that is located in a Flood Zone within a community participating in the Flood Program, Borrower shall, and shall cause any applicable Loan Party to, maintain through the Flood Program or through private insurance policies, with financially sound and reputable insurance companies (except to the extent that any insurance company insuring the Property of Borrower and each other Loan Party ceases to be financially sound and reputable after the Closing Date, in which case, Borrower shall promptly replace such insurance company with a financially sound and reputable insurance company), (A) such flood insurance coverage under policies issued pursuant to and in compliance with the Flood Insurance Laws ("Flood Insurance Policies") in an amount equal to the maximum limit of coverage available for such Property under Flood Insurance Laws, subject only to deductibles consistent in scope and amount with those permitted under the Flood Program and (B) such additional coverage as required by Administrative Agent, if any, under supplemental private insurance policies in an amount **[so required by Administrative Agent], which when added to the coverage provided under the Flood Insurance Policies required under the foregoing clause (A), is not less than the aggregate sum of the Commitments [not less than 100% of insurable replacement cost of the improvements on such Property].  Such flood insurance coverage must be** obtained either prior to the Closing Date [or immediately prior to the pouring of concrete for the slab, footings, piers, columns or like structures].  Should Borrower fail to obtain such coverage in a timely manner, Borrower acknowledges and agrees that Administrative Agent may force place appropriate coverage and charge any associated premiums to Borrower. Administrative Agent (for the benefit of itself and the Lenders) shall be named First Mortgagee and provide a Lenders Loss Payable endorsement if applicable. Borrower shall deliver to Administrative Agent a copy of a renewal or replacement policy (or other evidence of renewal of an Insurance Policy previously delivered to Administrative Agent) of all insurance required above, together with written evidence of full payment of the annual premiums therefore at least 30 days prior to the expiration of the existing insurance.  Any such insurance may be provided under so called "blanket" policies, so long as the amounts and coverages thereunder will, in

EXHIBIT E – Page 3

ME1 42686889v.6

Administrative Agent's sole judgment, provide protection equivalent to that provided under a single policy meeting the requirements of this paragraph.

Administrative Agent's name and address needs to be reflected on all coverage as follows (or as hereafter directed in writing to Borrower by Administrative Agent):

> Citizens Bank, N.A., as Administrative Agent for the benefit of all Lenders
> ISAOA/ATIMA
> Ann: Collateral Management Team M/C#MMF160
> 20 Cabot Road Medford, MA 02155

EXHIBIT E – Page 4

## **EXHIBIT F**

Borrower's Certificate for Payment

_____

_____

ATTN:  _____

      RE:    Application for Advance or confirmation of equity contribution in connection with a $_____ loan to _____ ("Borrower").

      1.    Pursuant to that certain Construction Loan Agreement dated _____, ____ (the "Construction Loan Agreement") between Borrower and _____ ("Lender"), Borrower

      (a)    hereby requests a loan advance in the amount of $_____. We acknowledge that this amount is subject to inspection, verification, and available funds.

      (b)    acknowledges and confirms an equity contribution as indicated on the Soft and Hard Cost Requisition attached hereto.

Funding Instructions

      2.    This Borrower's Certificate is to be utilized only in satisfaction of costs and charges with respect to the Project and Improvements thereon as shown on the Budget, and set forth in 4(l), below.

      3.    The Borrower agrees to provide, if requested by Lender, a Vendor Payee Listing showing the name and the amount currently due each party to whom Borrower is obligated for labor, material and/or services supplies.

      4.    The Borrower also certifies and agrees that:

      (a)    It has complied with all duties and obligations required to date to be carried out and performed by it pursuant to the terms of the Construction Loan Agreement;

      (b)    No Default or Event of Default as defined in the Construction Loan Agreement has occurred and is continuing and;

      (c)    All change orders or changes to the Plans and Specifications have been submitted to and approved by Lender;

      (d)    All funds previously disbursed have been used for the purposes as set forth in the Loan Documents executed between Borrower and Lender;

      (e)    All outstanding claims for labor, materials and/or services furnished prior to this draw period have been paid or will be paid from the proceeds of this disbursement;

ME1 42686889v.6

(f)     All construction prior to the date of this Borrower's Certificate has been accomplished in accordance with the Plans and Specifications;

(g)     All sums advanced by Lender or contributed by equity on account of this Borrower's Certificate will be used solely for the purpose of paying obligations owing as shown on the attached documentation and no item(s) for which payment is requested and/or equity is contributed has (have) been the basis for any prior disbursement and/or equity contribution;

(h)     There are no liens outstanding against the Project or its equipment except for Permitted Exceptions, Lender's liens and security interests as agreed upon in the Loan Agreement;

(i)     The amount of undisbursed Loan Proceeds and/or approved equity requirement remaining is sufficient to pay the cost of completing the Project in accordance with the Plans and Specifications originally submitted to the Lender as modified by Lender approved changed orders;

(j)     All representations and warranties contained in the Construction Loan Agreement are true and correct as of the date hereof.

(k)     The undersigned understands that this certification is made for the purpose of inducing Lender to make an advance to Borrower and that, in making such advance, Lender will rely upon the accuracy of the matters stated in this certificate.

(l)     The amount of Loan Proceeds requested hereunder, broken down by Budget line items is as follows:  _____.

(m)     The amount of Loan Proceeds previously disbursed for each line item set forth in (l) above is as follows:  _____.

(n)     The remaining balance of Loan Proceeds is:  $_____.

5.     Disbursement of the Loan Proceeds hereby requested are subject to the receipt by Lender, in those states where applicable, of a certificate from the issuing title company stating that no claims have been filed of record which adversely affects the title of Borrower to the Project, subsequent to the filing of the Lender's Mortgage.

6.     Capitalized terms used in this Borrower's Certificate and not otherwise defined shall have the same meaning and definitions as those set forth in the Construction Loan Agreement.

ME1 42686889v.6

7.      The Borrower, or authorized signer, certifies that the statements made in this Borrower's Certificate and any documents submitted herewith and identified herein are true and has duly caused this Borrower's Certificate to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:_____

Borrower:

By: _____
Name: _____
Title: _____

## EXHIBIT G

### FORM RELEASE OF LIENS FOR PARTIAL PAYMENT

THIS RELEASE is made this ___day of _____, 20__ by _____ of the firm, _____ ("Contractor"), with offices at _____, in favor of _____, with an address of _____ (the "Owner").

A.      Contractor has contracted with Owner by a contract dated _____, 20__, as amended from time to time (the "Contract") for certain services and related work (the "Project") relating to certain premises located at _____, on real estate described in Exhibit "A" attached hereto (the "Property").

B.      As of _____, 20__ (the "Payment Date"), Contractor has furnished materials and /or performed services and/or work at or relating to the Property.

C.      Contractor has agreed to release all liens which Contractor has prior to the Payment Date with respect to the Property by reason of materials furnished and services and work performed at or relating to the Property.

NOW THIS AGREEMENT WITNESSETH:

1.      Contractor, for itself and anyone else acting or claiming through or under it, acknowledges that it has been paid in full for all materials furnished or work performed at or relating to the Property at any time prior to the Payment Date, and has no claim, counterclaim or set-off against Owner or any person or entity having any title or interest in all or any part of the Property.

2.      Contractor, for itself and anyone else acting or claiming through or under it, does hereby remise, release and forever quitclaim unto Owner, Owner's successors and assigns and any other person or entity having any title or interest in all or any part of the Property, and their respective successors and assigns, all manner of liens, claims and demands whatsoever which contractor has or might or could have on or against the Property or the estate or title of Owner or any person or entity having any title or interest in all or any part of the Property, shall have, hold and enjoy the Property free and discharged from all liens, claims, or demands whatsoever which Contractor has or could have, arising prior to the Payment Date.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

ME1 42686889v.6

IN WITNESS WHEREOF, intending to be legally bound, the Contractor has caused this Release of Liens to be executed as of the day and year first above written.

WITNESS:                                      CONTRACTOR:

Attest: _____              By: _____

                                              Name:

## **EXHIBIT H**

FORM FINAL RELEASE OF LIENS

THIS RELEASE is made this ____ day of _____, 20__ by _____("Contractor"), with offices at _____, in favor of _____, with an address of _____ (the "Owner").

A.    Contractor has contracted with Owner by a contract dated _____, 20__, as amended from time to time (the "Contract") for certain services and related work (the "Project") relating to certain premises known as _____, on real estate described in Exhibit "A" attached hereto (the "Property").

B.    As of the date hereof Contractor has furnished materials and/or services performed, services and/or work at or relating to the Property and has been paid in full for such materials, services and/or work.

C.    Contractor has agreed to release all liens which Contractor has with respect to the Property by reason of materials furnished and services and work performed at or relating to the Property.

THEREFORE, in consideration of the above recitals and the within promises and intending to be legally bound, the parties agree as follows:

1.    Contractor, for itself, its successors and assigns and anyone else acting or claiming through or under it, acknowledges that it has been paid in full for all materials furnished or work performed at or relating to the Property at any time and has no claim, counterclaim or set-off against Owner, its officers, partners, directors, employees, sureties, successors and assigns, or any person or entity having any title or interest in all or part of the Property.

2.    Contractor, for itself, its successors and assigns and anyone else acting or claiming through or under it, does hereby remise, release and forever quitclaim unto Owner, Owner's officers, partners, directors, employees, sureties, successors and assigns and any other person or entity having any title or interest in all or any part of the Property, and their respective successors and assigns, all manner of liens, claims and demands whatsoever which Contractor has or might or could have on or against the Property or the estate or title of Owner or any person or entity having any title or interest in all or any part of the Property, at any time so that Owner and any person or entity having any title or interest in all or any part of the Property, shall have, hold and enjoy the Property free and discharged from all liens, claims, or demands whatsoever which Contractor has or could have, arising under its Contract or otherwise.

3.    In the event that any claim is asserted by a subcontractor or supplier against the Mortgagee, _____ Bank, Contractor shall hold harmless, indemnify, and defend _____ Bank and its officers, partners, directors, employees, sureties, successors and assigns from any and all such claims, losses, damages, arising or alleged to have arisen from the provision of materials and/or performance of services and/or work on the Project.

ME1 42686889v.6

IN WITNESS WHEREOF, intending to be legally bound, the Contractor has executed this Release of Liens as of the day and year first above written.

WITNESS:                                CONTRACTOR:


Attest: _____    By: _____
                                            Name:
                                            Title:


ME1 42686889v.6

# EXHIBIT B

# PROMISSORY NOTE

U.S. $10,000,000.00                                    Executed on November 16, 2022
                                                       Effective as of November 17, 2022

FOR VALUE RECEIVED, the undersigned, **HANCOCK LOFTS LLC**, a Pennsylvania limited liability company (hereinafter referred to as "Borrower"), hereby promises to pay to the order of **CITIZENS BANK, N.A.** (the "Lender"), at its principal office at One Logan Square, 130 North 18th Street, Suite 1310, Mailstop: PL 1350, Philadelphia, PA 19103, or at such other place as the holder hereof may from time to time designate in advance in writing, the principal sum of TEN MILLION 00/100 DOLLARS ($10,000,000.00) (the "Loan"), or so much thereof as may be advanced from time to time, together with interest on the unpaid principal balance thereon from time to time outstanding, at the rates and at the times hereinafter provided.

The proceeds of the loan evidenced by this Promissory Note (this "Note") shall be advanced pursuant to the terms and conditions of that certain Construction Loan Agreement by and between Borrower and Lender dated as of even date herewith (as the same may be amended, supplemented, extended, modified, substituted or consolidated, the "Loan Agreement"). This Note evidences the Loan. Payment of this Note is governed by the Loan Agreement, the terms of which are incorporated herein by express reference as if fully set forth herein. Capitalized terms used and not otherwise defined herein shall have the meaning given to them in the Loan Agreement.

1.      **Interest**.  The principal amount hereof outstanding from time to time shall bear interest until paid in full at the Applicable Interest Rate.

2.      **Monthly Payments**.  During the Construction Period, payments of interest will be due and payable on each Interest Payment Date in the amount of all interest accrued during the immediately preceding calendar month until the Loan is paid in full.  All payments on account of the indebtedness evidenced by this Note shall be made to Lender not later than 11:00 a.m. Eastern Standard Time on the day when due in lawful money of the United States and shall be first applied to late charges, costs of collection or enforcement and other similar amounts due, if any, under this Note and any of the other Loan Documents, then to interest due and payable hereunder and the remainder to principal due and payable hereunder.

3.      **Principal and Interest Payments**.  Commencing on the first Permanent Loan Payment Date following the conversion to the Permanent Loan, and continuing on each Permanent Loan Payment Date thereafter, up to and including the Permanent Loan Maturity Date, Borrower shall make principal payments in the scheduled Principal Repayment Amount together with the monthly payments of interest.  Borrower hereby acknowledges and agrees that such principal payments will not be sufficient to repay the Loan by the Maturity Date or the Permanent Loan Maturity Date, as the case may be, and that a balloon payment of all outstanding principal, together with accrued and unpaid interest will be due upon maturity of this Note, whether by acceleration or otherwise.

4.        **Prepayment**.  Borrower may, upon written notice to Lender, at any time and from time to time, voluntarily prepay the Loan in whole or in part without premium or penalty (except as set forth in Section 3.7 of the Loan Agreement), provided that such notice must be received by Lender not later than 1:00 p.m. (1) three U.S. Government Securities Business Days prior to any date of prepayment of a SOFR Loan and (2) one Business Day prior to the date of prepayment of an ABR Loan.  Each such notice shall specify the proposed date and amount of such prepayment. If such notice is given by Borrower, Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Each prepayment of the Loan shall be applied first to late payment charges or other sums owed to Lender, if applicable, next to accrued and unpaid interest which is then due and payable, if applicable, and then to principal installments in inverse order of maturity.  No partial prepayment shall postpone or interrupt payments of interest or the payment of the remaining principal balance, all of which shall continue to be due and payable at the time and in the manner set forth in this Note.

5.        **Maturity Date**.  The indebtedness evidenced hereby shall mature on the Maturity Date (unless Borrower converts the Construction Loan to the Permanent Loan, in which case indebtedness shall **mature** on the Permanent Loan Maturity Date).  On the Maturity Date (or the Permanent Loan Maturity Date, as the case may be), the entire outstanding principal balance hereof, together with accrued and unpaid interest and all other sums evidenced by this Note, shall, if not sooner paid, become immediately due and payable.

6.        **Default**.  Upon the occurrence of any of the following events, at the election of Lender, the entire unpaid principal balance of this Note, together with all accrued but unpaid interest thereon and all other sums or charges due hereunder or secured by or required to be paid by Borrower under any of the Loan Documents, shall become immediately due and payable:

(a)  If Borrower fails to pay any monthly installment of interest or of principal and interest on the date when such payment is due as herein provided; or

(b)  If Borrower fails to pay the entire outstanding principal balance together with accrued and unpaid interest on the Maturity Date (or if applicable, the Permanent Loan Maturity Date); or

(c)  If an Event of Default occurs under the Loan Agreement or any of the other Loan Documents; or

(d)  If Borrower defaults in the due performance and observance of any term of any other agreement with Lender beyond any applicable notice and grace period contained therein, including, without limitation, all agreements between Lender and Borrower which give rise to Hedging Obligations.

Notice of such election by Lender is hereby expressly waived as part of the consideration for this Loan.  Nothing contained herein shall be construed to restrict the exercise of any other rights or remedies granted to Lender hereunder or under any of the other Loan Documents upon the failure of Borrower to perform any provision hereof or of any of the other Loan Documents.

2

7.    **Default Rate; Late Charge**.  Regardless of whether the Applicable Interest Rate would otherwise then be in effect, in the event (a) the principal balance hereof is not paid when due whether by acceleration or upon the Maturity Date (or if applicable, the Permanent Loan Maturity Date) or (b) upon the occurrence and during the continuance beyond any applicable notice and cure period, of an Event of Default, then the principal balance hereof shall bear interest from and thereafter at the Default Rate.  In addition, for any installment of principal and/or interest, which is not paid within ten (10) days after the due date thereof, the Late Charge shall be due and payable to the holder of this Note on demand to cover the extra expense involved in handling delinquent payments.

8.    **Binding Effect**.  This Note shall be binding upon Borrower, its successors and permitted assigns, whether expressed or not, and each owner and holder from time to time of this Note.

9.    **Time is of the Essence**.  Time is of the essence as to Borrower's performance and observances of all obligations and time periods applicable to Borrower pursuant to this Note.

10.    **Borrower Waivers**.  Borrower hereby waives demand, presentment for payment, protest, notice of protest, notice of nonpayment and any and all lack of diligence or delays in collection or enforcement of this Note or the other Loan Documents, and expressly consents to any extension of time of payment hereof, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this Note, and to any substitution, exchange or release of the collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any party primarily or secondarily liable hereunder or of any of the security for this Note, the acceptance of other parties to be liable for any of the indebtedness evidenced hereby or under the other Loan Documents or of other security therefor, or any other indulgence or forbearance which may be made, without notice to any party and without in any way affecting the liability of any party.

Borrower hereby waives, in favor of the holder hereof, any and all rights of contribution, subrogation, exoneration and any similar rights and interest so long as any amount evidenced by this Note, together with any additional amount secured by any of the Loan Documents, remains unpaid.  Borrower agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender; and Borrower consents to any indulgences and all extensions of time.  Borrower hereby waives and renounces for itself, its successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption and homestead laws now provided, or which may hereafter be provided, by the laws of the United States and of any state thereof against the enforcement and collection of the obligations evidenced by this Note.

11.    **Cumulative Rights**.  No delay on the part of the holder of this Note in the exercise of any power or right under this Note, or any of the other Loan Documents, shall operate as a waiver thereof, nor shall a single or partial exercise of any other power or right.  Enforcement by the holder of this Note or any security for the payment thereof shall not constitute any election by it of remedies so as to preclude the exercise of any other remedy available to it.

3

ME1 42766565v.2

12.     **Governing Law**.  This Note has been negotiated, executed and delivered in the Commonwealth of Pennsylvania, and shall be construed and enforced in accordance with the Laws of the Commonwealth of Pennsylvania, except to the extent pre-empted by Federal laws without reference to the choice of law or conflicts of law principles of that State.

13.     **Lender's Costs**.  If this Note is not paid when due, whether at maturity or by acceleration or otherwise, or if an Event of Default occurs hereunder or under any of the Loan Documents, Borrower promises to pay all costs of collection incurred by Lender, including without limitation reasonable attorneys' fees to the fullest extent not prohibited by applicable law, and all expenses incurred in connection with the protection or realization of any collateral, whether or not suit is filed hereon or on any instrument granting a security interest.

14.     **Compliance with Applicable Law**.  The parties hereto intend and believe that each provision in this Note comports with all applicable local, state and federal laws and judicial decisions.  However, if any provision or provisions, or if any portion of any provision or provisions, in this Note is found by a court of law to be in violation of any applicable Laws or public policy, and if such court should declare such portion, provision or provisions of this Note to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Note shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained herein, and that the rights, obligations and interest of Borrower and the holder or holders hereof under the remainder of this Note shall continue in full force and effect.

15.     **WAIVER OF JURY TRIAL; JURISDICTION, VENUE, SERVICE**.  BORROWER HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, AND LENDER BY ITS ACCEPTANCE HEREOF, EACH WAIVES THE RIGHT OF A JURY TRIAL IN EACH AND EVERY ACTION ON THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, IT BEING ACKNOWLEDGED AND AGREED THAT ANY ISSUES OF FACT IN ANY SUCH ACTION ARE MORE APPROPRIATELY DETERMINED BY THE COURTS.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS NOTE (EACH, A "PROCEEDING"), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY OF PHILADELPHIA, COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS NOTE SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION.  BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER

4

APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY PENNSYLVANIA STATE OR UNITED STATES COURT SITTING IN THE CITY AND COUNTY OF PHILADELPHIA MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT THE ADDRESS INDICATED SET FORTH IN THE LOAN AGREEMENT, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; <u>EXCEPT</u> THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

16.     **CONFESSION OF JUDGMENT AND EXECUTION**.     UPON THE OCCURRENCE OF AN EVENT OF DEFAULT, BORROWER IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR BORROWER IN ANY AND ALL ACTIONS AND TO CONFESS JUDGMENT AGAINST BORROWER FOR ALL OR ANY PART OF THE SUMS DUE UNDER THIS NOTE, INCLUDING, BUT NOT LIMITED TO, THE ENTIRE UNPAID PRINCIPAL OF THIS NOTE, TOGETHER WITH INTEREST, INCLUDING INTEREST ON ANY JUDGMENT OBTAINED BY LENDER AT THE APPLICABLE DEFAULT RATE UNTIL ACTUAL PAYMENT IS MADE TO LENDER IN THE FULL AMOUNT DUE TO LENDER, LATE CHARGES, AND ALL OTHER SUMS PAID BY LENDER ON BEHALF OF BORROWER OR SUMS PAYABLE BY BORROWER TO OR ON BEHALF OF LENDER PURSUANT TO THE TERMS OF THIS NOTE AND/OR THE LOAN DOCUMENTS, TOGETHER WITH COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION FOR COLLECTION IN THE AMOUNT OF FIFTEEN PERCENT (15%) THEREOF, BUT IN NO EVENT LESS THAN $25,000.00.     BORROWER FURTHER AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD UPON THE OCCURRENCE AND CONTINUANCE OF AN EVENT OF DEFAULT, TO APPEAR FOR AND ENTER JUDGMENT AGAINST BORROWER IN AN ACTION OF REPLEVIN OR ANY OTHER ACTION TO RECOVER POSSESSION OF ANY COLLATERAL SECURING THIS NOTE.  SUCH CONFESSIONS OF JUDGMENT OR ACTIONS SHALL BE WITH RELEASE OF ERRORS, WAIVERS OF APPEALS, WITHOUT STAY OF EXECUTION AND BORROWER WAIVES ALL RELIEF FROM ANY AND ALL APPRAISEMENT OR EXEMPTION LAWS NOW IN FORCE OR HEREAFTER ENACTED. IF A COPY OF THIS NOTE, VERIFIED BY AN OFFICIAL OR AN OFFICER OF LENDER, SHALL BE FILED IN ANY PROCEEDING OR ACTION WHEREIN JUDGMENT IS TO BE CONFESSED, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF AND SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR HEREIN FOR AND CONFESS JUDGMENT AGAINST BORROWER AS PROVIDED HEREIN.  JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS AND NO SINGLE EXERCISE OF THE AFORESAID POWERS TO CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, SHALL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, AVOIDABLE, OR VOID, BUT THE POWER SHALL CONTINUE UNDIMINISHED AND IT MAY BE EXERCISED FROM TIME TO TIME AFTER AND AS LENDER SHALL ELECT UNTIL SUCH TIME AS LENDER SHALL HAVE RECEIVED PAYMENT IN FULL OF ALL SUMS DUE UNDER THIS NOTE AND UNDER THE MORTGAGE, TOGETHER WITH INTEREST, COSTS, AND FEES.

ME1 42766565v.2

17.    **WAIVER OF DEFENSES TO CONFESSION OF JUDGMENT AND EXECUTION**.  BORROWER HAS REVIEWED THE WARRANT OF ATTORNEY FOR CONFESSION OF JUDGMENT SET FORTH IN SECTION 16 ABOVE WITH BORROWER'S ATTORNEY AND ACKNOWLEDGES THAT LENDER IS AUTHORIZED TO TAKE ANY ACTION WITHOUT ANY ADVANCE NOTICE TO BORROWER, BOTH TO CONFESS JUDGMENT AND, TO THE EXTENT PERMITTED BY LAW, IMMEDIATELY THEREAFTER TO TAKE ANY ADDITIONAL ACTION TO ENFORCE THE JUDGMENT, SUCH AS ATTACHING, EXECUTING UPON, SEIZING, TAKING POSSESSION OF AND SELLING ANY OF BORROWER'S REAL ESTATE, OTHER TANGIBLE OR INTANGIBLE PROPERTY, INCLUDING BANK ACCOUNTS AND RECEIVABLES.  THEREFORE, BORROWER IS AWARE THAT, TO THE EXTENT PERMITTED BY LAW, IT HAS GIVEN UP ANY RIGHTS IT MIGHT HAVE TO A HEARING TO CONTEST THE VALIDITY OF ANY SUCH JUDGMENT OR OTHER CLAIMS THAT LENDER MAY ASSERT THEREUNDER.  BORROWER SPECIFICALLY AND VOLUNTARILY WAIVES AND RELINQUISHES ANY RIGHTS IT MAY HAVE TO ANY NOTICE OR HEARING OR OTHER DUE PROCESS IN CONNECTION WITH LENDER'S IMPLEMENTATION OF ITS RIGHTS TO TAKE JUDGMENT, OR TO EXECUTE UPON OR TAKE ANY ADDITIONAL ACTION TO ENFORCE SUCH JUDGMENT.  BORROWER ALSO SPECIFICALLY RELEASES ANY RIGHTS IT MAY HAVE TO CHALLENGE SUCH ACTION BY LENDER OR TO CLAIM OR RECOVER ANY DAMAGES AGAINST LENDER IN CONNECTION WITH SUCH ACTIONS, TO THE EXTENT PERMITTED BY LAW.  BORROWER ACKNOWLEDGES THAT IT IS REPRESENTED BY COUNSEL AND THAT BORROWER'S COUNSEL HAS REVIEWED AND EXPLAINED THE MEANING OF THESE WAIVERS TO BORROWER.

18.    **Miscellaneous**.

(a)    If Borrower consists of more than one person, each shall be jointly and severally liable to perform the obligations of Borrower under this Note.

(b)    All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.

(c)    Titles of articles and sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK—
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

6

ME1 42766565v.2

*[SIGNATURE PAGE TO PROMISSORY NOTE]*

**BORROWER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS PROMISSORY NOTE INCLUDING, WITHOUT LIMITATION, THE WAIVER OF JURY TRIAL AND THE CONFESSION OF JUDGMENT, AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.**

IN WITNESS WHEREOF, intending to be legally bound, Borrower has caused this Promissory Note to be duly executed and delivered under seal as of the day and year first above set forth.

<u>**BORROWER**</u>:

**HANCOCK LOFTS LLC**, a Pennsylvania limited liability company

**By:**   **Hancock Lofts MM LLC**, a Pennsylvania limited liability company, its managing member

By:_____[SEAL]
Name:   Harrison Merriman Finberg
Title:   Sole Member

COMMONWEALTH OF PENNSYLVANIA,

                                    SS.:

COUNTY OF PHILADELPHIA,

BE IT REMEMBERED, that on this 16ᵗʰ day of November, 2022, before me, the subscriber, personally appeared Harrison Merriman Finberg, who acknowledged under oath, to my satisfaction, that this person: (a) is the sole member of Hancock Lofts MM LLC, a Pennsylvania limited liability company (the "Managing Member"), itself the managing member of Hancock Lofts LLC, a Pennsylvania limited liability company (the "Company"), the borrower named in the within instrument and is authorized to sign the within instrument on behalf of the Company; and (b) as such sole member of the Managing Member, signed, sealed and delivered this instrument as the voluntary act and deed of the Company by signing the name of the Company.

WITNESS my hand and seal the day and year aforesaid.

_____
Notary Public
My Commission Expires

Commonwealth of Pennsylvania - Notary Seal
ADAM SCHNEIDER, Notary Public
Philadelphia County
My Commission Expires May 5, 2023
Commission Number 1233256

[Citizens-Hancock Lofts-Signature/Notary Page to Promissory Note]

# EXHIBIT C

## GUARANTY OF PAYMENT

THIS GUARANTY OF PAYMENT (this "Guaranty") made on the 16th day of November, 2022 and effective as of November 17, 2022, by **HARRISON MERRIMAN FINBERG,** an adult individual ("Guarantor"), to and for the benefit of **CITIZENS BANK, N.A.**("Lender").

## RECITALS

WHEREAS, HANCOCK LOFTS LLC, a Pennsylvania limited liability company ("Borrower") and Lender entered into that certain Construction Loan Agreement dated on or about the date hereof (as same may be supplemented, restated, superseded, amended or replaced from time to time, the "Loan Agreement") whereby Lender agreed to make a loan (the "Loan") to Borrower in the principal amount of up to TEN MILLION AND 00/100 DOLLARS ($10,000,000.00), to finance the development and construction of the Project (as defined in the Loan Agreement). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

WHEREAS, in connection with the Loan, Borrower has executed and delivered to Lender that certain Promissory Note (the "Note") dated of even date herewith in the amount of the Loan, which Note is secured by (i) an Open-End Mortgage, Assignment of Leases and Rents, and Security Agreement (the "Mortgage") made by Borrower in favor of Lender on the Project and (ii) the other Loan Documents.

WHEREAS, Guarantor will derive an economic benefit from the Loan evidenced and secured by the Note, the Mortgage and the other Loan Documents.

WHEREAS, Lender has relied on the statements and agreements contained herein in agreeing to make the Loan, and the execution and delivery of this Guaranty by Guarantor is a condition precedent to the making of the Loan by Lender.

## AGREEMENTS

NOW, THEREFORE, intending to be legally bound, Guarantor, in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, hereby covenants and agrees for the benefit of Lender and its respective successors, endorsees, transferees, participants and assigns as follows:

1.    Guarantor absolutely, unconditionally, irrevocably, and jointly and severally guarantees:

(a)    the full and prompt payment of the principal of and interest on the Note when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, and the full and prompt payment of all sums which may now be or may hereafter become due and owing under the Note, the Loan Agreement and the other Loan Documents;

1

ME1 42768822v.2

(b)　　the prompt, full and complete performance of all of Borrower's obligations under each and every covenant contained in the Loan Documents; and

(c)　　the full and prompt payment of any Enforcement Costs (as hereinafter defined in <u>Section 8</u> hereof); and

(d)　　intentionally omitted.

All amounts due, debts, liabilities and payment obligations described in subsections (a) through (c) of this <u>Section 1</u> shall be hereinafter collectively referred to as the "Guaranteed Obligations."

Notwithstanding anything to the contrary contained herein, the Guaranteed Obligations and all other guaranties provided herein shall expressly exclude any Excluded Swap Obligations (as defined below).  For the purposes of this Section 1, the following terms have the meaning ascribed below:

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Excluded Swap Obligation" means, with respect to Guarantor, any Swap Obligation (as defined below) if, and to the extent that, all or a portion of the guarantee of Guarantor of, or the grant by Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

2.　　In the event Borrower shall fail to pay in full, when due, any of the Guaranteed Obligations, Guarantor agrees, on demand by Lender or the holder of the Note, to pay the Guaranteed Obligations regardless of any defense, right of set-off or claims which Borrower or Guarantor may have against Lender or the holder of the Note.  All of the remedies set forth herein and/or provided for in any of the Loan Documents or at law or equity shall be equally available to Lender, and the choice by Lender of one such remedy over another shall not be subject to question or challenge by Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff, or failure to mitigate damages in any action, proceeding, or counteraction by Lender to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Lender from subsequently electing to exercise a different remedy.  Without limitation to the generality of

2

the foregoing, it is expressly hereby acknowledged and agreed that the obligations of Guarantor hereunder are independent of the obligations of Borrower or any other guarantor or indemnitor under any of the other Loan Documents to which they may be a party, and a separate action or actions may be brought and prosecuted against Guarantor whether or not any action is brought against Borrower, any other guarantor or indemnitor and whether or not Borrower is joined in any such action or actions.

3.      Guarantor does hereby (a) waive notice of acceptance of this Guaranty by Lender and any and all notices and demands of every kind which may be required to be given by any statute, rule or law, (b) agree to refrain from asserting, until after repayment in full of the Loan, any defense, right of set-off or other claim which Guarantor may have against Borrower (c) waive any defense, right of set-off or other claim which Guarantor or Borrower may have against Lender, or the holder of the Note, (d) waive any and all rights Guarantor may have under any anti-deficiency statute or other similar protections, (e) waive presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge Guarantor with liability, and (f) waive any failure by Lender to inform Guarantor of any facts Lender may now or hereafter know about Borrower, the Project, the Loan, or the transactions contemplated by the Loan Agreement, it being understood and agreed that Lender has no duty so to inform and that Guarantor is fully responsible for being and remaining informed by Borrower of all circumstances bearing on the risk of nonperformance of Borrower's obligations.  In addition to, and without limitation to, the foregoing waivers, Guarantor hereby also waives (a) any right to require Lender, as a condition of payment or performance or completion by Guarantor, to (i) proceed against Borrower, any other guarantor, or any other person, (ii) proceed against or exhaust any security held from Borrower, any other guarantor, or any other person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower, including, without limitation, any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument related thereto or by reason of the cessation of the liability of Borrower from any cause other than payment, performance and completion in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty and any legal or equitable discharge of any Guarantor's obligations hereunder (other than indefeasible payment, performance and completion of the Guaranteed Obligations or the Loan in full), (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (e) any release, discharge, modification, impairment or limitation of the liability of Borrower to Lender, whether consented to by Lender, consensual or arising by operation of law or any proceedings in bankruptcy or reorganization, or from any other cause, other than payment in full of the Loan; (f) any defense based on any rejection or disaffirmance of the Guaranteed Obligations, or any part thereof, or any security held therefor, in any such proceedings in bankruptcy or reorganization; (g) any defense based on any action taken

3

or omitted by Lender in any proceedings in bankruptcy or insolvency involving Borrower, including any election to have their claim allowed as being secured, partially secured or unsecured, any extension of credit by Lender to Borrower in any proceedings in bankruptcy or insolvency, and taking and holding by Lender of any security for any such extension of credit. The obligations of the undersigned Guarantor under this Guaranty extend to all amendments, supplements, modifications, renewals, replacements or extensions of the Loan Documents and all Hedging Contracts (as defined in the Mortgage) at any rate or rates of interest. The liability of Guarantor and the rights of the Lender under this Guaranty will not be impaired or affected in any manner by, and Guarantor hereby consents in advance to, and waives any requirement of notice for, any (1) disposition, impairment, release, surrender, substitution, or modification of any collateral securing the Guaranteed Obligations or the obligations created by this Guaranty or failure to perfect a security interest in any collateral; (2) release (including adjudication or discharge in bankruptcy) or settlement with Borrower or any other party which may be or become liable for the Guaranteed Obligations (including, without limitation, any maker, endorser, guarantor or surety); (3) delay in enforcement of payment of the Guaranteed Obligations or delay in enforcement of this Guaranty; (4) delay, omission, waiver, or forbearance in exercising any right or power with respect to the Guaranteed Obligations or this Guaranty; (5) defense arising from the enforceability, validity or genuineness of any of the Loan Documents; (6) defenses or counterclaims that Borrower may assert under or in respect of any of the Loan Documents, including, but not limited to, failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, infancy, statute of limitations, lender liability, accord and satisfaction and usury; or (7) any other act or omission which might otherwise constitute a legal or equitable discharge of the undersigned. Credit may be granted or continued from time to time by Lender to Borrower without notice to or authorization from Guarantor, regardless of the financial or other condition of Borrower at the time of any such grant or continuation. Lender shall have no obligation to disclose or discuss with Guarantor its assessment of the financial condition of Borrower. Guarantor acknowledges that no representations of any kind whatsoever have been made by Lender. No modification or waiver of any of the provisions of this Guaranty shall be binding upon Lender except as expressly set forth in a writing duly signed and delivered by Lender.

Further, and without limitation to the foregoing Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability of this Guaranty or giving rise to any reduction, limitation, impairment, discharge or termination of Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment or performance under the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations and/or the Loan Documents, and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of any of Borrower's obligations under the Loan Documents and take and hold security for the payment or performance of this Guaranty or the Loan Documents; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment or performance of Borrower's obligations under the Loan Documents, any other guaranties of the Loan, or any other obligation of any person (including any other guarantor) with respect to the Loan; (v) enforce and apply any security now or hereafter held by or for the benefit of Lender in respect of this Guaranty or the Loan and direct the order or manner of sale thereof, and to bid at any such sale, or exercise any other right or remedy that Lender may have against any such

4

ME1 42768822v.2

security, in each case as in its discretion it may determine, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any security for the Guaranteed Obligations; (vi) apply any payments or recoveries from Borrower, Guarantor or any other source, and any proceeds of any security, to the Guaranteed Obligation in such manner, order and priority as Lender may elect (whether or not those obligations are guaranteed by this Guaranty or secured at the time of the application); and (vii) exercise any other rights available to it under the Loan Documents.

Lender may take any of the foregoing actions upon any terms and conditions as Lender may elect, without giving notice to, or obtaining consent from, Guarantor and without affecting the liability of Guarantor to Lender and this Guaranty and the obligations of Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason, including, without limitation, the occurrence of any of the following, whether or not Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or the Loan, or with respect to any other guaranty of or security for the payment or performance of the Guaranteed Obligations or the Loan; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including without limitation provisions relating to events of default) of the Loan Documents, or of any other guaranty or security for the Guaranteed Obligations or the Loan, in each case whether or not in accordance with the terms of the Loan Documents or any agreement relating to such other guaranty or security; (iii) any Loan Document, at any time being found to be illegal, invalid or unenforceable with respect to Borrower; (iv) the application of payments received from any source (other than payments received pursuant to this Guaranty or from the proceeds of any security for the Guaranteed Obligations or the Loan except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations or the Loan) to the payment of indebtedness other than the Loan, even though Lender might have elected to apply such payment to any part or all of the Loan; (v) Lender's consent to the change, reorganization or termination of the ownership structure or existence of Borrower or any of its Affiliates and to any corresponding restructuring of the Loan, including, without limitation, the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Loan, including, without limitation, the Guaranteed Obligations; (vii) the acquisition or transfer of title to the Project to Lender, any Affiliate of Lender or any designee of Lender (including, without limitation, any purchaser through foreclosure, deed in lieu or otherwise); (viii) any act or event which might otherwise discharge, reduce, limit or modify Guarantor's obligations under this Guaranty; (ix) any waiver, extension, modification, forbearance, delay or other act or omission of Lender, or their failure to proceed promptly or otherwise as against Borrower, Guarantor or any security; (x) any action, omission or circumstance which might increase the likelihood that Guarantor may be called upon to perform under this Guaranty or which might affect the rights or remedies of any Guarantor as against Borrower; or (xi) any dealings occurring at any time between Borrower and Lender, whether relating to the Guaranteed Obligations or otherwise.

4.    Guarantor further agrees that Guarantor's liability as guarantor shall not be

5

impaired or affected by any renewals or extensions which may be made from time to time, with or without the knowledge or consent of Guarantor of the time for payment of interest or principal under the Note, it being the intent hereof that, subject to Lender's compliance with the terms of this Guaranty, Guarantor shall remain liable for the payment of the Guaranteed Obligations, until the Guaranteed Obligations has been paid in full, notwithstanding any act or thing which might otherwise operate as a legal or equitable discharge of a surety. Guarantor further understands and agrees that Lender may at any time enter into agreements with Borrower to amend and modify the Note, Loan Agreement, Mortgage or other Loan Documents, and may waive or release any provision or provisions of the Note, Loan Agreement, Mortgage and other Loan Documents or any thereof, and, with reference to such instruments, may make and enter into any such agreement or agreements as Lender and Borrower may deem proper and desirable, without in any manner impairing or affecting this Guaranty or any of Lender's rights hereunder or Guarantor's obligations hereunder.

5.        This is an absolute, present and continuing guaranty of payment and not of collection. Guarantor agrees that this Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any other security or collateral given in connection herewith or with the Note, Loan Agreement, Mortgage or any of the other Loan Documents through foreclosure or sale proceedings, as the case may be, under the Mortgage or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Lender to join Borrower in any action brought hereunder or to commence any action against or obtain any judgment against Borrower or to pursue any other remedy or enforce any other right. Guarantor further agrees that nothing contained herein or otherwise shall prevent Lender from pursuing concurrently or successively all rights and remedies available to it at law and/or in equity or under the Note, Loan Agreement, Mortgage or any other Loan Documents, and the exercise of any of Lender's rights or the completion of any of its remedies shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent and unconditional under any and all circumstances whatsoever and Guarantor shall remain fully liable for the payment and performance of all of the Guaranteed Obligations until the Loan and all Guaranteed Obligations have been indefeasibly paid and performed in full. None of Guarantor's obligations under this Guaranty or any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Borrower under the Note, Loan Agreement, Mortgage or other Loan Documents or by reason of the bankruptcy of Borrower or by reason of any creditor or bankruptcy proceeding instituted by or against Borrower. In the event of the foreclosure of the Mortgage and of a deficiency, Guarantor hereby promises and agrees forthwith to pay the amount of such deficiency notwithstanding the fact that recovery of said deficiency against Borrower would not be allowed by applicable law; however, the foregoing shall not be deemed to require that Lender institute foreclosure proceedings or otherwise resort to or exhaust any other collateral or security prior to or concurrently with enforcing this Guaranty. As used in this Guaranty, an "indefeasible" payment shall mean and refer to a payment that is no longer subject to potential disaffirmance, impairment, set aside, offset, recoupment, defeasance, recovery, disallowance, or recapture pursuant to the provisions of any federal or state law, regulation or order applicable to or governing creditors' rights, including, without limitation, Title 11 of the United States Code, as amended, either by reason of the passage of time following such payment or the final judgment of a court of competent

6

jurisdiction establishing the unassailable right of the party receiving such payment to retain such payment without reduction, offset, or other impairment.

6.      If and to the extent that, for any reason, any payment (or portion thereof) by or on behalf of Borrower or Guarantor in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by Lender or any holder of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or insolvency, the appointment of a receiver, intervenor, conservator, trustee or similar officer for Borrower, or otherwise, then the obligations of Guarantor shall be automatically reinstated and will continue to be effective as though such payment had not been made regardless of whether Lender contested the order requiring return of such payment. Guarantor agrees that it will indemnify Lender on demand for all costs and expenses (including, without limitation, fees and expenses of counsel) incurred by Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

7.      In the event Lender or any holder of the Note shall assign the Note and this Guaranty, Guarantor will accord full recognition thereto and agrees that all rights and remedies of Lender or such holder hereunder shall be enforceable against Guarantor by such assignee with the same force and effect and to the same extent as would have been enforceable by Lender or such holder but for such assignment; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of its assignee or transferee, to enforce this Guaranty for Lender's benefit to the extent any portion of the Guaranteed Obligations or any interest therein is not assigned or transferred.

8.      If:  (a) the Lender or holder of this Guaranty retains an attorney for collection of this Guaranty or this Guaranty is collected through any legal proceeding; (b) an attorney is retained to represent Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty; (c) an attorney is retained to provide advice or other representation with respect to this Guaranty; or (d) an attorney is retained to represent Lender in any proceedings whatsoever in connection with this Guaranty, then Guarantor shall pay to Lender upon demand all reasonable attorney's fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding brought to enforce this Guaranty as well as the other Loan Documents.

9.      The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions.  However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty is found by a court of competent jurisdiction to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and

7

ME1 42768822v.2

that the rights, obligations and interest of Lender or the holder of the Note under the remainder of this Guaranty shall continue in full force and effect.

10.    **TO THE GREATEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS GUARANTY (EACH, A "PROCEEDING"), LENDER AND GUARANTOR IRREVOCABLY (A) SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN PHILADELPHIA COUNTY, PENNSYLVANIA, AND (B) WAIVE ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS GUARANTY SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. LENDER AND GUARANTOR FURTHER AGREE AND CONSENT THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY PENNSYLVANIA STATE OR UNITED STATES COURT SITTING IN THE CITY OF PHILADELPHIA AND MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE APPLICABLE PARTY AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; <u>EXCEPT</u> THAT IF SUCH PARTY SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

AS HIS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON HIS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED IN THE MANNER PROVIDED HEREIN FOR NOTICE TO GUARANTOR SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE COMMONWEALTH OF PENNSYLVANIA.  GUARANTOR (A) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (B) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND

8

ADDRESS FOR SERVICE OF PROCESS, AND (C) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN PENNSYLVANIA OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

11.    ANY INDEBTEDNESS OF BORROWER TO GUARANTOR NOW OR HEREAFTER EXISTING IS HEREBY SUBORDINATED TO THE PAYMENT AND PERFORMANCE OF THE GUARANTEED OBLIGATIONS.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHTS SUCH GUARANTOR MAY HAVE AT ANY TIME (WHETHER ARISING DIRECTLY OR INDIRECTLY, BY OPERATION OF LAW OR CONTRACT) TO ASSERT ANY CLAIM AGAINST BORROWER ON ACCOUNT OF PAYMENTS MADE BY GUARANTOR UNDER THIS GUARANTY, INCLUDING, WITHOUT LIMITATION, ANY AND ALL RIGHTS OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION OR INDEMNITY.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY SUBORDINATES ANY AND ALL GUARANTEED OBLIGATIONS OF BORROWER TO GUARANTOR, PRESENT AND FUTURE, HOWEVER EVIDENCED, TO THE PRIOR PAYMENT OF THE GUARANTEED OBLIGATIONS TO LENDER.

12.    Any amounts received by Lender from any source on account of the Loan may be utilized by Lender for the payment of the Guaranteed Obligations and any other obligations of Borrower to Lender in such order or priority as Lender may from time to time elect.

13.    **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS GUARANTY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  GUARANTOR FURTHER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY LEGAL PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER WITH RESPECT TO THIS GUARANTY OR OTHERWISE IN RESPECT OF THE LOAN, ANY AND EVERY RIGHT GUARANTOR MAY HAVE TO (A) INTERPOSE ANY COUNTERCLAIM THEREIN, OTHER THAN A COMPULSORY COUNTERCLAIM, AND (B) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.  NOTHING CONTAINED IN THE IMMEDIATELY PRECEDING SENTENCE SHALL PREVENT OR PROHIBIT GUARANTOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.**

9

14.     Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (i) if hand delivered or if sent by telecopy, effective upon receipt or (ii) if delivered by overnight courier service, effective on the next Business Day following delivery to such courier service, or (iii) if mailed by United States registered or certified mail, postage prepaid, return receipt requested, effective two (2) Business Days after deposit in the United States mails, with copies via e-mail; addressed in each case as follows:

Guarantor:              Harrison Finberg
                        2001 Market Street, Suite 2519
                        Philadelphia, PA  19103

With a copy to:         BERMAN INDICTOR LLP
                        30 N. 41st Street, Suite 450
                        Philadelphia, PA 19104
                        Attention:  Penny S. Indictor, Esq.
                        Michael J. Robins, Esq.

Lender:                 Citizens Bank, N.A.
                        One Logan Square
                        130 North 18th Street, Suite 1310
                        Mailstop: PL1350
                        Philadelphia, PA 19103-6998
                        Attention:  Molly Skilton, Vice President
                        molly.skilton@citizensbank.com

With a copy to:         McCarter & English LLP
                        1600 Market Street, Suite 3900
                        Philadelphia, PA 19103
                        Attention:  Inez M. Markovich, Esquire
                        Facsimile:  (215) 988-4319
                        imarkovich@mccarter.com

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

15.     In order to induce Lender to make the Loan, Guarantor makes the following representations and warranties to Lender set forth in this Section.  Guarantor acknowledges that but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan.

(a)     Guarantor is an adult individual, *sui juris*, and of full capacity to enter into, deliver and perform this Guaranty.

10

ME1 42768822v.2

(b)    Any and all balance sheets, net worth statements, and other financial data with respect to Guarantor which have heretofore been given to Lender by or on behalf of Guarantor fairly and accurately present the financial condition of Guarantor as of the respective dates thereof.

(c)    the execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (i) any laws, order, rule, regulation, writ, injunction or decree now in effect of any Government Authority, or court having jurisdiction over Guarantor, (ii) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty, (iii) the instruments creating any trust holding title to any assets included in Guarantor's financial statements, or (iv) the organizational or other documents of Guarantor.

(d)    This Guaranty has been duly and validly executed and delivered by Guarantor.

(e)    No authorizations, approvals or consents of, and no filings or registrations with, any governmental or regulatory authority or agency are necessary for the execution, delivery or performance by Guarantor of this Guaranty or for the validity or enforceability hereof.

(f)    This Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms.

(g)    Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, which may adversely affect Guarantor's ability to fulfill his obligations under this Guaranty.  There are no judgments or orders, in the aggregate, for the payment of money rendered against Guarantor for an amount in excess of $25,000.  Guarantor is not in default under any agreements which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

All of the foregoing representations and warranties shall be deemed remade on the date of the Initial Disbursement of Loan Proceeds, on the date of each advance of Loan Proceeds, and upon any extension of the Loan pursuant to the Loan Agreement.  Guarantor hereby agrees to indemnify and hold Lender free and harmless from and against all loss, cost, liability, damage, and expense, including reasonable attorney's fees and costs, which Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties as of the date the foregoing representations and warranties are made and are remade.

16.    This Guaranty shall be binding upon the heirs, executors, legal and personal representatives, successors and assigns of Guarantor and shall not be discharged in whole or in part by the death of Guarantor.  If more than one party executes this Guaranty, the liability of all such parties shall be joint and several.

17.    Guarantor hereby covenants and agrees to furnish to the Lender, (i) not later than one hundred twenty (120) days after the closing of each fiscal year, an annual personal financial statement, together with supporting bank and brokerage account statements, certified to Lender by such Guarantor as being true and complete in all material respects and (ii) copies of all filed

11

tax returns with all schedules as well as corresponding K-1s, with respect to Guarantor within thirty (30) days of filing.  In addition, Guarantor will, promptly after the Lender's written request therefor, provide the Lender with such other financial information as the Lender may reasonably request.  Guarantor represents and warrants to the Lender that all financial statements furnished or to be furnished to the Lender with respect to Guarantor will accurately reflect, in all material respects, Guarantor's financial condition at the times and for the periods therein stated.

18.    Guarantor hereby agrees, covenants, represents and warrants that so long as any portion of the Guaranteed Obligations remains outstanding, such Guarantor will not give or otherwise transfer or dispose of any material portion of such Guarantor's assets to any other person or entity for less than the reasonably equivalent value of such assets.

19.    **THIS GUARANTY SHALL BE GOVERNED BY, AND EXCEPT TO THE EXTENT PRE-EMPTED BY FEDERAL LAW, CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, EXCEPT TO THE APPLICABLE CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.**

20.    Lender shall be entitled to honor any request for Loan Proceeds made by Borrower and shall have no obligation to see to the proper disposition of such advances.  Guarantor agrees that his obligations hereunder shall not be released or affected by reason of any improper disposition by Borrower of such Loan Proceeds.

21.    This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

22.    Lender hereby notifies Guarantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), Lender is required to obtain, verify and record information that identifies each Guarantor, which information includes the name and address of each Guarantor and other information that will allow the Lender to identify Guarantor in accordance with the Act.

23.    The terms of this Guaranty may be waived, modified or amended only by an instrument in writing duly executed by Guarantor and Lender.

24.    Neither failure to exercise, nor any delay in exercising, on the part of Lender, any right or remedy under this Guaranty or any of the Loan Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.  This Guaranty is subject to enforcement at law or in equity, including actions for damages or specific performance.  Time is of the essence hereof with respect to Guarantors' performance hereunder.

25.    All payments under this Guaranty shall be made free and clear of, and without deduction for, any and all present and future taxes, levies or other fees or payments to public authorities of similar nature.

12

26.    **CONFESSION OF JUDGMENT AND EXECUTION**.    UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, GUARANTOR IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR GUARANTOR IN ANY AND ALL ACTIONS AND TO CONFESS JUDGMENT AGAINST GUARANTOR FOR ALL OR ANY PART OF THE SUMS DUE UNDER THIS GUARANTY; AND IN EITHER CASE FOR INTEREST, INCLUDING INTEREST ON ANY JUDGMENT OBTAINED BY LENDER AT THE APPLICABLE DEFAULT RATE UNTIL ACTUAL PAYMENT IS MADE TO LENDER IN THE FULL AMOUNT DUE TO LENDER, LATE CHARGES, COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION FOR COLLECTION IN THE AMOUNT OF FIFTEEN PERCENT (15%) THEREOF, BUT IN NO EVENT LESS THAN $25,000.00.  GUARANTOR FURTHER AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, TO APPEAR FOR AND ENTER JUDGMENT AGAINST SUCH GUARANTOR IN AN ACTION OF REPLEVIN OR ANY OTHER ACTION TO RECOVER POSSESSION OF ANY COLLATERAL SECURING THIS GUARANTY.  SUCH CONFESSIONS OF JUDGMENT OR ACTIONS SHALL BE WITH RELEASE OF ERRORS, WAIVERS OF APPEALS, WITHOUT STAY OF EXECUTION AND GUARANTOR WAIVES ALL RELIEF FROM ANY AND ALL APPRAISEMENT OR EXEMPTION LAWS NOW IN FORCE OR HEREAFTER ENACTED.  IF A COPY OF THIS GUARANTY, VERIFIED BY AN OFFICIAL OR AN OFFICER OF LENDER, SHALL BE FILED IN ANY PROCEEDING OR ACTION WHEREIN JUDGMENT IS TO BE CONFESSED, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF AND SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR HEREIN FOR AND CONFESS JUDGMENT AGAINST GUARANTOR AS PROVIDED HEREIN.  JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS AND NO SINGLE EXERCISE OF THE AFORESAID POWERS TO CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, SHALL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, AVOIDABLE, OR VOID, BUT THE POWER SHALL CONTINUE UNDIMINISHED AND IT MAY BE EXERCISED FROM TIME TO TIME AFTER AND AS LENDER SHALL ELECT UNTIL SUCH TIME AS LENDER SHALL HAVE RECEIVED PAYMENT IN FULL OF ALL SUMS DUE UNDER THIS GUARANTY, TOGETHER WITH INTEREST, COSTS, AND FEES.

27.    **WAIVER OF DEFENSES TO CONFESSION OF JUDGMENT AND EXECUTION**.  GUARANTOR HAS REVIEWED THE WARRANT OF ATTORNEY FOR CONFESSION OF JUDGMENT SET FORTH IN SECTION 26 ABOVE WITH GUARANTOR'S ATTORNEY AND ACKNOWLEDGES THAT LENDER IS AUTHORIZED TO TAKE ANY ACTION WITHOUT ANY ADVANCE NOTICE TO GUARANTOR, TO CONFESS JUDGMENT. THEREFORE, GUARANTOR IS AWARE THAT, TO THE EXTENT PERMITTED BY LAW, IT HAS GIVEN UP ANY RIGHTS IT MIGHT HAVE TO A HEARING TO CONTEST THE VALIDITY OF ANY SUCH JUDGMENT OR OTHER CLAIMS THAT LENDER MAY ASSERT THEREUNDER.  GUARANTOR SPECIFICALLY AND VOLUNTARILY WAIVES AND RELINQUISHES ANY RIGHTS IT MAY HAVE TO ANY NOTICE OR HEARING OR OTHER DUE PROCESS IN CONNECTION WITH LENDER'S IMPLEMENTATION OF ITS RIGHTS TO TAKE JUDGMENT, OR TO EXECUTE UPON OR

13

TAKE ANY ADDITIONAL ACTION TO ENFORCE SUCH JUDGMENT.  GUARANTOR ALSO SPECIFICALLY RELEASES ANY RIGHTS IT MAY HAVE TO CHALLENGE SUCH ACTION BY LENDER OR TO CLAIM OR RECOVER ANY DAMAGES AGAINST LENDER IN CONNECTION WITH SUCH ACTIONS, TO THE EXTENT PERMITTED BY LAW. GUARANTOR ACKNOWLEDGES THAT IT IS REPRESENTED BY COUNSEL AND THAT SUCH GUARANTOR'S COUNSEL HAS REVIEWED AND EXPLAINED THE MEANING OF THESE WAIVERS TO GUARANTOR.

28.    **LIMITATION OF LIABILITY**.

(a)    If the Loan is converted to the Permanent Loan in accordance with all of the terms and conditions set forth in the Loan Agreement, the principal portion of the Guaranteed Obligations shall be reduced to fifty percent (50%) of the Permanent Loan Amount.

(b)    The limitations upon Guarantor's liability provided in Section 28(a) above will apply only to the payment obligations under Section 1(a) and not to the other Guaranteed Obligations including, without limitation, the Enforcement Costs.  In addition to Guarantor's Obligations under this Guaranty, Guarantor is undertaking and agreeing to obligations under other guaranties, indemnities and agreements executed by Guarantor with respect to the Loan, none of which will be limited by Section 28(a) above.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

14

ME1 42768822v.2

*[SIGNATURE PAGE TO PAYMENT GUARANTY]*

**GUARANTOR ACKNOWLEDGES THAT HE HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS GUARANTY, INCLUDING THE CONFESSION OF JUDGMENT AND WAIVER OF JURY TRIAL, AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.**

IN WITNESS WHEREOF, intending to be legally bound, Guarantor has executed this Guaranty under seal as of the date first written above.

**WITNESS**:                                    **GUARANTOR**:

_____            _____(SEAL)
                                                **Harrison Merriman Finberg**, individually

COMMONWEALTH OF PENNSYLVANIA
                                                            SS.:
COUNTY OF PHILADELPHIA

On the _16_ day of November, 2022, before me, the subscriber, a notary public in and for the Commonwealth and County aforesaid, personally appeared Harrison Merriman Finberg, known to be or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that the same was executed for the purposes therein contained.

WITNESS my hand and seal the day and year aforesaid.

_____
Notary Public

My Commission Expires:

Commonwealth of Pennsylvania - Notary Seal
ADAM SCHNEIDER, Notary Public
Philadelphia County
My Commission Expires May 5, 2023
Commission Number 1233256

[Citizens-Hancock Lofts-Signature/Notary Page to Guaranty of Payment (Finberg)]

## GUARANTY OF PAYMENT

THIS GUARANTY OF PAYMENT (this "Guaranty") made on the 16th day of November, 2022 and effective as of November 17, 2022, by **SANJAY GUPTA,** an adult individual ("Guarantor"), to and for the benefit of **CITIZENS BANK, N.A.**("Lender").

RECITALS

WHEREAS, HANCOCK LOFTS LLC, a Pennsylvania limited liability company ("Borrower") and Lender entered into that certain Construction Loan Agreement dated on or about the date hereof (as same may be supplemented, restated, superseded, amended or replaced from time to time, the "Loan Agreement") whereby Lender agreed to make a loan (the "Loan") to Borrower in the principal amount of up to TEN MILLION AND 00/100 DOLLARS ($10,000,000.00), to finance the development and construction of the Project (as defined in the Loan Agreement). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

WHEREAS, in connection with the Loan, Borrower has executed and delivered to Lender that certain Promissory Note (the "Note") dated of even date herewith in the amount of the Loan, which Note is secured by (i) an Open-End Mortgage, Assignment of Leases and Rents, and Security Agreement (the "Mortgage") made by Borrower in favor of Lender on the Project and (ii) the other Loan Documents.

WHEREAS, Guarantor will derive an economic benefit from the Loan evidenced and secured by the Note, the Mortgage and the other Loan Documents.

WHEREAS, Lender has relied on the statements and agreements contained herein in agreeing to make the Loan, and the execution and delivery of this Guaranty by Guarantor is a condition precedent to the making of the Loan by Lender.

## AGREEMENTS

NOW, THEREFORE, intending to be legally bound, Guarantor, in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, hereby covenants and agrees for the benefit of Lender and its respective successors, endorsees, transferees, participants and assigns as follows:

1.	Guarantor absolutely, unconditionally, irrevocably, and jointly and severally guarantees:

(a)	the full and prompt payment of the principal of and interest on the Note when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, and the full and prompt payment of all sums which may now be or may hereafter become due and owing under the Note, the Loan Agreement and the other Loan Documents;

1

ME1 42768946v.2

(b)    the prompt, full and complete performance of all of Borrower's obligations under each and every covenant contained in the Loan Documents; and

(c)    the full and prompt payment of any Enforcement Costs (as hereinafter defined in Section 8 hereof); and

(d)    intentionally omitted.

All amounts due, debts, liabilities and payment obligations described in subsections (a) through (c) of this Section 1 shall be hereinafter collectively referred to as the "Guaranteed Obligations."

Notwithstanding anything to the contrary contained herein, the Guaranteed Obligations and all other guaranties provided herein shall expressly exclude any Excluded Swap Obligations (as defined below).  For the purposes of this Section 1, the following terms have the meaning ascribed below:

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Excluded Swap Obligation" means, with respect to Guarantor, any Swap Obligation (as defined below) if, and to the extent that, all or a portion of the guarantee of Guarantor of, or the grant by Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

2.    In the event Borrower shall fail to pay in full, when due, any of the Guaranteed Obligations, Guarantor agrees, on demand by Lender or the holder of the Note, to pay the Guaranteed Obligations regardless of any defense, right of set-off or claims which Borrower or Guarantor may have against Lender or the holder of the Note.  All of the remedies set forth herein and/or provided for in any of the Loan Documents or at law or equity shall be equally available to Lender, and the choice by Lender of one such remedy over another shall not be subject to question or challenge by Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff, or failure to mitigate damages in any action, proceeding, or counteraction by Lender to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Lender from subsequently electing to exercise a different remedy.  Without limitation to the generality of

2

the foregoing, it is expressly hereby acknowledged and agreed that the obligations of Guarantor hereunder are independent of the obligations of Borrower or any other guarantor or indemnitor under any of the other Loan Documents to which they may be a party, and a separate action or actions may be brought and prosecuted against Guarantor whether or not any action is brought against Borrower, any other guarantor or indemnitor and whether or not Borrower is joined in any such action or actions.

3.    Guarantor does hereby (a) waive notice of acceptance of this Guaranty by Lender and any and all notices and demands of every kind which may be required to be given by any statute, rule or law, (b) agree to refrain from asserting, until after repayment in full of the Loan, any defense, right of set-off or other claim which Guarantor may have against Borrower (c) waive any defense, right of set-off or other claim which Guarantor or Borrower may have against Lender, or the holder of the Note, (d) waive any and all rights Guarantor may have under any anti-deficiency statute or other similar protections, (e) waive presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge Guarantor with liability, and (f) waive any failure by Lender to inform Guarantor of any facts Lender may now or hereafter know about Borrower, the Project, the Loan, or the transactions contemplated by the Loan Agreement, it being understood and agreed that Lender has no duty so to inform and that Guarantor is fully responsible for being and remaining informed by Borrower of all circumstances bearing on the risk of nonperformance of Borrower's obligations.  In addition to, and without limitation to, the foregoing waivers, Guarantor hereby also waives (a) any right to require Lender, as a condition of payment or performance or completion by Guarantor, to (i) proceed against Borrower, any other guarantor, or any other person, (ii) proceed against or exhaust any security held from Borrower, any other guarantor, or any other person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower, including, without limitation, any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument related thereto or by reason of the cessation of the liability of Borrower from any cause other than payment, performance and completion in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty and any legal or equitable discharge of any Guarantor's obligations hereunder (other than indefeasible payment, performance and completion of the Guaranteed Obligations or the Loan in full), (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (e) any release, discharge, modification, impairment or limitation of the liability of Borrower to Lender, whether consented to by Lender, consensual or arising by operation of law or any proceedings in bankruptcy or reorganization, or from any other cause, other than payment in full of the Loan; (f) any defense based on any rejection or disaffirmance of the Guaranteed Obligations, or any part thereof, or any security held therefor, in any such proceedings in bankruptcy or reorganization; (g) any defense based on any action taken

3

or omitted by Lender in any proceedings in bankruptcy or insolvency involving Borrower, including any election to have their claim allowed as being secured, partially secured or unsecured, any extension of credit by Lender to Borrower in any proceedings in bankruptcy or insolvency, and taking and holding by Lender of any security for any such extension of credit.  The obligations of the undersigned Guarantor under this Guaranty extend to all amendments, supplements, modifications, renewals, replacements or extensions of the Loan Documents and all Hedging Contracts (as defined in the Mortgage) at any rate or rates of interest.  The liability of Guarantor and the rights of the Lender under this Guaranty will not be impaired or affected in any manner by, and Guarantor hereby consents in advance to, and waives any requirement of notice for, any (1) disposition, impairment, release, surrender, substitution, or modification of any collateral securing the Guaranteed Obligations or the obligations created by this Guaranty or failure to perfect a security interest in any collateral; (2) release (including adjudication or discharge in bankruptcy) or settlement with Borrower or any other party which may be or become liable for the Guaranteed Obligations (including, without limitation, any maker, endorser, guarantor or surety); (3) delay in enforcement of payment of the Guaranteed Obligations or delay in enforcement of this Guaranty; (4) delay, omission, waiver, or forbearance in exercising any right or power with respect to the Guaranteed Obligations or this Guaranty; (5) defense arising from the enforceability, validity or genuineness of any of the Loan Documents; (6) defenses or counterclaims that Borrower may assert under or in respect of any of the Loan Documents, including, but not limited to, failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, infancy, statute of limitations, lender liability, accord and satisfaction and usury; or (7) any other act or omission which might otherwise constitute a legal or equitable discharge of the undersigned.  Credit may be granted or continued from time to time by Lender to Borrower without notice to or authorization from Guarantor, regardless of the financial or other condition of Borrower at the time of any such grant or continuation.  Lender shall have no obligation to disclose or discuss with Guarantor its assessment of the financial condition of Borrower.  Guarantor acknowledges that no representations of any kind whatsoever have been made by Lender.  No modification or waiver of any of the provisions of this Guaranty shall be binding upon Lender except as expressly set forth in a writing duly signed and delivered by Lender.

Further, and without limitation to the foregoing Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability of this Guaranty or giving rise to any reduction, limitation, impairment, discharge or termination of Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment or performance under the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations and/or the Loan Documents, and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of any of Borrower's obligations under the Loan Documents and take and hold security for the payment or performance of this Guaranty or the Loan Documents; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment or performance of Borrower's obligations under the Loan Documents, any other guaranties of the Loan, or any other obligation of any person (including any other guarantor) with respect to the Loan; (v) enforce and apply any security now or hereafter held by or for the benefit of Lender in respect of this Guaranty or the Loan and direct the order or manner of sale thereof, and to bid at any such sale, or exercise any other right or remedy that Lender may have against any such

4

ME1 42768946v.2

security, in each case as in its discretion it may determine, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any security for the Guaranteed Obligations; (vi) apply any payments or recoveries from Borrower, Guarantor or any other source, and any proceeds of any security, to the Guaranteed Obligation in such manner, order and priority as Lender may elect (whether or not those obligations are guaranteed by this Guaranty or secured at the time of the application); and (vii) exercise any other rights available to it under the Loan Documents.

Lender may take any of the foregoing actions upon any terms and conditions as Lender may elect, without giving notice to, or obtaining consent from, Guarantor and without affecting the liability of Guarantor to Lender and this Guaranty and the obligations of Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason, including, without limitation, the occurrence of any of the following, whether or not Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or the Loan, or with respect to any other guaranty of or security for the payment or performance of the Guaranteed Obligations or the Loan; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including without limitation provisions relating to events of default) of the Loan Documents, or of any other guaranty or security for the Guaranteed Obligations or the Loan, in each case whether or not in accordance with the terms of the Loan Documents or any agreement relating to such other guaranty or security; (iii) any Loan Document, at any time being found to be illegal, invalid or unenforceable with respect to Borrower; (iv) the application of payments received from any source (other than payments received pursuant to this Guaranty or from the proceeds of any security for the Guaranteed Obligations or the Loan except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations or the Loan) to the payment of indebtedness other than the Loan, even though Lender might have elected to apply such payment to any part or all of the Loan; (v) Lender's consent to the change, reorganization or termination of the ownership structure or existence of Borrower or any of its Affiliates and to any corresponding restructuring of the Loan, including, without limitation, the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Loan, including, without limitation, the Guaranteed Obligations; (vii) the acquisition or transfer of title to the Project to Lender, any Affiliate of Lender or any designee of Lender (including, without limitation, any purchaser through foreclosure, deed in lieu or otherwise); (viii) any act or event which might otherwise discharge, reduce, limit or modify Guarantor's obligations under this Guaranty; (ix) any waiver, extension, modification, forbearance, delay or other act or omission of Lender, or their failure to proceed promptly or otherwise as against Borrower, Guarantor or any security; (x) any action, omission or circumstance which might increase the likelihood that Guarantor may be called upon to perform under this Guaranty or which might affect the rights or remedies of any Guarantor as against Borrower; or (xi) any dealings occurring at any time between Borrower and Lender, whether relating to the Guaranteed Obligations or otherwise.

4.    Guarantor further agrees that Guarantor's liability as guarantor shall not be

5

ME1 42768946v.2

impaired or affected by any renewals or extensions which may be made from time to time, with or without the knowledge or consent of Guarantor of the time for payment of interest or principal under the Note, it being the intent hereof that, subject to Lender's compliance with the terms of this Guaranty, Guarantor shall remain liable for the payment of the Guaranteed Obligations, until the Guaranteed Obligations has been paid in full, notwithstanding any act or thing which might otherwise operate as a legal or equitable discharge of a surety.  Guarantor further understands and agrees that Lender may at any time enter into agreements with Borrower to amend and modify the Note, Loan Agreement, Mortgage or other Loan Documents, and may waive or release any provision or provisions of the Note, Loan Agreement, Mortgage and other Loan Documents or any thereof, and, with reference to such instruments, may make and enter into any such agreement or agreements as Lender and Borrower may deem proper and desirable, without in any manner impairing or affecting this Guaranty or any of Lender's rights hereunder or Guarantor's obligations hereunder.

5.      This is an absolute, present and continuing guaranty of payment and not of collection.  Guarantor agrees that this Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any other security or collateral given in connection herewith or with the Note, Loan Agreement, Mortgage or any of the other Loan Documents through foreclosure or sale proceedings, as the case may be, under the Mortgage or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Lender to join Borrower in any action brought hereunder or to commence any action against or obtain any judgment against Borrower or to pursue any other remedy or enforce any other right.  Guarantor further agrees that nothing contained herein or otherwise shall prevent Lender from pursuing concurrently or successively all rights and remedies available to it at law and/or in equity or under the Note, Loan Agreement, Mortgage or any other Loan Documents, and the exercise of any of Lender's rights or the completion of any of its remedies shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent and unconditional under any and all circumstances whatsoever and Guarantor shall remain fully liable for the payment and performance of all of the Guaranteed Obligations until the Loan and all Guaranteed Obligations have been indefeasibly paid and performed in full.  None of Guarantor's obligations under this Guaranty or any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Borrower under the Note, Loan Agreement, Mortgage or other Loan Documents or by reason of the bankruptcy of Borrower or by reason of any creditor or bankruptcy proceeding instituted by or against Borrower.  In the event of the foreclosure of the Mortgage and of a deficiency, Guarantor hereby promises and agrees forthwith to pay the amount of such deficiency notwithstanding the fact that recovery of said deficiency against Borrower would not be allowed by applicable law; however, the foregoing shall not be deemed to require that Lender institute foreclosure proceedings or otherwise resort to or exhaust any other collateral or security prior to or concurrently with enforcing this Guaranty.  As used in this Guaranty, an "indefeasible" payment shall mean and refer to a payment that is no longer subject to potential disaffirmance, impairment, set aside, offset, recoupment, defeasance, recovery, disallowance, or recapture pursuant to the provisions of any federal or state law, regulation or order applicable to or governing creditors' rights, including, without limitation, Title 11 of the United States Code, as amended, either by reason of the passage of time following such payment or the final judgment of a court of competent

6

jurisdiction establishing the unassailable right of the party receiving such payment to retain such payment without reduction, offset, or other impairment.

6.      If and to the extent that, for any reason, any payment (or portion thereof) by or on behalf of Borrower or Guarantor in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by Lender or any holder of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or insolvency, the appointment of a receiver, intervenor, conservator, trustee or similar officer for Borrower, or otherwise, then the obligations of Guarantor shall be automatically reinstated and will continue to be effective as though such payment had not been made regardless of whether Lender contested the order requiring return of such payment. Guarantor agrees that it will indemnify Lender on demand for all costs and expenses (including, without limitation, fees and expenses of counsel) incurred by Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

7.      In the event Lender or any holder of the Note shall assign the Note and this Guaranty, Guarantor will accord full recognition thereto and agrees that all rights and remedies of Lender or such holder hereunder shall be enforceable against Guarantor by such assignee with the same force and effect and to the same extent as would have been enforceable by Lender or such holder but for such assignment; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of its assignee or transferee, to enforce this Guaranty for Lender's benefit to the extent any portion of the Guaranteed Obligations or any interest therein is not assigned or transferred.

8.      If:  (a) the Lender or holder of this Guaranty retains an attorney for collection of this Guaranty or this Guaranty is collected through any legal proceeding; (b) an attorney is retained to represent Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty; (c) an attorney is retained to provide advice or other representation with respect to this Guaranty; or (d) an attorney is retained to represent Lender in any proceedings whatsoever in connection with this Guaranty, then Guarantor shall pay to Lender upon demand all reasonable attorney's fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding brought to enforce this Guaranty as well as the other Loan Documents.

9.      The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions.  However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty is found by a court of competent jurisdiction to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and

7

that the rights, obligations and interest of Lender or the holder of the Note under the remainder of this Guaranty shall continue in full force and effect.

10.    **TO THE GREATEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS GUARANTY (EACH, A "PROCEEDING"), LENDER AND GUARANTOR IRREVOCABLY (A) SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN PHILADELPHIA COUNTY, PENNSYLVANIA, AND (B) WAIVE ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS GUARANTY SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. LENDER AND GUARANTOR FURTHER AGREE AND CONSENT THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY PENNSYLVANIA STATE OR UNITED STATES COURT SITTING IN THE CITY OF PHILADELPHIA AND MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE APPLICABLE PARTY AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; <u>EXCEPT</u> THAT IF SUCH PARTY SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

AS HIS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON HIS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED IN THE MANNER PROVIDED HEREIN FOR NOTICE TO GUARANTOR SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE COMMONWEALTH OF PENNSYLVANIA.  GUARANTOR (A) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (B) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND

8

ADDRESS FOR SERVICE OF PROCESS, AND (C) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN PENNSYLVANIA OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

11.    ANY INDEBTEDNESS OF BORROWER TO GUARANTOR NOW OR HEREAFTER EXISTING IS HEREBY SUBORDINATED TO THE PAYMENT AND PERFORMANCE OF THE GUARANTEED OBLIGATIONS.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHTS SUCH GUARANTOR MAY HAVE AT ANY TIME (WHETHER ARISING DIRECTLY OR INDIRECTLY, BY OPERATION OF LAW OR CONTRACT) TO ASSERT ANY CLAIM AGAINST BORROWER ON ACCOUNT OF PAYMENTS MADE BY GUARANTOR UNDER THIS GUARANTY, INCLUDING, WITHOUT LIMITATION, ANY AND ALL RIGHTS OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION OR INDEMNITY.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY SUBORDINATES ANY AND ALL GUARANTEED OBLIGATIONS OF BORROWER TO GUARANTOR, PRESENT AND FUTURE, HOWEVER EVIDENCED, TO THE PRIOR PAYMENT OF THE GUARANTEED OBLIGATIONS TO LENDER.

12.    Any amounts received by Lender from any source on account of the Loan may be utilized by Lender for the payment of the Guaranteed Obligations and any other obligations of Borrower to Lender in such order or priority as Lender may from time to time elect.

13.    **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS GUARANTY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  GUARANTOR FURTHER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY LEGAL PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER WITH RESPECT TO THIS GUARANTY OR OTHERWISE IN RESPECT OF THE LOAN, ANY AND EVERY RIGHT GUARANTOR MAY HAVE TO (A) INTERPOSE ANY COUNTERCLAIM THEREIN, OTHER THAN A COMPULSORY COUNTERCLAIM, AND (B) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.  NOTHING CONTAINED IN THE IMMEDIATELY PRECEDING SENTENCE SHALL PREVENT OR PROHIBIT GUARANTOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.**

ME1 42768946v.2

14.     Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (i) if hand delivered or if sent by telecopy, effective upon receipt or (ii) if delivered by overnight courier service, effective on the next Business Day following delivery to such courier service, or (iii) if mailed by United States registered or certified mail, postage prepaid, return receipt requested, effective two (2) Business Days after deposit in the United States mails, with copies via e-mail; addressed in each case as follows:

| | |
|---|---|
| Guarantor: | Sanjay Gupta<br>2796 Buttercup Court<br>Huntingdon Valley, PA  19006 |
| With a copy to: | BERMAN INDICTOR LLP<br>30 N. 41st Street, Suite 450<br>Philadelphia, PA 19104<br>Attention:  Penny S. Indictor, Esq.<br>Michael J. Robins, Esq. |
| Lender: | Citizens Bank, N.A.<br>One Logan Square<br>130 North 18th Street, Suite 1310<br>Mailstop: PL1350<br>Philadelphia, PA 19103-6998<br>Attention:  Molly Skilton, Vice President<br>molly.skilton@citizensbank.com |
| With a copy to: | McCarter & English LLP<br>1600 Market Street, Suite 3900<br>Philadelphia, PA 19103<br>Attention:  Inez M. Markovich, Esquire<br>Facsimile:  (215) 988-4319<br>imarkovich@mccarter.com |

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

15.     In order to induce Lender to make the Loan, Guarantor makes the following representations and warranties to Lender set forth in this Section.  Guarantor acknowledges that but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan.

(a)     Guarantor is an adult individual, *sui juris*, and of full capacity to enter into, deliver and perform this Guaranty.

10

(b)     Any and all balance sheets, net worth statements, and other financial data with respect to Guarantor which have heretofore been given to Lender by or on behalf of Guarantor fairly and accurately present the financial condition of Guarantor as of the respective dates thereof.

(c)     the execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (i) any laws, order, rule, regulation, writ, injunction or decree now in effect of any Government Authority, or court having jurisdiction over Guarantor, (ii) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty, (iii) the instruments creating any trust holding title to any assets included in Guarantor's financial statements, or (iv) the organizational or other documents of Guarantor.

(d)     This Guaranty has been duly and validly executed and delivered by Guarantor.

(e)     No authorizations, approvals or consents of, and no filings or registrations with, any governmental or regulatory authority or agency are necessary for the execution, delivery or performance by Guarantor of this Guaranty or for the validity or enforceability hereof.

(f)     This Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms.

(g)     Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, which may adversely affect Guarantor's ability to fulfill his obligations under this Guaranty.  There are no judgments or orders, in the aggregate, for the payment of money rendered against Guarantor for an amount in excess of $25,000.  Guarantor is not in default under any agreements which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

All of the foregoing representations and warranties shall be deemed remade on the date of the Initial Disbursement of Loan Proceeds, on the date of each advance of Loan Proceeds, and upon any extension of the Loan pursuant to the Loan Agreement.  Guarantor hereby agrees to indemnify and hold Lender free and harmless from and against all loss, cost, liability, damage, and expense, including reasonable attorney's fees and costs, which Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties as of the date the foregoing representations and warranties are made and are remade.

16.     This Guaranty shall be binding upon the heirs, executors, legal and personal representatives, successors and assigns of Guarantor and shall not be discharged in whole or in part by the death of Guarantor.  If more than one party executes this Guaranty, the liability of all such parties shall be joint and several.

17.     Guarantor hereby covenants and agrees to furnish to the Lender, (i) not later than one hundred twenty (120) days after the closing of each fiscal year, an annual personal financial statement, together with supporting bank and brokerage account statements, certified to Lender by such Guarantor as being true and complete in all material respects and (ii) copies of all filed

11

tax returns with all schedules as well as corresponding K-1s, with respect to Guarantor within thirty (30) days of filing.  In addition, Guarantor will, promptly after the Lender's written request therefor, provide the Lender with such other financial information as the Lender may reasonably request.  Guarantor represents and warrants to the Lender that all financial statements furnished or to be furnished to the Lender with respect to Guarantor will accurately reflect, in all material respects, Guarantor's financial condition at the times and for the periods therein stated.

18.     Guarantor hereby agrees, covenants, represents and warrants that so long as any portion of the Guaranteed Obligations remains outstanding, such Guarantor will not give or otherwise transfer or dispose of any material portion of such Guarantor's assets to any other person or entity for less than the reasonably equivalent value of such assets.

19.     **THIS GUARANTY SHALL BE GOVERNED BY, AND EXCEPT TO THE EXTENT PRE-EMPTED BY FEDERAL LAW, CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, EXCEPT TO THE APPLICABLE CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.**

20.     Lender shall be entitled to honor any request for Loan Proceeds made by Borrower and shall have no obligation to see to the proper disposition of such advances.  Guarantor agrees that his obligations hereunder shall not be released or affected by reason of any improper disposition by Borrower of such Loan Proceeds.

21.     This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

22.     Lender hereby notifies Guarantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), Lender is required to obtain, verify and record information that identifies each Guarantor, which information includes the name and address of each Guarantor and other information that will allow the Lender to identify Guarantor in accordance with the Act.

23.     The terms of this Guaranty may be waived, modified or amended only by an instrument in writing duly executed by Guarantor and Lender.

24.     Neither failure to exercise, nor any delay in exercising, on the part of Lender, any right or remedy under this Guaranty or any of the Loan Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.  This Guaranty is subject to enforcement at law or in equity, including actions for damages or specific performance.  Time is of the essence hereof with respect to Guarantors' performance hereunder.

25.     All payments under this Guaranty shall be made free and clear of, and without deduction for, any and all present and future taxes, levies or other fees or payments to public authorities of similar nature.

12

ME1 42768946v.2

26.    **CONFESSION OF JUDGMENT AND EXECUTION**.    UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, GUARANTOR IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR GUARANTOR IN ANY AND ALL ACTIONS AND TO CONFESS JUDGMENT AGAINST GUARANTOR FOR ALL OR ANY PART OF THE SUMS DUE UNDER THIS GUARANTY; AND IN EITHER CASE FOR INTEREST, INCLUDING INTEREST ON ANY JUDGMENT OBTAINED BY LENDER AT THE APPLICABLE DEFAULT RATE UNTIL ACTUAL PAYMENT IS MADE TO LENDER IN THE FULL AMOUNT DUE TO LENDER, LATE CHARGES, COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION FOR COLLECTION IN THE AMOUNT OF FIFTEEN PERCENT (15%) THEREOF, BUT IN NO EVENT LESS THAN $25,000.00.  GUARANTOR FURTHER AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, TO APPEAR FOR AND ENTER JUDGMENT AGAINST SUCH GUARANTOR IN AN ACTION OF REPLEVIN OR ANY OTHER ACTION TO RECOVER POSSESSION OF ANY COLLATERAL SECURING THIS GUARANTY.  SUCH CONFESSIONS OF JUDGMENT OR ACTIONS SHALL BE WITH RELEASE OF ERRORS, WAIVERS OF APPEALS, WITHOUT STAY OF EXECUTION AND GUARANTOR WAIVES ALL RELIEF FROM ANY AND ALL APPRAISEMENT OR EXEMPTION LAWS NOW IN FORCE OR HEREAFTER ENACTED.  IF A COPY OF THIS GUARANTY, VERIFIED BY AN OFFICIAL OR AN OFFICER OF LENDER, SHALL BE FILED IN ANY PROCEEDING OR ACTION WHEREIN JUDGMENT IS TO BE CONFESSED, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF AND SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR HEREIN FOR AND CONFESS JUDGMENT AGAINST GUARANTOR AS PROVIDED HEREIN.  JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS AND NO SINGLE EXERCISE OF THE AFORESAID POWERS TO CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, SHALL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, AVOIDABLE, OR VOID, BUT THE POWER SHALL CONTINUE UNDIMINISHED AND IT MAY BE EXERCISED FROM TIME TO TIME AFTER AND AS LENDER SHALL ELECT UNTIL SUCH TIME AS LENDER SHALL HAVE RECEIVED PAYMENT IN FULL OF ALL SUMS DUE UNDER THIS GUARANTY, TOGETHER WITH INTEREST, COSTS, AND FEES.

27.    **WAIVER OF DEFENSES TO CONFESSION OF JUDGMENT AND EXECUTION**.  GUARANTOR HAS REVIEWED THE WARRANT OF ATTORNEY FOR CONFESSION OF JUDGMENT SET FORTH IN SECTION 26 ABOVE WITH GUARANTOR'S ATTORNEY AND ACKNOWLEDGES THAT LENDER IS AUTHORIZED TO TAKE ANY ACTION WITHOUT ANY ADVANCE NOTICE TO GUARANTOR, TO CONFESS JUDGMENT. THEREFORE, GUARANTOR IS AWARE THAT, TO THE EXTENT PERMITTED BY LAW, IT HAS GIVEN UP ANY RIGHTS IT MIGHT HAVE TO A HEARING TO CONTEST THE VALIDITY OF ANY SUCH JUDGMENT OR OTHER CLAIMS THAT LENDER MAY ASSERT THEREUNDER.  GUARANTOR SPECIFICALLY AND VOLUNTARILY WAIVES AND RELINQUISHES ANY RIGHTS IT MAY HAVE TO ANY NOTICE OR HEARING OR OTHER DUE PROCESS IN CONNECTION WITH LENDER'S IMPLEMENTATION OF ITS RIGHTS TO TAKE JUDGMENT, OR TO EXECUTE UPON OR

13

TAKE ANY ADDITIONAL ACTION TO ENFORCE SUCH JUDGMENT.  GUARANTOR ALSO SPECIFICALLY RELEASES ANY RIGHTS IT MAY HAVE TO CHALLENGE SUCH ACTION BY LENDER OR TO CLAIM OR RECOVER ANY DAMAGES AGAINST LENDER IN CONNECTION WITH SUCH ACTIONS, TO THE EXTENT PERMITTED BY LAW. GUARANTOR ACKNOWLEDGES THAT IT IS REPRESENTED BY COUNSEL AND THAT SUCH GUARANTOR'S COUNSEL HAS REVIEWED AND EXPLAINED THE MEANING OF THESE WAIVERS TO GUARANTOR.

28.  **<u>LIMITATION OF LIABILITY</u>**.

(a)  If the Loan is converted to the Permanent Loan in accordance with all of the terms and conditions set forth in the Loan Agreement, the principal portion of the Guaranteed Obligations shall be reduced to fifty percent (50%) of the Permanent Loan Amount.

(b)  The limitations upon Guarantor's liability provided in Section 28(a) above will apply only to the payment obligations under Section 1(a) and not to the other Guaranteed Obligations including, without limitation, the Enforcement Costs.  In addition to Guarantor's Obligations under this Guaranty, Guarantor is undertaking and agreeing to obligations under other guaranties, indemnities and agreements executed by Guarantor with respect to the Loan, none of which will be limited by Section 28(a) above.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

14

*[SIGNATURE PAGE TO PAYMENT GUARANTY]*

**GUARANTOR ACKNOWLEDGES THAT HE HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS GUARANTY, INCLUDING THE CONFESSION OF JUDGMENT AND WAIVER OF JURY TRIAL, AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.**

IN WITNESS WHEREOF, intending to be legally bound, Guarantor has executed this Guaranty under seal as of the date first written above.

**WITNESS**:                                                      **GUARANTOR**:

_____              _____(SEAL)
                                                                 **Sanjay Gupta**, individually

COMMONWEALTH OF PENNSYLVANIA                    SS.:
COUNTY OF Philadelphia

On the 16 day of November, 2022, before me, the subscriber, a notary public in and for the Commonwealth and County aforesaid, personally appeared Sanjay Gupta, known to be or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that the same was executed for the purposes therein contained.

WITNESS my hand and seal the day and year aforesaid.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
ADAM SCHNEIDER, Notary Public
Philadelphia County
My Commission Expires May 5, 2023
Commission Number 1233256

My Commission Expires:

[Citizens-Hancock Lofts-Signature/Notary Page to Guaranty of Payment (Gupta)]

## GUARANTY OF PAYMENT

THIS GUARANTY OF PAYMENT (this "Guaranty") made on the 16th day of November, 2022 and effective as of November 17, 2022, by **PRAMOD KESHRI,** an adult individual ("Guarantor"), to and for the benefit of **CITIZENS BANK, N.A.**("Lender").

RECITALS

WHEREAS, HANCOCK LOFTS LLC, a Pennsylvania limited liability company ("Borrower") and Lender entered into that certain Construction Loan Agreement dated on or about the date hereof (as same may be supplemented, restated, superseded, amended or replaced from time to time, the "Loan Agreement") whereby Lender agreed to make a loan (the "Loan") to Borrower in the principal amount of up to TEN MILLION AND 00/100 DOLLARS ($10,000,000.00), to finance the development and construction of the Project (as defined in the Loan Agreement).   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

WHEREAS, in connection with the Loan, Borrower has executed and delivered to Lender that certain Promissory Note (the "Note") dated of even date herewith in the amount of the Loan, which Note is secured by (i) an Open-End Mortgage, Assignment of Leases and Rents, and Security Agreement (the "Mortgage") made by Borrower in favor of Lender on the Project and (ii) the other Loan Documents.

WHEREAS, Guarantor will derive an economic benefit from the Loan evidenced and secured by the Note, the Mortgage and the other Loan Documents.

WHEREAS, Lender has relied on the statements and agreements contained herein in agreeing to make the Loan, and the execution and delivery of this Guaranty by Guarantor is a condition precedent to the making of the Loan by Lender.

## AGREEMENTS

NOW, THEREFORE, intending to be legally bound, Guarantor, in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, hereby covenants and agrees for the benefit of Lender and its respective successors, endorsees, transferees, participants and assigns as follows:

1.      Guarantor absolutely, unconditionally, irrevocably, and jointly and severally guarantees:

(a)      the full and prompt payment of the principal of and interest on the Note when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, and the full and prompt payment of all sums which may now be or may hereafter become due and owing under the Note, the Loan Agreement and the other Loan Documents;

1

ME1 42768973v.2

(b)     the prompt, full and complete performance of all of Borrower's obligations under each and every covenant contained in the Loan Documents; and

(c)     the full and prompt payment of any Enforcement Costs (as hereinafter defined in Section 8 hereof); and

(d)     intentionally omitted.

All amounts due, debts, liabilities and payment obligations described in subsections (a) through (c) of this Section 1 shall be hereinafter collectively referred to as the "Guaranteed Obligations."

Notwithstanding anything to the contrary contained herein, the Guaranteed Obligations and all other guaranties provided herein shall expressly exclude any Excluded Swap Obligations (as defined below). For the purposes of this Section 1, the following terms have the meaning ascribed below:

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Excluded Swap Obligation" means, with respect to Guarantor, any Swap Obligation (as defined below) if, and to the extent that, all or a portion of the guarantee of Guarantor of, or the grant by Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

2.     In the event Borrower shall fail to pay in full, when due, any of the Guaranteed Obligations, Guarantor agrees, on demand by Lender or the holder of the Note, to pay the Guaranteed Obligations regardless of any defense, right of set-off or claims which Borrower or Guarantor may have against Lender or the holder of the Note. All of the remedies set forth herein and/or provided for in any of the Loan Documents or at law or equity shall be equally available to Lender, and the choice by Lender of one such remedy over another shall not be subject to question or challenge by Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff, or failure to mitigate damages in any action, proceeding, or counteraction by Lender to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Lender from subsequently electing to exercise a different remedy. Without limitation to the generality of

2

ME1 42768973v.2

the foregoing, it is expressly hereby acknowledged and agreed that the obligations of Guarantor hereunder are independent of the obligations of Borrower or any other guarantor or indemnitor under any of the other Loan Documents to which they may be a party, and a separate action or actions may be brought and prosecuted against Guarantor whether or not any action is brought against Borrower, any other guarantor or indemnitor and whether or not Borrower is joined in any such action or actions.

3.    Guarantor does hereby (a) waive notice of acceptance of this Guaranty by Lender and any and all notices and demands of every kind which may be required to be given by any statute, rule or law, (b) agree to refrain from asserting, until after repayment in full of the Loan, any defense, right of set-off or other claim which Guarantor may have against Borrower (c) waive any defense, right of set-off or other claim which Guarantor or Borrower may have against Lender, or the holder of the Note, (d) waive any and all rights Guarantor may have under any anti-deficiency statute or other similar protections, (e) waive presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge Guarantor with liability, and (f) waive any failure by Lender to inform Guarantor of any facts Lender may now or hereafter know about Borrower, the Project, the Loan, or the transactions contemplated by the Loan Agreement, it being understood and agreed that Lender has no duty so to inform and that Guarantor is fully responsible for being and remaining informed by Borrower of all circumstances bearing on the risk of nonperformance of Borrower's obligations.  In addition to, and without limitation to, the foregoing waivers, Guarantor hereby also waives (a) any right to require Lender, as a condition of payment or performance or completion by Guarantor, to (i) proceed against Borrower, any other guarantor, or any other person, (ii) proceed against or exhaust any security held from Borrower, any other guarantor, or any other person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower, including, without limitation, any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument related thereto or by reason of the cessation of the liability of Borrower from any cause other than payment, performance and completion in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty and any legal or equitable discharge of any Guarantor's obligations hereunder (other than indefeasible payment, performance and completion of the Guaranteed Obligations or the Loan in full), (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (e) any release, discharge, modification, impairment or limitation of the liability of Borrower to Lender, whether consented to by Lender, consensual or arising by operation of law or any proceedings in bankruptcy or reorganization, or from any other cause, other than payment in full of the Loan; (f) any defense based on any rejection or disaffirmance of the Guaranteed Obligations, or any part thereof, or any security held therefor, in any such proceedings in bankruptcy or reorganization; (g) any defense based on any action taken

3

or omitted by Lender in any proceedings in bankruptcy or insolvency involving Borrower, including any election to have their claim allowed as being secured, partially secured or unsecured, any extension of credit by Lender to Borrower in any proceedings in bankruptcy or insolvency, and taking and holding by Lender of any security for any such extension of credit. The obligations of the undersigned Guarantor under this Guaranty extend to all amendments, supplements, modifications, renewals, replacements or extensions of the Loan Documents and all Hedging Contracts (as defined in the Mortgage) at any rate or rates of interest. The liability of Guarantor and the rights of the Lender under this Guaranty will not be impaired or affected in any manner by, and Guarantor hereby consents in advance to, and waives any requirement of notice for, any (1) disposition, impairment, release, surrender, substitution, or modification of any collateral securing the Guaranteed Obligations or the obligations created by this Guaranty or failure to perfect a security interest in any collateral; (2) release (including adjudication or discharge in bankruptcy) or settlement with Borrower or any other party which may be or become liable for the Guaranteed Obligations (including, without limitation, any maker, endorser, guarantor or surety); (3) delay in enforcement of payment of the Guaranteed Obligations or delay in enforcement of this Guaranty; (4) delay, omission, waiver, or forbearance in exercising any right or power with respect to the Guaranteed Obligations or this Guaranty; (5) defense arising from the enforceability, validity or genuineness of any of the Loan Documents; (6) defenses or counterclaims that Borrower may assert under or in respect of any of the Loan Documents, including, but not limited to, failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, infancy, statute of limitations, lender liability, accord and satisfaction and usury; or (7) any other act or omission which might otherwise constitute a legal or equitable discharge of the undersigned. Credit may be granted or continued from time to time by Lender to Borrower without notice to or authorization from Guarantor, regardless of the financial or other condition of Borrower at the time of any such grant or continuation. Lender shall have no obligation to disclose or discuss with Guarantor its assessment of the financial condition of Borrower. Guarantor acknowledges that no representations of any kind whatsoever have been made by Lender. No modification or waiver of any of the provisions of this Guaranty shall be binding upon Lender except as expressly set forth in a writing duly signed and delivered by Lender.

Further, and without limitation to the foregoing Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability of this Guaranty or giving rise to any reduction, limitation, impairment, discharge or termination of Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment or performance under the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations and/or the Loan Documents, and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of any of Borrower's obligations under the Loan Documents and take and hold security for the payment or performance of this Guaranty or the Loan Documents; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment or performance of Borrower's obligations under the Loan Documents, any other guaranties of the Loan, or any other obligation of any person (including any other guarantor) with respect to the Loan; (v) enforce and apply any security now or hereafter held by or for the benefit of Lender in respect of this Guaranty or the Loan and direct the order or manner of sale thereof, and to bid at any such sale, or exercise any other right or remedy that Lender may have against any such

4

security, in each case as in its discretion it may determine, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any security for the Guaranteed Obligations; (vi) apply any payments or recoveries from Borrower, Guarantor or any other source, and any proceeds of any security, to the Guaranteed Obligation in such manner, order and priority as Lender may elect (whether or not those obligations are guaranteed by this Guaranty or secured at the time of the application); and (vii) exercise any other rights available to it under the Loan Documents.

Lender may take any of the foregoing actions upon any terms and conditions as Lender may elect, without giving notice to, or obtaining consent from, Guarantor and without affecting the liability of Guarantor to Lender and this Guaranty and the obligations of Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason, including, without limitation, the occurrence of any of the following, whether or not Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or the Loan, or with respect to any other guaranty of or security for the payment or performance of the Guaranteed Obligations or the Loan; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including without limitation provisions relating to events of default) of the Loan Documents, or of any other guaranty or security for the Guaranteed Obligations or the Loan, in each case whether or not in accordance with the terms of the Loan Documents or any agreement relating to such other guaranty or security; (iii) any Loan Document, at any time being found to be illegal, invalid or unenforceable with respect to Borrower; (iv) the application of payments received from any source (other than payments received pursuant to this Guaranty or from the proceeds of any security for the Guaranteed Obligations or the Loan except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations or the Loan) to the payment of indebtedness other than the Loan, even though Lender might have elected to apply such payment to any part or all of the Loan; (v) Lender's consent to the change, reorganization or termination of the ownership structure or existence of Borrower or any of its Affiliates and to any corresponding restructuring of the Loan, including, without limitation, the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Loan, including, without limitation, the Guaranteed Obligations; (vii) the acquisition or transfer of title to the Project to Lender, any Affiliate of Lender or any designee of Lender (including, without limitation, any purchaser through foreclosure, deed in lieu or otherwise); (viii) any act or event which might otherwise discharge, reduce, limit or modify Guarantor's obligations under this Guaranty; (ix) any waiver, extension, modification, forbearance, delay or other act or omission of Lender, or their failure to proceed promptly or otherwise as against Borrower, Guarantor or any security; (x) any action, omission or circumstance which might increase the likelihood that Guarantor may be called upon to perform under this Guaranty or which might affect the rights or remedies of any Guarantor as against Borrower; or (xi) any dealings occurring at any time between Borrower and Lender, whether relating to the Guaranteed Obligations or otherwise.

4.    Guarantor further agrees that Guarantor's liability as guarantor shall not be

5

impaired or affected by any renewals or extensions which may be made from time to time, with or without the knowledge or consent of Guarantor of the time for payment of interest or principal under the Note, it being the intent hereof that, subject to Lender's compliance with the terms of this Guaranty, Guarantor shall remain liable for the payment of the Guaranteed Obligations, until the Guaranteed Obligations has been paid in full, notwithstanding any act or thing which might otherwise operate as a legal or equitable discharge of a surety. Guarantor further understands and agrees that Lender may at any time enter into agreements with Borrower to amend and modify the Note, Loan Agreement, Mortgage or other Loan Documents, and may waive or release any provision or provisions of the Note, Loan Agreement, Mortgage and other Loan Documents or any thereof, and, with reference to such instruments, may make and enter into any such agreement or agreements as Lender and Borrower may deem proper and desirable, without in any manner impairing or affecting this Guaranty or any of Lender's rights hereunder or Guarantor's obligations hereunder.

5.      This is an absolute, present and continuing guaranty of payment and not of collection. Guarantor agrees that this Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any other security or collateral given in connection herewith or with the Note, Loan Agreement, Mortgage or any of the other Loan Documents through foreclosure or sale proceedings, as the case may be, under the Mortgage or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Lender to join Borrower in any action brought hereunder or to commence any action against or obtain any judgment against Borrower or to pursue any other remedy or enforce any other right. Guarantor further agrees that nothing contained herein or otherwise shall prevent Lender from pursuing concurrently or successively all rights and remedies available to it at law and/or in equity or under the Note, Loan Agreement, Mortgage or any other Loan Documents, and the exercise of any of Lender's rights or the completion of any of its remedies shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent and unconditional under any and all circumstances whatsoever and Guarantor shall remain fully liable for the payment and performance of all of the Guaranteed Obligations until the Loan and all Guaranteed Obligations have been indefeasibly paid and performed in full. None of Guarantor's obligations under this Guaranty or any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Borrower under the Note, Loan Agreement, Mortgage or other Loan Documents or by reason of the bankruptcy of Borrower or by reason of any creditor or bankruptcy proceeding instituted by or against Borrower. In the event of the foreclosure of the Mortgage and of a deficiency, Guarantor hereby promises and agrees forthwith to pay the amount of such deficiency notwithstanding the fact that recovery of said deficiency against Borrower would not be allowed by applicable law; however, the foregoing shall not be deemed to require that Lender institute foreclosure proceedings or otherwise resort to or exhaust any other collateral or security prior to or concurrently with enforcing this Guaranty. As used in this Guaranty, an "indefeasible" payment shall mean and refer to a payment that is no longer subject to potential disaffirmance, impairment, set aside, offset, recoupment, defeasance, recovery, disallowance, or recapture pursuant to the provisions of any federal or state law, regulation or order applicable to or governing creditors' rights, including, without limitation, Title 11 of the United States Code, as amended, either by reason of the passage of time following such payment or the final judgment of a court of competent

6

ME1 42768973v.2

jurisdiction establishing the unassailable right of the party receiving such payment to retain such payment without reduction, offset, or other impairment.

6.      If and to the extent that, for any reason, any payment (or portion thereof) by or on behalf of Borrower or Guarantor in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by Lender or any holder of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or insolvency, the appointment of a receiver, intervenor, conservator, trustee or similar officer for Borrower, or otherwise, then the obligations of Guarantor shall be automatically reinstated and will continue to be effective as though such payment had not been made regardless of whether Lender contested the order requiring return of such payment. Guarantor agrees that it will indemnify Lender on demand for all costs and expenses (including, without limitation, fees and expenses of counsel) incurred by Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

7.      In the event Lender or any holder of the Note shall assign the Note and this Guaranty, Guarantor will accord full recognition thereto and agrees that all rights and remedies of Lender or such holder hereunder shall be enforceable against Guarantor by such assignee with the same force and effect and to the same extent as would have been enforceable by Lender or such holder but for such assignment; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of its assignee or transferee, to enforce this Guaranty for Lender's benefit to the extent any portion of the Guaranteed Obligations or any interest therein is not assigned or transferred.

8.      If: (a) the Lender or holder of this Guaranty retains an attorney for collection of this Guaranty or this Guaranty is collected through any legal proceeding; (b) an attorney is retained to represent Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty; (c) an attorney is retained to provide advice or other representation with respect to this Guaranty; or (d) an attorney is retained to represent Lender in any proceedings whatsoever in connection with this Guaranty, then Guarantor shall pay to Lender upon demand all reasonable attorney's fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding brought to enforce this Guaranty as well as the other Loan Documents.

9.      The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty is found by a court of competent jurisdiction to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and

7

ME1 42768973v.2

that the rights, obligations and interest of Lender or the holder of the Note under the remainder of this Guaranty shall continue in full force and effect.

10.    **TO THE GREATEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS GUARANTY (EACH, A "PROCEEDING"), LENDER AND GUARANTOR IRREVOCABLY (A) SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN PHILADELPHIA COUNTY, PENNSYLVANIA, AND (B) WAIVE ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS GUARANTY SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. LENDER AND GUARANTOR FURTHER AGREE AND CONSENT THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY PENNSYLVANIA STATE OR UNITED STATES COURT SITTING IN THE CITY OF PHILADELPHIA AND MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE APPLICABLE PARTY AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; <u>EXCEPT</u> THAT IF SUCH PARTY SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

AS HIS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON HIS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED IN THE MANNER PROVIDED HEREIN FOR NOTICE TO GUARANTOR SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE COMMONWEALTH OF PENNSYLVANIA.  GUARANTOR (A) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (B) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND

8

ADDRESS FOR SERVICE OF PROCESS, AND (C) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN PENNSYLVANIA OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

11.    ANY INDEBTEDNESS OF BORROWER TO GUARANTOR NOW OR HEREAFTER EXISTING IS HEREBY SUBORDINATED TO THE PAYMENT AND PERFORMANCE OF THE GUARANTEED OBLIGATIONS.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHTS SUCH GUARANTOR MAY HAVE AT ANY TIME (WHETHER ARISING DIRECTLY OR INDIRECTLY, BY OPERATION OF LAW OR CONTRACT) TO ASSERT ANY CLAIM AGAINST BORROWER ON ACCOUNT OF PAYMENTS MADE BY GUARANTOR UNDER THIS GUARANTY, INCLUDING, WITHOUT LIMITATION, ANY AND ALL RIGHTS OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION OR INDEMNITY.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY SUBORDINATES ANY AND ALL GUARANTEED OBLIGATIONS OF BORROWER TO GUARANTOR, PRESENT AND FUTURE, HOWEVER EVIDENCED, TO THE PRIOR PAYMENT OF THE GUARANTEED OBLIGATIONS TO LENDER.

12.    Any amounts received by Lender from any source on account of the Loan may be utilized by Lender for the payment of the Guaranteed Obligations and any other obligations of Borrower to Lender in such order or priority as Lender may from time to time elect.

13.    **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS GUARANTY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  GUARANTOR FURTHER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY LEGAL PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER WITH RESPECT TO THIS GUARANTY OR OTHERWISE IN RESPECT OF THE LOAN, ANY AND EVERY RIGHT GUARANTOR MAY HAVE TO (A) INTERPOSE ANY COUNTERCLAIM THEREIN, OTHER THAN A COMPULSORY COUNTERCLAIM, AND (B) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.  NOTHING CONTAINED IN THE IMMEDIATELY PRECEDING SENTENCE SHALL PREVENT OR PROHIBIT GUARANTOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.**

9

14.    Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (i) if hand delivered or if sent by telecopy, effective upon receipt or (ii) if delivered by overnight courier service, effective on the next Business Day following delivery to such courier service, or (iii) if mailed by United States registered or certified mail, postage prepaid, return receipt requested, effective two (2) Business Days after deposit in the United States mails, with copies via e-mail; addressed in each case as follows:

Guarantor:          Pramod Keshri
                    4 Ren Way
                    Doylestown, PA  18901

With a copy to:     BERMAN INDICTOR LLP
                    30 N. 41st Street, Suite 450
                    Philadelphia, PA 19104
                    Attention:  Penny S. Indictor, Esq.
                    Michael J. Robins, Esq.

Lender:             Citizens Bank, N.A.
                    One Logan Square
                    130 North 18th Street, Suite 1310
                    Mailstop: PL1350
                    Philadelphia, PA 19103-6998
                    Attention:  Molly Skilton, Vice President
                    molly.skilton@citizensbank.com

With a copy to:     McCarter & English LLP
                    1600 Market Street, Suite 3900
                    Philadelphia, PA 19103
                    Attention:  Inez M. Markovich, Esquire
                    Facsimile:  (215) 988-4319
                    imarkovich@mccarter.com

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

15.    In order to induce Lender to make the Loan, Guarantor makes the following representations and warranties to Lender set forth in this Section.  Guarantor acknowledges that but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan.

(a)    Guarantor is an adult individual, *sui juris*, and of full capacity to enter into, deliver and perform this Guaranty.

10

ME1 42768973v.2

(b)     Any and all balance sheets, net worth statements, and other financial data with respect to Guarantor which have heretofore been given to Lender by or on behalf of Guarantor fairly and accurately present the financial condition of Guarantor as of the respective dates thereof.

(c)     the execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (i) any laws, order, rule, regulation, writ, injunction or decree now in effect of any Government Authority, or court having jurisdiction over Guarantor, (ii) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty, (iii) the instruments creating any trust holding title to any assets included in Guarantor's financial statements, or (iv) the organizational or other documents of Guarantor.

(d)     This Guaranty has been duly and validly executed and delivered by Guarantor.

(e)     No authorizations, approvals or consents of, and no filings or registrations with, any governmental or regulatory authority or agency are necessary for the execution, delivery or performance by Guarantor of this Guaranty or for the validity or enforceability hereof.

(f)     This Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms.

(g)     Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, which may adversely affect Guarantor's ability to fulfill his obligations under this Guaranty.  There are no judgments or orders, in the aggregate, for the payment of money rendered against Guarantor for an amount in excess of $25,000.  Guarantor is not in default under any agreements which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

All of the foregoing representations and warranties shall be deemed remade on the date of the Initial Disbursement of Loan Proceeds, on the date of each advance of Loan Proceeds, and upon any extension of the Loan pursuant to the Loan Agreement.  Guarantor hereby agrees to indemnify and hold Lender free and harmless from and against all loss, cost, liability, damage, and expense, including reasonable attorney's fees and costs, which Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties as of the date the foregoing representations and warranties are made and are remade.

16.     This Guaranty shall be binding upon the heirs, executors, legal and personal representatives, successors and assigns of Guarantor and shall not be discharged in whole or in part by the death of Guarantor.  If more than one party executes this Guaranty, the liability of all such parties shall be joint and several.

17.     Guarantor hereby covenants and agrees to furnish to the Lender, (i) not later than one hundred twenty (120) days after the closing of each fiscal year, an annual personal financial statement, together with supporting bank and brokerage account statements, certified to Lender by such Guarantor as being true and complete in all material respects and (ii) copies of all filed

11

tax returns with all schedules as well as corresponding K-1s, with respect to Guarantor within thirty (30) days of filing. In addition, Guarantor will, promptly after the Lender's written request therefor, provide the Lender with such other financial information as the Lender may reasonably request. Guarantor represents and warrants to the Lender that all financial statements furnished or to be furnished to the Lender with respect to Guarantor will accurately reflect, in all material respects, Guarantor's financial condition at the times and for the periods therein stated.

18.     Guarantor hereby agrees, covenants, represents and warrants that so long as any portion of the Guaranteed Obligations remains outstanding, such Guarantor will not give or otherwise transfer or dispose of any material portion of such Guarantor's assets to any other person or entity for less than the reasonably equivalent value of such assets.

19.     **THIS GUARANTY SHALL BE GOVERNED BY, AND EXCEPT TO THE EXTENT PRE-EMPTED BY FEDERAL LAW, CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, EXCEPT TO THE APPLICABLE CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.**

20.     Lender shall be entitled to honor any request for Loan Proceeds made by Borrower and shall have no obligation to see to the proper disposition of such advances. Guarantor agrees that his obligations hereunder shall not be released or affected by reason of any improper disposition by Borrower of such Loan Proceeds.

21.     This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

22.     Lender hereby notifies Guarantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), Lender is required to obtain, verify and record information that identifies each Guarantor, which information includes the name and address of each Guarantor and other information that will allow the Lender to identify Guarantor in accordance with the Act.

23.     The terms of this Guaranty may be waived, modified or amended only by an instrument in writing duly executed by Guarantor and Lender.

24.     Neither failure to exercise, nor any delay in exercising, on the part of Lender, any right or remedy under this Guaranty or any of the Loan Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. This Guaranty is subject to enforcement at law or in equity, including actions for damages or specific performance. Time is of the essence hereof with respect to Guarantors' performance hereunder.

25.     All payments under this Guaranty shall be made free and clear of, and without deduction for, any and all present and future taxes, levies or other fees or payments to public authorities of similar nature.

ME1 42768973v.2

26. **CONFESSION OF JUDGMENT AND EXECUTION**.  UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, GUARANTOR IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR GUARANTOR IN ANY AND ALL ACTIONS AND TO CONFESS JUDGMENT AGAINST GUARANTOR FOR ALL OR ANY PART OF THE SUMS DUE UNDER THIS GUARANTY; AND IN EITHER CASE FOR INTEREST, INCLUDING INTEREST ON ANY JUDGMENT OBTAINED BY LENDER AT THE APPLICABLE DEFAULT RATE UNTIL ACTUAL PAYMENT IS MADE TO LENDER IN THE FULL AMOUNT DUE TO LENDER, LATE CHARGES, COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION FOR COLLECTION IN THE AMOUNT OF FIFTEEN PERCENT (15%) THEREOF, BUT IN NO EVENT LESS THAN $25,000.00.  GUARANTOR FURTHER AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, TO APPEAR FOR AND ENTER JUDGMENT AGAINST SUCH GUARANTOR IN AN ACTION OF REPLEVIN OR ANY OTHER ACTION TO RECOVER POSSESSION OF ANY COLLATERAL SECURING THIS GUARANTY.  SUCH CONFESSIONS OF JUDGMENT OR ACTIONS SHALL BE WITH RELEASE OF ERRORS, WAIVERS OF APPEALS, WITHOUT STAY OF EXECUTION AND GUARANTOR WAIVES ALL RELIEF FROM ANY AND ALL APPRAISEMENT OR EXEMPTION LAWS NOW IN FORCE OR HEREAFTER ENACTED.  IF A COPY OF THIS GUARANTY, VERIFIED BY AN OFFICIAL OR AN OFFICER OF LENDER, SHALL BE FILED IN ANY PROCEEDING OR ACTION WHEREIN JUDGMENT IS TO BE CONFESSED, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF AND SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR HEREIN FOR AND CONFESS JUDGMENT AGAINST GUARANTOR AS PROVIDED HEREIN.  JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS AND NO SINGLE EXERCISE OF THE AFORESAID POWERS TO CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, SHALL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, AVOIDABLE, OR VOID, BUT THE POWER SHALL CONTINUE UNDIMINISHED AND IT MAY BE EXERCISED FROM TIME TO TIME AFTER AND AS LENDER SHALL ELECT UNTIL SUCH TIME AS LENDER SHALL HAVE RECEIVED PAYMENT IN FULL OF ALL SUMS DUE UNDER THIS GUARANTY, TOGETHER WITH INTEREST, COSTS, AND FEES.

27. **WAIVER OF DEFENSES TO CONFESSION OF JUDGMENT AND EXECUTION**.  GUARANTOR HAS REVIEWED THE WARRANT OF ATTORNEY FOR CONFESSION OF JUDGMENT SET FORTH IN SECTION 26 ABOVE WITH GUARANTOR'S ATTORNEY AND ACKNOWLEDGES THAT LENDER IS AUTHORIZED TO TAKE ANY ACTION WITHOUT ANY ADVANCE NOTICE TO GUARANTOR, TO CONFESS JUDGMENT. THEREFORE, GUARANTOR IS AWARE THAT, TO THE EXTENT PERMITTED BY LAW, IT HAS GIVEN UP ANY RIGHTS IT MIGHT HAVE TO A HEARING TO CONTEST THE VALIDITY OF ANY SUCH JUDGMENT OR OTHER CLAIMS THAT LENDER MAY ASSERT THEREUNDER.  GUARANTOR SPECIFICALLY AND VOLUNTARILY WAIVES AND RELINQUISHES ANY RIGHTS IT MAY HAVE TO ANY NOTICE OR HEARING OR OTHER DUE PROCESS IN CONNECTION WITH LENDER'S IMPLEMENTATION OF ITS RIGHTS TO TAKE JUDGMENT, OR TO EXECUTE UPON OR

13

ME1 42768973v.2

TAKE ANY ADDITIONAL ACTION TO ENFORCE SUCH JUDGMENT.  GUARANTOR ALSO SPECIFICALLY RELEASES ANY RIGHTS IT MAY HAVE TO CHALLENGE SUCH ACTION BY LENDER OR TO CLAIM OR RECOVER ANY DAMAGES AGAINST LENDER IN CONNECTION WITH SUCH ACTIONS, TO THE EXTENT PERMITTED BY LAW. GUARANTOR ACKNOWLEDGES THAT IT IS REPRESENTED BY COUNSEL AND THAT SUCH GUARANTOR'S COUNSEL HAS REVIEWED AND EXPLAINED THE MEANING OF THESE WAIVERS TO GUARANTOR.

28.    **LIMITATION OF LIABILITY**.

(a)    If the Loan is converted to the Permanent Loan in accordance with all of the terms and conditions set forth in the Loan Agreement, the principal portion of the Guaranteed Obligations shall be reduced to fifty percent (50%) of the Permanent Loan Amount.

(b)    The limitations upon Guarantor's liability provided in Section 28(a) above will apply only to the payment obligations under Section 1(a) and not to the other Guaranteed Obligations including, without limitation, the Enforcement Costs.  In addition to Guarantor's Obligations under this Guaranty, Guarantor is undertaking and agreeing to obligations under other guaranties, indemnities and agreements executed by Guarantor with respect to the Loan, none of which will be limited by Section 28(a) above.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

14

ME1 42768973v.2

*[SIGNATURE PAGE TO PAYMENT GUARANTY]*

**GUARANTOR ACKNOWLEDGES THAT HE HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS GUARANTY, INCLUDING THE CONFESSION OF JUDGMENT AND WAIVER OF JURY TRIAL, AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.**

IN WITNESS WHEREOF, intending to be legally bound, Guarantor has executed this Guaranty under seal as of the date first written above.

**WITNESS**:                                    **GUARANTOR**:

_____                    _____(SEAL)
                                            **Pramod Keshri**, individually

COMMONWEALTH OF PENNSYLVANIA
                                            SS.:
COUNTY OF Philadelphia

On the 16 day of November, 2022, before me, the subscriber, a notary public in and for the Commonwealth and County aforesaid, personally appeared Pramod Keshri, known to be or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that the same was executed for the purposes therein contained.

WITNESS my hand and seal the day and year aforesaid.

_____
Notary Public

My Commission Expires:

Commonwealth of Pennsylvania - Notary Seal
ADAM SCHNEIDER, Notary Public
Philadelphia County
My Commission Expires May 5, 2023
Commission Number 1233256

[Citizens-Hancock Lofts-Signature/Notary Page to Guaranty of Payment (P Keshri)]

## GUARANTY OF PAYMENT

THIS GUARANTY OF PAYMENT (this "Guaranty") made on the 16th day of November, 2022 and effective as of November 17, 2022, by **AJAY K. KESHRI,** an adult individual ("Guarantor"), to and for the benefit of **CITIZENS BANK, N.A.**("Lender").

RECITALS

WHEREAS, HANCOCK LOFTS LLC, a Pennsylvania limited liability company ("Borrower") and Lender entered into that certain Construction Loan Agreement dated on or about the date hereof (as same may be supplemented, restated, superseded, amended or replaced from time to time, the "Loan Agreement") whereby Lender agreed to make a loan (the "Loan") to Borrower in the principal amount of up to TEN MILLION AND 00/100 DOLLARS ($10,000,000.00), to finance the development and construction of the Project (as defined in the Loan Agreement).  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

WHEREAS, in connection with the Loan, Borrower has executed and delivered to Lender that certain Promissory Note (the "Note") dated of even date herewith in the amount of the Loan, which Note is secured by (i) an Open-End Mortgage, Assignment of Leases and Rents, and Security Agreement (the "Mortgage") made by Borrower in favor of Lender on the Project and (ii) the other Loan Documents.

WHEREAS, Guarantor will derive an economic benefit from the Loan evidenced and secured by the Note, the Mortgage and the other Loan Documents.

WHEREAS, Lender has relied on the statements and agreements contained herein in agreeing to make the Loan, and the execution and delivery of this Guaranty by Guarantor is a condition precedent to the making of the Loan by Lender.

**AGREEMENTS**

NOW, THEREFORE, intending to be legally bound, Guarantor, in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, hereby covenants and agrees for the benefit of Lender and its respective successors, endorsees, transferees, participants and assigns as follows:

1.     Guarantor absolutely, unconditionally, irrevocably, and jointly and severally guarantees:

(a)     the full and prompt payment of the principal of and interest on the Note when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, and the full and prompt payment of all sums which may now be or may hereafter become due and owing under the Note, the Loan Agreement and the other Loan Documents;

1

(b)    the prompt, full and complete performance of all of Borrower's obligations under each and every covenant contained in the Loan Documents; and

(c)    the full and prompt payment of any Enforcement Costs (as hereinafter defined in Section 8 hereof); and

(d)    intentionally omitted.

All amounts due, debts, liabilities and payment obligations described in subsections (a) through (c) of this Section 1 shall be hereinafter collectively referred to as the "Guaranteed Obligations."

Notwithstanding anything to the contrary contained herein, the Guaranteed Obligations and all other guaranties provided herein shall expressly exclude any Excluded Swap Obligations (as defined below).  For the purposes of this Section 1, the following terms have the meaning ascribed below:

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Excluded Swap Obligation" means, with respect to Guarantor, any Swap Obligation (as defined below) if, and to the extent that, all or a portion of the guarantee of Guarantor of, or the grant by Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

2.    In the event Borrower shall fail to pay in full, when due, any of the Guaranteed Obligations, Guarantor agrees, on demand by Lender or the holder of the Note, to pay the Guaranteed Obligations regardless of any defense, right of set-off or claims which Borrower or Guarantor may have against Lender or the holder of the Note.  All of the remedies set forth herein and/or provided for in any of the Loan Documents or at law or equity shall be equally available to Lender, and the choice by Lender of one such remedy over another shall not be subject to question or challenge by Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff, or failure to mitigate damages in any action, proceeding, or counteraction by Lender to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Lender from subsequently electing to exercise a different remedy.  Without limitation to the generality of

2

the foregoing, it is expressly hereby acknowledged and agreed that the obligations of Guarantor hereunder are independent of the obligations of Borrower or any other guarantor or indemnitor under any of the other Loan Documents to which they may be a party, and a separate action or actions may be brought and prosecuted against Guarantor whether or not any action is brought against Borrower, any other guarantor or indemnitor and whether or not Borrower is joined in any such action or actions.

3.      Guarantor does hereby (a) waive notice of acceptance of this Guaranty by Lender and any and all notices and demands of every kind which may be required to be given by any statute, rule or law, (b) agree to refrain from asserting, until after repayment in full of the Loan, any defense, right of set-off or other claim which Guarantor may have against Borrower (c) waive any defense, right of set-off or other claim which Guarantor or Borrower may have against Lender, or the holder of the Note, (d) waive any and all rights Guarantor may have under any anti-deficiency statute or other similar protections, (e) waive presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge Guarantor with liability, and (f) waive any failure by Lender to inform Guarantor of any facts Lender may now or hereafter know about Borrower, the Project, the Loan, or the transactions contemplated by the Loan Agreement, it being understood and agreed that Lender has no duty so to inform and that Guarantor is fully responsible for being and remaining informed by Borrower of all circumstances bearing on the risk of nonperformance of Borrower's obligations.  In addition to, and without limitation to, the foregoing waivers, Guarantor hereby also waives (a) any right to require Lender, as a condition of payment or performance or completion by Guarantor, to (i) proceed against Borrower, any other guarantor, or any other person, (ii) proceed against or exhaust any security held from Borrower, any other guarantor, or any other person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower, including, without limitation, any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument related thereto or by reason of the cessation of the liability of Borrower from any cause other than payment, performance and completion in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty and any legal or equitable discharge of any Guarantor's obligations hereunder (other than indefeasible payment, performance and completion of the Guaranteed Obligations or the Loan in full), (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (e) any release, discharge, modification, impairment or limitation of the liability of Borrower to Lender, whether consented to by Lender, consensual or arising by operation of law or any proceedings in bankruptcy or reorganization, or from any other cause, other than payment in full of the Loan; (f) any defense based on any rejection or disaffirmance of the Guaranteed Obligations, or any part thereof, or any security held therefor, in any such proceedings in bankruptcy or reorganization; (g) any defense based on any action taken

3

or omitted by Lender in any proceedings in bankruptcy or insolvency involving Borrower, including any election to have their claim allowed as being secured, partially secured or unsecured, any extension of credit by Lender to Borrower in any proceedings in bankruptcy or insolvency, and taking and holding by Lender of any security for any such extension of credit. The obligations of the undersigned Guarantor under this Guaranty extend to all amendments, supplements, modifications, renewals, replacements or extensions of the Loan Documents and all Hedging Contracts (as defined in the Mortgage) at any rate or rates of interest. The liability of Guarantor and the rights of the Lender under this Guaranty will not be impaired or affected in any manner by, and Guarantor hereby consents in advance to, and waives any requirement of notice for, any (1) disposition, impairment, release, surrender, substitution, or modification of any collateral securing the Guaranteed Obligations or the obligations created by this Guaranty or failure to perfect a security interest in any collateral; (2) release (including adjudication or discharge in bankruptcy) or settlement with Borrower or any other party which may be or become liable for the Guaranteed Obligations (including, without limitation, any maker, endorser, guarantor or surety); (3) delay in enforcement of payment of the Guaranteed Obligations or delay in enforcement of this Guaranty; (4) delay, omission, waiver, or forbearance in exercising any right or power with respect to the Guaranteed Obligations or this Guaranty; (5) defense arising from the enforceability, validity or genuineness of any of the Loan Documents; (6) defenses or counterclaims that Borrower may assert under or in respect of any of the Loan Documents, including, but not limited to, failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, infancy, statute of limitations, lender liability, accord and satisfaction and usury; or (7) any other act or omission which might otherwise constitute a legal or equitable discharge of the undersigned. Credit may be granted or continued from time to time by Lender to Borrower without notice to or authorization from Guarantor, regardless of the financial or other condition of Borrower at the time of any such grant or continuation. Lender shall have no obligation to disclose or discuss with Guarantor its assessment of the financial condition of Borrower. Guarantor acknowledges that no representations of any kind whatsoever have been made by Lender. No modification or waiver of any of the provisions of this Guaranty shall be binding upon Lender except as expressly set forth in a writing duly signed and delivered by Lender.

Further, and without limitation to the foregoing Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability of this Guaranty or giving rise to any reduction, limitation, impairment, discharge or termination of Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment or performance under the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations and/or the Loan Documents, and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of any of Borrower's obligations under the Loan Documents and take and hold security for the payment or performance of this Guaranty or the Loan Documents; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment or performance of Borrower's obligations under the Loan Documents, any other guaranties of the Loan, or any other obligation of any person (including any other guarantor) with respect to the Loan; (v) enforce and apply any security now or hereafter held by or for the benefit of Lender in respect of this Guaranty or the Loan and direct the order or manner of sale thereof, and to bid at any such sale, or exercise any other right or remedy that Lender may have against any such

4

security, in each case as in its discretion it may determine, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any security for the Guaranteed Obligations; (vi) apply any payments or recoveries from Borrower, Guarantor or any other source, and any proceeds of any security, to the Guaranteed Obligation in such manner, order and priority as Lender may elect (whether or not those obligations are guaranteed by this Guaranty or secured at the time of the application); and (vii) exercise any other rights available to it under the Loan Documents.

Lender may take any of the foregoing actions upon any terms and conditions as Lender may elect, without giving notice to, or obtaining consent from, Guarantor and without affecting the liability of Guarantor to Lender and this Guaranty and the obligations of Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason, including, without limitation, the occurrence of any of the following, whether or not Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or the Loan, or with respect to any other guaranty of or security for the payment or performance of the Guaranteed Obligations or the Loan; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including without limitation provisions relating to events of default) of the Loan Documents, or of any other guaranty or security for the Guaranteed Obligations or the Loan, in each case whether or not in accordance with the terms of the Loan Documents or any agreement relating to such other guaranty or security; (iii) any Loan Document, at any time being found to be illegal, invalid or unenforceable with respect to Borrower; (iv) the application of payments received from any source (other than payments received pursuant to this Guaranty or from the proceeds of any security for the Guaranteed Obligations or the Loan except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations or the Loan) to the payment of indebtedness other than the Loan, even though Lender might have elected to apply such payment to any part or all of the Loan; (v) Lender's consent to the change, reorganization or termination of the ownership structure or existence of Borrower or any of its Affiliates and to any corresponding restructuring of the Loan, including, without limitation, the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Loan, including, without limitation, the Guaranteed Obligations; (vii) the acquisition or transfer of title to the Project to Lender, any Affiliate of Lender or any designee of Lender (including, without limitation, any purchaser through foreclosure, deed in lieu or otherwise); (viii) any act or event which might otherwise discharge, reduce, limit or modify Guarantor's obligations under this Guaranty; (ix) any waiver, extension, modification, forbearance, delay or other act or omission of Lender, or their failure to proceed promptly or otherwise as against Borrower, Guarantor or any security; (x) any action, omission or circumstance which might increase the likelihood that Guarantor may be called upon to perform under this Guaranty or which might affect the rights or remedies of any Guarantor as against Borrower; or (xi) any dealings occurring at any time between Borrower and Lender, whether relating to the Guaranteed Obligations or otherwise.

4.    Guarantor further agrees that Guarantor's liability as guarantor shall not be

5

ME1 42768995v.2

impaired or affected by any renewals or extensions which may be made from time to time, with or without the knowledge or consent of Guarantor of the time for payment of interest or principal under the Note, it being the intent hereof that, subject to Lender's compliance with the terms of this Guaranty, Guarantor shall remain liable for the payment of the Guaranteed Obligations, until the Guaranteed Obligations has been paid in full, notwithstanding any act or thing which might otherwise operate as a legal or equitable discharge of a surety. Guarantor further understands and agrees that Lender may at any time enter into agreements with Borrower to amend and modify the Note, Loan Agreement, Mortgage or other Loan Documents, and may waive or release any provision or provisions of the Note, Loan Agreement, Mortgage and other Loan Documents or any thereof, and, with reference to such instruments, may make and enter into any such agreement or agreements as Lender and Borrower may deem proper and desirable, without in any manner impairing or affecting this Guaranty or any of Lender's rights hereunder or Guarantor's obligations hereunder.

5.     This is an absolute, present and continuing guaranty of payment and not of collection. Guarantor agrees that this Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any other security or collateral given in connection herewith or with the Note, Loan Agreement, Mortgage or any of the other Loan Documents through foreclosure or sale proceedings, as the case may be, under the Mortgage or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Lender to join Borrower in any action brought hereunder or to commence any action against or obtain any judgment against Borrower or to pursue any other remedy or enforce any other right. Guarantor further agrees that nothing contained herein or otherwise shall prevent Lender from pursuing concurrently or successively all rights and remedies available to it at law and/or in equity or under the Note, Loan Agreement, Mortgage or any other Loan Documents, and the exercise of any of Lender's rights or the completion of any of its remedies shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent and unconditional under any and all circumstances whatsoever and Guarantor shall remain fully liable for the payment and performance of all of the Guaranteed Obligations until the Loan and all Guaranteed Obligations have been indefeasibly paid and performed in full. None of Guarantor's obligations under this Guaranty or any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Borrower under the Note, Loan Agreement, Mortgage or other Loan Documents or by reason of the bankruptcy of Borrower or by reason of any creditor or bankruptcy proceeding instituted by or against Borrower. In the event of the foreclosure of the Mortgage and of a deficiency, Guarantor hereby promises and agrees forthwith to pay the amount of such deficiency notwithstanding the fact that recovery of said deficiency against Borrower would not be allowed by applicable law; however, the foregoing shall not be deemed to require that Lender institute foreclosure proceedings or otherwise resort to or exhaust any other collateral or security prior to or concurrently with enforcing this Guaranty. As used in this Guaranty, an "indefeasible" payment shall mean and refer to a payment that is no longer subject to potential disaffirmance, impairment, set aside, offset, recoupment, defeasance, recovery, disallowance, or recapture pursuant to the provisions of any federal or state law, regulation or order applicable to or governing creditors' rights, including, without limitation, Title 11 of the United States Code, as amended, either by reason of the passage of time following such payment or the final judgment of a court of competent

ME1 42768995v.2

jurisdiction establishing the unassailable right of the party receiving such payment to retain such payment without reduction, offset, or other impairment.

6.      If and to the extent that, for any reason, any payment (or portion thereof) by or on behalf of Borrower or Guarantor in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by Lender or any holder of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or insolvency, the appointment of a receiver, intervenor, conservator, trustee or similar officer for Borrower, or otherwise, then the obligations of Guarantor shall be automatically reinstated and will continue to be effective as though such payment had not been made regardless of whether Lender contested the order requiring return of such payment. Guarantor agrees that it will indemnify Lender on demand for all costs and expenses (including, without limitation, fees and expenses of counsel) incurred by Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

7.      In the event Lender or any holder of the Note shall assign the Note and this Guaranty, Guarantor will accord full recognition thereto and agrees that all rights and remedies of Lender or such holder hereunder shall be enforceable against Guarantor by such assignee with the same force and effect and to the same extent as would have been enforceable by Lender or such holder but for such assignment; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of its assignee or transferee, to enforce this Guaranty for Lender's benefit to the extent any portion of the Guaranteed Obligations or any interest therein is not assigned or transferred.

8.      If:  (a) the Lender or holder of this Guaranty retains an attorney for collection of this Guaranty or this Guaranty is collected through any legal proceeding; (b) an attorney is retained to represent Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty; (c) an attorney is retained to provide advice or other representation with respect to this Guaranty; or (d) an attorney is retained to represent Lender in any proceedings whatsoever in connection with this Guaranty, then Guarantor shall pay to Lender upon demand all reasonable attorney's fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding brought to enforce this Guaranty as well as the other Loan Documents.

9.      The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions.  However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty is found by a court of competent jurisdiction to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and

7

that the rights, obligations and interest of Lender or the holder of the Note under the remainder of this Guaranty shall continue in full force and effect.

10.    **TO THE GREATEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS GUARANTY (EACH, A "PROCEEDING"), LENDER AND GUARANTOR IRREVOCABLY (A) SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN PHILADELPHIA COUNTY, PENNSYLVANIA, AND (B) WAIVE ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS GUARANTY SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. LENDER AND GUARANTOR FURTHER AGREE AND CONSENT THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY PENNSYLVANIA STATE OR UNITED STATES COURT SITTING IN THE CITY OF PHILADELPHIA AND MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE APPLICABLE PARTY AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; <u>EXCEPT</u> THAT IF SUCH PARTY SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

AS HIS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON HIS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED IN THE MANNER PROVIDED HEREIN FOR NOTICE TO GUARANTOR SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE COMMONWEALTH OF PENNSYLVANIA.  GUARANTOR (A) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (B) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND

8

ADDRESS FOR SERVICE OF PROCESS, AND (C) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN PENNSYLVANIA OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

11.    ANY INDEBTEDNESS OF BORROWER TO GUARANTOR NOW OR HEREAFTER EXISTING IS HEREBY SUBORDINATED TO THE PAYMENT AND PERFORMANCE OF THE GUARANTEED OBLIGATIONS.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHTS SUCH GUARANTOR MAY HAVE AT ANY TIME (WHETHER ARISING DIRECTLY OR INDIRECTLY, BY OPERATION OF LAW OR CONTRACT) TO ASSERT ANY CLAIM AGAINST BORROWER ON ACCOUNT OF PAYMENTS MADE BY GUARANTOR UNDER THIS GUARANTY, INCLUDING, WITHOUT LIMITATION, ANY AND ALL RIGHTS OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION OR INDEMNITY.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY SUBORDINATES ANY AND ALL GUARANTEED OBLIGATIONS OF BORROWER TO GUARANTOR, PRESENT AND FUTURE, HOWEVER EVIDENCED, TO THE PRIOR PAYMENT OF THE GUARANTEED OBLIGATIONS TO LENDER.

12.    Any amounts received by Lender from any source on account of the Loan may be utilized by Lender for the payment of the Guaranteed Obligations and any other obligations of Borrower to Lender in such order or priority as Lender may from time to time elect.

13.    **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS GUARANTY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  GUARANTOR FURTHER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY LEGAL PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER WITH RESPECT TO THIS GUARANTY OR OTHERWISE IN RESPECT OF THE LOAN, ANY AND EVERY RIGHT GUARANTOR MAY HAVE TO (A) INTERPOSE ANY COUNTERCLAIM THEREIN, OTHER THAN A COMPULSORY COUNTERCLAIM, AND (B) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.  NOTHING CONTAINED IN THE IMMEDIATELY PRECEDING SENTENCE SHALL PREVENT OR PROHIBIT GUARANTOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.**

9

14.     Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (i) if hand delivered or if sent by telecopy, effective upon receipt or (ii) if delivered by overnight courier service, effective on the next Business Day following delivery to such courier service, or (iii) if mailed by United States registered or certified mail, postage prepaid, return receipt requested, effective two (2) Business Days after deposit in the United States mails, with copies via e-mail; addressed in each case as follows:

| | |
|---|---|
| Guarantor: | Ajay K. Keshri<br>2731 Norfolk Lane<br>Doylestown, PA  18902 |
| With a copy to: | BERMAN INDICTOR LLP<br>30 N. 41st Street, Suite 450<br>Philadelphia, PA 19104<br>Attention:  Penny S. Indictor, Esq.<br>Michael J. Robins, Esq. |
| Lender: | Citizens Bank, N.A.<br>One Logan Square<br>130 North 18th Street, Suite 1310<br>Mailstop: PL1350<br>Philadelphia, PA 19103-6998<br>Attention:  Molly Skilton, Vice President<br>molly.skilton@citizensbank.com |
| With a copy to: | McCarter & English LLP<br>1600 Market Street, Suite 3900<br>Philadelphia, PA 19103<br>Attention:  Inez M. Markovich, Esquire<br>Facsimile:  (215) 988-4319<br>imarkovich@mccarter.com |

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

15.     In order to induce Lender to make the Loan, Guarantor makes the following representations and warranties to Lender set forth in this Section.  Guarantor acknowledges that but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan.

(a)     Guarantor is an adult individual, *sui juris*, and of full capacity to enter into, deliver and perform this Guaranty.

10

(b)     Any and all balance sheets, net worth statements, and other financial data with respect to Guarantor which have heretofore been given to Lender by or on behalf of Guarantor fairly and accurately present the financial condition of Guarantor as of the respective dates thereof.

(c)     the execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (i) any laws, order, rule, regulation, writ, injunction or decree now in effect of any Government Authority, or court having jurisdiction over Guarantor, (ii) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty, (iii) the instruments creating any trust holding title to any assets included in Guarantor's financial statements, or (iv) the organizational or other documents of Guarantor.

(d)     This Guaranty has been duly and validly executed and delivered by Guarantor.

(e)     No authorizations, approvals or consents of, and no filings or registrations with, any governmental or regulatory authority or agency are necessary for the execution, delivery or performance by Guarantor of this Guaranty or for the validity or enforceability hereof.

(f)     This Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms.

(g)     Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, which may adversely affect Guarantor's ability to fulfill his obligations under this Guaranty.  There are no judgments or orders, in the aggregate, for the payment of money rendered against Guarantor for an amount in excess of $25,000.  Guarantor is not in default under any agreements which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

All of the foregoing representations and warranties shall be deemed remade on the date of the Initial Disbursement of Loan Proceeds, on the date of each advance of Loan Proceeds, and upon any extension of the Loan pursuant to the Loan Agreement.  Guarantor hereby agrees to indemnify and hold Lender free and harmless from and against all loss, cost, liability, damage, and expense, including reasonable attorney's fees and costs, which Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties as of the date the foregoing representations and warranties are made and are remade.

16.     This Guaranty shall be binding upon the heirs, executors, legal and personal representatives, successors and assigns of Guarantor and shall not be discharged in whole or in part by the death of Guarantor.  If more than one party executes this Guaranty, the liability of all such parties shall be joint and several.

17.     Guarantor hereby covenants and agrees to furnish to the Lender, (i) not later than one hundred twenty (120) days after the closing of each fiscal year, an annual personal financial statement, together with supporting bank and brokerage account statements, certified to Lender by such Guarantor as being true and complete in all material respects and (ii) copies of all filed

11

ME1 42768995v.2

tax returns with all schedules as well as corresponding K-1s, with respect to Guarantor within thirty (30) days of filing.  In addition, Guarantor will, promptly after the Lender's written request therefor, provide the Lender with such other financial information as the Lender may reasonably request.  Guarantor represents and warrants to the Lender that all financial statements furnished or to be furnished to the Lender with respect to Guarantor will accurately reflect, in all material respects, Guarantor's financial condition at the times and for the periods therein stated.

18.     Guarantor hereby agrees, covenants, represents and warrants that so long as any portion of the Guaranteed Obligations remains outstanding, such Guarantor will not give or otherwise transfer or dispose of any material portion of such Guarantor's assets to any other person or entity for less than the reasonably equivalent value of such assets.

19.     **THIS GUARANTY SHALL BE GOVERNED BY, AND EXCEPT TO THE EXTENT PRE-EMPTED BY FEDERAL LAW, CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, EXCEPT TO THE APPLICABLE CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.**

20.     Lender shall be entitled to honor any request for Loan Proceeds made by Borrower and shall have no obligation to see to the proper disposition of such advances.  Guarantor agrees that his obligations hereunder shall not be released or affected by reason of any improper disposition by Borrower of such Loan Proceeds.

21.     This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

22.     Lender hereby notifies Guarantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), Lender is required to obtain, verify and record information that identifies each Guarantor, which information includes the name and address of each Guarantor and other information that will allow the Lender to identify Guarantor in accordance with the Act.

23.     The terms of this Guaranty may be waived, modified or amended only by an instrument in writing duly executed by Guarantor and Lender.

24.     Neither failure to exercise, nor any delay in exercising, on the part of Lender, any right or remedy under this Guaranty or any of the Loan Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.  This Guaranty is subject to enforcement at law or in equity, including actions for damages or specific performance.  Time is of the essence hereof with respect to Guarantors' performance hereunder.

25.     All payments under this Guaranty shall be made free and clear of, and without deduction for, any and all present and future taxes, levies or other fees or payments to public authorities of similar nature.

12

ME1 42768995v.2

26.    **CONFESSION OF JUDGMENT AND EXECUTION**.    UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, GUARANTOR IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR GUARANTOR IN ANY AND ALL ACTIONS AND TO CONFESS JUDGMENT AGAINST GUARANTOR FOR ALL OR ANY PART OF THE SUMS DUE UNDER THIS GUARANTY; AND IN EITHER CASE FOR INTEREST, INCLUDING INTEREST ON ANY JUDGMENT OBTAINED BY LENDER AT THE APPLICABLE DEFAULT RATE UNTIL ACTUAL PAYMENT IS MADE TO LENDER IN THE FULL AMOUNT DUE TO LENDER, LATE CHARGES, COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION FOR COLLECTION IN THE AMOUNT OF FIFTEEN PERCENT (15%) THEREOF, BUT IN NO EVENT LESS THAN $25,000.00. GUARANTOR FURTHER AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, TO APPEAR FOR AND ENTER JUDGMENT AGAINST SUCH GUARANTOR IN AN ACTION OF REPLEVIN OR ANY OTHER ACTION TO RECOVER POSSESSION OF ANY COLLATERAL SECURING THIS GUARANTY. SUCH CONFESSIONS OF JUDGMENT OR ACTIONS SHALL BE WITH RELEASE OF ERRORS, WAIVERS OF APPEALS, WITHOUT STAY OF EXECUTION AND GUARANTOR WAIVES ALL RELIEF FROM ANY AND ALL APPRAISEMENT OR EXEMPTION LAWS NOW IN FORCE OR HEREAFTER ENACTED. IF A COPY OF THIS GUARANTY, VERIFIED BY AN OFFICIAL OR AN OFFICER OF LENDER, SHALL BE FILED IN ANY PROCEEDING OR ACTION WHEREIN JUDGMENT IS TO BE CONFESSED, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF AND SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR HEREIN FOR AND CONFESS JUDGMENT AGAINST GUARANTOR AS PROVIDED HEREIN. JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS AND NO SINGLE EXERCISE OF THE AFORESAID POWERS TO CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, SHALL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, AVOIDABLE, OR VOID, BUT THE POWER SHALL CONTINUE UNDIMINISHED AND IT MAY BE EXERCISED FROM TIME TO TIME AFTER AND AS LENDER SHALL ELECT UNTIL SUCH TIME AS LENDER SHALL HAVE RECEIVED PAYMENT IN FULL OF ALL SUMS DUE UNDER THIS GUARANTY, TOGETHER WITH INTEREST, COSTS, AND FEES.

27.    **WAIVER OF DEFENSES TO CONFESSION OF JUDGMENT AND EXECUTION**. GUARANTOR HAS REVIEWED THE WARRANT OF ATTORNEY FOR CONFESSION OF JUDGMENT SET FORTH IN SECTION 26 ABOVE WITH GUARANTOR'S ATTORNEY AND ACKNOWLEDGES THAT LENDER IS AUTHORIZED TO TAKE ANY ACTION WITHOUT ANY ADVANCE NOTICE TO GUARANTOR, TO CONFESS JUDGMENT. THEREFORE, GUARANTOR IS AWARE THAT, TO THE EXTENT PERMITTED BY LAW, IT HAS GIVEN UP ANY RIGHTS IT MIGHT HAVE TO A HEARING TO CONTEST THE VALIDITY OF ANY SUCH JUDGMENT OR OTHER CLAIMS THAT LENDER MAY ASSERT THEREUNDER. GUARANTOR SPECIFICALLY AND VOLUNTARILY WAIVES AND RELINQUISHES ANY RIGHTS IT MAY HAVE TO ANY NOTICE OR HEARING OR OTHER DUE PROCESS IN CONNECTION WITH LENDER'S IMPLEMENTATION OF ITS RIGHTS TO TAKE JUDGMENT, OR TO EXECUTE UPON OR

13

TAKE ANY ADDITIONAL ACTION TO ENFORCE SUCH JUDGMENT.  GUARANTOR ALSO SPECIFICALLY RELEASES ANY RIGHTS IT MAY HAVE TO CHALLENGE SUCH ACTION BY LENDER OR TO CLAIM OR RECOVER ANY DAMAGES AGAINST LENDER IN CONNECTION WITH SUCH ACTIONS, TO THE EXTENT PERMITTED BY LAW. GUARANTOR ACKNOWLEDGES THAT IT IS REPRESENTED BY COUNSEL AND THAT SUCH GUARANTOR'S COUNSEL HAS REVIEWED AND EXPLAINED THE MEANING OF THESE WAIVERS TO GUARANTOR.

28. **<u>LIMITATION OF LIABILITY</u>**.

(a) If the Loan is converted to the Permanent Loan in accordance with all of the terms and conditions set forth in the Loan Agreement, the principal portion of the Guaranteed Obligations shall be reduced to fifty percent (50%) of the Permanent Loan Amount.

(b) The limitations upon Guarantor's liability provided in Section 28(a) above will apply only to the payment obligations under Section 1(a) and not to the other Guaranteed Obligations including, without limitation, the Enforcement Costs.  In addition to Guarantor's Obligations under this Guaranty, Guarantor is undertaking and agreeing to obligations under other guaranties, indemnities and agreements executed by Guarantor with respect to the Loan, none of which will be limited by Section 28(a) above.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

ME1 42768995v.2

*[SIGNATURE PAGE TO PAYMENT GUARANTY]*

**GUARANTOR ACKNOWLEDGES THAT HE HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS GUARANTY, INCLUDING THE CONFESSION OF JUDGMENT AND WAIVER OF JURY TRIAL, AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.**

IN WITNESS WHEREOF, intending to be legally bound, Guarantor has executed this Guaranty under seal as of the date first written above.

**WITNESS**:                                              **GUARANTOR**:

_____                    _____(SEAL)
                                                                **Ajay K. Keshri**, individually

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF Philadelphia                          SS.:

On the 16th day of November, 2022, before me, the subscriber, a notary public in and for the Commonwealth and County aforesaid, personally appeared Ajay K. Keshri, known to be or satisfactorily proven to be the person whose name is subscribed to the within instrument and acknowledged that the same was executed for the purposes therein contained.

WITNESS my hand and seal the day and year aforesaid.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
ADAM SCHNEIDER, Notary Public
Philadelphia County
My Commission Expires May 5, 2023
Commission Number 1233256

My Commission Expires:

[Citizens-Hancock Lofts-Signature/Notary Page to Guaranty of Payment (A Keshri)]

## GUARANTY OF PAYMENT

THIS GUARANTY OF PAYMENT (this "Guaranty") made on the 16th day of November, 2022 and effective as of November 17, 2022, by **FINEHILL CONSTRUCTION LLC,** a Pennsylvania limited liability company ("Guarantor"), to and for the benefit of **CITIZENS BANK, N.A.**("Lender").

### RECITALS

WHEREAS, HANCOCK LOFTS LLC, a Pennsylvania limited liability company ("Borrower") and Lender entered into that certain Construction Loan Agreement dated on or about the date hereof (as same may be supplemented, restated, superseded, amended or replaced from time to time, the "Loan Agreement") whereby Lender agreed to make a loan (the "Loan") to Borrower in the principal amount of up to TEN MILLION AND 00/100 DOLLARS ($10,000,000.00), to finance the development and construction of the Project (as defined in the Loan Agreement).  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

WHEREAS, in connection with the Loan, Borrower has executed and delivered to Lender that certain Promissory Note (the "Note") dated of even date herewith in the amount of the Loan, which Note is secured by (i) an Open-End Mortgage, Assignment of Leases and Rents, and Security Agreement (the "Mortgage") made by Borrower in favor of Lender on the Project and (ii) the other Loan Documents.

WHEREAS, Guarantor will derive an economic benefit from the Loan evidenced and secured by the Note, the Mortgage and the other Loan Documents.

WHEREAS, Lender has relied on the statements and agreements contained herein in agreeing to make the Loan, and the execution and delivery of this Guaranty by Guarantor is a condition precedent to the making of the Loan by Lender.

### AGREEMENTS

NOW, THEREFORE, intending to be legally bound, Guarantor, in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, hereby covenants and agrees for the benefit of Lender and its respective successors, endorsees, transferees, participants and assigns as follows:

1.      Guarantor absolutely, unconditionally, irrevocably, and jointly and severally guarantees:

(a)      the full and prompt payment of the principal of and interest on the Note when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, and the full and prompt payment of all sums which may now be or may hereafter become due and owing under the Note, the Loan Agreement and the other Loan Documents;

1

ME1 42769092v.2

(b)     the prompt, full and complete performance of all of Borrower's obligations under each and every covenant contained in the Loan Documents; and

(c)     the full and prompt payment of any Enforcement Costs (as hereinafter defined in Section 8 hereof); and

(d)     intentionally omitted.

All amounts due, debts, liabilities and payment obligations described in subsections (a) through (c) of this Section 1 shall be hereinafter collectively referred to as the "Guaranteed Obligations."

Notwithstanding anything to the contrary contained herein, the Guaranteed Obligations and all other guaranties provided herein shall expressly exclude any Excluded Swap Obligations (as defined below).  For the purposes of this Section 1, the following terms have the meaning ascribed below:

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Excluded Swap Obligation" means, with respect to Guarantor, any Swap Obligation (as defined below) if, and to the extent that, all or a portion of the guarantee of Guarantor of, or the grant by Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

2.     In the event Borrower shall fail to pay in full, when due, any of the Guaranteed Obligations, Guarantor agrees, on demand by Lender or the holder of the Note, to pay the Guaranteed Obligations regardless of any defense, right of set-off or claims which Borrower or Guarantor may have against Lender or the holder of the Note.  All of the remedies set forth herein and/or provided for in any of the Loan Documents or at law or equity shall be equally available to Lender, and the choice by Lender of one such remedy over another shall not be subject to question or challenge by Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff, or failure to mitigate damages in any action, proceeding, or counteraction by Lender to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Lender

2

ME1 42769092v.2

from subsequently electing to exercise a different remedy.  Without limitation to the generality of the foregoing, it is expressly hereby acknowledged and agreed that the obligations of Guarantor hereunder are independent of the obligations of Borrower or any other guarantor or indemnitor under any of the other Loan Documents to which they may be a party, and a separate action or actions may be brought and prosecuted against Guarantor whether or not any action is brought against Borrower, any other guarantor or indemnitor and whether or not Borrower is joined in any such action or actions.

3.     Guarantor does hereby (a) waive notice of acceptance of this Guaranty by Lender and any and all notices and demands of every kind which may be required to be given by any statute, rule or law, (b) agree to refrain from asserting, until after repayment in full of the Loan, any defense, right of set-off or other claim which Guarantor may have against Borrower (c) waive any defense, right of set-off or other claim which Guarantor or Borrower may have against Lender, or the holder of the Note, (d) waive any and all rights Guarantor may have under any anti-deficiency statute or other similar protections, (e) waive presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge Guarantor with liability, and (f) waive any failure by Lender to inform Guarantor of any facts Lender may now or hereafter know about Borrower, the Project, the Loan, or the transactions contemplated by the Loan Agreement, it being understood and agreed that Lender has no duty so to inform and that Guarantor is fully responsible for being and remaining informed by Borrower of all circumstances bearing on the risk of nonperformance of Borrower's obligations.  In addition to, and without limitation to, the foregoing waivers, Guarantor hereby also waives (a) any right to require Lender, as a condition of payment or performance or completion by Guarantor, to (i) proceed against Borrower, any other guarantor, or any other person, (ii) proceed against or exhaust any security held from Borrower, any other guarantor, or any other person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower, including, without limitation, any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument related thereto or by reason of the cessation of the liability of Borrower from any cause other than payment, performance and completion in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Guaranty and any legal or equitable discharge of any Guarantor's obligations hereunder (other than indefeasible payment, performance and completion of the Guaranteed Obligations or the Loan in full), (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (e) any release, discharge, modification, impairment or limitation of the liability of Borrower to Lender, whether consented to by Lender, consensual or arising by operation of law or any proceedings in bankruptcy or reorganization, or from any other cause, other than payment in full of the Loan; (f) any defense based on any rejection or disaffirmance of the Guaranteed Obligations, or any part thereof, or any security held therefor,

3

in any such proceedings in bankruptcy or reorganization; (g) any defense based on any action taken or omitted by Lender in any proceedings in bankruptcy or insolvency involving Borrower, including any election to have their claim allowed as being secured, partially secured or unsecured, any extension of credit by Lender to Borrower in any proceedings in bankruptcy or insolvency, and taking and holding by Lender of any security for any such extension of credit.  The obligations of the undersigned Guarantor under this Guaranty extend to all amendments, supplements, modifications, renewals, replacements or extensions of the Loan Documents and all Hedging Contracts (as defined in the Mortgage) at any rate or rates of interest.  The liability of Guarantor and the rights of the Lender under this Guaranty will not be impaired or affected in any manner by, and Guarantor hereby consents in advance to, and waives any requirement of notice for, any (1) disposition, impairment, release, surrender, substitution, or modification of any collateral securing the Guaranteed Obligations or the obligations created by this Guaranty or failure to perfect a security interest in any collateral; (2) release (including adjudication or discharge in bankruptcy) or settlement with Borrower or any other party which may be or become liable for the Guaranteed Obligations (including, without limitation, any maker, endorser, guarantor or surety); (3) delay in enforcement of payment of the Guaranteed Obligations or delay in enforcement of this Guaranty; (4) delay, omission, waiver, or forbearance in exercising any right or power with respect to the Guaranteed Obligations or this Guaranty; (5) defense arising from the enforceability, validity or genuineness of any of the Loan Documents; (6) defenses or counterclaims that Borrower may assert under or in respect of any of the Loan Documents, including, but not limited to, failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, infancy, statute of limitations, lender liability, accord and satisfaction and usury; or (7) any other act or omission which might otherwise constitute a legal or equitable discharge of the undersigned.  Credit may be granted or continued from time to time by Lender to Borrower without notice to or authorization from Guarantor, regardless of the financial or other condition of Borrower at the time of any such grant or continuation.  Lender shall have no obligation to disclose or discuss with Guarantor its assessment of the financial condition of Borrower.  Guarantor acknowledges that no representations of any kind whatsoever have been made by Lender.  No modification or waiver of any of the provisions of this Guaranty shall be binding upon Lender except as expressly set forth in a writing duly signed and delivered by Lender.

Further, and without limitation to the foregoing Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability of this Guaranty or giving rise to any reduction, limitation, impairment, discharge or termination of Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment or performance under the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations and/or the Loan Documents, and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of any of Borrower's obligations under the Loan Documents and take and hold security for the payment or performance of this Guaranty or the Loan Documents; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment or performance of Borrower's obligations under the Loan Documents, any other guaranties of the Loan, or any other obligation of any person (including any other guarantor) with respect to the Loan; (v) enforce and apply any security now or hereafter held by or for the benefit of Lender in respect of this Guaranty or the Loan and direct the order or manner of sale thereof, and to bid at

4

any such sale, or exercise any other right or remedy that Lender may have against any such security, in each case as in its discretion it may determine, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor against Borrower or any security for the Guaranteed Obligations; (vi) apply any payments or recoveries from Borrower, Guarantor or any other source, and any proceeds of any security, to the Guaranteed Obligation in such manner, order and priority as Lender may elect (whether or not those obligations are guaranteed by this Guaranty or secured at the time of the application); and (vii) exercise any other rights available to it under the Loan Documents.

Lender may take any of the foregoing actions upon any terms and conditions as Lender may elect, without giving notice to, or obtaining consent from, Guarantor and without affecting the liability of Guarantor to Lender and this Guaranty and the obligations of Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason, including, without limitation, the occurrence of any of the following, whether or not Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or the Loan, or with respect to any other guaranty of or security for the payment or performance of the Guaranteed Obligations or the Loan; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including without limitation provisions relating to events of default) of the Loan Documents, or of any other guaranty or security for the Guaranteed Obligations or the Loan, in each case whether or not in accordance with the terms of the Loan Documents or any agreement relating to such other guaranty or security; (iii) any Loan Document, at any time being found to be illegal, invalid or unenforceable with respect to Borrower; (iv) the application of payments received from any source (other than payments received pursuant to this Guaranty or from the proceeds of any security for the Guaranteed Obligations or the Loan except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations or the Loan) to the payment of indebtedness other than the Loan, even though Lender might have elected to apply such payment to any part or all of the Loan; (v) Lender's consent to the change, reorganization or termination of the ownership structure or existence of Borrower or any of its Affiliates and to any corresponding restructuring of the Loan, including, without limitation, the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Loan, including, without limitation, the Guaranteed Obligations; (vii) the acquisition or transfer of title to the Project to Lender, any Affiliate of Lender or any designee of Lender (including, without limitation, any purchaser through foreclosure, deed in lieu or otherwise); (viii) any act or event which might otherwise discharge, reduce, limit or modify Guarantor's obligations under this Guaranty; (ix) any waiver, extension, modification, forbearance, delay or other act or omission of Lender, or their failure to proceed promptly or otherwise as against Borrower, Guarantor or any security; (x) any action, omission or circumstance which might increase the likelihood that Guarantor may be called upon to perform under this Guaranty or which might affect the rights or remedies of any Guarantor as against Borrower; or (xi) any dealings occurring at any time between Borrower and Lender, whether relating to the Guaranteed Obligations or otherwise.

5

4.      Guarantor further agrees that Guarantor's liability as guarantor shall not be impaired or affected by any renewals or extensions which may be made from time to time, with or without the knowledge or consent of Guarantor of the time for payment of interest or principal under the Note, it being the intent hereof that, subject to Lender's compliance with the terms of this Guaranty, Guarantor shall remain liable for the payment of the Guaranteed Obligations, until the Guaranteed Obligations has been paid in full, notwithstanding any act or thing which might otherwise operate as a legal or equitable discharge of a surety.  Guarantor further understands and agrees that Lender may at any time enter into agreements with Borrower to amend and modify the Note, Loan Agreement, Mortgage or other Loan Documents, and may waive or release any provision or provisions of the Note, Loan Agreement, Mortgage and other Loan Documents or any thereof, and, with reference to such instruments, may make and enter into any such agreement or agreements as Lender and Borrower may deem proper and desirable, without in any manner impairing or affecting this Guaranty or any of Lender's rights hereunder or Guarantor's obligations hereunder.

5.      This is an absolute, present and continuing guaranty of payment and not of collection.  Guarantor agrees that this Guaranty may be enforced by Lender without the necessity at any time of resorting to or exhausting any other security or collateral given in connection herewith or with the Note, Loan Agreement, Mortgage or any of the other Loan Documents through foreclosure or sale proceedings, as the case may be, under the Mortgage or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Lender to join Borrower in any action brought hereunder or to commence any action against or obtain any judgment against Borrower or to pursue any other remedy or enforce any other right.  Guarantor further agrees that nothing contained herein or otherwise shall prevent Lender from pursuing concurrently or successively all rights and remedies available to it at law and/or in equity or under the Note, Loan Agreement, Mortgage or any other Loan Documents, and the exercise of any of Lender's rights or the completion of any of its remedies shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent and unconditional under any and all circumstances whatsoever and Guarantor shall remain fully liable for the payment and performance of all of the Guaranteed Obligations until the Loan and all Guaranteed Obligations have been indefeasibly paid and performed in full.  None of Guarantor's obligations under this Guaranty or any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Borrower under the Note, Loan Agreement, Mortgage or other Loan Documents or by reason of the bankruptcy of Borrower or by reason of any creditor or bankruptcy proceeding instituted by or against Borrower.  In the event of the foreclosure of the Mortgage and of a deficiency, Guarantor hereby promises and agrees forthwith to pay the amount of such deficiency notwithstanding the fact that recovery of said deficiency against Borrower would not be allowed by applicable law; however, the foregoing shall not be deemed to require that Lender institute foreclosure proceedings or otherwise resort to or exhaust any other collateral or security prior to or concurrently with enforcing this Guaranty.  As used in this Guaranty, an "indefeasible" payment shall mean and refer to a payment that is no longer subject to potential disaffirmance, impairment, set aside, offset, recoupment, defeasance, recovery, disallowance, or recapture pursuant to the provisions of any federal or state law, regulation or order applicable to or governing creditors' rights, including, without limitation, Title 11 of the United States Code, as amended, either by reason of the passage of time following such payment or the final judgment of a court of competent

6

jurisdiction establishing the unassailable right of the party receiving such payment to retain such payment without reduction, offset, or other impairment.

6.       If and to the extent that, for any reason, any payment (or portion thereof) by or on behalf of Borrower or Guarantor in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by Lender or any holder of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or insolvency, the appointment of a receiver, intervenor, conservator, trustee or similar officer for Borrower, or otherwise, then the obligations of Guarantor shall be automatically reinstated and will continue to be effective as though such payment had not been made regardless of whether Lender contested the order requiring return of such payment. Guarantor agrees that it will indemnify Lender on demand for all costs and expenses (including, without limitation, fees and expenses of counsel) incurred by Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

7.       In the event Lender or any holder of the Note shall assign the Note and this Guaranty, Guarantor will accord full recognition thereto and agrees that all rights and remedies of Lender or such holder hereunder shall be enforceable against Guarantor by such assignee with the same force and effect and to the same extent as would have been enforceable by Lender or such holder but for such assignment; provided, however, that unless Lender shall otherwise consent in writing, Lender shall have an unimpaired right, prior and superior to that of its assignee or transferee, to enforce this Guaranty for Lender's benefit to the extent any portion of the Guaranteed Obligations or any interest therein is not assigned or transferred.

8.       If:  (a) the Lender or holder of this Guaranty retains an attorney for collection of this Guaranty or this Guaranty is collected through any legal proceeding; (b) an attorney is retained to represent Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty; (c) an attorney is retained to provide advice or other representation with respect to this Guaranty; or (d) an attorney is retained to represent Lender in any proceedings whatsoever in connection with this Guaranty, then Guarantor shall pay to Lender upon demand all reasonable attorney's fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding brought to enforce this Guaranty as well as the other Loan Documents.

9.       The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions.  However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty is found by a court of competent jurisdiction to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and

7

that the rights, obligations and interest of Lender or the holder of the Note under the remainder of this Guaranty shall continue in full force and effect.

10.    **TO THE GREATEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER.  WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS GUARANTY (EACH, A "PROCEEDING"), LENDER AND GUARANTOR IRREVOCABLY (A) SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN PHILADELPHIA COUNTY, PENNSYLVANIA, AND (B) WAIVE ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS GUARANTY SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. LENDER AND GUARANTOR FURTHER AGREE AND CONSENT THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY PENNSYLVANIA STATE OR UNITED STATES COURT SITTING IN THE CITY OF PHILADELPHIA AND MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE APPLICABLE PARTY AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF SUCH PARTY SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

AS HIS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON HIS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED IN THE MANNER PROVIDED HEREIN FOR NOTICE TO GUARANTOR SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE COMMONWEALTH OF PENNSYLVANIA.  GUARANTOR (A) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (B) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE COUNTY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND

8

ME1 42769092v.2

ADDRESS FOR SERVICE OF PROCESS, AND (C) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN PENNSYLVANIA OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

11.    ANY INDEBTEDNESS OF BORROWER TO GUARANTOR NOW OR HEREAFTER EXISTING IS HEREBY SUBORDINATED TO THE PAYMENT AND PERFORMANCE OF THE GUARANTEED OBLIGATIONS.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHTS SUCH GUARANTOR MAY HAVE AT ANY TIME (WHETHER ARISING DIRECTLY OR INDIRECTLY, BY OPERATION OF LAW OR CONTRACT) TO ASSERT ANY CLAIM AGAINST BORROWER ON ACCOUNT OF PAYMENTS MADE BY GUARANTOR UNDER THIS GUARANTY, INCLUDING, WITHOUT LIMITATION, ANY AND ALL RIGHTS OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION OR INDEMNITY.  UNTIL SUCH TIME AS ONE HUNDRED PERCENT (100%) OF THE GUARANTEED OBLIGATIONS SHALL HAVE BEEN SATISFIED OR DISCHARGED, REGARDLESS OF THE AMOUNT OF GUARANTOR'S OBLIGATION TO LENDER HEREUNDER, GUARANTOR IRREVOCABLY SUBORDINATES ANY AND ALL GUARANTEED OBLIGATIONS OF BORROWER TO GUARANTOR, PRESENT AND FUTURE, HOWEVER EVIDENCED, TO THE PRIOR PAYMENT OF THE GUARANTEED OBLIGATIONS TO LENDER.

12.    Any amounts received by Lender from any source on account of the Loan may be utilized by Lender for the payment of the Guaranteed Obligations and any other obligations of Borrower to Lender in such order or priority as Lender may from time to time elect.

13.    **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS GUARANTY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  GUARANTOR FURTHER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY LEGAL PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER WITH RESPECT TO THIS GUARANTY OR OTHERWISE IN RESPECT OF THE LOAN, ANY AND EVERY RIGHT GUARANTOR MAY HAVE TO (A) INTERPOSE ANY COUNTERCLAIM THEREIN, OTHER THAN A COMPULSORY COUNTERCLAIM, AND (B) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.  NOTHING CONTAINED IN THE IMMEDIATELY PRECEDING SENTENCE SHALL PREVENT OR PROHIBIT GUARANTOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.**

ME1 42769092v.2

14. Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (i) if hand delivered or if sent by telecopy, effective upon receipt or (ii) if delivered by overnight courier service, effective on the next Business Day following delivery to such courier service, or (iii) if mailed by United States registered or certified mail, postage prepaid, return receipt requested, effective two (2) Business Days after deposit in the United States mails, with copies via e-mail; addressed in each case as follows:

| | |
|---|---|
| Guarantor: | FineHill Construction LLC<br>2001 Market Street, Suite 2519<br>Philadelphia, PA  19103 |
| With a copy to: | BERMAN INDICTOR LLP<br>30 N. 41st Street, Suite 450<br>Philadelphia, PA 19104<br>Attention:  Penny S. Indictor, Esq.<br>Michael J. Robins, Esq. |
| Lender: | Citizens Bank, N.A.<br>One Logan Square<br>130 North 18th Street, Suite 1310<br>Mailstop: PL1350<br>Philadelphia, PA 19103-6998<br>Attention:  Molly Skilton, Vice President<br>molly.skilton@citizensbank.com |
| With a copy to: | McCarter & English LLP<br>1600 Market Street, Suite 3900<br>Philadelphia, PA 19103<br>Attention:  Inez M. Markovich, Esquire<br>Facsimile:  (215) 988-4319<br>imarkovich@mccarter.com |

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

15. In order to induce Lender to make the Loan, Guarantor makes the following representations and warranties to Lender set forth in this Section.  Guarantor acknowledges that but for the truth and accuracy of the matters covered by the following representations and warranties, Lender would not have agreed to make the Loan.

(a) Guarantor is an adult individual, *sui juris*, and of full capacity to enter into, deliver and perform this Guaranty.

10

(b)    Any and all balance sheets, net worth statements, and other financial data with respect to Guarantor which have heretofore been given to Lender by or on behalf of Guarantor fairly and accurately present the financial condition of Guarantor as of the respective dates thereof.

(c)    the execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (i) any laws, order, rule, regulation, writ, injunction or decree now in effect of any Government Authority, or court having jurisdiction over Guarantor, (ii) any contractual restriction binding on or affecting Guarantor or Guarantor's property or assets which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty, (iii) the instruments creating any trust holding title to any assets included in Guarantor's financial statements, or (iv) the organizational or other documents of Guarantor.

(d)    This Guaranty has been duly and validly executed and delivered by Guarantor.

(e)    No authorizations, approvals or consents of, and no filings or registrations with, any governmental or regulatory authority or agency are necessary for the execution, delivery or performance by Guarantor of this Guaranty or for the validity or enforceability hereof.

(f)    This Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms.

(g)    Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Guarantor, threatened or affecting Guarantor, which may adversely affect Guarantor's ability to fulfill his obligations under this Guaranty. There are no judgments or orders, in the aggregate, for the payment of money rendered against Guarantor for an amount in excess of $25,000. Guarantor is not in default under any agreements which may adversely affect Guarantor's ability to fulfill its obligations under this Guaranty.

All of the foregoing representations and warranties shall be deemed remade on the date of the Initial Disbursement of Loan Proceeds, on the date of each advance of Loan Proceeds, and upon any extension of the Loan pursuant to the Loan Agreement. Guarantor hereby agrees to indemnify and hold Lender free and harmless from and against all loss, cost, liability, damage, and expense, including reasonable attorney's fees and costs, which Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations and warranties as of the date the foregoing representations and warranties are made and are remade.

16.    This Guaranty shall be binding upon the heirs, executors, legal and personal representatives, successors and assigns of Guarantor and shall not be discharged in whole or in part by the death of Guarantor. If more than one party executes this Guaranty, the liability of all such parties shall be joint and several.

17.    Guarantor hereby covenants and agrees to furnish to the Lender, each in form and substance acceptable to Lender: (i) at Lender's request, annually, within one hundred twenty (120) days after the closing of each fiscal year internally prepared profit and loss statement, income statement and balance sheet for that fiscal year, which shall set forth, in reasonable detail,

11

the results of operations and conditions of the Guarantor, certified as true and correct by the Guarantor's president or chief financial officer, and (ii) copies of all filed tax returns with all schedules as well as corresponding K-1s, with respect to Guarantor within thirty (30) days of filing.  In addition, Guarantor will, promptly after the Lender's written request therefor, provide the Lender with such other financial information as the Lender may reasonably request. Guarantor represents and warrants to the Lender that all financial statements furnished or to be furnished to the Lender with respect to Guarantor will accurately reflect, in all material respects, Guarantor's financial condition at the times and for the periods therein stated.

18.    Guarantor hereby agrees, covenants, represents and warrants that so long as any portion of the Guaranteed Obligations remains outstanding, such Guarantor will not give or otherwise transfer or dispose of any material portion of such Guarantor's assets to any other person or entity for less than the reasonably equivalent value of such assets.

19.    **THIS GUARANTY SHALL BE GOVERNED BY, AND EXCEPT TO THE EXTENT PRE-EMPTED BY FEDERAL LAW, CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, EXCEPT TO THE APPLICABLE CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.**

20.    Lender shall be entitled to honor any request for Loan Proceeds made by Borrower and shall have no obligation to see to the proper disposition of such advances.  Guarantor agrees that his obligations hereunder shall not be released or affected by reason of any improper disposition by Borrower of such Loan Proceeds.

21.    This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

22.    Lender hereby notifies Guarantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), Lender is required to obtain, verify and record information that identifies each Guarantor, which information includes the name and address of each Guarantor and other information that will allow the Lender to identify Guarantor in accordance with the Act.

23.    The terms of this Guaranty may be waived, modified or amended only by an instrument in writing duly executed by Guarantor and Lender.

24.    Neither failure to exercise, nor any delay in exercising, on the part of Lender, any right or remedy under this Guaranty or any of the Loan Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.  This Guaranty is subject to enforcement at law or in equity, including actions for damages or specific performance.  Time is of the essence hereof with respect to Guarantors' performance hereunder.

ME1 42769092v.2

25. All payments under this Guaranty shall be made free and clear of, and without deduction for, any and all present and future taxes, levies or other fees or payments to public authorities of similar nature.

26. **CONFESSION OF JUDGMENT AND EXECUTION**. UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, GUARANTOR IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR GUARANTOR IN ANY AND ALL ACTIONS AND TO CONFESS JUDGMENT AGAINST GUARANTOR FOR ALL OR ANY PART OF THE SUMS DUE UNDER THIS GUARANTY; AND IN EITHER CASE FOR INTEREST, INCLUDING INTEREST ON ANY JUDGMENT OBTAINED BY LENDER AT THE APPLICABLE DEFAULT RATE UNTIL ACTUAL PAYMENT IS MADE TO LENDER IN THE FULL AMOUNT DUE TO LENDER, LATE CHARGES, COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION FOR COLLECTION IN THE AMOUNT OF FIFTEEN PERCENT (15%) THEREOF, BUT IN NO EVENT LESS THAN $25,000.00. GUARANTOR FURTHER AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD UPON THE OCCURRENCE AND CONTINUANCE OF A DEFAULT BY GUARANTOR HEREUNDER, TO APPEAR FOR AND ENTER JUDGMENT AGAINST SUCH GUARANTOR IN AN ACTION OF REPLEVIN OR ANY OTHER ACTION TO RECOVER POSSESSION OF ANY COLLATERAL SECURING THIS GUARANTY. SUCH CONFESSIONS OF JUDGMENT OR ACTIONS SHALL BE WITH RELEASE OF ERRORS, WAIVERS OF APPEALS, WITHOUT STAY OF EXECUTION AND GUARANTOR WAIVES ALL RELIEF FROM ANY AND ALL APPRAISEMENT OR EXEMPTION LAWS NOW IN FORCE OR HEREAFTER ENACTED. IF A COPY OF THIS GUARANTY, VERIFIED BY AN OFFICIAL OR AN OFFICER OF LENDER, SHALL BE FILED IN ANY PROCEEDING OR ACTION WHEREIN JUDGMENT IS TO BE CONFESSED, IT SHALL NOT BE NECESSARY TO FILE THE ORIGINAL HEREOF AND SUCH VERIFIED COPY SHALL BE SUFFICIENT WARRANT FOR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR HEREIN FOR AND CONFESS JUDGMENT AGAINST GUARANTOR AS PROVIDED HEREIN. JUDGMENT MAY BE CONFESSED FROM TIME TO TIME UNDER THE AFORESAID POWERS AND NO SINGLE EXERCISE OF THE AFORESAID POWERS TO CONFESS JUDGMENT, OR A SERIES OF JUDGMENTS, SHALL BE DEEMED TO EXHAUST THE POWER, WHETHER OR NOT SUCH EXERCISE SHALL BE HELD BY ANY COURT TO BE INVALID, AVOIDABLE, OR VOID, BUT THE POWER SHALL CONTINUE UNDIMINISHED AND IT MAY BE EXERCISED FROM TIME TO TIME AFTER AND AS LENDER SHALL ELECT UNTIL SUCH TIME AS LENDER SHALL HAVE RECEIVED PAYMENT IN FULL OF ALL SUMS DUE UNDER THIS GUARANTY, TOGETHER WITH INTEREST, COSTS, AND FEES.

27. **WAIVER OF DEFENSES TO CONFESSION OF JUDGMENT AND EXECUTION**. GUARANTOR HAS REVIEWED THE WARRANT OF ATTORNEY FOR CONFESSION OF JUDGMENT SET FORTH IN SECTION 26 ABOVE WITH GUARANTOR'S ATTORNEY AND ACKNOWLEDGES THAT LENDER IS AUTHORIZED TO TAKE ANY ACTION WITHOUT ANY ADVANCE NOTICE TO GUARANTOR, TO CONFESS JUDGMENT. THEREFORE, GUARANTOR IS AWARE THAT, TO THE EXTENT PERMITTED BY LAW, IT HAS GIVEN UP ANY RIGHTS IT MIGHT HAVE TO A HEARING TO CONTEST THE VALIDITY OF ANY SUCH JUDGMENT OR OTHER CLAIMS THAT

13

ME1 42769092v.2

LENDER MAY ASSERT THEREUNDER. GUARANTOR SPECIFICALLY AND VOLUNTARILY WAIVES AND RELINQUISHES ANY RIGHTS IT MAY HAVE TO ANY NOTICE OR HEARING OR OTHER DUE PROCESS IN CONNECTION WITH LENDER'S IMPLEMENTATION OF ITS RIGHTS TO TAKE JUDGMENT, OR TO EXECUTE UPON OR TAKE ANY ADDITIONAL ACTION TO ENFORCE SUCH JUDGMENT. GUARANTOR ALSO SPECIFICALLY RELEASES ANY RIGHTS IT MAY HAVE TO CHALLENGE SUCH ACTION BY LENDER OR TO CLAIM OR RECOVER ANY DAMAGES AGAINST LENDER IN CONNECTION WITH SUCH ACTIONS, TO THE EXTENT PERMITTED BY LAW. GUARANTOR ACKNOWLEDGES THAT IT IS REPRESENTED BY COUNSEL AND THAT SUCH GUARANTOR'S COUNSEL HAS REVIEWED AND EXPLAINED THE MEANING OF THESE WAIVERS TO GUARANTOR.

28. **LIMITATION OF LIABILITY**.

(a)    If the Loan is converted to the Permanent Loan in accordance with all of the terms and conditions set forth in the Loan Agreement, the principal portion of the Guaranteed Obligations shall be reduced to fifty percent (50%) of the Permanent Loan Amount.

(b)    The limitations upon Guarantor's liability provided in Section 28(a) above will apply only to the payment obligations under Section 1(a) and not to the other Guaranteed Obligations including, without limitation, the Enforcement Costs  In addition to Guarantor's Obligations under this Guaranty, Guarantor is undertaking and agreeing to obligations under other guaranties, indemnities and agreements executed by Guarantor with respect to the Loan, none of which will be limited by Section 28(a) above.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

14

*[SIGNATURE PAGE TO PAYMENT GUARANTY]*

**GUARANTOR ACKNOWLEDGES THAT HE HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS GUARANTY, INCLUDING THE CONFESSION OF JUDGMENT AND WAIVER OF JURY TRIAL, AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE.**

IN WITNESS WHEREOF, intending to be legally bound, Guarantor has executed this Guaranty under seal as of the date first written above.

**WITNESS**:                                                  **GUARANTOR**:

                                                             **FINEHILL CONSTRUCTION LLC**, a
                                                             Pennsylvania liability company

_____                By:_____(SEAL)
                                                             Name:    Harrison Merriman Finberg
                                                             Title:     Sole Member

COMMONWEALTH OF PENNSYLVANIA
                                                    SS.:

COUNTY OF PHILADELPHIA

BE IT REMEMBERED, that on this _16th_ day of November, 2022, before me, the subscriber, personally appeared Harrison Merriman Finberg, who acknowledged under oath, to my satisfaction, that this person: (a) is the sole member of FineHill Construction LLC, a Pennsylvania limited liability company (the "Company"), the guarantor named in the within instrument and is authorized to sign the within instrument on behalf of the Company; and (b) as such member, signed, sealed and delivered this instrument as the voluntary act and deed of the Company by signing the name of the Company.

WITNESS my hand and seal the day and year aforesaid.

_____
Notary Public
My Commission Expires:

> Commonwealth of Pennsylvania - Notary Seal
> ADAM SCHNEIDER, Notary Public
> Philadelphia County
> My Commission Expires May 5, 2023
> Commission Number 1233256

[Citizens-Hancock Lofts-Signature/Notary Page to Guaranty of Payment (FineHill)]

# EXHIBIT D

## DISCLOSURE FOR CONFESSION OF JUDGMENT

This Disclosure for Confession of Judgment ("Disclosure"), dated November 16, 2022, to be effective as of November 17, 2022, is executed and delivered by the undersigned in connection with that certain Construction Loan Agreement, that certain Guaranty of Payment, and that certain Guaranty of Completion and Performance, each dated same date herewith, by and between **HARRISON MERRIMAN FINBERG,** an adult individual ("Surety") and **CITIZENS BANK, N.A.,** ("Lender").  All capitalized terms used but not defined herein shall have the meanings given to such terms in, or by reference in, the Loan Agreement.

A representative of Lender has explained to me that the **Guaranty of Payment** and the **Guaranty of Completion and Performance** (together, collectively, the "Suretyship Agreement") that I am signing as Surety contains wording:

1.      which permits Lender to obtain a judgment against me in any federal or state court in the Commonwealth of Pennsylvania.

2.      by which I am consenting to the entry of judgment against me, and to execution efforts on such judgment (which may result in the taking of my property), without a court hearing prior to such execution efforts.  The judgment may be obtained without the following, all of which I have intentionally, understandingly, and knowingly waive:

a.      the right to notice of any hearing (whether such rights arise under the United States Constitution, the constitution of any state, any federal or state statute, or any judicial decision) on the validity of any claim that may be asserted against me by the Lender under the Loan Documents);

b.      the right to reduce or set off a claim by deducting a claim I may have against Lender;

c.      release of all errors;

d.      inquest (the right to ascertain whether the rents and profits of real estate will be sufficient to satisfy the judgment within seven years);

e.      stay of execution;

f.      exemption laws now in force or hereafter to be passed.

I am fully aware of the constitutional and statutory rights to prior notice and hearing on the validity of any claims that may be asserted against me by the Lender under the Loan Documents before judgment can be entered and before my assets can be executed on, garnished, or attached;

I am fully aware that by authorizing confession of judgment,  I am giving up the right to notice or opportunity to be heard prior to the entry of judgment in favor of Lender and prior to garnishment and attachment of my bank accounts and other assets; and that the Lender may garnish and attach such bank accounts and other

ME1 42785743v.1

2

assets (whether personal property or other assets) without prior notice or opportunity for a hearing;

I am fully aware that a judgment entered against me will constitute a lien upon any of my real estate located in the county in which judgment is entered and will entitle the Lender to execute against such real property without opportunity for a hearing;

I acknowledge that I will be unable to challenge the judgment in the event that the Lender enters the judgment, except by proceeding to open or strike the judgment; and that such a proceeding will require the payment of attorneys' fees and costs by me;

I release the Lender, its successors and assigns, and its and their counsel, from all actions and omissions (including errors, defects and imperfections) in all proceedings and actions filed or taken to enforce its and their rights and remedies, including entry of the confessed judgment against the Borrower and in executing upon that judgment;

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

2

ME1 42785743v.1

I certify that all the blanks in this Disclosure were filled in when I signed it, and that I received a copy of this Disclosure at the time of signing. I had the ability to have counsel present and agree to and understand the above terms explicitly.

WITNESS:

_____

SURETY:

_____
Harrison Merriman Finberg, an adult individual

Sworn to and subscribed before me this $\underline{16}$ day of November, 2022.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
ADAM SCHNEIDER, Notary Public
Philadelphia County
My Commission Expires May 5, 2023
Commission Number 1233256

[Citizens-Hancock Lofts-Signature/Notary Page to Disclosure for COJ (Finberg)]

## DISCLOSURE FOR CONFESSION OF JUDGMENT

This Disclosure for Confession of Judgment ("Disclosure"), dated November 16, 2022, to be effective as of November 17, 2022, is executed and delivered by the undersigned in connection with that certain Construction Loan Agreement, that certain Guaranty of Payment, and that certain Guaranty of Completion and Performance, each dated same date herewith, by and between **SANJAY GUPTA**, an adult individual ("Surety") and **CITIZENS BANK, N.A.,** ("Lender"). All capitalized terms used but not defined herein shall have the meanings given to such terms in, or by reference in, the Loan Agreement.

A representative of Lender has explained to me that the **Guaranty of Payment** and the **Guaranty of Completion and Performance** (together, collectively, the "Suretyship Agreement") that I am signing as Surety contains wording:

1.    which permits Lender to obtain a judgment against me in any federal or state court in the Commonwealth of Pennsylvania.

2.    by which I am consenting to the entry of judgment against me, and to execution efforts on such judgment (which may result in the taking of my property), without a court hearing prior to such execution efforts. The judgment may be obtained without the following, all of which I have intentionally, understandingly, and knowingly waive:

      a.    the right to notice of any hearing (whether such rights arise under the United States Constitution, the constitution of any state, any federal or state statute, or any judicial decision) on the validity of any claim that may be asserted against me by the Lender under the Loan Documents);

      b.    the right to reduce or set off a claim by deducting a claim I may have against Lender;

      c.    release of all errors;

      d.    inquest (the right to ascertain whether the rents and profits of real estate will be sufficient to satisfy the judgment within seven years);

      e.    stay of execution;

      f.    exemption laws now in force or hereafter to be passed.

I am fully aware of the constitutional and statutory rights to prior notice and hearing on the validity of any claims that may be asserted against me by the Lender under the Loan Documents before judgment can be entered and before my assets can be executed on, garnished, or attached;

I am fully aware that by authorizing confession of judgment, I am giving up the right to notice or opportunity to be heard prior to the entry of judgment in favor of Lender and prior to garnishment and attachment of my bank accounts and other assets; and that the Lender may garnish and attach such bank accounts and other

2

assets (whether personal property or other assets) without prior notice or opportunity for a hearing;

I am fully aware that a judgment entered against me will constitute a lien upon any of my real estate located in the county in which judgment is entered and will entitle the Lender to execute against such real property without opportunity for a hearing;

I acknowledge that I will be unable to challenge the judgment in the event that the Lender enters the judgment, except by proceeding to open or strike the judgment; and that such a proceeding will require the payment of attorneys' fees and costs by me;

I release the Lender, its successors and assigns, and its and their counsel, from all actions and omissions (including errors, defects and imperfections) in all proceedings and actions filed or taken to enforce its and their rights and remedies, including entry of the confessed judgment against the Borrower and in executing upon that judgment;

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –<br>SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

ME1 42786056v.1

I certify that all the blanks in this Disclosure were filled in when I signed it, and that I received a copy of this Disclosure at the time of signing. I had the ability to have counsel present and agree to and understand the above terms explicitly.

WITNESS:

SURETY:

Sanjay Gupta, an adult individual

Sworn to and subscribed before me this 16th day of November, 2022.

Notary Public

Commonwealth of Pennsylvania - Notary Seal
ADAM SCHNEIDER, Notary Public
Philadelphia County
My Commission Expires May 5, 2023
Commission Number 1233256

[Citizens-Hancock Lofts-Signature/Notary Page to Disclosure for COJ (Gupta)]

## DISCLOSURE FOR CONFESSION OF JUDGMENT

This Disclosure for Confession of Judgment ("Disclosure"), dated November 16, 2022, to be effective as of November 17, 2022, is executed and delivered by the undersigned in connection with that certain Construction Loan Agreement, that certain Guaranty of Payment, and that certain Guaranty of Completion and Performance, each dated same date herewith, by and between **PRAMOD KESHRI,** an adult individual ("Surety") and **CITIZENS BANK, N.A.,** ("Lender").   All capitalized terms used but not defined herein shall have the meanings given to such terms in, or by reference in, the Loan Agreement.

A representative of Lender has explained to me that the **Guaranty of Payment** and the **Guaranty of Completion and Performance** (together, collectively, the "Suretyship Agreement") that I am signing as Surety contains wording:

1.      which permits Lender to obtain a judgment against me in any federal or state court in the Commonwealth of Pennsylvania.

2.      by which I am consenting to the entry of judgment against me, and to execution efforts on such judgment (which may result in the taking of my property), without a court hearing prior to such execution efforts.   The judgment may be obtained without the following, all of which I have intentionally, understandingly, and knowingly waive:

a.      the right to notice of any hearing (whether such rights arise under the United States Constitution, the constitution of any state, any federal or state statute, or any judicial decision) on the validity of any claim that may be asserted against me by the Lender under the Loan Documents);

b.      the right to reduce or set off a claim by deducting a claim I may have against Lender;

c.      release of all errors;

d.      inquest (the right to ascertain whether the rents and profits of real estate will be sufficient to satisfy the judgment within seven years);

e.      stay of execution;

f.      exemption laws now in force or hereafter to be passed.

I am fully aware of the constitutional and statutory rights to prior notice and hearing on the validity of any claims that may be asserted against me by the Lender under the Loan Documents before judgment can be entered and before my assets can be executed on, garnished, or attached;

I am fully aware that by authorizing confession of judgment,  I am giving up the right to notice or opportunity to be heard prior to the entry of judgment in favor of Lender and prior to garnishment and attachment of my bank accounts and other assets; and that the Lender may garnish and attach such bank accounts and other

ME1 42786148v.1

2

assets (whether personal property or other assets) without prior notice or opportunity for a hearing;

I am fully aware that a judgment entered against me will constitute a lien upon any of my real estate located in the county in which judgment is entered and will entitle the Lender to execute against such real property without opportunity for a hearing;

I acknowledge that I will be unable to challenge the judgment in the event that the Lender enters the judgment, except by proceeding to open or strike the judgment; and that such a proceeding will require the payment of attorneys' fees and costs by me;

I release the Lender, its successors and assigns, and its and their counsel, from all actions and omissions (including errors, defects and imperfections) in all proceedings and actions filed or taken to enforce its and their rights and remedies, including entry of the confessed judgment against the Borrower and in executing upon that judgment;

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

2

ME1 42786148v.1

I certify that all the blanks in this Disclosure were filled in when I signed it, and that I received a copy of this Disclosure at the time of signing. I had the ability to have counsel present and agree to and understand the above terms explicitly.

WITNESS:                                                SURETY:

_____                    _____
                                                        Pramod Keshri, an adult individual

Sworn to and subscribed before me
this 16 day of November, 2022.

_____
        Notary Public

Commonwealth of Pennsylvania - Notary Seal
ADAM SCHNEIDER, Notary Public
Philadelphia County
My Commission Expires May 5, 2023
Commission Number 1233256

[Citizens-Hancock Lofts-Signature/Notary Page to Disclosure for COJ (P Keshri)]

## DISCLOSURE FOR CONFESSION OF JUDGMENT

This Disclosure for Confession of Judgment ("Disclosure"), dated November 16, 2022, to be effective as of November 17, 2022, is executed and delivered by the undersigned in connection with that certain Construction Loan Agreement, that certain Guaranty of Payment, and that certain Guaranty of Completion and Performance, each dated same date herewith, by and between **AJAY K. KESHRI,** an adult individual ("Surety") and **CITIZENS BANK, N.A.,** ("Lender").  All capitalized terms used but not defined herein shall have the meanings given to such terms in, or by reference in, the Loan Agreement.

A representative of Lender has explained to me that the **Guaranty of Payment** and the **Guaranty of Completion and Performance** (together, collectively, the "Suretyship Agreement") that I am signing as Surety contains wording:

1.      which permits Lender to obtain a judgment against me in any federal or state court in the Commonwealth of Pennsylvania.

2.      by which I am consenting to the entry of judgment against me, and to execution efforts on such judgment (which may result in the taking of my property), without a court hearing prior to such execution efforts.  The judgment may be obtained without the following, all of which I have intentionally, understandingly, and knowingly waive:

        a.      the right to notice of any hearing (whether such rights arise under the United States Constitution, the constitution of any state, any federal or state statute, or any judicial decision) on the validity of any claim that may be asserted against me by the Lender under the Loan Documents);

        b.      the right to reduce or set off a claim by deducting a claim I may have against Lender;

        c.      release of all errors;

        d.      inquest (the right to ascertain whether the rents and profits of real estate will be sufficient to satisfy the judgment within seven years);

        e.      stay of execution;

        f.      exemption laws now in force or hereafter to be passed.

I am fully aware of the constitutional and statutory rights to prior notice and hearing on the validity of any claims that may be asserted against me by the Lender under the Loan Documents before judgment can be entered and before my assets can be executed on, garnished, or attached;

I am fully aware that by authorizing confession of judgment, I am giving up the right to notice or opportunity to be heard prior to the entry of judgment in favor of Lender and prior to garnishment and attachment of my bank accounts and other assets; and that the Lender may garnish and attach such bank accounts and other

ME1 42786185v.1

2

assets (whether personal property or other assets) without prior notice or opportunity for a hearing;

I am fully aware that a judgment entered against me will constitute a lien upon any of my real estate located in the county in which judgment is entered and will entitle the Lender to execute against such real property without opportunity for a hearing;

I acknowledge that I will be unable to challenge the judgment in the event that the Lender enters the judgment, except by proceeding to open or strike the judgment; and that such a proceeding will require the payment of attorneys' fees and costs by me;

I release the Lender, its successors and assigns, and its and their counsel, from all actions and omissions (including errors, defects and imperfections) in all proceedings and actions filed or taken to enforce its and their rights and remedies, including entry of the confessed judgment against the Borrower and in executing upon that judgment;

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

2

ME1 42786185v.1

I certify that all the blanks in this Disclosure were filled in when I signed it, and that I received a copy of this Disclosure at the time of signing. I had the ability to have counsel present and agree to and understand the above terms explicitly.

WITNESS:                                               SURETY:

_____                    _____
                                                              Ajay K. Keshri, an adult individual

Sworn to and subscribed before me
this ___ day of November, 2022.

_____
        Notary Public

```
Commonwealth of Pennsylvania - Notary Seal
       ADAM SCHNEIDER, Notary Public
             Philadelphia County
      My Commission Expires May 5, 2023
         Commission Number 1233256
```

[Citizens-Hancock Lofts-Signature/Notary Page to Disclosure for COJ (A Keshri)]

## DISCLOSURE FOR CONFESSION OF JUDGMENT

This Disclosure for Confession of Judgment ("Disclosure"), dated November 16, 2022, effective as of November 17, 2022, is executed and delivered by the undersigned in connection with that certain Construction Loan Agreement, that certain Guaranty of Payment, and that certain Guaranty of Completion and Performance, each dated same date herewith, by and between **FINEHILL CONSTRUCTION LLC,** an Pennsylvania limited liability company ("Surety") and **CITIZENS BANK, N.A.,** ("Lender").  All capitalized terms used but not defined herein shall have the meanings given to such terms in, or by reference in, the Loan Agreement.

A representative of Lender has explained to me that the **Guaranty of Payment** and the **Guaranty of Completion and Performance** (together, collectively, the "Suretyship Agreement") that I am signing as Surety contains wording:

1.    which permits Lender to obtain a judgment against me in any federal or state court in the Commonwealth of Pennsylvania.

2.    by which I am consenting to the entry of judgment against me, and to execution efforts on such judgment (which may result in the taking of my property), without a court hearing prior to such execution efforts.  The judgment may be obtained without the following, all of which I have intentionally, understandingly, and knowingly waive:

a.    the right to notice of any hearing (whether such rights arise under the United States Constitution, the constitution of any state, any federal or state statute, or any judicial decision) on the validity of any claim that may be asserted against me by the Lender under the Loan Documents);

b.    the right to reduce or set off a claim by deducting a claim I may have against Lender;

c.    release of all errors;

d.    inquest (the right to ascertain whether the rents and profits of real estate will be sufficient to satisfy the judgment within seven years);

e.    stay of execution;

f.    exemption laws now in force or hereafter to be passed.

I am fully aware of the constitutional and statutory rights to prior notice and hearing on the validity of any claims that may be asserted against me by the Lender under the Loan Documents before judgment can be entered and before my assets can be executed on, garnished, or attached;

I am fully aware that by authorizing confession of judgment,  I am giving up the right to notice or opportunity to be heard prior to the entry of judgment in favor of Lender and prior to garnishment and attachment of my bank accounts and other assets; and that the Lender may garnish and attach such bank accounts and other

ME1 42786217v.1

2

assets (whether personal property or other assets) without prior notice or opportunity for a hearing;

I am fully aware that a judgment entered against me will constitute a lien upon any of my real estate located in the county in which judgment is entered and will entitle the Lender to execute against such real property without opportunity for a hearing;

I acknowledge that I will be unable to challenge the judgment in the event that the Lender enters the judgment, except by proceeding to open or strike the judgment; and that such a proceeding will require the payment of attorneys' fees and costs by me;

I release the Lender, its successors and assigns, and its and their counsel, from all actions and omissions (including errors, defects and imperfections) in all proceedings and actions filed or taken to enforce its and their rights and remedies, including entry of the confessed judgment against the Borrower and in executing upon that judgment;

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGE TO IMMEDIATELY FOLLOW]

ME1 42786217v.1

I certify that all the blanks in this Disclosure were filled in when I signed it, and that I received a copy of this Disclosure at the time of signing. I had the ability to have counsel present and agree to and understand the above terms explicitly.

WITNESS:                                    SURETY:

                                            **FINEHILL CONSTRUCTION LLC**, a
                                            Pennsylvania limited liability company

_____          By:_____
                                            Name:    Harrison Merriman Finberg
                                            Title:    Sole Member

Sworn to and subscribed before me
this 16 day of November, 2022.

_____
       Notary Public

> Commonwealth of Pennsylvania - Notary Seal
> ADAM SCHNEIDER, Notary Public
> Philadelphia County
> My Commission Expires May 5, 2023
> Commission Number 1233256

[Citizens-Hancock Lofts-Signature/Notary Page to Disclosure for COJ (FineHill)]

# EXHIBIT E

**Citizens**™

April 21, 2025

VIA CERTIFIED MAIL

Hancock Lofts LLC
1415 S. 12th Street
Philadelphia, PA  19147
Attention: Mr. Harrison Finberg

> **Re:    $10,000,000.00 Commercial Construction Loan from Citizens Bank, N.A. to Hancock Lofts LLC**

Dear Mr. Finberg:

Reference is made to that certain Construction Loan Agreement effective as of November 17, 2022 (the "Loan Agreement") by and between Citizens Bank, N.A. (the "Lender") and Hancock Lofts LLC (the "Borrower").  Pursuant to the Loan Agreement, the Lender made a construction loan in the maximum principal amount of $10,000,000.00 (the "Loan") to the Borrower.  The Loan is evidenced by a Promissory Note of the Borrower executed on November 16, 2022 and effective as of November 17, 2022 in the maximum principal amount of $10,000,000.00 (the "Note").  The Loan Agreement, the Note, together with all other agreement, instruments, mortgages, assignments, guaranties, financing statements, and other documents executed in connection with and/or pertaining to the Loan are referred to, collectively, as the "Loan Documents".  All capitalized terms that appear herein without definition shall have the meanings ascribed to such terms in the Loan Documents.

Please be advised that defaults and Events of Default have occurred and are continuing under the Loan Documents as a result of, without limitation: (a) the Borrower's failure to achieve Substantial Completion of Construction within twenty-four (24) months from the Loan Closing Date, (b) the Individual Guarantors' failure to deliver the following personal financial statements and/or tax returns or extensions as required under Section 7.10 of the Loan Agreement: (i) Ajay K. Keshri's current personal financial statement for 2025, together with supporting bank and brokerage account statements, and copies of his filed tax returns and/or extensions for years 2021-2023, (ii) copies of Harrison Merriman Finberg's filed tax returns for years 2021 and 2023, and (iii) copies of Pramod Keshri's filed tax returns for years 2021 and 2023, (c) the filing of a municipal lien against the Borrower in the amount of $1,201.00 by the Water Revenue Bureau of the City of Philadelphia, and (d) the Borrower's failing to maintain the Loan "In Balance", as required in Section 6.13 of the Loan Agreement.  Notably, the Individual Guarantors' failure to deliver the aforesaid personal financial statements, together with supporting bank and brokerage account statements, prevents the Lender from determining whether the Guarantors are in compliance with the Liquidity covenant set forth in Paragraph 7.10(f) of the Loan Agreement.  The aforesaid defaults and Events of Default are referred to, collectively, as the "Existing Defaults".

ME1 52795792v.2

The Borrower is hereby required to cure (and to cause the Individual Guarantors to cure) the Existing Defaults described in (a) through (c) above within twenty (20) days of the date of this letter.  The Borrower is also required to deposit $1,201,127.00 with Lender to put the Loan In Balance no later than May 1, 2025.  The Lender is concerned about the existence of the Existing Defaults which, unless cured as required in this letter, will prevent the Borrower from exercising the Extension Option and the Permanent Loan Conversion Option and, even more importantly, will constitute Events of Default entitling the Lender to exercise any and all rights and remedies available to the Lender under the Loan Documents and applicable law.  Please contact me to discuss this matter at your earliest opportunity.

Nothing set forth herein shall be construed as an agreement by the Lender to consent to any action and/or modification of the Loan Documents which may be proposed or requested by the Borrower and/or to grant any extension(s) with respect to the deadline for Substantial Completion of Construction and/or the Construction Period.  Furthermore, nothing set forth herein shall be construed as a waiver by the Lender of the Existing Defaults and/or any other default(s) existing under the Loan Documents and/or any of its rights and remedies under the Loan Documents, applicable law or at equity, and the Lender hereby reserves and preserves any and all such rights and remedies, and no compromise, forbearance or further forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document  shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

Very truly yours,

By:_____
Molly J. Skilton, Vice President
Community Development Lending

cc:    Inez M. Markovich, Esquire (via e-mail imarkovich@mccarter.com)
       Penny S. Indictor, Esq. (via certified mail)
       Michael J. Taichman-Robins, Esq. (via certified mail)
       Mr. Ajay K. Keshri (via certified mail)
       Mr. Harrison Merriman Finberg (via certified mail)
       Mr. Sanjay Gupta (via certified mail)
       Mr. Pramod Keshri (via certified mail)
       Ms. Veronica M. Alger (via e-mail veronica.m.alger@citizensbank.com)

- 2 -

ME1 52795792v.2

*Execution Version*

**⚹⚹ Citizens**

May 6, 2025

**By Overnight Courier**

Hancock Lofts LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103
Attention: Mr. Harrison Finberg

FineHill Construction LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

Ajay K. Keshri
2731 Norfolk Lane
Doylestown, PA 18902

Pramod Keshri
4 Ren Way
Doylestown, PA 18901

Sanjay Gupta
2796 Buttercup Court
Huntingdon Valley, PA 19006

Harrison Finberg
2001 Market Street, Suite 2519
Philadelphia, PA 19103

      Re:    <u>Reservation of Rights Letter</u>

Ladies and Gentlemen:

      Reference is made to (i) that certain Construction Loan Agreement, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), by and among Citizens Bank, N. A. (the "<u>Lender</u>") and Hancock Lofts LLC, a Pennsylvania limited liability company (the "<u>Borrower</u>"), (ii) that certain Promissory Note, effective as of November 17, 2022, made by Borrower to Lender (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Note</u>"), (iii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise

Hancock Lofts LLC
May 6, 2025
Page 2

modified from time to time, the "Entity Guaranty"), by FineHill Construction LLC, a Pennsylvania limited liability company (the "Entity Guarantor") in favor of Lender, (iv) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Ajay Guaranty"), by Ajay K. Keshri ("Ajay") in favor of Lender, (v) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Pramod Guaranty"), by Pramod Keshri ("Pramod") in favor of Lender, (vi) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Sanjay Guaranty"), by Sanjay Gupta ("Sanjay") in favor of Lender, (vii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Harrison Guaranty", together with the Ajay Guaranty, the Pramod Guaranty, and the Sanjay Guaranty, the "Individual Guarantees" and together with the Entity Guaranty, collectively the "Guarantees"), by Harrison Merriman Finberg ("Harrison", together with Ajay, Pramod, and Sanjay, the "Individual Guarantors" and together with the Entity Guarantor, collectively, the "Guarantors") in favor of Lender, and (viii) that certain reservation of rights letter from Lender to Borrower dated April 21, 2025 (the "4/21/2025 Letter"), a copy of which is attached hereto as Exhibit A. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

With regard to the Existing Defaults (as defined in the 4/21/25 Letter), to the extent they were not cured as set forth in the 4/21/2025 Letter, they have ripened into Events of Default. Those include the failure to deposit $1,201,127.00 with the Lender on or before May 1, 2025 to put the Loan In Balance.

Pursuant to Section 7.10(a)(4) of the Loan Agreement and Section 17 of the Individual Guarantees, each Individual Guarantor is required to deliver a current financial statement (i.e., as of a current date) in a form satisfactory to the Lender within 120 days of the fiscal year ended December 31, 2024, along with the related information required thereby, to be certified by such Individual Guarantor as true and correct in all material respects (collectively for the Individual Guarantors, the "Individual Guarantors' Current PFS Information"). Additionally, pursuant to Section 17 of the Entity Guaranty, the Entity Guarantor was required to deliver to the Lender within 120 days of such fiscal year end an internally prepared profit and loss statement, income statement and balance sheet, which shall set forth the results of operations and conditions of the Entity Guarantor, to be certified as true and correct by the Entity Guarantor's president or chief financial officer (the "Entity Guarantor's Current Financial Information"). The failure by the Guarantors to so provide such information pursuant to the Guarantees constituted Events of Default pursuant to Section 10(t) of the Loan Agreement. Nonetheless, demand is hereby on the Individual Guarantors and the Entity Guarantor to provide the applicable Individual Guarantors' Current PFS Information and the Entity Guarantor's Current Financial Information, respectively. The form of personal financial statement satisfactory to the Lender is attached hereto as Exhibit B. The Events of Default expressly described herein are collectively defined as the "Specified Events of Default".

The Note provides that upon the occurrence and during the continuance of an Event of Default, the principal balance of the Note shall bear interest at the Default Rate, which is defined

Hancock Lofts LLC
May 6, 2025
Page 3

as 4% over the Applicable Interest Rate. The Lender intends to conduct diligence as to when the first Event of Default occurred under the Loan Agreement. Subject to that diligence and without waiving any rights under the Loan Documents, the Default Rate commenced on April 30, 2025.

Notice is hereby given that, pursuant the Loan Documents, all principal, accrued and unpaid interest and other sums required to be paid under the Loan Documents shall become due and payable on May 17, 2025.

As a result of the Specified Events of Defaults, the Lender is entitled to exercise its rights and remedies against the Borrower, each Individual Guarantor and the Entity Guarantor under the Loan Documents and applicable law, including declaring the Note to be due and payable, exercising rights and remedies with respect to collateral and commencing one or more collections' action for payment against the Guarantors.

No past or future action or non-action, including, for the avoidance of doubt, the acceptance of payments by the Lender (other than the payment in full), shall be deemed to waive or release the Specified Events of Defaults, any other Events of Default or Defaults (including, without limitation, any other Default or Event of Default of which the Lender may or may not be aware), all of which are reserved and not waived.

No delay or inaction by the Lender in the exercise of any of its rights and remedies under the Loan Agreement or any other Loan Document, all of which remain in full force and effect, shall: (i) constitute (x) a modification or an alteration of the terms, conditions or covenants of such documents, all of which remain in full force and effect, (y) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved or (z) a forbearance arrangement; or (ii) relieve or release the Borrower or any Guarantor in any way from any of their respective duties, obligations, covenants or agreements under such documents or from the consequences of any of the Specified Events of Default or any other or Event of Default or Default.

Further, no compromise, forbearance or further forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

Pursuant to Section 13.10 of the Loan Agreement, copies of all notices, demands, requests and other communications sent to the Lender should be provided to Holland & Knight LLP, 10 St. James Avenue, 11th Floor Boston, Massachusetts 02116, attention: Kerry S. Kehoe, Esq. (and not McCarter & English LLP) in the manner set forth therein.

Hancock Lofts LLC
May 6, 2025
Page 4

Lastly, all communications with the Lender should be directed to the undersigned, as the new relationship manager for this matter (contact information: veronica.m.alger@citizensbank.com or (617) 894-0816).

Very truly yours,

CITIZENS BANK, NATIONAL ASSOCIATION

By: _____
Name: Veronica M. Alger
Title:  Senior Vice President


cc (via overnight courier):

Penny S. Indictor, Esq.
30 N. 41st Street, Suite 450
Philadelphia, Pennsylvania 19104

## Exhibit A

## 4/21/2025 Letter

[See attached]

# Citizens™

April 21, 2025

VIA CERTIFIED MAIL

Hancock Lofts LLC
1415 S. 12th Street
Philadelphia, PA  19147
Attention: Mr. Harrison Finberg

> **Re:    $10,000,000.00 Commercial Construction Loan from Citizens Bank, N.A. to Hancock Lofts LLC**

Dear Mr. Finberg:

Reference is made to that certain Construction Loan Agreement effective as of November 17, 2022 (the "Loan Agreement") by and between Citizens Bank, N.A. (the "Lender") and Hancock Lofts LLC (the "Borrower"). Pursuant to the Loan Agreement, the Lender made a construction loan in the maximum principal amount of $10,000,000.00 (the "Loan") to the Borrower. The Loan is evidenced by a Promissory Note of the Borrower executed on November 16, 2022 and effective as of November 17, 2022 in the maximum principal amount of $10,000,000.00 (the "Note"). The Loan Agreement, the Note, together with all other agreement, instruments, mortgages, assignments, guaranties, financing statements, and other documents executed in connection with and/or pertaining to the Loan are referred to, collectively, as the "Loan Documents". All capitalized terms that appear herein without definition shall have the meanings ascribed to such terms in the Loan Documents.

Please be advised that defaults and Events of Default have occurred and are continuing under the Loan Documents as a result of, without limitation: (a) the Borrower's failure to achieve Substantial Completion of Construction within twenty-four (24) months from the Loan Closing Date, (b) the Individual Guarantors' failure to deliver the following personal financial statements and/or tax returns or extensions as required under Section 7.10 of the Loan Agreement: (i) Ajay K. Keshri's current personal financial statement for 2025, together with supporting bank and brokerage account statements, and copies of his filed tax returns and/or extensions for years 2021-2023, (ii) copies of Harrison Merriman Finberg's filed tax returns for years 2021 and 2023, and (iii) copies of Pramod Keshri's filed tax returns for years 2021 and 2023, (c) the filing of a municipal lien against the Borrower in the amount of $1,201.00 by the Water Revenue Bureau of the City of Philadelphia, and (d) the Borrower's failing to maintain the Loan "In Balance", as required in Section 6.13 of the Loan Agreement. Notably, the Individual Guarantors' failure to deliver the aforesaid personal financial statements, together with supporting bank and brokerage account statements, prevents the Lender from determining whether the Guarantors are in compliance with the Liquidity covenant set forth in Paragraph 7.10(f) of the Loan Agreement. The aforesaid defaults and Events of Default are referred to, collectively, as the "Existing Defaults".

ME1 52795792v.2

The Borrower is hereby required to cure (and to cause the Individual Guarantors to cure) the Existing Defaults described in (a) through (c) above within twenty (20) days of the date of this letter. The Borrower is also required to deposit $1,201,127.00 with Lender to put the Loan In Balance no later than May 1, 2025. The Lender is concerned about the existence of the Existing Defaults which, unless cured as required in this letter, will prevent the Borrower from exercising the Extension Option and the Permanent Loan Conversion Option and, even more importantly, will constitute Events of Default entitling the Lender to exercise any and all rights and remedies available to the Lender under the Loan Documents and applicable law. Please contact me to discuss this matter at your earliest opportunity.

Nothing set forth herein shall be construed as an agreement by the Lender to consent to any action and/or modification of the Loan Documents which may be proposed or requested by the Borrower and/or to grant any extension(s) with respect to the deadline for Substantial Completion of Construction and/or the Construction Period. Furthermore, nothing set forth herein shall be construed as a waiver by the Lender of the Existing Defaults and/or any other default(s) existing under the Loan Documents and/or any of its rights and remedies under the Loan Documents, applicable law or at equity, and the Lender hereby reserves and preserves any and all such rights and remedies, and no compromise, forbearance or further forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

Very truly yours,

By: _____

Molly J. Skilton, Vice President
Community Development Lending

cc:    Inez M. Markovich, Esquire (via e-mail imarkovich@mccarter.com)
       Penny S. Indictor, Esq. (via certified mail)
       Michael J. Taichman-Robins, Esq. (via certified mail)
       Mr. Ajay K. Keshri (via certified mail)
       Mr. Harrison Merriman Finberg (via certified mail)
       Mr. Sanjay Gupta (via certified mail)
       Mr. Pramod Keshri (via certified mail)
       Ms. Veronica M. Alger (via e-mail veronica.m.alger@citizensbank.com)

- 2 -

ME1 52795792v.2

## EXHIBIT B

### Form of Personal Financial Statement

[See attached]

# Personal Financial Statement                    ❄ Citizens Bank

As of (Date)_____          Borrowing Entity Name: _____

## APPLICANT INFORMATION

Name:
(Print name as it appears on driver's license)                          DOB:_____   SSN#:_____

Spouse/Legal Partner Name:
(Print name as it appears on driver's license)                          DOB:_____   SSN#:_____

Residence Address:                          City, State & Zip:

## PERSONAL INFORMATION

| | |
|---|---|
| Do you have a will? ☐ No ☐ Yes (If yes, list executor name & address) | Are you a partner or officer in any other venture? ☐ No ☐ Yes (If yes, describe) |
| Have you obtained or applied for credit in any other name? ☐ No ☐ Yes (If yes, describe) | Have you ever declared bankruptcy? ☐ No ☐ Yes (If yes, describe) |
| Are you a defendant in any suits or legal actions? ☐ No ☐ Yes (If yes, please upload supporting documents) | Are any assets pledged other than as described in other sections? ☐ No ☐ Yes (If yes, describe) |
| Federal and State Income taxes settled through (date): _____ | Have you ever been convicted of a felony? ☐ No ☐ Yes |

Are you obligated to pay alimony, child support or separate maintenance payments? ☐ No ☐ Yes (If yes, describe)
** Alimony, child support or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

| ASSETS (Do not include assets of doubtful value) | Amount (Omit Cents) | LIABILITIES | Amount (Omit Cents) |
|---|---|---|---|
| Cash, Checking, Savings, CDs, Money Market Accounts - See Section 1 | $ | Amounts Payable to Financial Institutions - Secured - See Section 7 | $ |
| Stocks, Bonds, Marketable Securities & US Gov't Securities - See Section 2 | $ | Amounts Payable to Financial Institutions - Unsecured - See Section 7 | $ |
| Non Marketable Sec - See Section 3 | $ | Amounts Due to Brokers | $ |
| Securities Held by Broker in Margin Accts | $ | Amounts Payable to Others - Secured | $ |
| Restricted or Controlled Stocks | $ | Amounts Payable to Others - Unsecured | $ |
| Real Estate Owned - See Section 4 | $ | Unpaid Federal and State Income Taxes | $ |
| Partial Interest in Real Estate Equities - See Section 5 | $ | Real Estate Mortgages Payable - See Section 4 & 5 | $ |
| Loans Receivable | $ | Other Unpaid Taxes and Interest | $ |
| Automobiles and Other Personal Property | $ | Accounts and Bills Due | $ |
| Cash Value - Life Insurance - See Section 6 | $ | Other Debts - List and Itemize | |
| Retirement / 401K / IRA | $ | | $ |
| Value of Business | $ | | $ |
| Other Assets - List and Itemize: | | TOTAL LIABILITIES | $ 0 |
| | $ | NET WORTH | $ 0 |
| TOTAL ASSETS | $ 0 | TOTAL LIABILITIES and NET WORTH | $ 0 |

| INCOME FOR YEAR ENDED | | CONTINGENT LIABILITIES | |
|---|---|---|---|
| Salary, Bonuses, Commissions | $ | Do you have any contingent liabilities? ☐ No ☐ Yes (If yes, describe) | |
| Dividends | $ | | |
| Real Estate Income | $ | As endorser, co-maker, guarantor or surety? | $ |
| Other Income | $ | On leases or contracts? | $ |
| Describe Other Income: | | Legal claims? | $ |
| | | Other special debt? | $ |
| TOTAL INCOME | $ 0 | Amount of contested income tax liens? | $ |

## SECTION 1: CHECKING, SAVINGS, CDs, & MONEY MARKET ACCOUNTS

| Type of Account | Name of Institution | In Name Of | Balance or Value |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Revised 10.21.20

## SECTION 2: STOCKS, BONDS, MARKETABLE SECURITIES & US GOVERNMENT SECURITIES

| # of Shares or Face Value (Bonds) | Description | In Name Of | Are These Pledged? | Market Value |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## SECTION 3: NON-MARKETABLE SECURITIES

| # of Shares | Description | In Name Of | Are These Pledged? | Source of Value | Value |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

## SECTION 4: REAL ESTATE OWNED

| Address & Type of Property | Title In Name Of | Date Acquired | Cost | Market Value | Mortgage Company | Mortgage Maturity | Mortgage Balance | Mo. Pmt |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## SECTION 5: PARTIAL INTERESTS IN REAL ESTATE EQUITIES

| Address & Type of Property | Title In Name Of | % of Ownership | Date Acquired | Cost | Market Value | Mortgage Maturity | Mortgage Balance | Mo. Pmt |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## SECTION 6: LIFE INSURANCE CARRIED, INCLUDING WHOLE, TERM AND GROUP INSURANCE

| Name of Insurance Co. | Owner of Policy | Beneficiary | Face Amt | Policy Loans | Cash Surrender Value |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

## SECTION 7: CREDIT GRANTED BY BANKS, CREDIT CARD COMPANIES, FINANCE COMPANIES OR OWED TO OTHERS

| Name & Address of Lender | Credit in the Name Of | Collateral | Original Date | High Credit | Balance | Mo. Pmt |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Representations and Warranties**

The information contained in this statement is provided to induce you to extend or to continue the extension of credit to the undersigned or to others upon the guarantee thereof. Each of the undersigned represents warrants and certifies that the information provided herein is true, correct and complete. Each of the undersigned agrees to notify you immediately and in writing of any change in name, address, or employment and of any material adverse change (1) in any of the information contained in this statement or (2) in the financial condition of any of the undersigned or (3) in the ability of any of the undersigned to perform its (or their) obligations to you. In the absence of such notice or a new and full written statement, this should be considered as a continuing statement and substantially correct. If the undersigned fail to notify you as required above, or if any of the information herein should prove to be inaccurate or incomplete in any material respect, you may declare the indebtedness of the undersigned or the indebtedness guaranteed by the undersigned, as the case may be, immediately due and payable.

You are authorized to make all inquiries you deem necessary to verify the accuracy of the information contained herein and to determine the creditworthiness of the undersigned. Each of the undersigned authorizes you to request credit reports, from time to time, containing credit and other reference information about the undersigned from third parties, such as credit reporting agencies. The undersigned authorize any person or consumer-reporting agency to give you any information it may have on the undersigned. Each of the undersigned authorizes you to answer questions about your credit experience with the undersigned. As long as any obligation or guarantee of the undersigned to you is outstanding, the undersigned shall supply annually an updated financial statement. This personal financial statement and any other financial or other information that the undersigned give you shall be your property.

**Notice to New York Residents:** Consumer reports may be requested in connection with the processing of your application and any resulting account. Upon your request, we will inform you of the names and addresses of any consumer reporting agencies that have provided us with such reports. New York residents may contact the New York State Department of Financial Services by telephone at 1-877-226-5697 or visit its website at www.dfs.ny.gov/

**Notice to Ohio Residents:** The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

☐ I hereby attest that my printed name above matches my name as it appears on my valid driver's license.

☐ I hereby attest that my printed name above matches my name as it appears on my valid driver's license.

Signature:_____ Date:_____

Signature:_____ Date:_____

ID Type:_____ ID#_____

ID Type:_____ ID#_____

Issue Date:_____ Exp Date:_____

Issue Date:_____ Exp Date:_____

VERIFICATION OF NEW CUSTOMER IDENTITY – Federal laws and regulations require us to request information from you prior to opening an account. The information we request may vary depending on the circumstances, but at a minimum, will include your name, address, an identification number such as your social security or taxpayer identification number, and for individuals, your date of birth. We are also required to verify the information you provide to us. This verification process may require you to provide us with supporting documentation that we deem appropriate. We may also seek to verify the information by other means. We reserve the right to request additional information and/or signatures from you from time to time. In all cases, the protection of our customer's identity and confidentiality is our pledge to you.

Equal Credit Opportunity Act (Regulation B) requires that we notify you that we may order an appraisal to determine your property's value and charge you for this appraisal. We will promptly give you a copy of any appraisal, even if your loan does not close. You can pay for an additional appraisal for your own use at your own cost.

**Clear Entries**

*Execution Version*

**꒱꒰ Citizens**

August 5, 2025

***By Overnight Courier***

Hancock Lofts LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103
Attention: Mr. Harrison Finberg

FineHill Construction LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

Ajay K. Keshri
2731 Norfolk Lane
Doylestown, PA 18902

Pramod Keshri
4 Ren Way
Doylestown, PA 18901

Sanjay Gupta
2796 Buttercup Court
Huntingdon Valley, PA 19006

Harrison Finberg
2001 Market Street, Suite 2519
Philadelphia, PA 19103

   Re:  <u>Reservation of Rights Letter</u>

Ladies and Gentlemen:

   Reference is made to (i) that certain Construction Loan Agreement, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), by and among Citizens Bank, N. A. (the "<u>Lender</u>") and Hancock Lofts LLC, a Pennsylvania limited liability company (the "<u>Borrower</u>"), (ii) that certain Promissory Note, effective as of November 17, 2022, made by Borrower to Lender (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Note</u>"), (iii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise

Hancock Lofts LLC
August 5, 2025
Page 2

modified from time to time, the "Entity Guaranty"), by FineHill Construction LLC, a Pennsylvania limited liability company (the "Entity Guarantor") in favor of Lender, (iv) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Ajay Guaranty"), by Ajay K. Keshri ("Ajay") in favor of Lender, (v) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Pramod Guaranty"), by Pramod Keshri ("Pramod") in favor of Lender, (vi) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Sanjay Guaranty"), by Sanjay Gupta ("Sanjay") in favor of Lender, (vii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Harrison Guaranty", together with the Ajay Guaranty, the Pramod Guaranty, and the Sanjay Guaranty, the "Individual Guarantees" and together with the Entity Guaranty, collectively the "Guarantees"), by Harrison Merriman Finberg ("Harrison", together with Ajay, Pramod, and Sanjay, the "Individual Guarantors" and together with the Entity Guarantor, collectively, the "Guarantors") in favor of Lender, (viii) that certain reservation of rights letter from Lender to Borrower dated April 21, 2025 (the "4/21/2025 Letter"), a copy of which is attached hereto as Exhibit A, (ix) that certain reservation of rights letter from Lender to Borrower dated May 6, 2025 (the "5/6/2025 Letter"), a copy of which is attached hereto as Exhibit B, and (x) that certain guarantor demand letter from Lender to the Guarantors dated May 21, 2025 (the "Guarantor Demand Letter"), a copy of which is attached hereto as Exhibit C. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

With regard to the Existing Defaults (as defined in the 4/21/25 Letter), to the extent they were not cured as set forth in the 4/21/2025 Letter, they have ripened into Events of Default. With regard to the Guarantor Demand Letter, Lender has not received a payment in full of the Payment Obligations from the Guarantors, as demanded thereunder (the "Payment Default"). The Guarantors' failure to provide said payment constituted an Event of Default pursuant to Section 10(a) of the Loan Agreement. The Events of Default expressly described herein, including, but not limited to, the Existing Defaults, the Specified Defaults (as defined in the 5/6/25 Letter), and the Payment Default are collectively defined herein as the "Outstanding Events of Default".

The Note provides that upon the occurrence and during the continuance of an Event of Default, the principal balance of the Note shall bear interest at the Default Rate, which is defined as 4% over the Applicable Interest Rate. The Lender intends to conduct diligence as to when the first Event of Default occurred under the Loan Agreement. Subject to that diligence and without waiving any rights under the Loan Documents, the Default Rate commenced on April 30, 2025, and continues to accrue.

As a result of the Outstanding Events of Defaults, the Lender is entitled to exercise its rights and remedies against the Borrower, each Individual Guarantor and the Entity Guarantor under the Loan Documents and applicable law, including exercising rights and remedies with respect to collateral and commencing one or more collections' action for payment against the Guarantors.

Hancock Lofts LLC
August 5, 2025
Page 3

No past or future action or non-action, including, for the avoidance of doubt, the acceptance of payments by the Lender (other than the payment in full), shall be deemed to waive or release the Outstanding Events of Defaults, any other Events of Default or Defaults (including, without limitation, any other Default or Event of Default of which the Lender may or may not be aware), all of which are reserved and not waived.

No delay or inaction by the Lender in the exercise of any of its rights and remedies under the Loan Agreement or any other Loan Document, all of which remain in full force and effect, shall: (i) constitute (x) a modification or an alteration of the terms, conditions or covenants of such documents, all of which remain in full force and effect, (y) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved or (z) a forbearance arrangement; or (ii) relieve or release the Borrower or any Guarantor in any way from any of their respective duties, obligations, covenants or agreements under such documents or from the consequences of any of the Outstanding Events of Default or any other or Event of Default or Default.

Further, no compromise, forbearance or further forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

Very truly yours,

CITIZENS BANK, NATIONAL ASSOCIATION

By: _____
Name: Veronica M. Alger
Title:   Senior Vice President

cc (via overnight courier):

Penny S. Indictor, Esq.
30 N. 41st Street, Suite 450
Philadelphia, Pennsylvania 19104

**Exhibit A**

**4/21/2025 Letter**

[See attached]

Case 2:26-cv-03115-GAW    Document 1    Filed 05/07/26    Page 255 of 285

**Citizens**™

April 21, 2025

VIA CERTIFIED MAIL

Hancock Lofts LLC
1415 S. 12th Street
Philadelphia, PA  19147
Attention: Mr. Harrison Finberg

> **Re:** **$10,000,000.00 Commercial Construction Loan from Citizens Bank, N.A. to Hancock Lofts LLC**

Dear Mr. Finberg:

Reference is made to that certain Construction Loan Agreement effective as of November 17, 2022 (the "Loan Agreement") by and between Citizens Bank, N.A. (the "Lender") and Hancock Lofts LLC (the "Borrower").  Pursuant to the Loan Agreement, the Lender made a construction loan in the maximum principal amount of $10,000,000.00 (the "Loan") to the Borrower.  The Loan is evidenced by a Promissory Note of the Borrower executed on November 16, 2022 and effective as of November 17, 2022 in the maximum principal amount of $10,000,000.00 (the "Note").  The Loan Agreement, the Note, together with all other agreement, instruments, mortgages, assignments, guaranties, financing statements, and other documents executed in connection with and/or pertaining to the Loan are referred to, collectively, as the "Loan Documents".  All capitalized terms that appear herein without definition shall have the meanings ascribed to such terms in the Loan Documents.

Please be advised that defaults and Events of Default have occurred and are continuing under the Loan Documents as a result of, without limitation: (a) the Borrower's failure to achieve Substantial Completion of Construction within twenty-four (24) months from the Loan Closing Date, (b) the Individual Guarantors' failure to deliver the following personal financial statements and/or tax returns or extensions as required under Section 7.10 of the Loan Agreement: (i) Ajay K. Keshri's current personal financial statement for 2025, together with supporting bank and brokerage account statements, and copies of his filed tax returns and/or extensions for years 2021-2023, (ii) copies of Harrison Merriman Finberg's filed tax returns for years 2021 and 2023, and (iii) copies of Pramod Keshri's filed tax returns for years 2021 and 2023, (c) the filing of a municipal lien against the Borrower in the amount of $1,201.00 by the Water Revenue Bureau of the City of Philadelphia, and (d) the Borrower's failing to maintain the Loan "In Balance", as required in Section 6.13 of the Loan Agreement.  Notably, the Individual Guarantors' failure to deliver the aforesaid personal financial statements, together with supporting bank and brokerage account statements, prevents the Lender from determining whether the Guarantors are in compliance with the Liquidity covenant set forth in Paragraph 7.10(f) of the Loan Agreement.  The aforesaid defaults and Events of Default are referred to, collectively, as the "Existing Defaults".

ME1 52795792v.2

The Borrower is hereby required to cure (and to cause the Individual Guarantors to cure) the Existing Defaults described in (a) through (c) above within twenty (20) days of the date of this letter.  The Borrower is also required to deposit $1,201,127.00 with Lender to put the Loan In Balance no later than May 1, 2025.  The Lender is concerned about the existence of the Existing Defaults which, unless cured as required in this letter, will prevent the Borrower from exercising the Extension Option and the Permanent Loan Conversion Option and, even more importantly, will constitute Events of Default entitling the Lender to exercise any and all rights and remedies available to the Lender under the Loan Documents and applicable law.  Please contact me to discuss this matter at your earliest opportunity.

Nothing set forth herein shall be construed as an agreement by the Lender to consent to any action and/or modification of the Loan Documents which may be proposed or requested by the Borrower and/or to grant any extension(s) with respect to the deadline for Substantial Completion of Construction and/or the Construction Period.  Furthermore, nothing set forth herein shall be construed as a waiver by the Lender of the Existing Defaults and/or any other default(s) existing under the Loan Documents and/or any of its rights and remedies under the Loan Documents, applicable law or at equity, and the Lender hereby reserves and preserves any and all such rights and remedies, and no compromise, forbearance or further forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document  shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

Very truly yours,

By: _____
Molly J. Skilton, Vice President
Community Development Lending

cc:    Inez M. Markovich, Esquire (via e-mail imarkovich@mccarter.com)
       Penny S. Indictor, Esq. (via certified mail)
       Michael J. Taichman-Robins, Esq. (via certified mail)
       Mr. Ajay K. Keshri (via certified mail)
       Mr. Harrison Merriman Finberg (via certified mail)
       Mr. Sanjay Gupta (via certified mail)
       Mr. Pramod Keshri (via certified mail)
       Ms. Veronica M. Alger (via e-mail veronica.m.alger@citizensbank.com)

- 2 -

ME1 52795792v.2

**<u>Exhibit B</u>**

**<u>5/6/2025 Letter</u>**

[See attached]

*Execution Version*

**ᴥᴥ Citizens**

May 6, 2025

**By Overnight Courier**

Hancock Lofts LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103
Attention: Mr. Harrison Finberg

FineHill Construction LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

Ajay K. Keshri
2731 Norfolk Lane
Doylestown, PA 18902

Pramod Keshri
4 Ren Way
Doylestown, PA 18901

Sanjay Gupta
2796 Buttercup Court
Huntingdon Valley, PA 19006

Harrison Finberg
2001 Market Street, Suite 2519
Philadelphia, PA 19103

      Re:     Reservation of Rights Letter

Ladies and Gentlemen:

      Reference is made to (i) that certain Construction Loan Agreement, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Citizens Bank, N. A. (the "Lender") and Hancock Lofts LLC, a Pennsylvania limited liability company (the "Borrower"), (ii) that certain Promissory Note, effective as of November 17, 2022, made by Borrower to Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), (iii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise

Hancock Lofts LLC
May 6, 2025
Page 2

modified from time to time, the "Entity Guaranty"), by FineHill Construction LLC, a Pennsylvania limited liability company (the "Entity Guarantor") in favor of Lender, (iv) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Ajay Guaranty"), by Ajay K. Keshri ("Ajay") in favor of Lender, (v) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Pramod Guaranty"), by Pramod Keshri ("Pramod") in favor of Lender, (vi) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Sanjay Guaranty"), by Sanjay Gupta ("Sanjay") in favor of Lender, (vii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Harrison Guaranty", together with the Ajay Guaranty, the Pramod Guaranty, and the Sanjay Guaranty, the "Individual Guarantees" and together with the Entity Guaranty, collectively the "Guarantees"), by Harrison Merriman Finberg ("Harrison", together with Ajay, Pramod, and Sanjay, the "Individual Guarantors" and together with the Entity Guarantor, collectively, the "Guarantors") in favor of Lender, and (viii) that certain reservation of rights letter from Lender to Borrower dated April 21, 2025 (the "4/21/2025 Letter"), a copy of which is attached hereto as Exhibit A. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

With regard to the Existing Defaults (as defined in the 4/21/25 Letter), to the extent they were not cured as set forth in the 4/21/2025 Letter, they have ripened into Events of Default. Those include the failure to deposit $1,201,127.00 with the Lender on or before May 1, 2025 to put the Loan In Balance.

Pursuant to Section 7.10(a)(4) of the Loan Agreement and Section 17 of the Individual Guarantees, each Individual Guarantor is required to deliver a current financial statement (i.e., as of a current date) in a form satisfactory to the Lender within 120 days of the fiscal year ended December 31, 2024, along with the related information required thereby, to be certified by such Individual Guarantor as true and correct in all material respects (collectively for the Individual Guarantors, the "Individual Guarantors' Current PFS Information"). Additionally, pursuant to Section 17 of the Entity Guaranty, the Entity Guarantor was required to deliver to the Lender within 120 days of such fiscal year end an internally prepared profit and loss statement, income statement and balance sheet, which shall set forth the results of operations and conditions of the Entity Guarantor, to be certified as true and correct by the Entity Guarantor's president or chief financial officer (the "Entity Guarantor's Current Financial Information"). The failure by the Guarantors to so provide such information pursuant to the Guarantees constituted Events of Default pursuant to Section 10(t) of the Loan Agreement. Nonetheless, demand is hereby on the Individual Guarantors and the Entity Guarantor to provide the applicable Individual Guarantors' Current PFS Information and the Entity Guarantor's Current Financial Information, respectively. The form of personal financial statement satisfactory to the Lender is attached hereto as Exhibit B. The Events of Default expressly described herein are collectively defined as the "Specified Events of Default".

The Note provides that upon the occurrence and during the continuance of an Event of Default, the principal balance of the Note shall bear interest at the Default Rate, which is defined

Hancock Lofts LLC
May 6, 2025
Page 3

as 4% over the Applicable Interest Rate. The Lender intends to conduct diligence as to when the first Event of Default occurred under the Loan Agreement. Subject to that diligence and without waiving any rights under the Loan Documents, the Default Rate commenced on April 30, 2025.

Notice is hereby given that, pursuant the Loan Documents, all principal, accrued and unpaid interest and other sums required to be paid under the Loan Documents shall become due and payable on May 17, 2025.

As a result of the Specified Events of Defaults, the Lender is entitled to exercise its rights and remedies against the Borrower, each Individual Guarantor and the Entity Guarantor under the Loan Documents and applicable law, including declaring the Note to be due and payable, exercising rights and remedies with respect to collateral and commencing one or more collections' action for payment against the Guarantors.

No past or future action or non-action, including, for the avoidance of doubt, the acceptance of payments by the Lender (other than the payment in full), shall be deemed to waive or release the Specified Events of Defaults, any other Events of Default or Defaults (including, without limitation, any other Default or Event of Default of which the Lender may or may not be aware), all of which are reserved and not waived.

No delay or inaction by the Lender in the exercise of any of its rights and remedies under the Loan Agreement or any other Loan Document, all of which remain in full force and effect, shall: (i) constitute (x) a modification or an alteration of the terms, conditions or covenants of such documents, all of which remain in full force and effect, (y) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved or (z) a forbearance arrangement; or (ii) relieve or release the Borrower or any Guarantor in any way from any of their respective duties, obligations, covenants or agreements under such documents or from the consequences of any of the Specified Events of Default or any other or Event of Default or Default.

Further, no compromise, forbearance or further forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

Pursuant to Section 13.10 of the Loan Agreement, copies of all notices, demands, requests and other communications sent to the Lender should be provided to Holland & Knight LLP, 10 St. James Avenue, 11th Floor Boston, Massachusetts 02116, attention: Kerry S. Kehoe, Esq. (and not McCarter & English LLP) in the manner set forth therein.

Hancock Lofts LLC
May 6, 2025
Page 4

Lastly, all communications with the Lender should be directed to the undersigned, as the new relationship manager for this matter (contact information: veronica.m.alger@citizensbank.com or (617) 894-0816).

Very truly yours,

CITIZENS BANK, NATIONAL
ASSOCIATION

By: _____

Name: Veronica M. Alger
Title:   Senior Vice President

cc (via overnight courier):

Penny S. Indictor, Esq.
30 N. 41st Street, Suite 450
Philadelphia, Pennsylvania 19104

**EXHIBIT C**

**Guarantor Demand Letter**

[See attached]

**✳ Citizens**®

May 21, 2025

***By Overnight Courier and Electronic Mail***

FineHill Construction LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

and

1415 S. 12th Avenue
Philadelphia, PA 19147

Ajay K. Keshri
2731 Norfolk Lane
Doylestown, PA 18902

Pramod Keshri
4 Ren Way
Doylestown, PA 18901

Sanjay Gupta
2796 Buttercup Court
Huntingdon Valley, PA 19006

Harrison Finberg
2001 Market Street, Suite 2519
Philadelphia, PA 19103

and

1415 S. 12th Avenue
Philadelphia, PA 19147

Hancock Lofts LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

and

1415 S. 12th Avenue

Philadelphia, PA 19147

Re: Guarantor Demand Letter

Ladies and Gentlemen:

Reference is made to (i) that certain Construction Loan Agreement, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Citizens Bank, N. A. (the "Lender") and Hancock Lofts LLC, a Pennsylvania limited liability company (the "Borrower"), (ii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Entity Guaranty"), by FineHill Construction LLC, a Pennsylvania limited liability company (the "Entity Guarantor") in favor of Lender, (iii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Ajay Guaranty"), by Ajay K. Keshri ("Ajay") in favor of Lender, (iv) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Pramod Guaranty"), by Pramod Keshri ("Pramod") in favor of Lender, (v) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Sanjay Guaranty"), by Sanjay Gupta ("Sanjay") in favor of Lender, (vi) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Harrison Guaranty", together with the Ajay Guaranty, the Pramod Guaranty, and the Sanjay Guaranty, the "Individual Guarantees" and together with the Entity Guaranty, collectively the "Payment Guarantees"), by Harrison Merriman Finberg ("Harrison", together with Ajay, Pramod, and Sanjay, the "Individual Guarantors" and together with the Entity Guarantor, collectively, the "Guarantors") in favor of Lender, and (vii) that certain reservation of rights letter from Lender to Borrower and Guarantors, dated May 6, 2025 (the "5/6/2025 Letter"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

The Maturity Date under the Loan Agreement was May 17, 2025. Pursuant to Section 3.9(c) of the Loan Agreement, all principal, interest and other sums due under the Loan Documents (collectively, the "Payment Obligations") have become due and payable in full.

Under the terms and provisions of the Payment Guarantees, the Guarantors have jointly and severally unconditionally guaranteed the Borrower's full and prompt payment of the Payment Obligations, as well as the full and prompt payment of all sums that become due and payable after the date hereof.  In the event the Borrower fails to pay when due any of those obligations, the Guarantors have agreed under the Payment Guarantees to pay to the Lender those obligations on demand by the Lender, regardless of any defense, right of set-off or claims which the Borrower or any Guarantor may have against the Lender.  Guarantors have further agreed in Section 8 of the Payment Guarantees to pay, upon demand by the Lender, all reasonable attorneys' fees, costs and expenses incurred by the Lender in connection with, among other things, the collection of the Payment Guarantees.

**Accordingly, the Lender hereby makes demand upon the Guarantors for the immediate payment in full of the Payment Obligations.** As noted in the 5/6/2025 Letter, the

principal balance of the Note is bearing interest at the Default Rate, resulting in per diem interest currently accruing in the amount of $2,988.39. Please contact the undersigned for a payoff statement. For the avoidance of any doubt, all rights of enforcement, collection or otherwise are explicitly reserved by the Lender with respect to the Borrower and Borrower's obligations under the Loan Agreement and any other Loan Document to which it is a party.

This letter does not, and should not be construed to, waive or release any obligation of the Borrower or any Guarantor and/or any past, present or future breach, violation, default, Default or Event of Default (whether by the Borrower or the Guarantors (or any of them)) under the Loan Agreement, the Payment Guarantees, any other Loan Document, or the Specified Events of Defaults (as defined in the 5/6/2025 Letter), and this letter does not directly or indirectly in any way whatsoever: (i) impair, prejudice or otherwise adversely affect the Lender's rights at any time to exercise any right, privilege or remedy in connection with the Loan Agreement, the Payment Guarantees (including pursuant to Section 8 thereof and the commencement of one or more collection actions against the Guarantors), any other Loan Document, or any other contract or instrument; (ii) amend or alter any provision of the Loan Agreement, the Payment Guarantees, any other Loan Document, or any other contract or instrument; (iii) constitute any agreement of the Lender to forbear from exercising any of its rights and remedies under the Loan Agreement, the Payment Guarantees, or any other Loan Document; or (iv) constitute any course of dealing or other basis for altering any obligation of the Borrower or any Guarantor or any right, privilege or remedy of the Lender under the Loan Agreement, the Payment Guarantees, any other Loan Document, or any other contract or instrument or constitute any consent by the Lender to any prior, existing or future violations of the Loan Agreement, the Payment Guarantees, any other Loan Document, or any other contract or instrument. Neither the Borrower nor any Guarantor may rely upon any verbal statements made, or purported to be made, by or on behalf of the Lender in connection with any alleged agreement of the Lender to refrain from exercising any of its rights and remedies under the Loan Agreement, the Payment Guarantees, any other Loan Document, or any other contract or instrument or under law or equity.

No delay or inaction by the Lender in the exercise of any of its rights and remedies under the Loan Agreement, the Payment Guarantees or any other Loan Document, all of which remain in full force and effect, nor the Lender's acceptance of less than all of the Payment Obligations, shall: (i) constitute (x) a modification or an alteration of the terms, conditions or covenants of such documents, all of which remain in full force and effect, (y) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved or (z) a forbearance arrangement; or (ii) relieve or release the Borrower or the Guarantors in any way from any of their respective duties, obligations, covenants or agreements under such documents or from the Specified Events of Default, any other Default or Event of Default, or the maturity of all principal, interest and other sums due under the Loan Documents as described above.

Further, no compromise, forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

\*\*\*\*\*\*\*\*

Please contact the undersigned at veronica.m.alger@citizensbank.com or (617) 894-0816 for the referenced payoff statement or should you have any questions about this letter.

Very truly yours,

CITIZENS BANK, NATIONAL
ASSOCIATION

By: _____
Name: Veronica M. Alger
Title:   Senior Vice President


cc (via overnight courier):

Penny S. Indictor, Esq.
30 N. 41st Street, Suite 450
Philadelphia, PA 19104

**⚛ Citizens**®

September 26, 2025

***By Overnight Courier***

Hancock Lofts LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103
Attention: Mr. Harrison Finberg

FineHill Construction LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

Ajay K. Keshri
2731 Norfolk Lane
Doylestown, PA 18902

Pramod Keshri
4 Ren Way
Doylestown, PA 18901

Sanjay Gupta
2796 Buttercup Court
Huntingdon Valley, PA 19006

Harrison Finberg
2001 Market Street, Suite 2519
Philadelphia, PA 19103

       Re:      Reservation of Rights Letter

Ladies and Gentlemen:

      Reference is made to (i) that certain Construction Loan Agreement, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Citizens Bank, N. A. (the "Lender") and Hancock Lofts LLC, a Pennsylvania limited liability company (the "Borrower"), (ii) that certain Promissory Note, effective as of November 17, 2022, made by Borrower to Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Note"), (iii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Entity Guaranty"), by FineHill Construction LLC, a Pennsylvania

Hancock Lofts LLC
September 26, 2025
Page 2

limited liability company (the "Entity Guarantor") in favor of Lender, (iv) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Ajay Guaranty"), by Ajay K. Keshri ("Ajay") in favor of Lender, (v) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Pramod Guaranty"), by Pramod Keshri ("Pramod") in favor of Lender, (vi) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Sanjay Guaranty"), by Sanjay Gupta ("Sanjay") in favor of Lender, (vii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Harrison Guaranty", together with the Ajay Guaranty, the Pramod Guaranty, and the Sanjay Guaranty, the "Individual Guarantees" and together with the Entity Guaranty, collectively the "Guarantees"), by Harrison Merriman Finberg ("Harrison", together with Ajay, Pramod, and Sanjay, the "Individual Guarantors" and together with the Entity Guarantor, collectively, the "Guarantors") in favor of Lender, (viii) that certain reservation of rights letter from Lender to Borrower dated April 21, 2025, (ix) that certain reservation of rights letter from Lender to Borrower dated May 6, 2025, (x) that certain guarantor demand letter from Lender to the Guarantors dated May 21, 2025, and (xi) that certain reservation of rights letter from Lender to Borrower dated August 5, 2025 (the "8/5/2025 Letter"), a copy of which is attached hereto as Exhibit A. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

The Outstanding Events of Defaults (as defined in the 8/5/2025 Letter) have occurred and are continuing. The Note provides that upon the occurrence and during the continuance of an Event of Default, the principal balance of the Note shall bear interest at the Default Rate, which is defined as 4% over the Applicable Interest Rate. The Lender intends to conduct diligence as to when the first Event of Default occurred under the Loan Agreement. Subject to that diligence and without waiving any rights under the Loan Documents, the Default Rate commenced on April 30, 2025, and continues to accrue.

As a result of the Outstanding Events of Defaults, the Lender is entitled to exercise its rights and remedies against the Borrower, each Individual Guarantor and the Entity Guarantor under the Loan Documents and applicable law, including exercising rights and remedies with respect to collateral and commencing one or more collections' action for payment against one or more of the Guarantors.

No past or future action or non-action, including, for the avoidance of doubt, the acceptance of payments by the Lender (other than the payment in full), shall be deemed to waive or release the Outstanding Events of Defaults, any other Events of Default or Defaults (including, without limitation, any other Default or Event of Default of which the Lender may or may not be aware), all of which are reserved and not waived.

No delay or inaction by the Lender in the exercise of any of its rights and remedies under the Loan Agreement or any other Loan Document, all of which remain in full force and effect, shall: (i) constitute (x) a modification or an alteration of the terms, conditions or covenants of such documents, all of which remain in full force and effect, (y) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, all of which are hereby expressly

Hancock Lofts LLC
September 26, 2025
Page 3

reserved or (z) a forbearance arrangement; or (ii) relieve or release the Borrower or any Guarantor in any way from any of their respective duties, obligations, covenants or agreements under such documents or from the consequences of any of the Outstanding Events of Default or any other or Event of Default or Default.

Further, no compromise, forbearance or further forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document (including with regard to the forgiveness of any interest allocable to the Default Rate or any other obligation of the Borrower or any Guarantor to the Lender) shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

Lastly, we note that the Borrower has communicated to the Lender its intention to refinance the obligations owing to the Lender under the Loan Agreement and related documents. In that respect, the Borrower recently provided the Lender with a sources and uses spreadsheet. We further note that the spreadsheet, however, does not reflect sufficient funds to pay in full those obligations (even assuming, *arguendo*, that interest allocable to the Default Rate is forgiven).

Very truly yours,

CITIZENS BANK, NATIONAL ASSOCIATION

By: _____
Name:  Veronica M. Alger
Title:    Senior Vice President

cc (via overnight courier):

Penny S. Indictor, Esq.
30 N. 41st Street, Suite 450
Philadelphia, Pennsylvania 19104

Richard J. Slavin
Hodgson Russ LLP
605 Third Avenue
Suite 2300
New York, NY  10158

**Exhibit A**

**8/5/2025 Letter**

[See attached]

*Execution Version*

**✖✖ Citizens**®

August 5, 2025

***By Overnight Courier***

Hancock Lofts LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103
Attention: Mr. Harrison Finberg

FineHill Construction LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

Ajay K. Keshri
2731 Norfolk Lane
Doylestown, PA 18902

Pramod Keshri
4 Ren Way
Doylestown, PA 18901

Sanjay Gupta
2796 Buttercup Court
Huntingdon Valley, PA 19006

Harrison Finberg
2001 Market Street, Suite 2519
Philadelphia, PA 19103

       Re:     <u>Reservation of Rights Letter</u>

Ladies and Gentlemen:

Reference is made to (i) that certain Construction Loan Agreement, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), by and among Citizens Bank, N. A. (the "<u>Lender</u>") and Hancock Lofts LLC, a Pennsylvania limited liability company (the "<u>Borrower</u>"), (ii) that certain Promissory Note, effective as of November 17, 2022, made by Borrower to Lender (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Note</u>"), (iii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise

Hancock Lofts LLC
August 5, 2025
Page 2

modified from time to time, the "Entity Guaranty"), by FineHill Construction LLC, a Pennsylvania limited liability company (the "Entity Guarantor") in favor of Lender, (iv) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Ajay Guaranty"), by Ajay K. Keshri ("Ajay") in favor of Lender, (v) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Pramod Guaranty"), by Pramod Keshri ("Pramod") in favor of Lender, (vi) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Sanjay Guaranty"), by Sanjay Gupta ("Sanjay") in favor of Lender, (vii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Harrison Guaranty", together with the Ajay Guaranty, the Pramod Guaranty, and the Sanjay Guaranty, the "Individual Guarantees" and together with the Entity Guaranty, collectively the "Guarantees"), by Harrison Merriman Finberg ("Harrison", together with Ajay, Pramod, and Sanjay, the "Individual Guarantors" and together with the Entity Guarantor, collectively, the "Guarantors") in favor of Lender, (viii) that certain reservation of rights letter from Lender to Borrower dated April 21, 2025 (the "4/21/2025 Letter"), a copy of which is attached hereto as Exhibit A, (ix) that certain reservation of rights letter from Lender to Borrower dated May 6, 2025 (the "5/6/2025 Letter"), a copy of which is attached hereto as Exhibit B, and (x) that certain guarantor demand letter from Lender to the Guarantors dated May 21, 2025 (the "Guarantor Demand Letter"), a copy of which is attached hereto as Exhibit C. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

With regard to the Existing Defaults (as defined in the 4/21/25 Letter), to the extent they were not cured as set forth in the 4/21/2025 Letter, they have ripened into Events of Default. With regard to the Guarantor Demand Letter, Lender has not received a payment in full of the Payment Obligations from the Guarantors, as demanded thereunder (the "Payment Default"). The Guarantors' failure to provide said payment constituted an Event of Default pursuant to Section 10(a) of the Loan Agreement. The Events of Default expressly described herein, including, but not limited to, the Existing Defaults, the Specified Defaults (as defined in the 5/6/25 Letter), and the Payment Default are collectively defined herein as the "Outstanding Events of Default".

The Note provides that upon the occurrence and during the continuance of an Event of Default, the principal balance of the Note shall bear interest at the Default Rate, which is defined as 4% over the Applicable Interest Rate. The Lender intends to conduct diligence as to when the first Event of Default occurred under the Loan Agreement. Subject to that diligence and without waiving any rights under the Loan Documents, the Default Rate commenced on April 30, 2025, and continues to accrue.

As a result of the Outstanding Events of Defaults, the Lender is entitled to exercise its rights and remedies against the Borrower, each Individual Guarantor and the Entity Guarantor under the Loan Documents and applicable law, including exercising rights and remedies with respect to collateral and commencing one or more collections' action for payment against the Guarantors.

Hancock Lofts LLC
August 5, 2025
Page 3

No past or future action or non-action, including, for the avoidance of doubt, the acceptance of payments by the Lender (other than the payment in full), shall be deemed to waive or release the Outstanding Events of Defaults, any other Events of Default or Defaults (including, without limitation, any other Default or Event of Default of which the Lender may or may not be aware), all of which are reserved and not waived.

No delay or inaction by the Lender in the exercise of any of its rights and remedies under the Loan Agreement or any other Loan Document, all of which remain in full force and effect, shall: (i) constitute (x) a modification or an alteration of the terms, conditions or covenants of such documents, all of which remain in full force and effect, (y) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved or (z) a forbearance arrangement; or (ii) relieve or release the Borrower or any Guarantor in any way from any of their respective duties, obligations, covenants or agreements under such documents or from the consequences of any of the Outstanding Events of Default or any other or Event of Default or Default.

Further, no compromise, forbearance or further forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

Very truly yours,

CITIZENS BANK, NATIONAL ASSOCIATION

By: _____
Name: Veronica M. Alger
Title:   Senior Vice President

cc (via overnight courier):

Penny S. Indictor, Esq.
30 N. 41st Street, Suite 450
Philadelphia, Pennsylvania 19104

# EXHIBIT F

**Citizens**

May 21, 2025

***By Overnight Courier and Electronic Mail***

FineHill Construction LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

and

1415 S. 12th Avenue
Philadelphia, PA 19147

Ajay K. Keshri
2731 Norfolk Lane
Doylestown, PA 18902

Pramod Keshri
4 Ren Way
Doylestown, PA 18901

Sanjay Gupta
2796 Buttercup Court
Huntingdon Valley, PA 19006

Harrison Finberg
2001 Market Street, Suite 2519
Philadelphia, PA 19103

and

1415 S. 12th Avenue
Philadelphia, PA 19147

Hancock Lofts LLC
2001 Market Street, Suite 2519
Philadelphia, PA 19103

and

1415 S. 12th Avenue

Philadelphia, PA 19147

Re: Guarantor Demand Letter

Ladies and Gentlemen:

Reference is made to (i) that certain Construction Loan Agreement, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Citizens Bank, N. A. (the "Lender") and Hancock Lofts LLC, a Pennsylvania limited liability company (the "Borrower"), (ii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Entity Guaranty"), by FineHill Construction LLC, a Pennsylvania limited liability company (the "Entity Guarantor") in favor of Lender, (iii) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Ajay Guaranty"), by Ajay K. Keshri ("Ajay") in favor of Lender, (iv) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Pramod Guaranty"), by Pramod Keshri ("Pramod") in favor of Lender, (v) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Sanjay Guaranty"), by Sanjay Gupta ("Sanjay") in favor of Lender, (vi) that certain Guaranty of Payment, effective as of November 17, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Harrison Guaranty", together with the Ajay Guaranty, the Pramod Guaranty, and the Sanjay Guaranty, the "Individual Guarantees" and together with the Entity Guaranty, collectively the "Payment Guarantees"), by Harrison Merriman Finberg ("Harrison", together with Ajay, Pramod, and Sanjay, the "Individual Guarantors" and together with the Entity Guarantor, collectively, the "Guarantors") in favor of Lender, and (vii) that certain reservation of rights letter from Lender to Borrower and Guarantors, dated May 6, 2025 (the "5/6/2025 Letter"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

The Maturity Date under the Loan Agreement was May 17, 2025. Pursuant to Section 3.9(c) of the Loan Agreement, all principal, interest and other sums due under the Loan Documents (collectively, the "Payment Obligations") have become due and payable in full.

Under the terms and provisions of the Payment Guarantees, the Guarantors have jointly and severally unconditionally guaranteed the Borrower's full and prompt payment of the Payment Obligations, as well as the full and prompt payment of all sums that become due and payable after the date hereof. In the event the Borrower fails to pay when due any of those obligations, the Guarantors have agreed under the Payment Guarantees to pay to the Lender those obligations on demand by the Lender, regardless of any defense, right of set-off or claims which the Borrower or any Guarantor may have against the Lender. Guarantors have further agreed in Section 8 of the Payment Guarantees to pay, upon demand by the Lender, all reasonable attorneys' fees, costs and expenses incurred by the Lender in connection with, among other things, the collection of the Payment Guarantees.

**Accordingly, the Lender hereby makes demand upon the Guarantors for the immediate payment in full of the Payment Obligations.** As noted in the 5/6/2025 Letter, the

principal balance of the Note is bearing interest at the Default Rate, resulting in per diem interest currently accruing in the amount of $2,988.39. Please contact the undersigned for a payoff statement. For the avoidance of any doubt, all rights of enforcement, collection or otherwise are explicitly reserved by the Lender with respect to the Borrower and Borrower's obligations under the Loan Agreement and any other Loan Document to which it is a party.

This letter does not, and should not be construed to, waive or release any obligation of the Borrower or any Guarantor and/or any past, present or future breach, violation, default, Default or Event of Default (whether by the Borrower or the Guarantors (or any of them)) under the Loan Agreement, the Payment Guarantees, any other Loan Document, or the Specified Events of Defaults (as defined in the 5/6/2025 Letter), and this letter does not directly or indirectly in any way whatsoever: (i) impair, prejudice or otherwise adversely affect the Lender's rights at any time to exercise any right, privilege or remedy in connection with the Loan Agreement, the Payment Guarantees (including pursuant to Section 8 thereof and the commencement of one or more collection actions against the Guarantors), any other Loan Document, or any other contract or instrument; (ii) amend or alter any provision of the Loan Agreement, the Payment Guarantees, any other Loan Document, or any other contract or instrument; (iii) constitute any agreement of the Lender to forbear from exercising any of its rights and remedies under the Loan Agreement, the Payment Guarantees, or any other Loan Document; or (iv) constitute any course of dealing or other basis for altering any obligation of the Borrower or any Guarantor or any right, privilege or remedy of the Lender under the Loan Agreement, the Payment Guarantees, any other Loan Document, or any other contract or instrument or constitute any consent by the Lender to any prior, existing or future violations of the Loan Agreement, the Payment Guarantees, any other Loan Document, or any other contract or instrument. Neither the Borrower nor any Guarantor may rely upon any verbal statements made, or purported to be made, by or on behalf of the Lender in connection with any alleged agreement of the Lender to refrain from exercising any of its rights and remedies under the Loan Agreement, the Payment Guarantees, any other Loan Document, or any other contract or instrument or under law or equity.

No delay or inaction by the Lender in the exercise of any of its rights and remedies under the Loan Agreement, the Payment Guarantees or any other Loan Document, all of which remain in full force and effect, nor the Lender's acceptance of less than all of the Payment Obligations, shall: (i) constitute (x) a modification or an alteration of the terms, conditions or covenants of such documents, all of which remain in full force and effect, (y) a waiver, release or limitation upon the Lender's exercise of any of its rights and remedies thereunder, all of which are hereby expressly reserved or (z) a forbearance arrangement; or (ii) relieve or release the Borrower or the Guarantors in any way from any of their respective duties, obligations, covenants or agreements under such documents or from the Specified Events of Default, any other Default or Event of Default, or the maturity of all principal, interest and other sums due under the Loan Documents as described above.

Further, no compromise, forbearance, consent, release, waiver, modification or other agreement or understanding with respect to the Loan Agreement or any other Loan Document shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until it is evidenced by a written agreement signed by an authorized representative of the Lender, which agreement is in form and substance satisfactory to the Lender in its sole discretion.

\*\*\*\*\*\*\*\*

Please contact the undersigned at veronica.m.alger@citizensbank.com or (617) 894-0816 for the referenced payoff statement or should you have any questions about this letter.

Very truly yours,

CITIZENS BANK, NATIONAL ASSOCIATION

By: _____
Name: Veronica M. Alger
Title:  Senior Vice President

cc (via overnight courier):

Penny S. Indictor, Esq.
30 N. 41st Street, Suite 450
Philadelphia, PA 19104

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CITIZENS BANK, N.A.,

    Plaintiff,

v.

FINEHILL CONSTRUCTION LLC, AJAY
K. KESHRI, PRAMOD KESHRI, SANJAY
GUPTA, and HARRISON M. FINBERG,

    Defendants.

Civil Action No. _____

## CONFESSION OF JUDGMENT

Pursuant to the authority contained in the warrants of attorney set forth in Section 26 of the Payment Guarantees, each made as of November 16, 2022 and effective as of November 17, 2022, true and correct copies of which are attached to the Affidavit filed in support of the complaint in this action, the undersigned counsel appear for Defendants FineHill Construction LLC, Ajay K. Keshri, Pramod Keshri, Sanjay Gupta, and Harrison M. Finberg, and confess judgment in favor of Plaintiff Citizens Bank, N.A. and against Defendants FineHill Construction LLC, Ajay K. Keshri, Pramod Keshri, Sanjay Gupta, and Harrison M. Finberg, jointly and severally, in the amount of $_____, plus post-judgment interest at the applicable base rate and default rate as provided in the Note and Loan Agreement together with additional legal fees and costs, broken down as follows:

| | |
|---|---|
| Unpaid Principal | $9,970,527.00 |
| Accrued but Unpaid Interest through May 7, 2026 | $114,145.92 |
| Interest at Default Rate through May 7, 2026 | $412,115.12 |
| Attorneys' Fees and Costs through March 17, 2026 | $266,957.77 |
| Appraisal: | $5,000.00 |
| **JUDGMENT TOTAL** | **$10,768,745.81** |

1

Dated: May 7, 2026

Respectfully submitted,

/s/ Benjamin R. Wilson
Benjamin R. Wilson (PA Bar No. 327118)
Lindsey C. Cook (PA Bar No. 332040)
HOLLAND & KNIGHT LLP
1650 Market Street, Suite 3300
Philadelphia, PA 19103
Tel: (215) 252-9571
Fax: (215) 687-6070
benjamin.wilson@hklaw.com
lindsey.cook@hklaw.com

*Attorneys for Plaintiff Citizens Bank, N.A.*

.

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITIZENS BANK, N.A., <br><br>     Plaintiff, <br><br> v. <br><br> FINEHILL CONSTRUCTION LLC, AJAY K. KESHRI, PRAMOD KESHRI, SANJAY GUPTA, and HARRISON M. FINBERG, <br><br>     Defendants. | Civil Action No. _____ |

**ASSESSMENT OF DAMAGES**

TO THE CLERK:

Please assess damages in favor of Plaintiff Citizens Bank, N.A. and against Defendants FineHill Construction LLC, Ajay K. Keshri, Pramod Keshri, Sanjay Gupta, and Harrison M. Finberg, jointly and severally, in the amount of $_____, plus post-judgment interest at the applicable base rate and default rate as provided in the Note and Loan Agreement together with additional legal fees and costs, broken down as follows:

| | |
|---|---|
| Unpaid Principal | $9,970,527.00 |
| Accrued but Unpaid Interest through May 7, 2026 | $114,145.92 |
| Interest at Default Rate through May 7, 2026 | $412,115.12 |
| Attorneys' Fees and Costs through March 17, 2026 | $266,957.77 |
| Appraisal: | $5,000.00 |
| **JUDGMENT TOTAL** | **$10,768,745.81** |

*[Signature page follows]*

1

Dated: May 7, 2026                    Respectfully submitted,

                                      */s/ Benjamin R. Wilson*
                                      Benjamin R. Wilson (PA Bar No. 327118)
                                      Lindsey C. Cook (PA Bar No. 332040)
                                      HOLLAND & KNIGHT LLP
                                      1650 Market Street, Suite 3300
                                      Philadelphia, PA 19103
                                      Tel: (215) 252-9571
                                      Fax: (215) 687-6070
                                      benjamin.wilson@hklaw.com
                                      lindsey.cook@hklaw.com

                                      *Attorneys for Plaintiff Citizens Bank, N.A.*